JOHN R. GARNER (246729)
MARIA E. MINNEY (289131)
GARNER LAW OFFICE
109 North. Marshall Avenue
P.O. Box 908
Willows, CA  95988
Telephone:  (530) 934-3324
Facsimile:   (530) 934-2334
john@garner-associates.com
maria@garner-associates.com

IVY T. NGO (249860)
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone:     (303) 757-3300
Facsimile:      (303) 759-5203
ngoi@fdazar.com

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD ANDERSON, RAYMOND KEITH CORUM, JESSE WORTHINGTON, and COLLEEN WORTHINGTON, each individually and on behalf of all others similarly situated, | No. |
| Plaintiffs, | **CLASS ACTION** |
| v. | COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY |
| EDWARD D. JONES & CO., L.P.; THE JONES FINANCIAL COMPANIES, L.L.L.P.; EDJ HOLDING COMPANY, INC.; JAMES D. WEDDLE; PENELOPE PENNINGTON; DANIEL J. TIMM; KENNETH R. CELLA, JR.; BRETT A. CAMPBELL; KEVIN D. BASTIEN; NORMAN L. EAKER; VINCENT J. FERRARI; TIMOTHY J. KIRLEY; JAMES A. TRICARICO, JR.; OLIVE STREET INVESTMENT ADVISORS, LLC; PASSPORT HOLDINGS, LLC; PASSPORT RESEARCH, LTD; and JOHN DOES 1-100, | **JURY TRIAL DEMANDED** |
| Defendants. | |

1

Plaintiffs Edward Anderson, Raymond Keith Corum, Jesse Worthington and Colleen Worthington, (collectively, "Plaintiffs"), by and through their counsel, allege the following against Defendants Edward D. Jones & Co., L.P., The Jones Financial Companies, L.L.L.P., EDJ Holding Company, Inc., James D. Weddle, Penelope ("Penny") Pennington, Daniel J. Timm, Kenneth R. Cella, Jr., Brett A. Campbell, Kevin D. Bastien, Norman L. Eaker, Vincent J. Ferrari, Timothy J. Kirley, and James A. Tricarico, Jr. (collectively, "Edward Jones" or "the Company") as well as Olive Street Investment Advisors, LLC, Passport Holdings, LLC, and Passport Research, Ltd. (collectively with Edward Jones, "Defendants") based upon personal information as to those allegations concerning Plaintiffs and the investigation of counsel as to all other matters, which included, without limitation: (a) review and analysis of public filings made by Edward Jones and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, investor communications, reports, advisories and other publications disseminated by certain of the Defendants and other related non-parties; (c) review and analysis of news articles, media reports and other publicly available information concerning Edward Jones and related non-parties; (d) consultation with experts; and (e) interviews with persons with knowledge of the conduct complained of herein.

## NATURE OF THE ACTION

1.      This is a federal securities and breach of fiduciary duty class action based upon a reverse churning scheme by Defendants to take advantage of trusting, long-standing clients and unlawfully shift their commission-based accounts to a fee-based program – Edward Jones Advisory Solutions ("Advisory Solutions") or Edward Jones Guided Solutions ("Guided Solutions") (collectively, "Advisory Programs"). In orchestrating this scheme to churn revenue from essentially dead assets, Edward Jones made misleading statements and material omissions to their clients, including Plaintiffs, about the amount of fees they would pay after their assets were moved into one of the Advisory Programs and about Edward Jones' preference for investing in proprietary funds only available through Advisory Solutions.  In addition, Defendants breached their fiduciary duties because clients who engaged in little to no trading activity paid more in fee-based accounts than they did in commission-based accounts and clients who were invested in a proprietary fund

were entitled to know about Defendants' competing interests that caused them to make self-interested investments on their clients' behalf.

2.      Plaintiffs bring this action under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), the Securities Act of 1933 (the "1933 Act"), and the fiduciary duty laws of the states of Missouri and California on behalf of themselves and all persons (including, without limitation, their beneficiaries) who had their commission-based accounts with Edward Jones moved into one of the Advisory Programs between March 30, 2013 and March 30, 2018 (the "Class Period"), inclusive, and who were damaged thereby (the "Class").

3.      Edward Jones' business model has allowed it to have a stronghold among working-class individuals in small communities across the country, like Plaintiffs, who were unsophisticated investors seeking professional investment guidance from someone they could also have a personal relationship with. Instead of further cementing the trust and goodwill it had fostered for decades in these small communities when the Department of Labor ("DOL") announced proposed additional required disclosures for fiduciaries, Edward Jones abused that trust in compelling clients into more expensive fee-based accounts in order to avoid the additional disclosures and grow its own bottom line.

4.      While Plaintiffs' accounts suffered from Edward Jones' unnecessary and misleading fees, Defendants reaped the handsome reward of the fraud alleged herein. During the Class Period, Edward Jones generated $17.2 billion in revenue specifically from asset-based fees, helping to push its earnings to record highs. And the Company's unlawful conduct only became more aggressive as the Class Period wore on, churning out an increasing amount of asset-based revenue each year. As Edward Jones admitted in its Form 10-K for fiscal year ending December 31, 2017 ("2017 10-K"), the Company's 14% increase in net revenue in 2017 was driven by "a 36% increase in asset-based fee revenue due to the increased investment of client assets into advisory programs." Edward Jones used this money to line the pockets of its complicit financial advisors and partners – to the tune of $272 million in bonuses to the Defendants named individually herein.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act [15 U.S.C. §78aa]; §22 of the 1933 Act [15 U.S.C. §77v] and 28 U.S.C. § 1331.

6.      Venue is proper in the Eastern District of California pursuant to 28 U.S.C. 1391(b) and 15 U.S. Code § 77v(a). Defendants are licensed to do business in this District, maintain a number of branch offices in this District, and services clients who are residents of this District. Plaintiffs are residents of this District and were or are clients of Edward Jones in this District.  In addition, many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged herein, Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

**THE PARTIES**

7.      Plaintiff Edward Anderson is a resident of Elk Creek, California and has had assets in a commission-based account with Edward Jones since July 12, 2012.  In June 2015, Anderson's Edward Jones financial advisor invited him into her office to pitch Advisory Solutions.  On July 1, 2015, Anderson executed the Advisory Solutions Fund Model Agreement and his assets with Edward Jones were subsequently moved into Advisory Solutions.  While Anderson was in Advisory Solutions, Edward Jones invested at least $61,216.60 of his assets into Bridge Builder mutual funds ("Bridge Builder") – which was approximately 60% of his total assets.  During the time Anderson was in Advisory Solutions, he paid over $6,000 in fees.

8.      Plaintiff Raymond Keith Corum is a resident of Willows, California and had assets in a commission-based account with Edward Jones until early 2015. At that time, Corum's Edward Jones financial advisor invited him into her office to pitch Advisory Solutions and afterwards moved his assets into Advisory Solutions despite his instruction to her to keep his account as it was. While Corum was in Advisory Solutions, Edward Jones invested at least $22,065.09 or 32% of his

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

1    assets into Bridge Builder. During the time Corum was in Advisory Solutions, he paid over $671 a
2    year in fees.

3        9.      Plaintiffs Jesse and Colleen Worthington are residents of Willows, California and
4    had assets in commission-based accounts with Edward Jones. In early 2014, their Edward Jones
5    financial advisor invited them into her office to pitch Advisory Solutions. Edward Jones
6    subsequently moved Jesse Worthington's assets into Advisory Solutions. In early 2015 Edward
7    Jones moved Colleen Worthington's assets into Advisory Solutions, investing at least $53,261.02
8    or 38% of her assets in Bridge Builder. In 2016, Edward Jones moved Jesse Worthington's Living
9    Trust into Guided Solutions, investing at least $4,500 of his assets in the Edward Jones Money
10   Market Fund, and over $38,000 of his assets into Edward Jones preferred partners' mutual funds,
11   with whom Edward Jones had a revenue sharing relationship. Jesse Worthington paid over $792 in
12   fees on his Guided Solutions account in 2016, and over $3,350 in fees during the time he was in
13   Advisory Solutions. During the time Colleen Worthington was in Advisory Solutions, she paid over
14   $2,130 in fees.

15       10.     Defendants consist of multiple, interconnected entities who worked in concert to
16   orchestrate the reverse churning scheme alleged herein to generate billions in revenue for
17   themselves by coercing Plaintiffs and the other members of the Class to move their commission-
18   based accounts with Edward Jones to an Advisory Program. The following chart summarizes
19   Defendants' incestuous relationships:

20
21
22
23
24
25
26
27
28

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17



18      11.     Defendant Edward D. Jones & Co, L.P. ("Edward D. Jones"), a Missouri Limited

19 Partnership headquartered in St. Louis, Missouri, is dually registered as a broker-dealer and as an

20 investment advisor under federal and state securities laws. Edward D. Jones provides brokerage

21 and related financial services to individuals and small businesses and is the principal operating

22 subsidiary of the Jones Financial Companies, L.L.L.P. ("Jones Financial").

23      12.     Defendant Jones Financial, headquartered in Des Peres Missouri, is the sole limited

24 partner of Edward D. Jones and directly and indirectly owns 100% of the capital in Edward D.

25 Jones and its wholly-owned subsidiaries.

26      13.     Defendant EDJ Holding Company, Inc. ("EDJ Holding"), incorporated in Missouri,

27 is the sole general partner of Edward D. Jones and a wholly-owned subsidiary of Jones Financial.

28

14.     Defendant Olive Street Investment Advisers, LLC ("Olive Street"), a 100% wholly-owned subsidiary of Jones Financial and a Missouri limited liability company, was established in 2012 and continues to be the investment adviser to the sub-advised funds in the Bridge Builder Trust which were designed solely for Advisory Solutions.  Throughout the Class Period, Olive Street had primary responsibility for the allocation of funds, setting the mutual funds' overall investment strategies, and the selection and management of subadvisors, as well as supervisory responsibility for the general management of the Bridge Builder Trust, subject to review and approval by its board of trustees.

15.     Defendant Passport Research, Ltd. ("Passport"), incorporated in Pennsylvania, has historically been the investment adviser to Edward Jones' two money market funds, one of which was no longer offered as of August 2016. Passport's revenue is primarily based on the value of client assets in the funds. Edward D. Jones is a 49.5% limited partner in Passport while Passport Holdings, LLC ("Passport Holdings") is a 50.5% limited partner in Passport.

16.     Defendant Passport Holdings, incorporated in Missouri, is a 50.5% limited partner in Passport and a 100% wholly-owned subsidiary of Edward D. Jones.

17.     Defendant James D. Weddle became the Managing Partner of Jones Financial on January 1, 2006 and continued to serve as the Managing Partner throughout the Class Period. During that time, he received more than $63.2 million in compensation that was derived from the misconduct alleged herein. Weddle's primary responsibilities as Managing Partner under the terms of the Partnership Agreement were to administer the Partnership's business, determine its policies, and control the management and conduct of the Partnership's business.  Weddle himself appointed all of the members of the Executive Committee during the Class Period.

18.     Defendant Penelope ("Penny") Pennington became a general partner of Edward Jones in 2006 and has served as the head of the Client Strategies Group since September 2014. Prior to her role in the Client Strategies Group, Pennington was responsible for the New Financial Advisor Training Department. Her duties encompass all of the Company's advice and guidance, products and services, marketing, and branch support related to clients' financial goals. She has served on the Executive Committee continuously since July 7, 2014.

7

19.     Defendant Daniel J. Timm became a general partner of Edward Jones in 1998 and assumed shared responsibility for the Branch Development division in July 2014, holding that position for the remainder of the Class Period. His duties encompass Financial Advisor Talent Acquisition, Branch Office Administrator Talent Acquisition and Performance, Branch Training, Branch Administration, Branch Insights, Learning and Support, and Branch and Region Development. Prior to July 2014, Timm was responsible for various departments including Financial Advisor Training, Financial Advisor Development, and Branch Administration. He served on the Executive Committee for the duration of the Class Period.

20.     Defendant Kenneth R. Cella, Jr. became a general partner of Edward Jones in 2002 and assumed shared responsibility for the Branch Development division in July 2014. He held that position and an accompanying seat on the executive committee for the remainder of the Class Period. His duties encompass Financial Advisor Talent Acquisition, Branch Office Administrator Talent Acquisition and Performance, Branch Training, Branch Administration, Branch Insights, Learning and Support, and Branch and Region Development. Prior to July 2014, Cella was responsible for various areas of the Client Strategies Group (including mutual funds, insurance, banking, and advisory areas) and for the Branch Training department.

21.     Defendant Brett A. Campbell was named a general partner of Edward Jones in 1993 and served as head of the Client Strategies Group until Defendant Pennington assumed the role in September 2014. As head of the Client Strategies Group, his responsibilities encompassed all of the Company's advice and guidance, products and services, marketing, and branch support related to clients' financial goals. Campbell served on the Executive Committee from the start of the Class Period until he retired from Edward Jones effective December 31, 2014.

22.     Defendant Kevin D. Bastien became a general partner of Edward Jones in 1998 and has served as Chief Financial Officer ("CFO") since January 2009. He held these positions and served on the Executive Committee for the duration of the Class Period.

23.     Norman L. Eaker became a general partner of Edward Jones in 1984 and served as the Chief Administrative Office from 2008 to his retirement effective December 31, 2016. He

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

served on the Executive Committee from the start of the Class Period until his retirement from the Company.

24.     Defendant Vincent J. Ferrari became a general partner of Edward Jones in 2004. He has served as the Chief Information Officer since 2007 and as a member of the Executive Committee since January 1, 2017, following the retirement of Norman L. Eaker.

25.     Defendant Timothy J. Kirley became a general partner in 1994 and served as the Chief Strategy Officer from 2010 until he assumed responsibility for Canada operations in September 2015. He was appointed to the Executive Committee in 2016, on which he has served since.

26.     Defendant James A. Tricarico, Jr. became a general partner and the general counsel of Edward Jones in 2006. He is now the Chief Legal Officer and has served on the Executive Committee for the duration of the Class Period.

27.     Defendants Weddle, Pennington, Timm, Cella, Campbell, Bastien, Eaker, Ferrari, Kirley, and Tricarico are collectively referred to herein as the "Individual Defendants." The 2017 10-K confirms that as members of Edward Jones' Executive Committee, as well as in their individual roles as principals of Edward Jones, the Individual Defendants were tasked with providing "counsel and advice to the Managing Partner in discharging his functions, including…helping to establish the strategic direction of the Partnership." As such, they played a decisive role in the implementation of the alleged scheme.

28.     Defendants John Doe 1-100. The true names and capacities of Defendants sued herein as John Does 1 through 100 are other active participants with the above-named participants whose identities have yet to be ascertained.

29.     Defendants Jones Financial, EDJ Holding, and the Individual Defendants are collectively referred to herein as the "Control Person Defendants." By virtue of their ownership of and operational control over Edward D. Jones, the Control Person Defendants exercised control over Edward D. Jones' general operations and possessed the power to determine the specific acts or omissions upon which Edward Jones' violations of the federal securities laws are predicated.

## BACKGROUND AND SUMMARY OF THE ACTION

### The Original Edward Jones Business Model

30.     From its inception in 1922, Edward Jones has been known, and has marketed itself, as an investment firm that offers individually tailored solutions for investors who want to have a personal relationship with the person investing their money. Edward Jones prides itself on its "knock-on-the-door" approach to offering financial services to mainly middle-income individuals in small communities. To succeed in its goal of individually tailored investment advice, Edward Jones has historically focused on offering commission-based accounts.

31.     In addition, Edward Jones has become known for its model of staffing one financial adviser per branch office. An Edward Jones office usually only has one other associate, a branch office administrator.

32.     While Edward Jones' one-broker-per-office model has allowed clients to choose their broker directly and deal with just that broker, it has also allowed Edward Jones to open offices in less-populated areas and towns where a large office staffed by many brokers would be unprofitable – and hence financially unsustainable – for other brokerage firms. This model has contributed to Edward Jones obtaining a stronghold in small communities, and to it currently having the largest number of branch offices among brokerage firms in the United States.

33.     Edward Jones' commission-based model benefited investors by offering them free counsel and guidance, unless there was a transaction. This model was particularly beneficial for middle-income individuals in small communities who generally engaged in very little trading.

### Edward Jones' Reverse Churning Scheme to Generate Revenue

34.     Then, after 86 years, Edward Jones shifted gears in 2008 and introduced a fee-based platform – Advisory Solutions. Unlike Edward Jones' long-established commission-based model charging a commission per transaction, the fee-based accounts in Advisory Solutions charged an annual expense fee. The standard fee was 1.35% to 1.50% of a client's assets, plus an administrative fee of nine basis points. But this standard fee could reach as high as 2% when including underlying fund expenses, and in addition, the managers who sub-advised the Advisory Solutions funds

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

charged a fee of 60 to 70 basis points. In comparison, mass-market firms like Vanguard and robo-advisers like Betterment charge asset management fees between 0.15 percent and 0.3 percent.

35.     In 2013, Edward Jones moved further away from its established business model and expanded its Advisory Solutions platform by creating its first proprietary product, Bridge Builder, which was only available to its clients in Advisory Solutions. The move baffled industry insiders as it directly opposed Edward Jones' long-stated policy not to sell proprietary products. Indeed, in a page from Edward Jones' website titled "Edward Jones vs. the Competition" from as recently as August 13, 2013, the Company explicitly stated: "Edward Jones offers no proprietary products."

36.     As depicted below, the amount of revenue Edward Jones generated from asset-based fees increased by approximately $500M from 2012 to 2013 with the addition of Bridge Builder to its Advisory Solutions platform, and that revenue has continued to grow by hundreds of millions of dollars every year since.  In comparison, the amount of revenue Edward Jones generated from commissions only modestly increased in 2012, was essentially flat from 2013 to 2015, and has substantially decreased from 2015 through the present as it has aggressively pushed its clients out of commission-based accounts into an Advisory Program.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY



37.     As Edward Jones was building up its fee-based revenue through Advisory Solutions, the DOL on April 14, 2015 released a proposed rule that would expand the number of persons who were subject to fiduciary best interest standards when they provided investment advice (the "DOL Fiduciary Rule").  Since these fiduciary best standards would apply to advisors who received commissions, this proposed rule further motivated Edward Jones to shift clients' commission-based accounts to Advisory Solutions.

38.     The DOL Fiduciary Rule sought to mitigate the effect of conflicts of interest in the investment marketplace through proposed exemptions that would only allow advisers to continue to receive fees that could create conflicts of interest if certain conditions were met.  Advisers who made investment recommendations to individual plan participants, IRA investors, and small plans could obtain a "best interest contract exemption" only if they and their firms formally acknowledged their fiduciary status and entered into a contract with their customers committing to fundamental standards of impartial conduct – including giving advice that was in the customer's best interest and making truthful statements about their compensation and the investments they were making for the customer.

39.     If fiduciary advisers and their firms entered into and complied with such a contract, clearly explained investment fees and costs, had appropriate policies and procedures to mitigate the

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

harmful effects of conflicts of interest, and retained certain data on their performance, they could receive fees that fiduciary advisers could not otherwise legally receive – including commissions, revenue sharing, and 12b-1 fees. If the advisors did not do so, they generally had to refrain from recommending investments for which they receive conflicted compensation, unless the fees fell under the scope of another exemption.

40.     According to the 2015 Edward Jones Revenue Sharing Disclosure, Edward Jones received nearly $200 million that year from mutual fund companies and insurers as part of agreements to promote products to their clients.  While permitted under the current rules, promotional payments to financial advisors such as these ones that Edward Jones received could face court challenges under the new federal fiduciary rule because they were precisely the intended target of the DOL Fiduciary Rule. To continue to receive these promotional payments, Edward Jones would have needed to comply with the "best interest contract exemption" by formally acknowledging its fiduciary status and entering into a contract with its customers committing to fundamental standards of impartial conduct.

41.     Due to the disclosure requirements that would be imposed on Edward Jones if it continued to offer commission-based accounts after the DOL Fiduciary Rule was implemented, the Company began to pivot its business strongly towards fee-based accounts by pushing its customers from commission-based accounts into Advisory Solutions accounts – regardless of whether the switch would be in the customer's best interest.

42.     Among the victims of Edward Jones' scheme were Plaintiffs Anderson, Corum, and the Worthingtons, who all had their assets switched from commission-based accounts to an Advisory Program in 2014 through 2016.

43.     Yet Edward Jones simultaneously marketed itself to Plaintiffs and other clients – as it had been doing for decades and building goodwill as a result – as providing advice in the best interest of small-town clients due to the Company's focus on personal relationships.  Indeed, in a September 2015 interview with Investment News, John Rahal, a principal in charge of recruiting and talent acquisition at Edward Jones, reaffirmed the Company's "one advisor per branch"

formula, stating "[t]hat's the way you deeply serve clients. You deeply serve clients by having a meaningful relationship with an appropriate amount of families that you focus on."

44.     While Edward Jones was adjusting its business for when the DOL Fiduciary Rule took effect, it was also trying to dissuade the DOL from implementing the proposed rule.  For example, in a July 21, 2015 comment letter to the DOL regarding the DOL Fiduciary Rule, Edward Jones disingenuously stated that "[t]he impact of the Proposed Rule will fall disproportionally on lower and moderate-income investors who stand likely to lose access to affordable guidance and assistance that is crucial if they are to meet their retirement savings needs."  In truth, the DOL Fiduciary Rule would protect the lower and moderate-income investors as long as they were in the commission-based accounts away from which Edward Jones was moving because the DOL Fiduciary Rule held advisors to a higher standard of care.

45.     As it became clear that the new DOL Fiduciary Rule would be imposed and with little change to the originally proposed language, Edward Jones began putting even more pressure on its advisors to switch their clients into Advisory Solutions. A former general partner with Edward Jones confirmed in an International Business Times article dated April 5, 2016 that the Company was "putting heavy pressure on their advisers to sell their Advisory Solutions platform."

46.     In an attempt to persuade more of its clients to switch to a fee-based platform, Edward Jones launched a second fee-based advisory service – Guided Solutions – in the second quarter of 2016. Like Advisory Solutions, Guided Solutions charged a standard fee of 1.35% to 1.50% of a client's assets which could reach as high as 2% when including underlying fund expenses.  Unlike Advisory Solutions, Guided Solutions was marketed as a client-directed advisory program where advisors worked with clients to build a portfolio.  Clients retained control over investment decisions, but advisors helped guide them through a required process of identifying their financial goals and selecting an appropriate portfolio objective.

47.     Edward Jones employed the same tactics in coercing existing clients to move their assets from commission-based accounts to Guided Solution, which substantially increased the amount of assets managed in the Advisory Programs.  As admitted by Edward Jones in its Form 10-K for fiscal year ending December 31, 2016, filed on March 15, 2017 ("2016 Form 10-K"):

"The launch of Guided Solutions in the second quarter of 2016 contributed to the increase in the average advisory programs' assets under care, the majority of which came from existing client assets."

48.     Guided Solutions allowed clients to choose from an extensive list of "Eligible Investments" which were pre-selected by Edward Jones.  Edward Jones had a financial incentive to include certain funds as "Eligible Investments" because it directly benefitted from the mutual fund families owned by Edward Jones as well as the mutual fund families from which Edward Jones received compensation under revenue-sharing agreements. In addition, Edward Jones retained the option to automatically invest Guided Solutions client funds not yet specifically invested by the client into one if its proprietary funds, the Edward Jones Money Market Fund, from which it received additional asset-based fee revenue.  These financial benefits to Edward Jones were not fully disclosed to clients.

49.     On April 6, 2016, the DOL issued the final version of the DOL Fiduciary Rule.  Just days later, on April 8, 2016, Defendant Weddle said that the Company hoped to have 20,000 brokers spread across its franchises of mostly one-broker offices by 2022.  The caveat, as Edward Jones indicated that summer, was that advisers would not be able to sell mutual funds on commission after the DOL Fiduciary Rule took effect.

50.     Edward Jones formally disclosed its plan to respond to the DOL Fiduciary Rule on August 17, 2016. Edward Jones' clients with more than $100,000 invested could keep paying commissions for each trade of stocks and bonds and the purchase of variable annuities, or they could go commission-free and pay a level fee based on their account size. Clients with less than $100,000 would be put into fee-based accounts and the Company would stop accepting accounts of less than $5,000. The commission-based accounts that existed before April 2016 that would be grandfathered could continue as such so long as no new money was placed into the account.

51.     Although Edward Jones' plan was not in the best interest of its clients, the Company was able to misleadingly blame it on the DOL Fiduciary Rule. Defendant Weddle even commented to the Wall Street Journal that same day that the DOL Fiduciary Rule would negatively affect the

Company's revenue.  Edward Jones had already begun shifting to a fee-based model in 2008, but it was able to more aggressively do so in 2016 under the guise of the DOL Fiduciary Rule

52.     Later that month, on August 28, 2016, Edward Jones said that it would stop offering clients mutual funds (and ETFs) for commission-based retirement accounts. Investors in those accounts would either have to make do with the hodgepodge of available stocks, bonds, variable annuities and certificates of deposit, or move to a managed account that charged an asset-based fee under Advisory Solutions.  A Bloomberg article titled "Edward Jones Really Likes Those Fees" was published on the same day which noted, in discussing Edward Jones' response to the DOL Fiduciary Rule, that "Edward Jones must know that the average investor's account is too small to properly diversify one stock and bond at a time. Taking away mutual funds and ETFs from commission-based accounts, therefore, all but forces those investors into asset-based fee accounts, which will mean higher costs for many of the firm's investors."

53.     In its quarterly financial disclosure on November 10, 2016, Edward Jones continued to cloak its reverse churning scheme under the guise of the impending DOL Fiduciary Rule, which it claimed could "materially" hurt its results. Rather than simply providing its clients with the higher standard of care that the DOL Fiduciary Rule would require, Edward Jones declared that "[i]mplementation of the rule will require changes in the manner in which the Partnership serves clients with retirement accounts, which is a substantial portion of the Partnership's business," and that "[t]he Partnership plans to offer fee-based solutions to retirement accounts and also intends to offer the so-called Best Interest Contract Exemption with limited transaction-based product offerings to retirement accounts meeting certain account minimums."  Edward Jones added that "[a]s the Partnership implements the rule, to the extent clients choose a higher percentage of fee-based solutions than historical practices or with not all products and services traditionally provided available in the future for transaction-based retirement accounts, the Partnership likely will experience a decrease in transaction-based revenue, net revenue, net income before allocations to partners and liquidity, which could be significant."

54.     In order to continue to grow its bottom line, which had flattened before it had begun moving to a fee-based model, Edward Jones clearly intended to – and did – compel clients into a

fee-based Advisory Program, regardless of whether such a move was suitable for – and served the best interests of – the clients.

55.     As a result, Edward Jones substantially increased the client assets managed in its Advisory Programs every year since the introduction of Bridge Builder in 2013. The assets under the Advisory Programs' care have nearly tripled from $101 billion in 2013 to $265 billion in 2017. Only by taking advantage of trusting clients who it was pushing into these more usurious fee-based arrangements – even disclosing in its Forms 10-K for fiscal years ending December 31, 2014, 2015, 2016, and 2017 that the annual increases were primarily driven by the relocation of client assets from commission-based accounts – was Edward Jones able to tout rapid growth within this segment of its business:



56.     The above graph demonstrates how Edward Jones funneled existing client assets into Advisory Programs from commission-based accounts. The blue portions of the graphs show how the majority of the increase in assets managed by Advisory Solutions came from existing accounts, while the smaller green portions reflect the relative paucity of new clients Edward Jones was able to bamboozle into the same arrangement. The blurred blue-green portions for 2013, 2016, and 2017 reflect the Company's general disclosure that the majority of the asset increase came from existing clients. In 2014 and 2015, the years for which the Company provided specific numerical data, Edward Jones preyed on the assets of existing clients versus new clients at high rates of 2:1 and 4:1, respectively.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

57.     And while Edward Jones' clients lost their hard-earned savings to these fees, its advisors, who executed the scheme alleged herein, were rewarded with handsome pay increases. As, Edward Jones touted in its Form 10-K for fiscal year ended December 31, 2014, filed on March 27, 2015, "Financial advisor compensation increased 9% ($178 million) in 2014 primarily due to increases in asset-based fee and trade revenues on which financial advisor commissions are based." Not only did Edward Jones improperly incentivize its advisors to violate their fiduciary duties and rack up fee revenue for the Company through its commission program, but is also terminated, gave smaller raises and bonuses to, and/or failed to promote advisors who disagreed with the Company's strategy and kept their clients in commission-based accounts.

### The Prohibition Against Reverse Churning

58.     Reverse churning is the practice of a financial advisor placing a client's funds into a fee-based account for no reason other than to collect the fee. These fee-based accounts require the client to pay a regular, fixed fee to the advisor, but the client often receives very little actual advice, trading, or account activity in exchange. Therefore, the advisory firm generates more revenue at the expense of the client who does not receive any recognizable benefit.  Because Edward Jones was compelling clients who typically had little to no trades to move from their commission-based accounts to a fee-based Advisory Program, it was reverse churning.

59.     Reverse churning has been found to violate the federal securities laws.  On July 7, 2003, in *Geman v. SEC*, 334 F.3d 1183 (10th Cir. 2003), the Tenth Circuit held that in shifting client assets from a commission-based structure to a fee-based structure, a firm must act as a fiduciary and justify the annual fee. In other words, if a firm wants to move a client from a commission-based account into a fee-based account, it must be able to justify the move as economical. The Court thereby upheld a SEC disciplinary order targeting reverse churning, holding that placing customers in fee-based accounts when commission-based accounts were more appropriate establishes a violation of the 1934 Act, including 15 U.S.C. § 78j, and Rule 10b–5 thereunder.

60.     The National Associations of Securities Dealers ("NASD"), the predecessor to Financial Industry Regulatory Authority ("FINRA"), has specifically warned financial advisors against reverse churning. In a November 2003 Notice to Members, NASD stated that:

> Fee-based programs typically charge a customer a fixed fee or percentage of assets under management in lieu of transaction-based commissions. While NASD recognizes the benefits these programs offer for many customers, they are not appropriate in all circumstances. NASD therefore reminds members that they must have reasonable grounds for believing that a fee-based program is appropriate for a particular customer, taking into account the services provided, cost, and customer preferences.

61.     FINRA formally adopted a rule to regulate against reverse churning on July 9, 2012. This rule, Rule 2111 – Suitability, created a duty to ensure that fee-based accounts are only recommended to those clients for whom they are suitable, as such accounts tend to be more expensive for clients who engage in little to no trading activity.

62.     The SEC has also had reverse churning on its radar. In a October 22, 2013 speech focusing on significant compliance issues identified in the financial industry, SEC Chair Mary Jo White declared  that a Risk Analysis Examination had identified "problematic behavior" which included "inadequate supervision of reverse churning, a practice where a client who trades infrequently is placed in a fee-based account."

63.     Andrew J. Bowden, Director, SEC Office of Compliance Inspections and Examinations, reiterated the dangers of fee-based accounts and reverse churning in a speech on March 6, 2014. He specifically stated: "Suffice it to say the move into fee-based wrap accounts is a widespread practice. A lot of people have jumped into the pool. We fear that the rationalization that 'everyone is doing it' may be adversely affecting peoples' thinking about how some of these arrangements are in the best interest of their clients."

64.     Then, in its January 2015 annual priority list for examinations, the SEC Office of Compliance Inspections and Examinations, under the subheading of "Protecting Retail Investors and Investors Saving for Retirement" listed "Fee Selection and Reverse Churning" as an area for examination, providing:

> Financial professionals serving retail investors are increasingly choosing to operate as an investment adviser or as a dually registered investment adviser/broker-dealer, rather than solely as a broker-dealer. Unlike broker-dealers, which typically charge

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

investors a commission or mark-up on purchases and sales of securities, investment advisers employ a variety of fee structures for the services offered to clients, including fees based on assets under management, hourly fees, performance-based fees, wrap fees, and unified fees. Where an adviser offers a variety of fee arrangements, we will focus on recommendations of account types and whether they are in the best interest of the client at the inception of the arrangement and thereafter, including fees charged, services provided, and disclosures made about such relationships.

65.    Although the DOL Fiduciary Rule imposed stricter requirements governing disclosures and fiduciary status on commission-based accounts, the practice of reverse churning is still prohibited.

**Edward Jones' Preference for Proprietary Funds and Funds With Which It Had a Revenue Sharing Relationship**

66.    Edward Jones launched its first proprietary product, Bridge Builder, in 2013 with one core fund and then in 2015, added two other fixed-income funds and five equity funds. The Bridge Builder family was, and is, exclusively available through Advisory Solutions. During the Class Period, the Bridge Builder family included, but is not limited to, Bridge Builder Core Bond, Bridge Builder Core Plus Bond, Bridge Builder INTL Equity, Bridge Builder Large Growth, Bridge Builder Large Value, and Bridge Builder Smallmid Growth.

67.    Bridge Builder was, and is, managed by Olive Street, a wholly owned subsidiary of Edward Jones.

68.    Clients who invested in Bridge Builder not only paid the standard fee for Advisory Solutions, which was 1.35% to 1.50% of the client's assets, but they also paid underlying expenses for the Bridge Builder fund(s) they were in. Thus, the standard fee reached as high as 2% if clients were invested in Bridge Builder. In addition, Advisory Solutions charged an administrative fee of nine basis points and the managers who sub-advised Bridge Builder charged a fee of 60 to 70 basis points. To top it off, Olive Street charged a fee based on the percentage of client assets under management.

69.    Because Olive Street is a wholly owned subsidiary of Edward Jones, Defendants directly financially benefitted from funneling clients into Bridge Builder.

70.    According to fund tracker Morningstar Inc., Edward Jones saw $15.6 billion of net flows into Bridge Builder in 2015 – the fourth-largest in the industry that year. The amount of

20

inflows into Bridge Builder was higher than "household name" funds such as BlackRock Inc., Fidelity Investments and American Funds.

71.    Since Bridge Builder was a relatively new family of mutual funds, investment insiders were baffled by its success. Particularly because in 2015, a majority of the Bridge Builder family was not even in existence for the full year.

72.    What investment insiders did not know was that Edward Jones was pushing existing clients into Advisory Solutions and then inappropriately investing a substantial amount of their assets into Bridge Builder.  At the same time, what those clients – including Plaintiffs – did not know was that Edward Jones had competing interests based on the additional fees it would receive that were causing its advisors to make the self-interested investment decision of investing client assets in Bridge Builder.

73.    All that was disclosed was that "[a]sset-based fee revenue also increased in 2016 due to an increase in Olive Street fees" in Edward Jones' 2016 Form 10-K.  Thus Defendants received an extra financial boost by investing clients' assets in Bridge Builder – on top of the asset-based fees they received from clients after moving their accounts into Advisory Solutions.

74.    In addition to omitting material facts regarding Bridge Builder, Edward Jones failed to disclose to Advisory Solutions clients its self-interested preference in investing their assets in the Company's mutual funds. Edward Jones had a practice of increasingly investing assets of Advisory Solutions clients not already in Bridge Builder in mutual fund companies with whom it had a revenue sharing relationship. For example, Edward Jones invested at least $6,900 of Plaintiff Colleen Worthington's assets into a mutual fund offered by American Funds Distributors, Inc. ("American"). American is an Edward Jones preferred partner, and Edward Jones received $55 million in 2015 alone from American as part of its revenue sharing agreement.  Edward Jones' advisors failed to meaningfully disclose to clients who were moved into Advisory Solutions the conflicts of interest inherent in its preference to favor preferred partners' mutual funds.

75.    Not until April 10, 2017 did Edward Jones provide disclosures about Bridge Builder in its Advisory Solutions brochures.

76.     Edward Jones' advisors also failed to disclose conflicts of interest to clients who were moved into Guided Solutions as they were providing self-interested investment advice.  For example, of the mutual fund companies with whom Edward Jones had a revenue sharing relationship, it received significant asset fee revenue from preferred partner Invesco Distributors, Inc. ("Invesco") and thus had a conflict of interest when telling clients to invest in mutual funds offered through Invesco. However, clients in Guided Solutions relied on such investment advice, including Plaintiff Jesse Worthington who had at least $24,000 invested in Invesco mutual funds in 2016, without knowing that Edward Jones' preference for Invesco was based on a revenue sharing agreement.  In 2016 alone, Edward Jones received $23.9 million from Invesco as part of its revenue sharing agreement.

77.     Plaintiff Jesse Worthington also had at least $14,000 invested in mutual funds through Franklin Templeton Distributors, Inc. ("Franklin"), another Edward Jones preferred partner, and was similarly unaware that Edward Jones' preference for Franklin was based on a revenue sharing agreement. In 2016 alone, Edward Jones received $31.1 million from Franklin as part of its revenue sharing agreement.

78.     Not only did Edward Jones generate more revenue by moving commission-based clients into a fee-based Advisory Program, doing so also allowed it to circumvent the disclosure requirements of the DOL Fiduciary Rule because then it would not have had to disclose the promotional payments it received when clients invested in mutual funds.

## DEFENDANTS' MISSTATEMENTS AND MATERIAL OMISSIONS

79.     During the Class Period, Edward Jones' financial advisors invited clients with commission-based accounts, including Plaintiffs, into their respective branch offices to introduce them to an Advisory Program.  In touting the benefits of these fee-based programs during the subsequent in-person meeting, the advisors failed to inform Plaintiffs that they would pay significantly more in fees if they moved their existing assets with Edward Jones into an Advisory Program.  The advisors further failed to inform Plaintiffs that they would pay significantly more in fees if Edward Jones invested their assets in Bridge Builder.

80.     Regardless of whether Plaintiffs verbally agreed to move their assets into a fee-based program during the meeting, the advisors then ushered them to the other room of the office where the branch office administrator had agreements ready for Plaintiffs to sign.  After developing a personal relationship with their advisor – and Edward Jones by association – over the course of regular in-person meetings over several years, Plaintiffs often simply signed any papers that the branch office administrator placed in front of them on their way out without question.  Either the same was true during the meeting in which Plaintiffs and the other Class members signed the Fund Model Client Agreement for Advisory Solutions ("Agreement"), or Plaintiffs and other Class members signed the Agreement without full knowledge of adverse material facts about Advisory Solutions.

81.     Furthermore, Edward Jones' Advisory Solutions' Fund Models Brochure (the "Brochure"), provided to Plaintiffs and the other Class members, contained statements that were misleading or omitted material information about Advisory Solutions.  For example, under the section of the Brochure entitled "Advisory Business," Defendants describe "Investors in Advisory Solutions [as] typically" those who:

- Need advice and guidance when making investment decisions
- Are at ease with a financial professional making their day-to-day investment decisions

82.     This description misleadingly implied that unless investors were in Advisory Solutions, they did not need advice and guidance when making investment decisions and did not feel comfortable with an Edward Jones financial professional making day-to-day investment decisions for them. But Plaintiffs and the other Class Members opened their Edwards Jones' commission-based accounts precisely because they needed investment advice and guidance and wanted to rely on a financial professional for their investment decisions.  Indeed, Plaintiffs and the other Class Members were already receiving investment advice and guidance and relying on their Edward Jones financial advisor for their investment decisions before moving into Advisory Solutions, they simply ended up paying more for such services after the move.

83.     In addition, under the section of the Brochure entitled "Comparing Costs and Expenses," Defendants state that:

> A financial advisor will typically earn more in upfront fees and commissions when you use brokerage services. In the alternative, a financial advisor will typically earn more over time if you invest in Advisory Solutions.

84.     This statement misleadingly implied that a similar amount in fees would be charged whether utilizing commission-based brokerage services or fee-based Advisory Solutions, but that the fees will simply be paid over time in Advisory Solutions rather than immediately upfront in commission-based accounts. In truth, Plaintiffs and the other Class members paid substantially more in fees after Edward Jones moved their commission-based accounts into Advisory Solutions.

85.     Next, under the section entitled "Item 11: Code of Ethics, Participation or Interest in Client Transactions and Personal Trading," Defendants represent that:

> Edward Jones has established a Code of Ethics to ensure that our associates:
>
> (1)     Act with integrity and in an ethical manner with you and all of our clients
> (2)     Place your and all of our clients' interests first

86.     While paying lip service to the Company's Code of Ethics, Defendants failed to disclose that they were incentivizing advisors to violate the Code of Ethics by promoting, giving pay raises and/or bonuses to, and/or not terminating advisors who inappropriately who inappropriately moved their clients with commission-based accounts to a fee-based Advisory Program, even when it was not in the clients' best interest.

**ADDITIONAL SCIENTER ALLEGATIONS**

87.     Edward Jones employs two supervisory arms. The formal supervisory arm is comprised of a network of Field Supervision Directors ("FSDs") based in either Arizona or Missouri.  FSDs directly supervise Financial Advisors ("FAs") strictly with regard to regulatory compliance. All other aspects of company management are routed through the Edward Jones' second supervisory arm, regional leadership teams, each led by a regional leader. During the Class Period, Defendant Weddle referred to regional leaders as "sales leader[s]" and the "pillar[s] of the

1    firm's management" tasked with branch office visits and overseeing the FAs within their respective

2    regions.

3            88.     As part of their reverse churning strategy, Edward Jones took advantage of its built-

4    in network of FSDs who conducted branch office visits under the auspices of "regulatory

5    compliance." During the Class Period, FSDs customarily targeted larger accounts involving

6    commission-based transactions for review. The FSDs would point to ways in which certain

7    commission-based transactions might be *perceived* as "churning" or "unsuitable," irrespective of

8    the evidence to the contrary, and would even come equipped with data showing the FAs what

9    percentage of their accounts were in Advisory Solutions relative to their peers. FSDs would then

10   explain to the FAs how they would make more money in the long term by transferring their clients'

11   commission-based accounts to Advisory Solutions and how they had a vested interest in

12   transferring those accounts to Advisory Solutions and shifting management decisions to Edward

13   Jones.  The purpose of the FSDs' visit was thus to essentially give a veiled threat from upper

14   management – transfer more commission-based accounts into Advisory Solutions or face stricter

15   scrutiny and possible termination.  Refusing to transfer commission-based accounts to Advisory

16   Solutions posed a risk that most FAs did not feel was worth taking. As a result, billions of dollars

17   under management were shifted into Advisory Solutions during the Class Period.

18           89.     At the regional level, Edward Jones' reverse churning strategy included aggressively

19   instructing FAs to sell Advisory Solutions during regional leadership meetings which were held

20   throughout the year. Not only were methods and strategies for marketing Advisory Solutions

21   discussed at those regional meetings, Edward Jones also used these meetings to foster a fraternal

22   environment in which achieving the Company's objectives was tantamount to "bleeding Edward

23   Jones' green" – which was expected of all advisors. Edward Jones put even more pressure on newer

24   advisors by holding weekly meetings with them which again focused on acquiring new accounts in

25   Advisory Solutions as well as the benefits of Advisory Solutions. FAs who transferred large

26   percentages of their clients' accounts to Advisory Solutions in short periods of time were applauded

27   by the regional leaders. Achieving regional goals and participation in regional activities was

28

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

rewarded in a myriad of ways, including promotion within the regional leadership structure in addition to limited and general partnership offerings.

90.     Defendants acted with scienter in that they all conspired to participate in the aforementioned scheme whereby they improperly compelled Plaintiffs and the other members of the Class into a fee-based Advisory Program, regardless of whether the move was suitable for, and served the best interest of, Plaintiffs and the other members of the Class.

91.     Defendants further acted with scienter because they knew that coercing Plaintiffs and the other members of the Class into moving their assets from Edward Jones' commission-based accounts into a fee-based Advisory Program, regardless of the suitability for the client, was illegal, created conflicts of interest, and violated SEC and FINRA Rules prohibiting reverse churning.

92.     Defendants are also charged with knowledge of FINRA Rule 2111, which provides, in relevant part, the following:

> (a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

93.     Defendants further acted with scienter in that they knew that the statements made to Plaintiffs and the other members of the Class to induce them to agree to shift their assets from commission-based accounts into a fee-based Advisory Program were false, misleading and omitted material information. Defendants knew that Plaintiffs and the other members of the Class were wholly relying on the expertise of Defendants, yet they betrayed that trust to financially benefit handsomely at the expense of Plaintiffs and the other members of the Class.

94.     Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein. In exchange for engaging in and allowing the unlawful practices alleged herein, Edward Jones received increased financial compensation in the form of annual fees and costs associated

with the Advisory Programs as well as undisclosed promotional payments from placing clients in Bridge Builder, all while avoiding the disclosure requirements of the DOL Fiduciary Rule because Plaintiffs and the other members of the Class were no longer in commission-based accounts.

95.     As evidenced by the Company's Form 10-K for fiscal year ending December 31, 2017 ("2017 Form 10-K") , the prosperity of Defendants' Advisory Programs was vital to the success of Edward Jones' business. Edward Jones reported billions of dollars in increases in asset-based fees during the Class Period, which more than offset the decrease in commission-based fees about which Defendants hyperbolically warned.  Edward Jones further disclosed that, every year during the Class Period, the majority of the increases in the assets under care in the Advisory Programs came from existing client assets.

96.     Edward Jones partners are primarily compensated through revenue-sharing proportionate to their general partner, subordinated limited partner and limited partner capital ownership interests in the Company. Thus, while general partners receive a healthy base salary of $175,000 per year, the vast majority of their earnings—in excess of $10 million every year in several cases—are dependent on the company's generation of an annual profit. As demonstrated in the chart below, the massive compensation totals received by the Individual Defendants were directly the result of the perpetration of the fraud and deceit alleged herein. It is important to note that Edward Jones discloses only the compensation of its CEO, CFO, and the next three highest earning general partners. As such, income data is not available for each of the Individual Defendants for every year in the class period. However, it is equally significant that these individuals, who were most proximately responsible for implementing the alleged scheme, were so well compensated for their efforts that they routinely ranked within the top five highest earning partners. Consequently, during the class period, the Individual Defendants earned at least $277,148,723 and likely substantially more. Put another way, subtracting away their guaranteed salaries, the seven Individual Defendants for which compensation data is known received over $272 million that was largely dependent on the Company's fee-based revenue. The Individual Defendants were therefore directly incentivized to execute the scheme alleged herein.

| Name | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|------|------|------|------|------|------|-------|
| James D. Weddle | $12,921,019 | $13,917,899 | $13,952,940 | $11,199,029 | $11,443,462 | $63,434,349 |
| Kevin D. Bastien | $8,617,937 | $10,453,515 | $11,173,621 | $10,043,559 | $11,770,557 | $52,059,189 |
| Penelope ("Penny") Pennington | N/A | N/A | N/A | N/A | $10,538,707 | $10,538,707 |
| Daniel J. Timm | $9,842,907 | $11,307,332 | $11,228,250 | $9,572,125 | $10,566,370 | $52,516,984 |
| Brett A. Campbell | $11,383,365 | $12,682,360 | Retired | Retired | Retired | $24,065,725 |
| Norman L. Eaker | $11,024,076 | $12,002,075 | $11,758,012 | $9,882,748 | Retired | $44,666,911 |
| James A. Tricarico Jr. | N/A | N/A | $10,306,348 | $9,143,785 | $10,416,725 | $29,866,858 |
| **Sum TOTAL** | | | | | | **$277,148,723** |

97.     Moreover, Defendants were highly motivated to conceal this scheme from Plaintiffs and the other members of the Class because, had Plaintiffs and the other members of the Class known that moving their commission-based accounts to a fee-based Advisory Program was not in their best interest, Plaintiffs and the other members of the Class  would not have agreed to make the move, and thereby would not have paid the improper substantially increased fees.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons, or their beneficiaries without limitation, who had their assets moved from Edward Jones' commission-based accounts to an Advisory Program during the Class Period and were damaged thereby.  Excluded from the Class are the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns.

99.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Record owners and other Class members may be identified from records maintained by Edward Jones or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to Lead Plaintiff, Edward Jones has reported billions of dollars in increases in asset-based fees while the commission-based fees have decreased during the Class Period.  In addition, Edward Jones has also disclosed that the majority of the increase in assets under care in its Advisory Programs every year during the Class Period came

from existing client assets. Edward Jones has further disclosed in its 2017 Form 10-K that it manages assets for 5.2 million households, totaling $1.121 trillion, of which approximately 28% is in Advisory Programs.    Accordingly, Plaintiffs reasonably believe there are thousands, if not tens of thousands, of members in the proposed Class.

100.    Plaintiffs' claims are typical of the claims of the members of the Class as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

101.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

102.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether Defendants breached their fiduciary duties to Class members;

(c)    Whether statements made by Defendants to Class members misrepresented or omitted material facts about their investments and the Advisory Programs; and

(d)    To what extent the Class members have sustained damages and the proper measure of damages.

103.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violation of § 10(b) of the 1934 Act and Rule 10b-5(a) and (c)**
**Promulgated Thereunder**
**Against All Defendants**

104.     Plaintiffs hereby repeat, reallege and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

105.     During the Class Period, each Defendant carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive members of the Class, as alleged herein and caused members of the Class to move their assets from commission-based accounts into a fee-based Advisory Program and to otherwise suffer damages. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

106.     Defendants (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon Plaintiffs and the other Class members who were compelled into moving assets from their commission-based accounts into a fee-based Advisory Program. This was done by Defendants in an effort to enrich themselves through undisclosed manipulative tactics by which they (1) Wrongfully generated more revenue by requiring members of the Class to pay substantially more fees without receiving any increased recognizable benefit; (2) Wrongfully received undisclosed promotional payments; and (3) Wrongfully avoided the requirements of the DOL Fiduciary Rule at the expense of members of the Class.

107.     All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

108.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Edward Jones and the scheme to compel clients into a fee-based Advisory Program, as specified herein.

109.     Defendants employed devices and artifices to defraud and engage in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and promotional payments as a result of the undisclosed practices of compelling clients into a fee-based Advisory Program, as alleged herein, and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon members of the Class.

110.     Class members reasonably relied upon the representation of Defendants, who were acting in a fiduciary capacity in coercing members of the Class to move their assets from commission-based accounts into a fee-based Advisory Program.

111.     Class members were ignorant of Defendants' fraudulent scheme. Class members were injured because had Class members known of Defendants' unlawful scheme, they would not have agreed to move their assets from commission-based accounts into a fee-based Advisory Program, and they would not have paid the fees or costs associated with that Advisory Program. Absent Defendants' wrongful conduct, Class members would not have been injured.

112.     By virtue of the foregoing, Defendants each violated Section 10(b) of the 1934 Act and Rule 10b-5(a) and (c) promulgated thereunder.

113.     As a direct and proximate result of Defendants' wrongful conduct, Class members suffered damages in connection with the movement of their assets from commission-based accounts into a fee-based Advisory Program during the Class Period.

114.     This claim was brought within the applicable statute of limitations.

**COUNT II**
**For Violation of § 10(b) of the 1934 Act and Rule 10b-5(b)**
**Promulgated Thereunder**
**Against All Defendants**

115.     Plaintiffs hereby repeat, reallege and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

116.     During the Class Period, Defendants employed manipulative and deceptive devices and contrivances in that they omitted to state material facts, including that moving Class members' assets from commission-based accounts into a fee-based Advisory Program would improperly result in substantially increased fees to Class members and that Defendants would receive undisclosed incentives from revenue sharing in exchange for pushing their clients into an Advisory Program, and that such incentives created inherent, insurmountable conflicts of interest.

117.     Defendants, individually and in concert, direct and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in and participated in a continuous course of conduct to conceal the adverse material information about the improper

1    incentives and conflicts of interest alleged herein. All Defendants are sued as primary participants

2    in the wrongful and illegal conduct and scheme charged herein.

3         118.    Defendants omitted to state material facts in order to profit improperly from millions

4    of dollars in incentive payments, as described above, made to them in the form of promotional

5    payments from investing Class members in certain mutual funds after moving their assets into an

6    Advisory Program.

7         119.    Defendants omitted to state material facts in order improperly receive additional fees

8    from members of the Class, with members of the Class receiving no additional, recognizable

9    benefits.

10        120.    Defendants omitted to state material facts in order to wrongfully avoid the

11    requirements of the DOL Fiduciary Rule at the expense of members of the Class.

12        121.    Defendants had actual knowledge of the omissions of material facts set forth herein,

13    or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such

14    facts, because they knew that the misconduct descried herein was, *inter alia*, against SEC and

15    FINRA rules. Such Defendants' material omissions were done knowingly or recklessly and for the

16    purpose and effect of concealing the truth.

17        122.    By failing to disclose material facts, as set forth above, Defendants exploited the

18    fiduciary relationship with Plaintiffs and the other members of the Class, manipulating them into

19    moving their assets from commission-based accounts into a fee-based Advisory Program and

20    paying substantially increased fees.  Plaintiffs and the other Class members would have refused to

21    have paid these increased fees had they known about the practices alleged herein. In relying on the

22    purported honesty of Edward Jones' business practices, and/or upon the fiduciary relationship

23    established between Defendants and Class members, and/or on the absence of material adverse

24    information that was known to or recklessly disregarded, but not disclosed by Defendants during

25    the Class Period, Plaintiffs and the other members of the Class moved their assets from

26    commission-based accounts into a fee-based Advisory Program during the Class Period, even

27    though such a move was adverse to their interests and improperly caused them to pay excessive

28    fees, and were damaged thereby.

123.    At the time of said material omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class known the truth concerning Defendants' improper motives to benefit from moving their assets from commission-based accounts into fee-based accounts, including to receive substantially increased fees and promotional payments, and to avoid the disclosure requirements under the DOL Fiduciary Rule, Plaintiffs and the other members of the Class would not have agreed to such a move, and thereby would not have paid the improperly excessive fees.

124.    By virtue of the foregoing, Defendants have violated Section 10(b) of the 1934 Act, and Rule 10b-5(b) promulgated thereunder.

125.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with the movement of their assets from commission-based accounts into a fee-based Advisory Program during the Class Period.

126.    This claim was brought within the applicable statute of limitations.

## COUNT III
### For Violation of § 12(a)(2) of the 1933 Act
### Against Edward D. Jones

127.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

128.    This claim is brought pursuant to Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), against Edward D. Jones.

129.    Edward D. Jones was the seller, or the successor-in-interest to the seller, within the meaning of the 1933 Act, for one or more of the respective mutual funds sold to Class members because it either transferred title of shares of the mutual funds to members of the Class and/or solicited the purchase of shares of the mutual funds by members of the Class, motivated in part by a desire to serve its own financial interests.

130.    During its sale of mutual funds to members of the Class, Edward D. Jones failed to disclose to Plaintiffs and the other members of the Class that moving their commission-based

1    accounts into one of the Advisory Programs was adverse to their interests, and benefited Defendants

2    at their expense.

3        131.    During its sale of mutual funds to members of the Class, Edward D. Jones failed to

4    disclose the incentives alleged herein that its investment advisors received in exchange for pushing

5    Edward D. Jones clients into the mutual funds. These incentives created insurmountable conflicts

6    of interest which were never meaningfully disclosed to investors.

7        132.    During its sale of mutual funds to members of the Class, Edward D. Jones made

8    numerous untrue statements of material fact to Plaintiffs and the other members of the Class to

9    coerce them to move into an Advisory Program, as alleged herein.

10       133.    Class members have sustained damages due to Edward D. Jones's violations.

11       134.    At the time their commission-based accounts were moved into an Advisory Program

12    pursuant to or traceable to Edward D. Jones's untrue statements of material fact and omissions,

13    Class members were without knowledge of the facts concerning the untrue statements of fact and

14    material omissions alleged herein and could not reasonably have possessed such knowledge.

15       135.    This claim was brought within the applicable statute of limitations.

16                             **COUNT IV**

                 **For Violation of § 15 of the 1933 Act**

17                 **Against Control Person Defendants**

18       136.    Plaintiffs repeat and re-allege each and every allegation contained above, except that

19    for purposes of this claim, Plaintiffs expressly excludes and disclaims any allegation that could be

20    construed as alleging fraud or intentional or reckless misconduct.

21       137.    This claim is brought pursuant to Section 15 of the 1933 Act against the Control

22    Person Defendants as control persons of Edward D. Jones. It is appropriate to treat these Defendants

23    as a group for pleading purposes and to presume that the false, misleading, and incomplete

24    information complained about herein are the collective actions of the Control Person Defendants

25    and Edward D. Jones.

26       138.    Edward D. Jones is liable under Section 12(a)(2) of the 1933 Act as set forth herein.

27

28

139.   Each of the Control Person Defendants was a "control person" of Edward D. Jones within the meaning of Section 15 of the 1933 Act, by virtue of their positions of operational control and/or ownership. At the time that Edward D. Jones improperly coerced Plaintiffs and the other members of the Class to move their commission-based accounts into one of the Advisory Programs – by virtue of their positions of control and authority over Edward D. Jones – the Control Person Defendants directly and indirectly, had the power and authority, and exercised the same, to cause Edward D. Jones to engage in the wrongful conduct complained of herein.

140.   Pursuant to Section 15 of the 1933 Act, by reason of the foregoing, the Control Person Defendants are liable to Plaintiffs and the other members of the Class to the same extent as is Edward D. Jones for its primary violations of Section 12(a)(2) of the 1933 Act.

141.   By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages against the Control Person Defendants.

**COUNT V**
**For Breach of Fiduciary Duty**
**Against All Defendants**

142.   Plaintiffs hereby repeat, reallege and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

143.   Prior to moving the assets of Plaintiffs and the other Class members into an Advisory Program, Edward Jones acted as a stockbroker to Plaintiffs and the other Class members in managing their commission-based accounts.

144.   The Advisory Solutions agreement signed by Plaintiffs and the other Class members provides the agreement shall be enforced in accordance with the laws of the State of Missouri.

145.   Under Missouri law, stockbrokers owe customers a fiduciary duty. This fiduciary duty includes at least these obligations: to manage the account as dictated by the customer's needs and objectives, to inform the customer of risks in particular investments, to refrain from self-dealing, to follow the customer's order instructions, to disclose any self-interest, to stay abreast of market changes, and to explain strategies. Implicit in these obligations is a duty to disclose to the customer material facts.

146.    In acting as a stockbroker to Plaintiffs and the other Class members prior to and during the transition of their assets from commission-based accounts to a fee-based Advisory Program, Defendants owed Plaintiffs and the other Class members a fiduciary duty.

147.    In shifting the assets of Plaintiffs and the other Class members from a commission-based structure to a fee-based structure, Defendants were required to act as fiduciaries.

148.    Defendants knew that Plaintiffs and the other Class members entrusted their assets to, and totally relied on the relationship of trust established with Defendants, and thereby intentionally assumed the position of fiduciaries of the assets of Plaintiffs and the other Class members.

149.    Plaintiffs and the other Class members relied exclusively and without reservation upon the representations, course of dealing and expertise of Defendants. In effect, Defendants exercised total discretionary or control authority over the assets of the Plaintiffs and the other Class members in Edward Jones' accounts.

150.    The fiduciary duty owed to Plaintiffs and the other Class members by Defendants required them to manage the accounts of Plaintiffs and the other Class members as dictated by the customer's needs and objectives, to inform the customer of risks in particular investments, to refrain from self-dealing, to follow the customer's order instructions, to disclose any self-interest, to stay abreast of market changes, and to explain strategies. Implicit in these obligations is a duty to disclose to the customer material facts.

151.    The fiduciary duty owed to Plaintiffs and the other Class members by Defendants required that, in moving Plaintiffs and the other Class members' assets from a commission-based structure to a fee-based structure, Defendants must justify the move as economical.

152.    All of the foregoing fiduciary duties have been breached by Defendants by virtue of the afore described wrongful activities, and said breaches directly and proximately caused Plaintiffs and the other Class members to suffer substantial damages for which Plaintiffs pray for relief, full restitution of all losses, punitive damages and recovery of all costs and expenses, including reasonable attorneys' fees.

**COUNT VI**
**For Breach of Fiduciary Duty**
**(On Behalf of California Subclass Only)**
**Against All Defendants**

153.    Plaintiffs hereby repeat, reallege and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

154.    Prior to moving the assets of Plaintiffs and the other Class members into an Advisory Program, Edward Jones acted as a stockbroker to Plaintiffs and the other Class members in managing their commission-based accounts.

155.    Under California law, stockbrokers owe customers a fiduciary duty. This imposes on the broker the duty of acting in the highest good faith. Furthermore, if the stockbroker has discretionary control over a customer's account, a more heightened fiduciary duty is imposed.

156.    In acting as a stockbroker to Plaintiffs and the other Class members prior to and during the transition of their assets from commission-based accounts to a fee-based Advisory Program, Defendants owed Plaintiffs and the other Class members a fiduciary duty.

157.    In shifting the assets of Plaintiffs and the other Class members from a commission-based structure to a fee-based structure, Defendants were required to act as fiduciaries.

158.    Defendants knew that Plaintiffs and the other Class members entrusted their accounts to, and totally relied on the relationship established with Defendants, and thereby intentionally assumed the position of fiduciaries of the accounts of Plaintiffs and the other Class members.

159.    Plaintiffs and the other Class members relied exclusively and without reservation upon the representations, course of dealing, and expertise of Defendants. In effect, Defendants exercised total discretionary or control authority over the accounts of Plaintiffs and the other Class members.

160.    The fiduciary duty owed to Plaintiffs and the other Class members by Defendants required Defendants to manage the accounts of Plaintiffs and the other Class members as dictated by the customer's needs and objectives, to inform the customer of risks in particular investments,

1   to refrain from self-dealing, to follow the customer's order instructions, to disclose any self-interest,

2   to stay abreast of market changes, and to explain strategies. Implicit in these obligations is a duty

3   to disclose to the customer material facts.

4        161.   The fiduciary duty owed to Plaintiffs and the other Class members by Defendants

5   required that, in moving the assets of Plaintiffs and the other Class members from a commission-

6   based structure to a fee-based structure, Defendants must justify the move as economical.

7        162.   All of the foregoing fiduciary duties have been breached by Defendants by virtue of

8   the afore described wrongful activities, and said breaches directly and proximately caused Plaintiffs

9   and the other Class members to suffer substantial damages for which Plaintiffs pray for relief, full

10  restitution of all losses, punitive damages and recovery of all costs and expenses, including

11  reasonable attorneys' fees.

12  **PRAYER FOR RELIEF**

13  WHEREFORE, Plaintiffs pray for relief and judgment as follows:

14  A.   Declaring that Defendants are liable pursuant to the 1933 and 1934 Acts;

15  B.   Declaring that Defendants breached their fiduciary duties;

16  C.   Determining and certifying that this action is a proper class action, certifying

17  Plaintiffs as class representatives, and appointing their counsel as Class Counsel

18  pursuant to Rule 23 of the Federal Rules of Civil Procedure

19  D.   Awarding compensatory damages in favor of Plaintiffs and the Class against

20  Defendants, jointly and severally, for damages sustained as a result of Defendants'

21  wrongdoing, in an amount to be proven at trial;

22  E.   Awarding all appropriate relief, including actual damages, statutory damages,

23  double damages, treble damages, punitive damages, consequential damages,

24  restitution, disgorgement, and any other appropriate compensatory, equitable, or

25  exemplary relief;

26  F.   Awarding Plaintiffs and the Class pre-judgment and post-judgment interest as well

27  as reasonable attorneys' fees, costs and expenses incurred in this action; and

28  G.   Awarding such other relief as the Court may deem just and proper.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated:  March 30, 2018                          Respectfully submitted,


                                                */s/*_____
                                                John Garner (246729)
                                                GARNER LAW OFFICE
                                                109 North Marshall Avenue
                                                P.O. Box 908
                                                Willows, CA 95988
                                                Telephone:     (530) 934-3324
                                                Facsimile:     (530) 934-2334
                                                jrg@erglaw.net

                                                Ivy T. Ngo (249860)
                                                FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                                14426 East Evans Avenue
                                                Aurora, CO 80014
                                                Telephone:     (303) 757-3300
                                                Facsimile:     (303) 759-5203
                                                ngoi@fdazar.com


                                                *Attorneys for Plaintiffs*

39

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY