IVY T. NGO (249860)
BRIAN HANLIN (*pro hac vice*)
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone:    (303) 757-3300
Facsimile:    (303) 759-5203
ngoi@fdazar.com
hanlinb@fdazar.com

JOHN R.GARNER (246729)
MARIA E. MINNEY (289131)
GARNER LAW OFFICE
109 North Marshall Avenue
P.O. Box 908
Willows, CA  95988
Telephone:    (530) 934-3324
Facsimile:    (530) 934-2334
john@garner-associates.com
maria@garner-associates.com

Attorneys for Lead Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE EDWARD D.  JONES & CO., L.P. SECURITIES LITIGATION | No.   18-CV-0714-JAM-AC<br><br>**CLASS ACTION**<br><br>AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY<br><br>**JURY TRIAL DEMANDED** |

1

**TABLE OF CONTENTS**

2

I.    NATURE OF THE ACTION ................................................................. **4**

3

II.   JURISDICTION AND VENUE ............................................................ **6**

4

III.  THE PARTIES ..................................................................................... **7**

5

IV.   BACKGROUND AND SUMMARY OF THE ACTION ......................... **13**

6

  A.   The Original Edward Jones Business Model ................................... **13**

7

  B.   Edward Jones' Reverse Churning Scheme to Generate Revenue ............... **15**

8

     1.   The Prohibition Against Reverse Churning ...................... **26**

9

     2.   Edward Jones' Preference for Proprietary Funds.................... **29**

10

  C.   Edward Jones' Higher-than-Industry-Standard Fees ................. **31**

11

V.    DEFENDANTS' MATERIAL OMISSIONS ................................. **35**

12

VI.   DEFENDANTS' SCIENTER ............................................................ **38**

13

  A.   Defendant's Extensive Involvement in Alleged Scheme as Senior Headers at Edward Jones …..................................................................... **38**

14

     1.   Edward Jones' Executive Committee............................... **40**

15

     2.   Edward Jones' Investment Policy Committee.................... **40**

16

     3.   Edward Jones' Management Committee........................... **41**

17

     4.   Edward Jones' Client Strategies Group Division ............... **42**

18

     5.   Edward Jones' Compliance Division ............................... **43**

19

     6.   Edward Jones' Branch and Development Division ............ **44**

20

     7.   Edward Jones' Investment Advisory Division .................. **45**

21

     8.   Edward Jones' Operations Division ................................. **45**

22

     9.   Edward Jones' Marketing Division................................. **45**

23

  B.   Edward Jones' Regional Management's Key Role in Alleged Scheme...................... **46**

24

  C.   Edward Jones' Perpetuated  Alleged Scheme Through Its Supervisory Arms ......... **49**

25

  D.   Edward Jones' Used Training as a Guise to Influence Financial Advisors ............... **51**

26

  E.   Defendant Weddle Interacted Closely with Financial Advisors.................... **52**

27

  F.   Edward Jones' Implemented Client Account Conversion Policies to Support Alleged Scheme …..................................................................... **53**

28

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

**G.  Defendants' Compensation Policies Incentivized Financial Advisors  to Sell Fee-Based Accounts** ........................................................................................ **54**

**H.  Defendants' Pecuniary Motive and Opportunity to  Implement  Alleged Scheme and Omit Material Information** ................................................................ **56**

**VII.  CLASS ACTION ALLEGATIONS** ......................................................... **60**

**COUNT I (For Violation of §10(b) of the 1934 Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)** ............................................ **62**

**COUNT II (For Violation of §10(b) of the 1934 Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants** ............................................. **64**

**COUNT III (For Violation of §20(a) of the 1934 Act Against Individual Defendants)** ............................................................................................................ **66**

**COUNT IV (For Violation of §12(a)(2) of the 1933 Act Against Edward D. Jones** .. **67**

**COUNT V (For Violation of §15 of the 1933 Act Against Individual Defendants)** .... **68**

**COUNT VI (For Breach of Fiduciary Duty Against All Defendants)** ........................ **69**

**COUNT VII (For Breach of Fiduciary Duty On Behalf of California Subclass Only Against All Defendants)** ......................................................................... **70**

**VIII.  PRAYER FOR RELIEF** ..................................................................... **72**

**IX.  JURY DEMAND** .............................................................................. **72**

3

Lead Plaintiffs Edward Anderson, Colleen Worthington, and Janet Goral ("Lead Plaintiffs") by and through their counsel, allege the following against Defendants Edward D. Jones & Co., L.P., The Jones Financial Companies, L.L.L.P., EDJ Holding Company, Inc., James D. Weddle, Penelope ("Penny") Pennington, Daniel J. Timm, Kenneth R. Cella, Jr., Brett A. Campbell, Kevin D. Bastien, Norman L. Eaker, Vincent J. Ferrari, Timothy J. Kirley, James A. Tricarico, Jr., Richard D. Link, and Pamela K. Cavness (collectively, "Edward Jones" or "the Company") as well as Olive Street Investment Advisors, LLC, Passport Holdings, LLC, and Passport Research, Ltd. (collectively with Edward Jones, "Defendants") based upon personal information as to those allegations concerning Lead Plaintiffs and the investigation of counsel as to all other matters, which included, without limitation: (a) review and analysis of public filings made by Edward Jones and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, investor communications, reports, advisories and other publications disseminated by certain of the Defendants and other related non-parties; (c) review and analysis of news articles, media reports and other publicly available information concerning Edward Jones and related non-parties; (d) consultation with experts; and (e) interviews with persons with knowledge of the conduct complained of herein.

## I.    NATURE OF THE ACTION

1.    This is a federal securities and breach of fiduciary duty class action based upon a reverse churning scheme by Defendants to take advantage of trusting, long-standing clients and unlawfully shift their commission-based accounts to a fee-based program – Edward Jones Advisory Solutions ("Advisory Solutions") or Edward Jones Guided Solutions ("Guided Solutions") (collectively, "Advisory Programs") for no other reason than to collect additional fees. In orchestrating this scheme to churn revenue from essentially dead assets no longer making money for the company, Edward Jones made material omissions to their clients, including Lead Plaintiffs, about the amount of fees they would pay after their assets were moved into one of the Advisory Programs, about Edward Jones' preference for investing in proprietary funds only available through Advisory Solutions, and about the absence of any measures taken to determine

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

1  the suitability of Advisory Programs for clients.  In addition, Defendants breached their fiduciary

2  duties because clients who engaged in little to no trading activity paid more in fee-based

3  accounts, which changed based on a percentage of the total assets under management, than they

4  did in commission-based accounts, which charged fees only when a transaction occurred, and

5  clients who were invested in a proprietary fund were entitled to know about Defendants'

6  competing interests that caused them to make self-interested investments on their clients' behalf.

7        2.     Lead Plaintiffs bring this action under § 10(b) of the Securities Exchange Act of

8  1934 (the "1934 Act"), Rule 10b-5(a) and (c) promulgated thereunder, the Securities Act of 1933

9  (the "1933 Act"), and the fiduciary duty laws of the states of Missouri and California on behalf of

10  themselves and all persons (including, without limitation, their beneficiaries) who had their

11  commission-based accounts with Edward Jones moved into one of the Advisory Programs

12  between March 30, 2013 and March 30, 2018 (the "Class Period"), inclusive, and who were

13  damaged thereby (the "Class").

14        3.     Edward Jones' business model has allowed it to have a stronghold among

15  working-class individuals in small communities across the country, like Lead Plaintiffs, who were

16  unsophisticated investors seeking professional investment guidance from someone with whom

17  they could have a personal relationship.  Instead of further cementing the trust and goodwill it had

18  fostered for decades in these small communities when the Department of Labor ("DOL")

19  announced proposed additional required disclosures regarding how much compensation they

20  received for putting their clients in certain investments for fiduciaries like Edward Jones, the

21  company abused that trust by compelling clients into more expensive fee-based accounts in order

22  to avoid the additional disclosures and grow its own bottom line.

23        4.     While Lead Plaintiffs' accounts suffered from Edward Jones' unnecessary fees

24  because they were historically buy and hold clients who engaged in little trading. Defendants

25  reaped the handsome reward of the fraud alleged herein.  During the Class Period, Edward Jones

26  generated ***$17.2 billion*** in revenue specifically from asset-based fees, pushing its earnings to

27  record highs. And the Company's unlawful conduct only became more aggressive as the Class

28  Period wore on, churning out increasing amounts of asset-based revenue each year by

5

1   implementing new policies and procedures which pushed its financial advisors to move their

2   clients into fee based accounts. Such policies and procedures include changing its financial

3   advisors' commission-based compensation to be revenue-based, making it technologically

4   difficult to manage client's assets unless they were in a fee based account, promoting and

5   showcasing those advisors who had 100% asset-based clients, and subjecting those advisors who

6   did not move their clients into an asset based account to increased scrutiny and disciplinary

7   actions by upper management. These changes created a Morton's Fork for financial advisors:

8   comply with the alleged scheme, at the expense of you client's best interests, or lose out on

9   additional pecuniary benefits and face greater potential retribution from upper management.

10      5.      As Edward Jones admitted in its Form 10-K for fiscal year ending December 31,

11  2017 ("2017 Form 10-K"), the Company's 14% increase in net revenue in 2017 was driven by "a

12  36% increase in asset-based fee revenue due to the increased investment of client assets into

13  advisory programs."  Edward Jones used this money to line the pockets of those partners and

14  financial advisors complicit in the alleged scheme – to the tune of ***$277 million*** in bonuses to the

15  Defendants named individually herein.

16  **II.     JURISDICTION AND VENUE**

17      6.      This Court has jurisdiction over the subject matter of this action pursuant to § 27

18  of the 1934 Act [15 U.S.C. § 78aa]; § 22 of the 1933 Act [15 U.S.C. § 77v] and 28 U.S.C. § 1331.

19      7.      Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §

20  1391(b) and 15 U.S. Code § 77v(a). Defendants are licensed to do business in this District,

21  maintain a number of branch offices in this District, and service clients who are residents of this

22  District. Lead Plaintiffs Edward Anderson, Colleen Worthington and Named Plaintiffs Raymond

23  Keith Corum and Jesse Worthington, are residents of this District and were or are clients of

24  Edward Jones in this District. In addition, many of the acts and conduct that constitute the

25  violations of law complained of herein, including dissemination to the public of statements that

26  omitted material information, occurred in and/or were issued from this District. In connection

27  with the acts alleged herein, Defendants used the means and instrumentalities of interstate

28

commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE PARTIES

8.      Lead Plaintiff Edward Anderson is a resident of Elk Creek, California and has had assets in a commission-based account with Edward Jones since July 12, 2012.  In June 2015, Anderson's Edward Jones financial advisor invited him into her office to pitch Advisory Solutions.  On July 1, 2015, Anderson executed the Advisory Solutions Fund Model Agreement and his financial advisor subsequently moved his assets with Edward Jones into Advisory Solutions. While in Advisory Solutions, Edward Jones invested at least $61,216.60, or approximately 60% of Anderson's assets, into Edward Jones' proprietary Bridge Builder mutual funds ("Bridge Builder") only available through Advisory Solutions.  During the time Anderson was in Advisory Solutions, he paid over $6,000 in fees, substantially more than he paid while his assets were in a commission-based account.

9.      Named Plaintiff Raymond Keith Corum is a resident of Willows, California and had assets in a commission-based account with Edward Jones until early 2015. At that time, Corum's Edward Jones financial advisor invited him into her office to pitch Advisory Solutions and afterward moved his assets into Advisory Solutions despite his instruction to her to keep his account as it was. While Corum was in Advisory Solutions, Edward Jones invested at least $22,065.09, or 32% of his assets, into Bridge Builder. During the time Corum was in Advisory Solutions, he paid over $671 in fees, substantially more than he paid while his assets were in a commission-based account.

10.      Lead Plaintiff Colleen Worthington and Named Plaintiff Jesse Worthington are residents of Willows, California and had assets in commission-based accounts with Edward Jones. In early 2014, their Edward Jones financial advisor invited them into her office to pitch Advisory Solutions. Edward Jones subsequently moved Jesse Worthington's assets into Advisory Solutions. In early 2015, Edward Jones moved Colleen Worthington's assets into Advisory Solutions, investing at least $53,261.02, or 38% of her assets, in Bridge Builder. In 2016, Edward Jones moved Jesse Worthington's Living Trust into Guided Solutions, investing at least $4,500 of

his assets in the Edward Jones Money Market Fund and over $38,000 of his assets into Edward Jones preferred partners' mutual funds, causing him to pay an asset-based fee on top of the fund fees. Jesse Worthington paid over $792 in fees on his Guided Solutions account in 2016, and over $3,350 in fees during the time he was in Advisory Solutions, substantially more than he paid while his assets were in a commission-based account. During the time Colleen Worthington was in Advisory Solutions, she paid over $2,130 in fees, substantially more than she paid while her assets were in a commission-based account.

11.     Lead Plaintiff Janet Goral is a resident of Durham, North Carolina, and had assets in a commission-based account with Edward Jones. In January 2018, her Edward Jones financial advisor invited her into his office to pitch Guided Solutions. Edward Jones subsequently moved approximately $904,789.25 of her assets into Guided Solutions.  Goral paid over $2,303.20 in fees on her Guided Solutions account during the approximately four months she was in the fee-based account, substantially more than she paid while her assets were in a commission-based account.

12.     Defendants consist of multiple, interconnected entities who worked in concert to orchestrate the reverse churning scheme alleged herein to generate billions in revenue for themselves by coercing Lead Plaintiffs and the other members of the Class to move their assets from commission-based accounts with Edward Jones to one of its Advisory Programs. The following chart summarizes Defendants' incestuous relationships with one another:

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY



13.     Defendant Edward D. Jones & Co., L.P. ("Edward D. Jones"), a Missouri Limited Partnership headquartered in St. Louis, Missouri, is dually registered as a broker-dealer and as an investment advisor under federal and state securities laws.  Edward D. Jones provides brokerage and related financial services to individuals and small businesses and is the principal operating subsidiary of the Jones Financial Companies, L.L.L.P. ("Jones Financial").

14.     Defendant Jones Financial, headquartered in Des Peres Missouri, is the sole limited partner of Edward D. Jones and directly and indirectly owns 100% of the capital in Edward D. Jones and its wholly-owned subsidiaries.

15.     Defendant EDJ Holding Company, Inc. ("EDJ Holding"), incorporated in Missouri, is the sole general partner of Edward D. Jones and a wholly-owned subsidiary of Jones Financial.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

16.     Defendant Olive Street Investment Advisers, LLC ("Olive Street"), a 100% wholly-owned subsidiary of Jones Financial and a Missouri limited liability company, was established in 2012 and continues to be the investment adviser to the sub-advised funds in the Bridge Builder Trust which were designed solely for Advisory Solutions.  Throughout the Class Period, Olive Street had primary responsibility for the allocation of funds, setting the mutual funds' overall investment strategies, and the selection and management of subadvisors, as well as supervisory responsibility for the general management of the Bridge Builder Trust, subject to review and approval by its board of trustees.

17.     Defendant Passport Research, Ltd. ("Passport"), incorporated in Pennsylvania, has historically been the investment adviser to Edward Jones' two money market funds, one of which was no longer offered as of August 2016.  Passport's revenue is primarily based on the value of client assets in the funds. Edward D. Jones is a 49.5% limited partner in Passport while Passport Holdings, LLC ("Passport Holdings") is a 50.5% limited partner in Passport.

18.     Defendant Passport Holdings, incorporated in Missouri, is a 50.5% limited partner in Passport and a 100% wholly-owned subsidiary of Edward D. Jones.

19.     Defendant James D. Weddle became the Managing Partner of Jones Financial on January 1, 2006, Managing Partner of Edward D. Jones in November 2006, and continued to serve as the Managing Partner of both entities throughout the Class Period.  During that time, he served as Jones Financial's Chief Executive Officer ("CEO") and received more than $63.2 million in compensation that was derived from the misconduct alleged herein. Weddle's primary responsibilities as Managing Partner under the terms of the Partnership Agreement with Jones Financial were to administer the Partnership's business, determine its policies, and control the management and conduct of the Partnership's business. Weddle himself appointed all of the members of the Executive Committee of Jones Financial ("Executive Committee") during the Class Period.

20.     Defendant Penelope ("Penny") Pennington became a general partner of Jones Financial and Principal of Edward D. Jones in 2006 and has served as the head of the Client Strategies Group since September 2014. Prior to her role in the Client Strategies Group,

1  Pennington was responsible for the New Financial Advisor Training Department. Her duties

2  encompassed all of Jones Financial's and Edward D. Jones' advice and guidance, products and

3  services, marketing, and branch support related to clients' financial goals. She has served on the

4  Executive Committee continuously since July 7, 2014.

5      21.    Defendant Daniel J. Timm became a general partner of Jones Financial and

6  Principal of Edward D. Jones in 1998 and assumed shared responsibility for the Branch

7  Development division in July 2014, holding that position for the remainder of the Class Period.

8  His duties encompassed Financial Advisor Talent Acquisition, Branch Office Administrator

9  Talent Acquisition and Performance, Branch Training, Branch Administration, Branch Insights,

10 Learning and Support, and Branch and Region Development.  Prior to July 2014, Timm was

11 responsible for various departments including Financial Advisor Training, Financial Advisor

12 Development, and Branch Administration. He served on the Executive Committee for the

13 duration of the Class Period.

14     22.    Defendant Kenneth R. Cella, Jr. became a general partner of Jones Financial and

15 Principal of Edward D. Jones in 2002 and assumed shared responsibility for the Branch

16 Development division in July 2014. He held that position and an accompanying seat on the

17 Executive Committee for the remainder of the Class Period. His duties encompassed Financial

18 Advisor Talent Acquisition, Branch Office Administrator Talent Acquisition and Performance,

19 Branch Training, Branch Administration, Branch Insights, Learning and Support, and Branch and

20 Region Development.  Prior to July 2014, Cella was responsible for various areas of the Client

21 Strategies Group (including mutual funds, insurance, banking, and advisory areas) and for the

22 Branch Training department.

23     23.    Defendant Brett A. Campbell was named a general partner of Jones Financial and

24 Principal of Edward D. Jones in 1993 and served as head of the Client Strategies Group until

25 Defendant Pennington assumed the role in September 2014. As head of the Client Strategies

26 Group, his responsibilities encompassed all of the Company's advice and guidance, products and

27 services, marketing, and branch support related to clients' financial goals. Campbell served on the

28

Executive Committee from the start of the Class Period until he retired from Edward Jones effective December 31, 2014.

24.     Defendant Kevin D. Bastien became a general partner of Jones Financial and Principal of Edward D. Jones in 1998 and has served as Chief Financial Officer ("CFO") since January 2009. He held these positions and served on the Executive Committee for the duration of the Class Period.

25.     Defendant Norman L. Eaker became a general partner of Jones Financial and Principal of Edward D. Jones in 1984 and served as the Chief Administrative Officer from 2008 until his retirement effective December 31, 2016. He also served on the Executive Committee during the Class Period until he retired.

26.     Defendant Vincent J. Ferrari became a general partner of Jones Financial and Principal of Edward D. Jones in 2004. He has served as the Chief Information Officer since 2007 and as a member of the Executive Committee since January 1, 2017, following the retirement of Defendant Eaker.

27.     Defendant Timothy J. Kirley became a general partner of Jones Financial and Principal of Edward D. Jones in 1994 and served as the Chief Strategy Officer from 2010 until assuming responsibility for Canada operations in September 2015. He has served on the Executive Committee since being appointed in 2016.

28.     Defendant James A. Tricarico, Jr. became a general partner and the general counsel of Jones Financial and Principal of Edward D. Jones in 2006. Until December 31, 2017, he was the Chief Legal Officer and served on both the Executive and Management Committees. He oversaw both the legal department and the compliance divisions, including the branch audit function. With regard to compliance, he was in charge of ensuring that that Edward Jones had policies and procedures in place to comply with all the applicable regulations.

29.     Defendant Richard D. Link, became a general partner of Jones Financial and Principal of Edward D. Jones in 2001. Since January 2016, he was the Chief Compliance Officer responsible for the overall performance of the Compliance Division. He also serves on the Management Committee.

30.     Defendant Pamela K. Cavness, as a general partner of Jones Financial, Principal of Edward D. Jones, and the Chief Compliance Officer from 1987 to 2015, was responsible for the overall performance of the Compliance Division. She also served on the Management Committee.

31.     Defendants Weddle, Pennington, Timm, Cella, Campbell, Bastien, Eaker, Ferrari, Kirley, Tricarico, Link, and Cavness are collectively referred to herein as the "Individual Defendants." The 2017 Form 10-K confirms that as members of Edward Jones' Executive Committee, as well as in their individual roles as partners/principals, the Defendants Weddle, Pennington, Timm, Cella, Campbell, Bastien, Eaker, Ferrari, Kirley, and Tricarico were tasked with providing "counsel and advice to the Managing Partner in discharging his functions, including…helping to establish the strategic direction of the Partnership." As such, they played a decisive role in the strategy and implementation of the alleged scheme.

32.     Defendants Jones Financial, EDJ Holding, and the Individual Defendants are collectively referred to herein as the "Control Person Defendants." By virtue of their ownership of and operational control over Edward D. Jones, the Control Person Defendants exercised control over Edward D. Jones' general operations and possessed the power to determine the specific acts or omissions upon which Edward Jones' violations of the federal securities laws are predicated.

33.     Defendants John Doe 1-100. The true names and capacities of Defendants sued herein as John Does 1 through 100 are other active participants with the above-named participants whose identities have yet to be ascertained.

## IV.     BACKGROUND AND SUMMARY OF THE ACTION

### A. The Original Edward Jones Business Model

34.     From its inception in 1922, Edward Jones has been known and has marketed itself, as an investment firm that offers individually tailored solutions for investors who want to have a personal relationship with the person investing their money. Edward Jones prides itself on its "knock-on-the-door" approach to offering financial services to mainly middle-income individuals in small communities. To succeed in its goal of individually tailored investment advice, Edward Jones has historically focused on offering commission-based accounts which only charged a commission when the client completed a transaction.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

35.     In addition, Edward Jones has become known for its model of staffing one financial adviser per branch office. An Edward Jones office usually only has one other associate, a branch office administrator. While Edward Jones' one-broker-per-office model has allowed clients to choose their broker directly and deal with just that broker, it has also allowed Edward Jones to open offices in less-populated areas and towns where a large office staffed by many brokers would be unprofitable – and hence financially unsustainable – for other brokerage firms. This model has contributed to Edward Jones obtaining a stronghold in small communities, and to it currently having the largest number of branch offices among brokerage firms in the U.S.

36.     Edward Jones' commission-based model benefited investors by offering them free counsel and guidance, unless and until clients completed a transaction. This model particularly benefitted middle-income individuals in small communities who generally engaged in very little trading.

37.     As a February 27, 2002 Wall Street Journal ("WSJ") article titled "Wall Street Firms Are Divided Over Brokers' Pay on Fee-Based Accounts" explained, Edward Jones didn't "offer fee-based accounts at all" at that point in time because it "advocate[d] a buy-and-hold investing strategy, in which investors h[u]ng on to a security or mutual fund for decades. The strategy [wa]sn't the most conducive for generating trading commissions, but many of its customers [we]ren't well-suited to fee-based accounts, either." The article even quoted former Edward Jones managing partner and CEO John W. Bachmann as saying that the Company "*could 'double [its] revenue overnight' if it introduced fee-based accounts, but such a pricing strategy doesn't make sense for investors who don't trade frequently*", and would likely alienate customers." [1]

38.     After Defendant Weddle took the reins of the Company as Managing Partner in 2006, he said: "customers shouldn't expect to see a big change in Jones's overall strategy." Susanne Craig, *St. Louis's (Other) Slugger: Weddle at Jones*, WSJ, Oct. 31, 2006. And in an

---

[1] Emphasis added, unless otherwise noted.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

April 1, 2006 interview with WealthManagement.com, Defendant Weddle detailed Edward Jones' clientele and why a wrap based, i.e. fee-based, investment model did not suit them:

> Under Weddle, the firm's commitment to the middle market, through what it describes as long-term, conservative investments, isn't going to change, he says. The typical Jones rep is 43 years old, has been in the business for six years and has 863 accounts worth about $44 million. The typical client is 54 years old, makes $61,525 a year and has $106,415 invested through Jones. (By comparison, a Merrill Lynch Financial Advisors' average book size is around $95 million.) Asked about the competition's pursuit of high-net-worth clients, Weddle replies: "They're fishing in a very small pond." And the trend towards wealth management and fee-based service models? "We have a managed accounts program with $500,000 minimums, but **our clients are buy and hold," he says. "The wrap pricing approach doesn't fit with that philosophy."**

John Churchill, *Keeping Up With the Joneses*, WealthManagement.com, Apr. 1, 2006.

**B. Edward Jones' Reverse Churning Scheme to Generate Revenue**

39.     Then, less than two years later, Edward Jones shifted gears in 2008 and introduced a fee-based platform for the first time in 86 years – Advisory Solutions. Unlike the Company's long-established commission-based model charging a commission per transaction, the fee-based accounts in Advisory Solutions charged an annual expense fee. The standard fee was 1.35% to 1.50% of a client's assets under management, plus an administrative fee of nine basis points (i.e., 0.09% of the assets under management). But this standard fee could reach as high as 2% when including underlying fund expenses and the managers who sub-advised the Advisory Solutions funds charged a fee of 60 to 70 basis points (i.e., 0.6-0.7% of the total assets under management). In comparison, mass-market firms like Vanguard and robo-advisers like Betterment charge annual asset management fees between 0.15 % and 0.3%.

40.     In 2013, Edward Jones moved further away from its established business model and expanded its Advisory Solutions platform by creating its first proprietary mutual fund product only available to clients in Advisory Solutions, Bridge Builder.  The move baffled industry insiders as it directly opposed Edward Jones' long-stated policy not to sell proprietary products. Indeed, the Company explicitly stated, "Edward Jones offers no proprietary products" in a page of its website titled "Edward Jones vs. the Competition" as recently as August 13, 2013.

41.     As depicted below, the amount of revenue Edward Jones generated from asset-based fees increased by approximately $500M from 2012 to 2013 with the addition of Bridge

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

Builder to its Advisory Solutions platform, and that revenue has continued to grow by hundreds of millions of dollars every year since. In comparison, the amount of revenue Edward Jones generated from commissions only modestly increased in 2012, was essentially flat from 2013 to 2015, and has substantially decreased from 2015 through the present as Edward Jones aggressively pushed its clients out of commission-based accounts into an Advisory Program, under the guise of the DOL Fiduciary Rule as further detailed below, regardless of whether such a move was suitable for clients.



42.     As Edward Jones grew its fee-based revenue through Advisory Solutions, the DOL on April 14, 2015, released a proposed rule that expanded the number of persons who were subject to fiduciary best interest standards when they provided investment advice (the "DOL Fiduciary Rule").  Since these fiduciary best standards would apply to advisors who received commissions such as Edward Jones' financial advisors, this proposed rule further motivated  the company to shift clients' commission-based accounts to Advisory Solutions so that their advisors would not be subject to the rule.

43.     The purpose of the DOL Fiduciary Rule was to mitigate the effect of conflicts of interest in the investment marketplace through proposed exemptions that would only allow advisers to continue to receive fees that could create conflicts of interest if certain conditions were met.  Advisers who made investment recommendations to individual plan participants, IRA

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF
FIDUCIARY DUTY

investors, and small plans could obtain a "best interest contract exemption" only if they and their firms formally acknowledged their fiduciary status and entered into a contract with their customers committing to fundamental standards of impartial conduct – including giving advice that was in the customer's best interest and making truthful statements about their compensation and the investments they made for the customer.

44. Thus, only if fiduciary advisers and their firms entered into and complied with such a contract with their clients, clearly explained to them the investment fees and costs, had appropriate policies and procedures to mitigate the harmful effects of conflicts of interest, and retained certain data on the performance of their clients' accounts, could they receive fees that fiduciary advisers could not otherwise legally receive – including commissions, revenue sharing, and 12b-1(i.e., marketing or distribution) fees. If the advisors did not do so, they generally had to refrain from recommending investments for which they receive conflicted compensation, unless the fees fell under the scope of another exemption.

45. According to the 2015 Edward Jones Revenue Sharing Disclosure, Edward Jones received nearly *$200 million* that year from mutual fund companies and insurers as part of agreements to promote products to their clients. While permitted under the current rules, such promotional payments to financial advisors were the intended target of the DOL Fiduciary Rule and thus could face court challenges under the Rule. To continue to receive these promotional payments after the DOL Fiduciary Rule took effect, Edward Jones would have needed to comply with the "best interest contract exemption" by formally acknowledging its fiduciary status and entering into a contract with its customers committing to fundamental standards of impartial conduct.

46. Due to the disclosure requirements that would be imposed on Edward Jones if it continued to offer commission-based accounts after the DOL Fiduciary Rule was implemented, the Company began to pivot its business more strongly towards fee-based accounts by pushing its clients from commission-based accounts into Advisory Programs in order to continue collecting promotional payments, regardless of whether the switch would be in the client's best interest.

47.     Among the victims of Edward Jones' scheme were Lead Plaintiffs, all of whom had their assets switched from commission-based accounts to an Advisory Program during the Class Period.

48.     Yet Edward Jones simultaneously marketed itself to Lead Plaintiffs and other clients – as it had been doing for decades and building goodwill as a result – as providing advice in the best interest of small-town clients due to the Company's focus on personal relationships. Indeed, in a September 2015 interview with Investment News, John Rahal, a principal in charge of recruiting and talent acquisition at Edward Jones, reaffirmed the Company's "one advisor per branch" formula, stating "[t]hat's the way you deeply serve clients. You deeply serve clients by having a meaningful relationship with an appropriate amount of families that you focus on."

49.     Edward Jones's marketing strategy also included framing the DOL Fiduciary Rule as having a negative impact on the type of customers it served. For example, in a July 21, 2015 comment letter to the DOL regarding the DOL Fiduciary Rule, Edward Jones disingenuously stated that "[t]he impact of the Proposed Rule will fall disproportionally on lower and moderate-income investors who stand likely to lose access to affordable guidance and assistance that is crucial if they are to meet their retirement savings needs." In truth, the DOL Fiduciary Rule would protect low- and moderate-income investors as long as they stayed in commission-based accounts. However, Edward Jones moved away from commission-based accounts because the DOL Fiduciary Rule would require additional disclosures for those accounts.

50.     Internal documents demonstrate why and how Edward Jones took advantage of the DOL Fiduciary Rule to continue their shift towards fee-based accounts during the summer of 2015. For example, an August 26, 2015 presentation made to Edward Jones management by one of the Company's Branch Office Administrators, who has since been promoted to Financial Service Specialist ("August 2015 Presentation"), detailed the potential impact of the DOL Fiduciary Rule as well as a course of action for Edward Jones to take in response to the Rule.

51.     Specifically, the August 2015 Presentation recognized that Edward Jones would face an increased risk if "fiduciary responsibility" was actually imputed upon its "novice advisors," causing "considerable risk to the firm." Yet even these novice advisors were already

fiduciaries and the key point of contact for customers with Edward Jones, dually registered as a broker-dealer and an investment advisor under federal and state securities laws.



52.     In addition, the August 2015 Presentation acknowledged to Edward Jones management that Advisory Solutions had high fees, but instead of considering returning to a corporate strategy and philosophy of commission-based accounts and putting customers' interests first, yet another fee-based account was proposed which would produce revenue for Edward Jones, but would be "Cheaper for the Investor" because it had "Fewer Sub Account Fees." Regardless of what the fee-based account was, the Presentation warned that "Churning" was a risk:



53.     The August 2015 Presentation further recommended making use of marketing to tout how "[m]eeting and exceeding the fiduciary hurdles of the proposed DOL regulation" through the Advisory Programs would "put Edward Jones in an industry leading position." Such

marketing would "Rebrand [] Financial Advisors as 'Advisers'" and "***Take advantage of the new regulations' public perception***":



54.     The August 2015 Presentation also called for an "intentional implementation process" from the top-down which included "Various types of employee training" and "Creat[ion of] buy-in from managing partners and regional leadership."

55.     Lastly, the August 2015 Presentation recognized that challenges Edward Jones faced in implementing a corporate-wide movement to fee-based accounts, including "Historical Performance," which was primarily dependent on revenue from commission-based accounts, and

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

the "FA Pay Structure," which did not incentivize advisors to put their clients into asset-based accounts.



56.     As it became clear that the new DOL Fiduciary Rule would be imposed and with little change to the originally proposed language, Edward Jones put even more pressure on its advisors to switch their clients into Advisory Solutions in order to collect more fees and grow the company's bottom line. A former general partner with Edward Jones confirmed in an April 5, 2016, International Business Times article that the Company was "putting heavy pressure on their advisers to sell their Advisory Solutions platform."

57.     In an attempt to persuade more of its clients to switch to a fee-based platform, Edward Jones launched a second fee-based advisory service – Guided Solutions – in the second quarter of 2016. Like Advisory Solutions, Guided Solutions charged a standard fee of 1.35% to 1.50% of a client's assets which could reach as high as 2% when including underlying fund expenses. Unlike Advisory Solutions, Guided Solutions was marketed as a client-directed advisory program where advisors worked with clients to build a portfolio. Clients retained control over investment decisions, but advisors helped guide them through a required process of identifying their financial goals and selecting an appropriate portfolio objective.

58.     Edward Jones employed the same tactics in coercing existing clients to move their assets from commission-based accounts to Guided Solutions as had been used with Advisory Solutions. As a result, "[t]he launch of Guided Solutions in the second quarter of 2016 contributed to the increase in the average advisory programs' assets under care, the majority of

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF
FIDUCIARY DUTY

1   which came from existing client assets."  Form 10-K for fiscal year ending December 31, 2016,

2   filed on March 15, 2017 ("2016 Form 10-K").

3        59.    Guided Solutions allowed clients to choose from an extensive list of mutual funds

4   which were "Eligible Investments" pre-selected by Edward Jones. Edward Jones had a financial

5   incentive to include certain funds as "Eligible Investments" because it directly benefitted from the

6   fund families owned by Edward Jones as well as the fund families from which Edward Jones

7   received compensation under revenue-sharing agreements. In addition, Edward Jones retained the

8   option to automatically invest Guided Solutions client funds not yet specifically invested by the

9   client into one if its proprietary funds, the Edward Jones Money Market Fund, from which it

10  received additional asset-based fee revenue. Edward Jones never fully disclosed these financial

11  benefits to clients.

12       60.    On April 6, 2016, the DOL issued the final version of the DOL Fiduciary Rule.

13  Just days later, on April 8, 2016, Defendant Weddle said that the Company hoped to have 20,000

14  brokers spread across its franchises of mostly one-broker offices by 2022. The caveat, as Edward

15  Jones would indicate that summer, was that the company was implementing policies and

16  procedures essentially preventing advisors from selling mutual funds on commission after the

17  DOL Fiduciary Rule took effect.

18       61.    Edward Jones formally disclosed its plan to respond to the DOL Fiduciary Rule on

19  August 17, 2016, as reported by the St. Louis Post-Dispatch. Instead of simply providing more

20  clear disclosures to its commission-based clients, those clients with more than $100,000 invested

21  could keep paying commissions for each trade of stocks and bonds and the purchase of variable

22  annuities, or they could go commission-free and pay a level fee based on their account size.

23  Commission-based clients with less than $100,000 would be put into fee-based accounts, and the

24  Company would stop accepting accounts of less than $5,000. The commission-based accounts

25  that existed before April 2016 that would be "grandfathered" could continue to exist so long as no

26  new money was placed into the account.

27       62.    Although Edward Jones' plan was not in the best interest of its clients, it was able

28  to shift the blame for these changes to the DOL Fiduciary Rule. On August 17, 2016, Defendant

1   Weddle even commented to the WSJ that the DOL Fiduciary Rule would negatively affect

2   Edward Jones revenue.  So even though the Company had already begun shifting to a fee-based

3   model in 2008, it was able to more aggressively do so in 2016 under the guise of complying with

4   the DOL Fiduciary Rule.

5        63.    Later that month, Edward Jones said that in further response to the DOL Fiduciary

6   Rule, it would "stop offering its clients mutual funds (and ETFs) ["Exchange Traded Funds"] for

7   commission-based retirement accounts" even though doing so "all but force[d] those investors

8   into asset-based fee accounts, which will mean higher costs for many of the firm's investors." Nir

9   Kaissar, *Edward Jones Really Likes Those Fees*, Bloomberg LP, Aug. 23, 2016 ("Bloomberg

10  Article"). As the Bloomberg Article pointed out, Edward Jones must have known "that the

11  average investor's account [wa]s too small to properly diversify one stock and bond at a time"

12  and that it did not have to take away mutual funds and ETFs to comply with the DOL Fiduciary

13  Rule because "[t]here are plenty of mutual funds and ETFs that don't pay brokers to sell their

14  funds. Many of them are low cost funds that are perfectly aligned with investors' best interests,

15  and there's no good reason why those funds couldn't be available to commission-based accounts

16  at Edward Jones." Since the DOL Fiduciary Rule was not "breaking new ground so much as

17  finally dragging brokers into the modern era," "traditional brokers" like Edward Jones were

18  "kidding themselves if they think they can stick it to investors and then blame regulators for the

19  gouging."

20       64.    Yet, in its quarterly financial disclosure on November 10, 2016, Edward Jones

21  continued to cloak its reverse churning scheme under the guise of avoiding the impending DOL

22  Fiduciary Rule's stringent requirements, which it claimed could "materially" damage its bottom

23  line.  Rather than simply providing its clients with the additional disclosures required by the DOL

24  Fiduciary Rule, Edward Jones declared that ***"[i]mplementation of the rule will require changes***

25  ***in the manner in which the Partnership serves clients with retirement accounts,*** which is a

26  substantial portion of the Partnership's business."  Even though Edward Jones was already

27  offering fee-based accounts the company announced that "[t]he Partnership plans to offer fee-

28  based solutions to retirement accounts and also intends to offer the so-called Best Interest

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF
FIDUCIARY DUTY

Contract Exemption with limited transaction-based product offerings to retirement accounts meeting certain account minimums." Without disclosing how much more revenue could be generated from fee based accounts, Edward Jones added that "[a]s the Partnership implements the rule, to the extent clients choose a higher percentage of fee-based solutions than historical practices or with not all products and services traditionally provided available in the future for transaction-based retirement accounts, the Partnership likely will experience a decrease in transaction-based revenue, net revenue, net income before allocations to partners and liquidity, which could be significant."

65.     In order to continue to grow its bottom line, which had flattened before it began moving to a fee-based model, Edward Jones clearly intended to – and did – compel clients into a fee-based Advisory Program, regardless of whether such a move was suitable for and served the best interests of the clients.

66.     As a result, Edward Jones substantially increased the client assets managed in its Advisory Programs every year since the introduction of its proprietary mutual fund family Bridge Builder, in 2013. The assets in the Advisory Programs' care have nearly tripled from $101 billion in 2013 to $265 billion in 2017. Only by taking advantage of trusting clients who it was pushing into these more usurious fee-based arrangements – even disclosing in its Forms 10-K for fiscal years ending December 31, 2014, 2015, 2016, and 2017 that the annual increases were primarily driven by the relocation of client assets from commission-based accounts – was Edward Jones able to tout rapid growth within this segment of its business:



67.     The above graph demonstrates how Edward Jones funneled existing client assets into Advisory Programs from commission-based accounts. The blue portions of the graphs show how the majority of the increase in assets managed by Advisory Solutions came from existing accounts, while the smaller green portions reflect the relative paucity of new clients Edward Jones was able to bamboozle into the same arrangement. The blurred blue-green portions for 2013, 2016, and 2017 reflect the Company's general disclosure that the majority of the asset increase came from existing clients. In 2014 and 2015, the years for which the Company provided specific numerical data, Edward Jones preyed on the assets of existing clients versus new clients at high rates of 2:1 and 4:1, respectively.

68.     And while Edward Jones' clients lost their hard-earned savings to these asset-based fees, advisors complicit in the scheme alleged herein were rewarded with handsome pay increases. As Edward Jones touted in its Form 10-K for fiscal year ended December 31, 2014, filed on March 27, 2015, "Financial advisor compensation increased 9% ($178 million) in 2014 primarily due to increases in asset-based fee and trade revenues on which financial advisor commissions are based." Not only did Edward Jones improperly incentivize its advisors to violate their fiduciary duties and rack up asset-based fee revenue for the Company through its compensation program, but it also terminated, gave smaller raises and bonuses to, and/or failed to promote advisors who disagreed with the Company's strategy and kept their clients in commission-based accounts.

69.     Thus, rather than applying the DOL Fiduciary Rule such that its clients' interests were put first, Edward Jones took the opportunity to line its own pockets with its clients' assets. Defendant Pennington in an interview published on May 23, 2018, in the *St. Louis Post-Dispatch* even referred to Edward Jones' response to the DOL Fiduciary Rule as an "opportunity to react" that the Company took full advantage of.

### 1. The Prohibition Against Reverse Churning

70.     Reverse churning is the practice of a financial advisor placing a client's funds into a fee-based account for no reason other than to collect the fee. These fee-based accounts require the client to pay a regular, fixed fee to the advisor, but the client often receives very little actual advice, trading, or account activity in exchange. Therefore, the advisory firm generates more revenue at the expense of the client who does not receive any cognizable benefit. Because Edward Jones compelled clients who typically had little to no trades to move from their commission-based accounts to a fee-based Advisory Program, it engaged in reverse churning.

71.     The practice of reverse churning violates the federal securities laws.  In *Geman v. SEC*, 334 F.3d 1183 (10th Cir. 2003), a registered broker-dealer and investment adviser offered a wrap fee program to its customers. Initially, the firm did not recommend particular securities; the firm contracted with portfolio managers to provide the advice component. In its promotional material, the firm expressly undertook fiduciary responsibilities to its customers. After the firm distributed its promotional materials, it decided to change its business model to further its profits. Instead of acting solely as an agent, it began to act as a principal, buying from or selling to its customers. The firm disclosed the change to clients' accounts in a letter to its clients, but only referred to new regulatory interpretations and improvements to the firm's technological capabilities as a justification for the change. The firm omitted any reference to its primary motivation, which was to profit from the change in clients' accounts.[1] In upholding the SEC's enforcement action against Geman, the Tenth Circuit held that the firm violated its fiduciary

---

[1] "The purported reasons for the decision, changes in regulations and in technology, were not actually factors in the decision at all. The firm failed to disclose that the primary motivation was to earn profits, and misleadingly represented that its fees would not be affected." *Id.* at 1188-89.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

duties to its clients in its omission of the fact that the firm's primary motive was to earn profits in changing its clients' accounts. *Id.* at 1189-90. The Court was not persuaded by Geman's argument that the new accounts were not detrimental to the client because, although some clients may not have been negatively impacted, the clients were effectively denied their ability to make choices "had they been fully and properly informed," and thus "the firm deprived its customers of the opportunity to obtain for themselves the more favorable prices that the firm was realizing in two-thirds of its principal trades." *Id.* at 1190. The Court further held that Geman's conduct violated the 1934 Act, including 15 U.S.C. § 78j, and Rule 10b-5 thereunder. *Id.* at 1191-92. In sum, the *Geman* case established that a firm acting as a fiduciary violates the federal securities laws when it changes its clients' accounts in order to financially benefit the firm at the expense of its clients, and omits material information while doing so.

72. The Financial Industry Regulatory Authority ("FINRA") the regulatory body charges with governing business between brokers like Edward Jones, dealers, and the investing public, formally adopted a rule to regulate against reverse churning on July 9, 2012. This rule, Rule 2111 – Suitability, created a duty to ensure that fee-based accounts are only recommended to those clients for whom they are suitable; as such accounts tend to be more expensive for clients who engage in little to no trading activity.

73. In its most recent annual Regulatory and Examination Priorities Letter, published January 8, 2018, FINRA declared that it "will continue to assess the adequacy of firms' controls to meet their suitability obligations," particularly "to unsophisticated, vulnerable investors." In addition, FINRA confirmed its focus on "situations in which registered representatives recommend a switch from a brokerage account to an investment adviser account where that switch clearly disadvantages the customer," such as "where the registered representative recommended that the customer purchase a securities product subject to a front-end sales charge in a brokerage account and then shortly thereafter recommended that account be transferred to a fee-based account."

74. Indeed, the "Fee-Based Account Questions & Answers" section of FINRA's website explains that because "customer accounts with low trading activity might be better suited

for a commission-based arrangement," the onus is on firms like Edward Jones to "take those steps necessary to assess whether a fee-based account is appropriate for a particular customer and to periodically update this assessment." Such steps include having "reasonable grounds to conclude that a fee-based account is appropriate" and training "brokers with respect to the features of fee based-accounts and the need to assess whether a fee-based account is appropriate for a customer."

75.     The SEC has also had reverse churning on its radar. In an October 22, 2013 speech focusing on significant compliance issues identified in the financial industry, SEC Chair Mary Jo White announced that a Risk Analysis Examination had identified "problematic behavior" which included "inadequate supervision of reverse churning, a practice where a client who trades infrequently is placed in a fee-based account."

76.     Andrew J. Bowden, Director, SEC Office of Compliance Inspections and Examinations, reiterated the dangers of fee-based accounts and reverse churning in a speech on March 6, 2014.  He specifically stated: "Suffice it to say the move into fee-based wrap accounts is a widespread practice. A lot of people have jumped into the pool. We fear that the rationalization that 'everyone is doing it' may be adversely affecting peoples' thinking about how some of these arrangements are in the best interest of their clients."

77.     Then, in its January 2015 annual priority list for examinations, the SEC Office of Compliance Inspections and Examinations, under the subheading of "Protecting Retail Investors and Investors Saving for Retirement" listed "Fee Selection and Reverse Churning" as an area for examination, providing:

> Unlike broker-dealers, which typically charge investors a commission or mark-up on purchases and sales of securities, investment advisers employ a variety of fee structures for the services offered to clients, including fees based on assets under management, hourly fees, performance-based fees, wrap fees, and unified fees. Where an adviser offers a variety of fee arrangements, we will focus on recommendations of account types and whether they are in the best interest of the client at the inception of the arrangement and thereafter, including fees charged, services provided, and disclosures made about such relationships.

78.     The SEC kept "Fee Selection and Reverse Churning" as a priority in 2016 and added "Wrap Fee Programs" as a priority in 2017 and 2018, which meant that it would "review

whether investment advisers are acting in a manner consistent with their fiduciary duty and whether they are meeting their contractual obligations to clients."

79.     Furthermore, the current SEC Guide to Broker-Dealer Registration makes clear that "[b]roker-dealers generally have an obligation to recommend only those specific investments or overall investment strategies that are suitable for their customers. The concept of suitability appears in specific [self-regulatory organization] rules such as [National Association of Securities Dealers] Rule 2310 and has been interpreted as an obligation under the antifraud provisions of the federal securities laws." While Rule 2310 was superseded by FINRA Rule 2111, broker-dealers are still bound to making a suitability determination under the latter rule.

80.     A September/October 2017 report by the Investments & Wealth Institute, the leading provider of advanced education for investment and wealth management professionals, entitled "Best Practices Arising from the DOL Fiduciary Rule," under the section "Best Practice: Establish Procedures to Prevent Reverse Churning," provided that "transitioning a client from a commission-based to a fee-based arrangement may not be appropriate in all cases. If the investments in an IRA, for example, have been largely static and require little oversight, it may be in the client's best interest if the assets remain in the current commission arrangement rather than shifting to a higher cost level-fee arrangement." Lead Plaintiffs and Class Members are precisely the type of clients whose assets should have remained in commission-based accounts.

81.     While the proposed DOL Fiduciary Rule, which imposed stricter requirements governing disclosures and fiduciary status on commission-based accounts was vacated on June 21, 2018 by the Fifth Circuit Court of Appeals in *Chambers of Commerce of the USA, et al., v. U.S. Department of Labor, et al.,* Case No. 17-10238 (5th Cir. 2018), no other investment company interpreted the Rule as requiring investors to be in fee-based accounts, or as changing the prohibition on reverse churning.

### 2. Edward Jones' Preference for Proprietary Funds

82.     Edward Jones launched its first proprietary mutual fund, Bridge Builder, in 2013 with one core fund and then in 2015 added two other fixed-income funds and five equity funds. The Bridge Builder family was, and is, exclusively available through Advisory Solutions. During

29

1   the Class Period, the Bridge Builder family included, but was not limited to, Bridge Builder Core

2   Bond, Bridge Builder Core Plus Bond, Bridge Builder INTL Equity, Bridge Builder Large

3   Growth, Bridge Builder Large Value, and Bridge Builder Smallmid Growth.

4       83.   Bridge Builder was, and is, managed by Olive Street, a wholly owned subsidiary

5   of Edward Jones.

6       84.   Clients who invested in Bridge Builder not only paid the standard fee for Advisory

7   Solutions – 1.35% to 1.50% of the client's assets – but they also paid underlying expenses for the

8   Bridge Builder fund(s) they invested in. Thus, those clients' standard fee reached as high as 2%.

9   In addition, Advisory Solutions charged an administrative fee of nine basis points (0.09%) and

10  the managers who sub-advised Bridge Builder charged a fee of 60 to 70 basis points (0.6 – 0.7%).

11  To top it off, Olive Street charged another fee based on the percentage of assets under

12  management.

13      85.   Because Olive Street is a wholly owned subsidiary of Edward Jones, Defendants

14  directly financially benefitted from funneling clients into Bridge Builder.

15      86.   According to fund tracker Morningstar Inc., Edward Jones saw $15.6 billion of net

16  flows into Bridge Builder in 2015 – the fourth-largest in the industry that year. The amount of

17  inflows into Bridge Builder was higher than "household name" funds such as BlackRock Inc.,

18  Fidelity Investments and American Funds.

19      87.   Since Bridge Builder was a relatively new family of mutual funds, analysts who

20  followed investment companies were baffled by its success. Particularly because in 2015, a

21  majority of the Bridge Builder family was not even in existence for the full year. Therefore,

22  financial advisors lacked historical returns data crucial to making a suitability determination.

23      88.   A mutual fund family's historical return is one of the essential data-points used to

24  determine whether to invest in that fund family. The historical performance gives investors

25  insight into how the fund will perform in good times (i.e., the bull market starting in or around

26  2009) and bad times (such as the Great Recession). Such an analysis is particularly important for

27  Edward Jones' mutual fund families, given its "buy-and-hold" model and its clients' typically

28

long-term investment in these funds. Despite lacking historical returns data, financial advisors and Edward Jones continued to funnel client assets into Bridge Builder.

89.     What investment insiders did not know was that Edward Jones was pushing existing clients into Advisory Solutions and then inappropriately investing a substantial amount of their assets into Bridge Builder. At the same time, what those clients – including Lead Plaintiffs – did not know was that Edward Jones had competing interests based on the additional fees it would receive and was incentivizing its advisors to make the self-interested investment decision of investing their clients' assets in Bridge Builder.

90.     Defendants received an extra financial boost by investing clients' assets in Bridge Builder – on top of the asset-based fees they received from clients after moving their accounts into Advisory Solutions. Yet all that was publicly disclosed was that "[a]sset-based fee revenue also increased in 2016 due to an increase in Olive Street fees" in Edward Jones' 2016 Form 10-K. Not until April 10, 2017 did Edward Jones disclose the fees associated with Bridge Builder in its Advisory Solutions brochures.

91.     Edward Jones not only generated more revenue by moving commission-based clients into a fee-based Advisory Program but doing so allowed it to circumvent the disclosure requirements of the pending DOL Fiduciary Rule and hide the promotional payments it received when clients invested in certain mutual funds.  Historically, a significant portion of Edward Jones' revenue came from revenue sharing arrangements with its Preferred Partner mutual fund families. Since the DOL Fiduciary Rule would have required Edward Jones to be more forthright with commission-based clients about these revenue sharing arrangements, transitioning to a fee-based business model allowed the Company to continue to receive such promotional payments without making adequate disclosures to its clients and not worry about coming under governmental and regulatory scrutiny for its lack of transparency.

**C. Edward Jones' Higher-than-Industry-Standard Fees**

92.     In order to generate more revenue, Edward Jones reverse churned the assets of Lead Plaintiffs and members of the Class based on the Company's policies and procedures, causing their assets to be transferred into an Advisory Program even though such a move was not

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

1   in their best interest because they engaged in minimal trading.  Adding insult to injury, Edward

2   Jones charged clients in its Advisory Programs some of the highest wrap fees in the industry –

3   1.35% to 1.50% of a client's assets.

4        93.    A research report by Advisory HQ found that the average financial advisor fees

5   and costs for 2017-2018 was 1.12% of assets under management for clients with more than

6   $100,000 in investments. Similarly, a Bloomberg's Investor Guide to Fees and Expenses report

7   from 2014 shows that clients with "more than $100,000 in investment accounts pay less than

8   1.12%" annually (on average) in management fees.  A reasonable fee for money management by

9   online advisors is even lower – about 0.25% to 0.30% of assets.

10       94.    Edward Jones' higher–than–industry-standard wrap fee, forced upon members of

11  the Class, caused significant economic damage. The DOL, in its publication "A Look at 401(k)

12  Plan Fees," illustrates the long-term impact of investing fees this way:

> Assume that you are an employee with 35 years until retirement and a current
> 401(k) account balance of $25,000. If returns on investments in your account over
> the next 35 years average 7 percent and fees and expenses reduce your average
> returns by 0.5 percent, your account balance will grow to $227,000 at retirement,
> even if there are no further contributions to your account. If fees and expenses are
> 1.5 percent, however, your account balance will grow to only $163,000. The 1
> percent difference in fees and expenses would reduce your account balance at
> retirement by 28 percent.

18       95.    In addition to being charged some of the highest wrap fees in the industry, Lead

19  Plaintiffs and other members of the Class who remained invested in the same mutual fund family

20  after moving into Advisory Solutions still paid the transaction fees specifically related to that

21  fund family.

22       96.    Historically, Edward Jones, via its Compliance Division, required commission-

23  based clients to be invested in class A share mutual funds offered by one of its preferred partners.

24  Class A shares are front-end loaded, so they charge a higher upfront transaction fee than other

25  classes of funds. However, these funds also tend to have lower fees over time, making them

26  beneficial for investors who plan on holding onto funds for several years.  Edward Jones'

27  preference for class A share mutual funds thus made sense according to its historical buy-and-

28  hold investing strategy.

97.     Class members whose assets were reinvested into the same preferred partner mutual fund families paid fees for those mutual funds a second time, on top of the annual advisory fee, when their accounts were moved into an Advisory Program. Those Class Members not only paid more in unnecessary and unjustifiable fees when their assets were reinvested but they lost the benefit of having already paid for the class A shares that they had been invested in. Moreover, they had to pay the annual advisory fee every year even if they did nothing but hold onto their investments.

98.     In liquidating certain Class Members' commission-based accounts to move their assets into fee-based accounts, Edward Jones sold their entire interest in class A share mutual funds despite having only recently bought the funds and not yet reaping the full benefit of their initial front-end cost. This is one factor, among many, that Edward Jones should have considered in analyzing the suitability of moving clients from commission-based to fee-based accounts. But Edward Jones did not do so.  Rather, the Company systematically failed to conduct adequate suitability reviews in its corporate-wide effort to compel clients into a fee-based Advisory Program, even when such a move was unsuitable for – and did not serve the best interests of – the clients.

99.     Edward Jones invested the assets of a large number of Class Members in Advisory Solutions, thereby allowing it to invest those assets in its proprietary mutual fund family: Bridge Builder. As a result of compelling those Class Members to invest in Bridge Builder, Edward Jones was able to generate two revenue streams from those Class Members – the Advisory Program's annual wrap fee and the Bridge Builder mutual fund and transaction fees.

100.    Because of the annual wrap fee, investing in the Bridge Builder funds cost Class Members more than if they had simply purchased class A shares in any other mutual fund. The one-time, upfront fees charged for class A shares in any other mutual fund would be spread out over the time that those shares were held, saving buy-and-hold clients' money over time. In contrast, Class Members whose assets were invested in Bridge Builder had to pay the annual fee for Advisory Solutions every year those shares were held, costing them more money over time.

101.    As demonstrated in the below graph of a hypothetical portfolio invested in typical Edward Jones' Preferred Partners' mutual funds, moving assets from a commission-based account into a fee-based Advisory Account in 2015 materially decreased how much the portfolio could have grown. Investing assets in Edward Jones' proprietary Bridge Builder Mutual Funds only decreased how much the portfolio could have grown even more because of the additional fees:



102.    This hypothetical portfolio begins with an investment of $68,516.87 in 2008. Keeping the assets in a commission-based account without a wrap fee would lead the assets to grow to approximately $227,199.39 in 2020. Conversely, moving those same assets into an Advisory Account with a wrap fee in 2015 would lead the assets to only grow to $208,076.77, and if those assets were also invested in Bridge Builder Mutual Funds, the growth would be even less – $203,241.44. Accordingly, under this scenario, an Edward Jones client moved into a fee-based Advisory Account would gain $19,122.62 less in their value after only 6 years with the

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

wrap fee and gain $23,957.96 less in value if the client was also invested in Bridge Builder Mutual Funds.

103.    Being invested in an Edward Jones preferred partner mutual fund and/or a Bridge Builder mutual fund, therefore, caused significant damage to Lead Plaintiffs and members of the Class – who had already incurred losses from being improperly reverse churned by Edward Jones.

## V.    DEFENDANTS' MATERIAL OMISSIONS

104.    During the Class Period, Edward Jones financial advisors – at the Company's behest– invited clients with commission-based accounts, including Lead Plaintiffs and other Class members, into their respective branch offices to introduce them to fee-based Advisory Programs. In touting the benefits of fee-based programs during the subsequent in-person meeting, the advisors uniformly omitted material information to Lead Plaintiffs and other Class Members to coerce them to sign paperwork moving their commission-based accounts into a fee-based Advisory Program.

105.    After the in-person meeting (and follow-up phone or in-person conversations in some situations), the advisors provided Lead Plaintiffs and other Class members with a Fund Account Authorization and Agreement Form ("Agreement") for them to sign to move their accounts into an Advisory Program. Lead Plaintiffs and other Class members were especially susceptible to coercion based on the material omissions alleged herein due to the personal relationship Edward Jones' advisors strove to develop with their clients as part of the Company's historical business model. Defendants' material omissions caused Lead Plaintiffs and other Class members to sign the Agreement without full knowledge of adverse material facts regarding Advisory Programs.

106.    The Agreement – the only document that Lead Plaintiffs and other Class members signed to move their commission-based accounts into a fee-based Advisory Program – omitted the following material information:

- Edward Jones had not conducted a sufficient analysis to determine the suitability of a fee-based Advisory Program for its commission-based clients;

- An Advisory Program would result in a higher fee to its formerly commission-based clients;

- An Advisory Program would financially benefit Edward Jones at the expense of its clients; and

- Edward Jones was incentivizing its financial advisors by promoting, giving pay raises and/or bonuses to, and/or not terminating advisors who moved their clients with commission-based accounts to an Advisory Program, even when it was not in their clients' best interest.

107.    The Agreement stated that Lead Plaintiffs and other Class members were furnished several other documents regarding the movement of their accounts into an Advisory Program. Those additional documents, namely the Fund Models Brochure, the Account Client Services Agreement, the Schedule of Fees, and the Client Profile, omitted the same material information as the Agreement:

- That Edward Jones had not conducted a sufficient analysis to determine the suitability of a fee-based Advisory Program for its commission-based clients;

- That an Advisory Program would result in a higher fee to its formerly commission-based clients;

- That an Advisory Program would financially benefit Edward Jones at the expense of its clients; and

- That Edward Jones was incentivizing its financial advisors by promoting, giving pay raises and/or bonuses to, and/or not terminating advisors who moved their clients with commission-based accounts to an Advisory Program, even when it was not in their clients' best interest.

108.    In addition to the Agreement and the other documents allegedly furnished to Lead Plaintiffs and members of the Class, Edward Jones advisors presented them with a brochure entitled "Making Good Choices" as part of the effort to coerce them to move their assets from commission-based accounts into a fee-based Advisory Program. The brochure, which purports to be Edward Jones' "Investment Policy Guidance Report," was presented to Class Members as a disclosure of the "options" that the client had and provided broad and esoteric descriptions of the types of accounts at Edward Jones. However, in describing the Advisory Programs, the "Making Good Choices" brochure omitted the same information as the Agreement:

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

- That Edward Jones had not conducted a sufficient analysis to determine the suitability of an Advisory Program for its clients;

- That an Advisory Program would result in a higher fee to its formerly commission-based clients;

- That an Advisory Program would financially benefit Edward Jones at the expense of its clients; and

- That Edward Jones was incentivizing its financial advisors by promoting, giving pay raises and/or bonuses to, and/or not terminating advisors who moved their clients with commission-based accounts to an Advisory Program, even when it was not in their clients' best interest.

109.   Furthermore, Edward Jones advisors were trained to use various sales tactics and strategies to specifically omit the aforementioned material information in their presentation of the "Making Good Choices" brochure in order to compel clients with commission-based accounts to move their assets into fee-based Advisory Programs.

110.   Edward Jones financial advisors also omitted material information when they took it upon themselves to explain the impact of the DOL Fiduciary Rule to Lead Plaintiffs and other Class members on behalf of Edward Jones. As Defendant Weddle stated in an August 17, 2016 WSJ article titled "Edward Jones Shakes Up Retirement Offerings Ahead of Fiduciary Rule," Edward Jones' "clientele, by and large, is not aware of the rule, the impact or the changes that will be necessary or the changes they will need to make to align, [] Our job, and we embrace this, is reaching out to them with an understanding some of them will need to change."

111.   Most notably, Edward Jones financial advisors omitted the material fact that the DOL Fiduciary Rule did not require them to move their clients with commission-based accounts to a fee-based Advisory Program. Rather, this "requirement" originated with Edward Jones itself. Edward Jones was aware but failed to disclose to Lead Plaintiffs and other Class Members, that the DOL Fiduciary Rule specifically allowed commission-based accounts under its Best Interest Contract exemption.

112.   In addition, in the process of moving Lead Plaintiffs and other Class Members into fee-based Advisory Programs, Edward Jones financial advisors failed to disclose the following material information:

37

- An accurate description of the material differences between their clients' commission-based accounts and the fee-based accounts in Advisory Programs;

- An accurate description of the fees charged by Advisory Programs;

- The cost and impact of the fees charged by Advisory Programs;

- That Bridge Builder is owned by, and financially benefits, Edward Jones, at the expense of its clients;

- That Edward Jones had not conducted a sufficient analysis to determine the suitability of a fee-based Advisory Program for its commission-based clients;

- That an Advisory Program would result in a higher fee to its formerly commission-based clients;

- That an Advisory Program would financially benefit Edward Jones at the expense of its clients; and

- That Edward Jones was incentivizing its financial advisors by promoting, giving pay raises and/or bonuses to, and/or not terminating advisors who moved their clients with commission-based accounts to an Advisory Program, even when it was not in their clients' best interest.

113.    While paying lip service to Edward Jones Code of Ethics – established "to ensure that our associates . . . place your and all of our clients' interest first . . . [and] comply with all applicable rules, regulations, and laws" – Defendants failed to disclose that they were incentivizing advisors to violate the Code of Ethics by promoting, giving pay raises and/or bonuses to, and/or not terminating advisors who inappropriately moved their clients with commission-based accounts to a fee-based Advisory Program, even when doing so was not in their clients' best interest.

114.    The material omissions alleged *herein* functioned to more quickly and with fewer objections compel Class members to fee-based accounts in accordance with the policies and procedures Edward Jones implemented in response to the DOL Fiduciary Rule.

## VI.    DEFENDANTS' SCIENTER

### A. Defendant's Extensive Involvement in Alleged Scheme as Senior Headers at Edward Jones

115.     The following chart illustrates the relevant upper management of Edward Jones structure and how involved the Individual Defendants' were in all aspects of the company's central planning and decision-making, including the policies and procedures which pushed financial advisors to have their commission-based clients' assets transferred to fee-based accounts:



116.     Defendant Weddle served as Edward Jones' managing partner throughout the Class Period and had the following responsibilities during that time, according to Edward Jones' 2017 Form 10-K:

> Under the terms of the Partnership Agreement, the Managing Partner has primary responsibility for ***administering the Partnership's business, determining its policies, and controlling the management and conduct of the Partnership's***

39

*business*. Under the terms of the Partnership Agreement, the Managing Partner's powers include, without limitation, the power to admit and dismiss general partners and the power to adjust the proportion of their respective interests in the Partnership…The Partnership's operating subsidiaries are managed by JFC, under the leadership of the Managing Partner, pursuant to services agreements.

### 1. Edward Jones' Executive Committee

117.   Defendants Weddle, Bastien, Cella, Ferrari, Pennington, Timm were Executive Committee members throughout the Class Period.

118.   Defendant Campbell was an Executive Committee member during the Class Period up to and until he retired on December 31, 2014. Defendant Eaker was an Executive Committee member during the Class Period up to and until he retired on December 31, 2016. Defendant Kirley was an Executive Committee member during the Class Period up to and until he retired on June 1, 2018. Defendant Tricarico was an Executive Committee member during the Class Period up to and until he retired on December 31, 2017.

119.   The Executive Committee had the following responsibilities during the Class Period, according to Edward Jones' 2017 Form 10-K:

> The Executive Committee consists of the Managing Partner and five to nine additional general partners appointed by the Managing Partner, with the specific number determined by the Managing Partner. Under the terms of the Partnership Agreement, the members of the Executive Committee are the executive officers of the Partnership. The purpose of the Executive Committee is to provide counsel and advice to the Managing Partner in discharging his functions, including the consideration of ownership of Partnership capital, ***ensuring the Partnership's business risks are managed appropriately and helping to establish the strategic direction of the Partnership***. In addition, the Executive Committee takes an ***active role in identifying, measuring and controlling the risks to which the Partnership is subject***.

120.   Through their day-to-day involvement in developing, implementing, overseeing, and/or approving the strategic direction of the Company on the Executive Committee, Defendants Weddle and Pennington knew of and/or consciously disregarded the material omissions alleged herein.

### 2. Edward Jones' Investment Policy Committee

121.   Defendants Weddle and Pennington were Executive Committee Sponsors on the Investment Policy Committee during the Class Period.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

122.     The Investment Policy Committee had the following responsibilities during the Class Period, according to Edward Jones' 2017 Form 10-K:

> The Partnership has an Investment Policy Committee ("IPC") which serves as a **steward of the Partnership's investment philosophy** and **develops and aligns the advice and guidance necessary** to help clients meet their financial goals ("IPC Guidance"). Such **IPC guidance is primarily related to investments and solutions and how they are incorporated into portfolios** and tailored to meet clients' needs.

123.     As Edward Jones explains on its website to its clients, "[w]hen you and your financial advisor develop your investment strategy together, you have the expertise of Edward Jones behind you. A significant part of this expertise is **the Edward Jones Investment Policy Committee (IPC)**, who **develops the firm's investment guidance**. **This guidance is integrated into the tools, systems and materials that your financial advisor uses** to help you move closer toward meeting your financial goals. When you invest with Edward Jones, your financial advisor tailors this overarching investment guidance to your individual goals and personal situation."

124.     Many of the documents that Class Members received to convince them to move their assets from commission-based accounts into a fee-based Advisory Program originated with the Investment Policy Committee, including the "Making Good Choices" brochure. These documents represent that they are an "Investment Policy Guidance Report," for the company's financial advisors to show their clients.  Defendants Weddle and Pennington, through their day-to-day involvement in developing, implementing, overseeing, and/or approving investment policy on the Investment Policy Committee, knew of and/or consciously disregarded the material omissions alleged herein.

### 3.   Edward Jones' Management Committee

125.     Defendants Bastien, Cella, Ferrari, Pennington, Timm, and Link were members of the Management Committee throughout the Class Period. Defendants Eaker, Kirley, Tricarico, and Cavness were on the Management Committee during the Class Period up to and until they retired. The Management Committee had the following responsibilities during the Class Period, according to Edward Jones' 2017 Form 10-K:

> The Management Committee consists of up to 25 general partners appointed by the Managing Partner, with the specific number determined by the Managing Partner, and includes the members of the Executive Committee. As of February 23, 2018,

41

the Management Committee consisted of 19 general partners. The Management Committee is generally comprised of general partners with ***overall responsibility for a significant or critical functional division or area*** of the Partnership's operating subsidiaries. The Management Committee meets weekly, is operational in nature, and is ***responsible for identifying, developing and accomplishing the Partnership's objectives*** through, among other means, sharing information across divisions and identifying and resolving risk management issues for the Partnership.

126. Defendants Bastien, Cella, Ferrari, Pennington, Timm, Eaker, Kirley, Tricarico, Link, and Cavness – through their day-to-day involvement in identifying, developing, and accomplishing Edward Jones' objective of moving Class members' assets into fee-based accounts – knew of or consciously disregarded the material omissions alleged herein.

127. Divisions relevant to the scheme alleged herein include the Client Strategies Group Division, the Compliance Division, the Branch and Region Development Division, the Investment Advisory Division, the Operations Division, and the Marketing Division. All these divisions, based out of Edward Jones's headquarters in St. Louis, Missouri or Tempe, Arizona, assisted in the creation and/or dissemination of the materials containing the alleged missions and/or the devising and/or implementation of the alleged reverse churning scheme.

### 4. Edward Jones' Client Strategies Group Division

128. According to Edward Jones' Form 10-Ks during the Class Period, its Client Strategies Group Division "encompasses all of the Partnership's advice and guidance, products and services, marketing, and branch support related to helping clients achieve their financial goals." In addition, Edward Jones describes on its website the role of Client Strategies associates to its financial advisors ("Financial Advisors") as "packag[ing] and deliver[ing] the firm's advice and guidance to help you guide your clients toward meeting their financial goals. Their tools and advice help you understand each client's individual needs so you can provide them with the best service."

129. One of the teams within the Client Strategies Group directly responsible for hastening the Company's transition of clients into fee-based Advisory Solutions accounts was Solutions, led by Kevin Alm, an Edward Jones principal. Kevin Alm reported to Defendant Campbell and Defendant Pennington during their tenures overseeing the Client Strategies Group Division. Edward Jones explicitly describes Solutions on the company website as "a team within

42

the Client Strategies Group that helps accelerate the Solutions-based approach and deliver the Edward Jones client experience. The team integrates the firm's advice and guidance, products and services, tools, training and field support to make it easier for branch teams to deliver tailored solutions to clients."

130.    Defendant Campbell oversaw the Client Strategies Group Division during the Class Period, prior to his retirement. Then, in September 2014, Defendant Penny Pennington assumed responsibility of the Client Strategies Group Division. Through their day-to-day involvement in leading the Client Strategies Group's interactions with Financial Advisors and branch teams, including informing Financial Advisors of the new policy of wholesale switching clients into fee-based accounts and changing the computer system and compensation program in order to pressure Financial Advisors to do so, Defendants Campbell and Pennington knew of and/or consciously disregarded the material omissions alleged herein.

### 5.  Edward Jones' Compliance Division

131.    According to Edward Jones' Form 10-Ks during the Class Period, its Compliance Division "monitor[s] day-to-day operations to determine compliance with applicable laws, rules and regulations." Edward Jones describes its Compliance Division online as follows:

> The Compliance division ***continuously evaluates, recommends and revises system, structure and process change*** necessary to prepare for the firm's 2020 Vision and ensure our client communications are transparent, accessible and easy to understand. The area also will play an integral role in ***ensuring compliance with new industry regulations and as the firm adopts new products*** and continues our evolution to solutions-based advice

132.    Edward Jones further explains the role of Compliance associates to its Financial Advisors on its website under "Headquarters Support" as:

> Ours is a highly regulated and often-changing industry. That's why we provide you access to a team of ***dedicated Compliance associates who handle the majority of your compliance and legal responsibilities***, freeing you up to spend more time advising clients and building a business. Our Field Supervision department supervises our branch offices to ensure compliance with industry regulations and that we serve our clients' best interests.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

133.   The Compliance Division's departments which relate to the fraud alleged herein include Branch Audit, Compliance Development, Compliance Resolution, Compliance Service, Field Supervision, HQ Compliance, Office of Regulatory Counsel, and Registration.

134.   Defendant Link has been the Chief Compliance Officer, responsible for the overall performance of the Compliance division, since January 2016. Defendant Cavness was the Chief Compliance Officer from 1987 to 2015. Defendant Tricarico oversaw the Compliance Division during the Class Period, prior to his retirement.

135.   Defendants Link, Cavness, and Tricarico, through their day-to-day involvement in evaluating, recommending, and revising compliance systems, and interacting directly with branch offices and Financial Advisors  regarding compliance with industry regulations and Edward Jones' policies and products, knew of and/or consciously disregarded the material omissions alleged herein.

**6.   Edward Jones' Branch and Development Division**

136.   Edward Jones describes the role of its Branch and Region Development associates to its Financial Advisors on its website as:

> Branch Training associates equip Financial Advisors and Branch Office Administrators (BOAs) with the knowledge and skills they need to provide clients with excellent service. We ***train, coach and support branch teams*** from the time they are hired all the way through to their retirement.

137.   The Branch and Region Development Division is also responsible for coordinating regional events and meetings where Financial Advisors are periodically informed of changes to Company policy, including the requirement that Financial Advisors push clients into a fee-based Advisory Program.

138.   The Branch and Region Development's departments which relate to the fraud alleged herein include Advisor Training, Advisor Coaching, and Support, Advanced Branch Support, and Branch and Learning Development.

139.   Defendants Pennington, Cella, and Timm oversaw the Branch and Region Development Division during the Class Period.  Defendants Cella and Timm are currently jointly responsible for this Division.

140.    Through Defendants Pennington, Cella, and Timm's, day-to-day involvement in developing and overseeing the training, coaching, and supporting branch teams, they knew of and/or consciously disregarded the material omissions alleged herein.

### 7.  Edward Jones' Investment Advisory Division

141.    Edward Jones describes the role of the Investment Advisory Division's associates to its Financial Advisors on its website as:

> The division's associates manage our advisory programs and affiliated mutual funds and provide advice and guidance to our clients and branches. We also **_identify and consider advisory-program market opportunities and risks_** in order to help our clients achieve their financial goals.

142.    The Investment Advisory Division's departments which relate to the fraud alleged herein include Investment Advisory – Program Management, Investment Advisory – Advice and Guidance, and Bridge Builder Mutual Funds – Fund Administration.

143.    Defendant Olive Street is responsible for performing investment advisory services for Edward Jones' Bridge Builder Mutual Funds.

### 8.  Edward Jones' Operations Division

144.    According to Edward Jones' Form 10-Ks during the Class Period, its Operations Division "**_monitor[s] day-to-day operations to determine compliance with applicable laws, rules and regulations_**." Defendant Ferrari oversaw the Operations Division during the Class Period, including the Division's departments – Corporate Actions, Client Reporting, and New Accounts.

### 9.  Edward Jones' Marketing Division

145.    Tim Rea, an Edward Jones principal and Management Committee member, was head of the Marketing Division during the Class Period.  According to the Edward Jones' website, in this role, he is "responsible for all marketing functions of the firm, including advertising, digital marketing, client and marketing insights, firm communications and public relations."

146.    Many of the documents that Edward Jones Financial Advisors received informing them of the Company policy, essentially requiring them to move clients into fee-based Advisory Accounts originated from the Marketing Division.

147.    Defendants Weddle, Bastien, Cella, Ferrari, Pennington, Timm, Eaker, Kirley, Tricarico, Link, and Cavness through their day-to-day involvement in the Management Committee and interactions with Tim Rea, knew of and/or consciously disregarded the material omissions alleged herein.

**B.  Edward Jones' Regional Management's Key Role in Alleged Scheme**

148.    Regional Leaders are Edward Jones general partners, appointed by senior management, who are responsible for overseeing the Financial Advisors in specified regions. The Company describes the role of the Regional Leaders to its Financial Advisors  on its website as follows:

> When you join Edward Jones, you'll be assigned to a region and introduced to your regional leader. Assigned by the firm's senior managers, the regional leader is a highly successful, well-respected veteran Financial Advisor who volunteers his or her time to advance the overall health and growth of their region. This includes overseeing the acclimation of new Financial Advisors to Edward Jones as well as **coordinating** *regional events and meetings where Financial Advisors come together to share ideas and encouragement and learn from everyone else's successes*.

149.    At the regional level, Defendants' reverse churning scheme included aggressively instructing Financial Advisors to sell Advisory Solutions during regional leadership meetings which were held throughout the year. There were at least four formal regional meetings held each year – winter, spring, summer, and fall – each of which was attended by at least one general partner. The Branch and Region Development Division was primarily responsible for coordinating the Winter and Fall regional meetings, working in tandem with regional leaders and other Divisions, including Client Strategies Group, Compliance, Investment Advisory, Operations, and Marketing. The summer regional meetings were a 3-day event organized by Edward Jones' home office in St. Louis, Missouri, serving as firm-wide annual business building meetings at the regional level.

150.    Not only were methods and strategies for marketing Advisory Solutions discussed at those regional meetings, Defendants also used the meetings to foster a fraternal environment in which achieving Edward Jones' objectives was tantamount to "bleeding Edward Jones' green" – which was expected of all advisors. Edward Jones put even more pressure on newer advisors by

holding weekly meetings with them which again focused on acquiring new accounts in, and touting the benefits of, Advisory Solutions. Financial Advisors who transferred large percentages of their clients' accounts to Advisory Solutions in short periods of time were applauded by the regional leaders. Achieving regional goals and participating in regional activities were rewarded in a myriad of ways, including promotion within the regional leadership structure and limited and general partnership offerings.

151.    During Edward Jones' summer regional meetings in or around June 2016 ("Summer 2016 Meetings"), Defendant Weddle appeared via video conference and informed Financial Advisors of changes to Company policy in response to the DOL Fiduciary rule, including the push to move existing client assets from commission-based accounts to fee-based Advisory Accounts. Others who spoke at the 2016 Summer Meetings included top-performing Financial Advisors, nearly all of whom had switched all or most of their clients to fee-based accounts.

152.    After the 2016 Summer Meetings, Financial Advisors received copies of the "Making Good Choices" brochure at their branch offices, which originated from the Marketing Division. Financial Advisors were instructed to use these brochures in convincing existing clients to move their assets from commission-based accounts to fee-based Advisory Accounts.  Financial Advisors also received a number of informational documents, originating from the Marketing Division, regarding Edward Jones' policy changes, including not allowing them to complete transactions in commission-based accounts and compensating and promoting them based on assets under management, rather than transactions, which essentially required them to move their clients' assets to fee-based Advisory Accounts.

153.    The use of regional meetings to instruct Financial Advisors and disseminate to them policies, procedures, and other materials that originated from Defendants via their various roles in the Divisions, Committees, and Groups alleged herein was a key component of the Company's strategy to no longer put its clients' interests ahead of its own and grow revenue through asset-based fees.

154.    In addition to the regional meetings and written materials, Edward Jones began implementing a new computer system for financial advisors after the summer 2016 Meetings which generated the Agreement that Class Members signed in order to move assets from their commission-based account into a fee-based Advisory Account. This new system, fully implemented in or around August 2016, automatically populated the Agreement based on prompts to the Financial Advisors regarding the Class Member. While this new system allegedly acted as a Compliance check based upon prompts entered by the Financial Advisors , it inevitably recommended a fee-based account based on the Company's changes in clients account management compensation, and promotion policies.

155.    Not only did Edward Jones' new computer system routinely attempt to place clients into Advisory Solutions – even when a client and his/her FA did not believe it would be in the client's best interest – the system was "cumbersome" to use if the client remained in a commission-based account. Financial Advisors who did not want to move their clients into fee-based accounts were forced to manipulate answers to computer-generated questions simply to pursue the clients' objectives and best interests by keeping their assets in commission-based accounts. In other words, the new computer system had the practical effect of tying the Financial Advisors' hands by making it extraordinarily burdensome to avoid moving clients into fee-based accounts.

156.    The Financial Advisors' computer system was a core aspect of how Edward Jones ran its business. The new computer system overhauled the way Financial Advisors managed clients, opened new client accounts, and ran their day-to-day operations. The new computer system thus represented a dramatic transformation of Edward Jones' business – one which originated with the Client Strategies Group led by Defendants Pennington and Cella.

157.    During 2015, the Marketing Division also sent letters to Class Members discussing the "grandfathering" of their commission-based accounts due to the DOL Fiduciary Rule and incorrectly informing them of the resulting need to transfer their assets to a fee-based account by a specific date or else have limited investment options.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

158.    Edward Jones' use of regional leaders to impart its policy changes upon Financial Advisors was not new a new practice for the Company. As July 13, 2007 *Amended Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sections and a Cease-And-Desist Order,* issued after Edward Jones' settlement with the SEC for its allegedly improper revenue sharing practices, described:

> At least one newsletter distributed by an Edward Jones regional leader conveyed this message by describing how "[r]evenue sharing can contribute large benefits to the firm in terms of profit and bonus." In a January 2000 regional newsletter, a regional leader further promoted the sales of mutual funds from Preferred Families that provide revenue sharing payments over those that do not provide revenue sharing by describing how, over a ten year period, an IR would receive an additional $256,369 in profit from the sales of such mutual funds. During regional and other meetings, another of Edward Jones' regional leaders, who was also a general partner, encouraged IRs in his region to sell the mutual funds of one Preferred Family over the funds of another Preferred Family that paid less revenue sharing.

159.    Through Defendants Pennington, Cella, and Timm's (1) day-to-day involvement in training, coaching, and supporting the Financial Advisors and branch teams, (2) coordinating of regional meetings, and (3) responsibilities as leaders of the Branch and Region Development Division, they knew of and/or consciously disregarded the material omissions alleged herein.

**C.  Edward Jones' Perpetuated Alleged Scheme Through Its Supervisory Arms**

160.    Defendants leveraged Edward Jones' supervisory arms as part of their reverse churning scheme. The formal supervisory arm was comprised of the Edward Jones Compliance and Operations Divisions based in Missouri, and a network of Field Supervision Directors ("Field Supervision Directors") based in either Arizona or Missouri. The Compliance Division, Operations Division, and Field Supervision Directors directly supervised Financial Advisors strictly with regard to regulatory compliance. All other aspects of Company management were routed through Edward Jones' second supervisory arm, the regional leadership teams, each led by a regional leader who had achieved general partner status. During the Class Period, Defendant Weddle referred to regional leaders of Edward Jones as "sales leader[s]" and the "pillar[s] of the firm's management" tasked with branch office visits and overseeing the Financial Advisors within their regions.

161.     The Compliance Division, Operations Division, and Field Supervision Directors were specifically tasked with ensuring the Financial Advisors compliance with regulatory requirements and Edward Jones policies, as described in Edward Jones' 2017 Form 10-K:

> ***Home office personnel, including those in the Operations and Compliance divisions, monitor day-to-day operations*** to determine compliance with applicable laws, rules and regulations.
>
> […]
>
> As a normal course of business, new accounts and ***client transactions are reviewed on a daily basis, in part, through the Partnership's field supervision function***, to mitigate the risk of non-compliance with regulatory requirements as well as any resulting negative impact on the Partnership's reputation.  To minimize the risk of regulatory non-compliance, each branch office is subject to an annual onsite branch audit, to review the financial advisor's business and competency.  Additionally, certain branches are visited regularly by field supervision directors to assure reasonable compliance.  The Partnership's Compliance division works with other business areas to advise and consult on business activities to help ensure compliance with regulatory requirements and Partnership policies.

162.     Through its Compliance Division and Field Supervision Directors, Edward Jones specifically took on the duty of ensuring (1) its Financial Advisors' complied with industry regulations, and (2) that the Financial Advisors conduct served the clients' best interests.

163.     Under the guise of regulatory compliance with the DOL Fiduciary Rule and serving the clients' best interests, the Compliance Division and Field Supervision Directors systematically required Financial Advisors to move existing clients' assets from commission-based accounts to fee-based accounts during the Class Period. Financial Advisors' failure to obey mandates from the Compliance Division and Field Supervision Directors could result in "compliance violations," and placing the nonconforming Financial Advisors on "supervision," among other punishments. Financial Advisors were hard-pressed to not obey these mandates from the Compliance Division and Field Supervision Directors, as Edward Jones was contractually in control of the client relationships.

164.     Defendants' reverse churning scheme took advantage of Edward Jones' built-in network of Field Supervision Directors who conducted branch office visits under the auspices of "regulatory compliance." During the Class Period, Field Supervision Directors customarily targeted larger commission-based accounts for review. The Field Supervision Directors would

point out how certain commission-based transactions may be *perceived* as "churning" or "unsuitable" – irrespective of the lack of evidence to the contrary – and would even come equipped with data showing the Financial Advisors' percentage of in Advisory Program Accounts relative to their peers. The Field Supervision Directors would then explain to the Financial Advisors how they would make more money by transferring their clients' assets from commission-based accounts to Advisory Programs and how they had a vested interest in transferring those assets to Advisory Programs and shifting the investment management decisions to Edward Jones. The purpose of the Field Supervision Directors' visit was thus to give a veiled threat from upper management – transfer more assets from commission-based accounts to Advisory Programs or face stricter scrutiny and possible termination. Refusing to move commission-based clients into Advisory Programs and potentially being disciplined or fixed was posed a risk that most Financial Advisors did not feel was worth taking. The more clients a Financial Advisor moved into Advisory Programs, the less likely that the Financial Advisor would be visited by an Field Supervision Director. As a result, billions of dollars under management at Edward Jones were shifted into Advisory Programs during the Class Period.

### D. Edward Jones' Used Training as a Guise to Influence Financial Advisors

165.    Training sessions for new Financial Advisors during the Class Period focused primarily on teaching new Financial Advisors how to sell fee-based accounts, including how to move existing clients from commission-based accounts into a fee-based Advisory Program.

166.    Edward Jones used a program entitled "Visiting Veterans" to follow up on its pressure and training at regional meetings to compel Financial Advisors to move their clients' assets from commission-based accounts to fee-based accounts. The program involved Edward Jones veteran Financial Advisors, typically general partners, visiting branch offices and aggressively touting the benefits of fee-based accounts. New Financial Advisors were particularly susceptible to this tactic due to these veterans' apparent knowledge and experience at Edward Jones.

167.    In addition, Edward Jones used its "Client Solutions Desk" to exert pressure on Financial Advisors to move clients' assets from commission-based accounts into fee-based

Advisory Programs. The Client Solutions Desk was a team of 3 to 4 veteran Financial Advisors based out of the Company's home office in St. Louis, Missouri acting as a point of contact for the Financial Advisors if they had inquiries regarding the new Edward Jones policies related to the DOL Fiduciary Rule.

168.   The fee-based focused training and increased pressure placed on new Financial Advisors to move existing commission-based clients into a fee-based Advisory Program exacerbated the reverse churning scheme alleged herein because of the sheer number of new Financial Advisors at Edward Jones during the Class Period who would not have known about or were trained in the Company's historical commission-based, client-first business model. As every single Edward Jones Form 10-K during the Class Period disclosed, "a significant number of the Partnership's financial advisors have been licensed as financial advisors for less than three years."

**E. Defendant Weddle Interacted Closely with Financial Advisors**

169.   Edward Jones' policy of moving existing commission-based clients, including Class Members, into fee-based accounts was further disseminated at the company's yearly Managing Partnership Conferences. The Company's top Financial Advisors and executives, including Defendant Weddle, attended these conferences during the Class Period.

170.   Defendant Weddle himself has described the Managing Partnership Conference as allowing "our most successful financial advisers to network and enables them to learn about trends in the market and industry, and share new ideas on how to better serve clients who are long-term individual investors." He also noted that "[w]e discuss a multitude of topics, including how to provide an ideal client service experience."

171.   The 2015 Managing Partnership Conference took place in Scottsdale, Arizona on or about April 23, 2015.

172.   The 2016 Managing Partnership Conference took place in St. Louis, Missouri from April 18 to April 20, 2016.

173.   Defendant Weddle discussed Edward Jones' response to the DOL Fiduciary Rule at the 2015 and 2016 Managing Partnership Conferences, encouraging attendees to move clients,

including Class Members, into fee-based accounts as per the Company's new client account management, compassion, and promotion policies.

174.    Defendant Weddle was also "known to wander into the cafeteria and eat lunch with associates to get a sense of what is going on in his organization" during the Class Period.

175.    Accordingly, Defendant Weddle knew of or consciously disregarded the material omissions alleged herein given the significant time he spent directly interacting with home office associates, Financial Advisors, and clients.

**F. Edward Jones' Implemented Client Account Conversion Policies to Support Alleged Scheme**

176.    Defendants' reverse churning scheme also included imposing specific policies making it more difficult for Financial Advisors to manage their clients' assets unless they were transferred into fee-based accounts. These policies were determined, approved and/or implemented by Defendant Weddle, as Managing Partner, as well as the members of the Executive Committee, the Investment Policy Committee, and the Client Strategies Group Division.   Such policies included the "grandfathering" of commission-based accounts which were not converted by April 10, 2017 without any changes made to the fee structure, but Financial Advisors were not permitted to add money to, make new purchases for, or rebalance mutual funds in those accounts on behalf of their clients. Edward Jones stopped offering mutual funds and ETFs for commission-based retirement accounts, knowing that its average investor's account was too small to properly diversify one stock and bond at a time and without access to mutual funds and ETFs, This effectively forced clients into fee-based accounts in order to access mutual funds and ETF's and maintain a properly diversified account. In addition, Edward Jones began requiring financial advisors to obtain from compliance prior approval for certain transactions such as selling stock and investing in mutual fund families and requiring minimum balances, effectively crippling IRA accounts starting in or around 2015. Fee-based accounts in an Advisory Program had no such requirement or limitation.

177.    Edward Jones even made the process for converting a commission-based account easy for its Financial Advisors, at the behest of Defendant Weddle, as Managing Partner, the

Executive and Investment Policy Committees, and the Client Strategies Group Division. When Financial Advisors accessed their clients' commission-based accounts, they could simply click a button in a client's portal that checked whether the account was eligible for conversion to a fee-based account. Financial Advisors did not have to do any analysis themselves to determine whether a fee-based account was suitable for a historically commission-based client and even if it was suitable, whether that client's best interests were served by having a fee-based account. Financial Advisors furthermore did not provide clients with any comparison worksheet or program delineating cost changes from commission-based accounts to Advisory Programs. After Edward Jones confirmed for the Financial Advisor that the client's fee-based account was eligible to be converted, Financial Advisors simply had to sell their clients on an Advisory Program and click on the convert button.

178.    Defendants Weddle, Pennington, Campbell, Kirley, Bastien, Cella, Ferrari, and Timm, knew of and/or consciously disregarded the material omissions alleged herein given their responsibilities in establishing, implementing and/or approving the client asset management and account conversion policies set forth *supra*.

**G.  Defendants' Compensation Policies Incentivized Financial Advisors  to Sell Fee-Based Accounts**

179.    During the Class Period, Edward Jones incentivized its Financial Advisors using the following four prong model:



Source: 2017 Edward Jones Financial Opportunity PowerPoint

54

180.    Beginning in or around 2013, Defendants changed Edward Jones' bonus and compensation structure to focus on the amount of assets under management rather than the amount of transactions executed in order to push Financial Advisors to sell Advisory Programs. Thus, during the Class Period, Edward Jones departed from its historical compensation structure based on trade-based commissions.  These compensation policies originated with by Defendant Weddle, as Managing Partner, as well as the Executive Committee, the Investment Policy Committee, and the Client Strategies Group Division. Edward Jones' financial disclosures during the Class Period evidence this change: as the number of Financial Advisors and assets under management at Edward Jones increased during the Class Period, trade-based commissions notably stagnated or decreased. And as Edward Jones disclosed in its January 9, 2017 Form 8-K, this decrease was due to "continued client investment in fee-based programs."

181.    This change in the compensation structure resulted in Financial Advisor salary or subsidy growing "$16 million, or 64%, including increases in **asset bonuses** for new financial advisors…" from 2016 to 2017.

182.    Similarly, the structure of the Travel Awards Program – lavish 7 to 10 day trips given to high-performing Financial Advisors and their families that could cost up to $7,000 – was changed such that the trips were awarded based on assets under management in Advisory Programs alone.

183.    Not only did Financial Advisors miss out on asset bonuses and extravagant trips if they did not move their clients' assets into an Advisory Program, they also risked being passed over for limited and general partnership opportunities because the general partners controlled how limited partnership was allocated to Financial Advisors, and the regional leaders who advocated for moving clients into fee-based accounts – typically during regional meetings – were general partners. The competition to become a partner in the "Golden Ring" and share in Edward Jones' profits drove Financial Advisors to bow to the pressure of moving their commission-based clients into a fee-based Advisory Program even when it was not suitable for the clients.

184.    Edward Jones used the "Golden Ring" as one of the primary incentives to drive Financial Advisors to tow the Company line.   Edward Jones described this partnership

1   opportunity in a 2014 Financial Advisor recruitment brochure entitled "The Financial Advisor

2   Opportunity" as follows:

3   **The Partnership Opportunity**

4   In addition to your compensation package, Financial Advisors in the past have had
the opportunity to invest in Edward Jones' parent company, The Jones Financial

5   Companies, L.L.L.P., a Missouri limited liability limited partnership ("JFC").
Historically, limited partnership offer selection has been based on the minimum

6   requirements of running a profitable and ethical branch as well as minimum tenure
requirements. After meeting these basic criteria, other considerations have been

7   leadership and the Financial Advisor's assistance to others in his or her region and
the firm. Today, more than 20,000 current and former Edward Jones associates are

8   limited partners of JFC [Jones Financial].

9   185.   Since Defendant Weddle determined, implemented and/or approved the Financial

10   Advisor compensation policies which increased Financial Advisor compensation, bonuses, and

11   other pecuniary opportunities for assets under management in Advisory Programs, which led to

12   the rise in the number of fee-based clients during the Class Period, he knew of and/or consciously

13   disregarded the material omissions alleged herein.

14   186.   Furthermore, the changes in Financial Advisor compensation, bonuses, the Travel

15   Awards Program and other pecuniary opportunities were key to Edward Jones' business model,

16   its retention and recruitment of Financial Advisors, and the conduct of the Financial Advisors

17   pushing the Financial Advisors to aggressively and improperly move their commission-based

18   clients into fee-based accounts.

19   **H. Defendants' Pecuniary Motive and Opportunity to Implement Alleged Scheme
and Omit Material Information**

20

21   187.   Defendants were highly motivated to facilitate and abide the wrongful conduct and

22   material omissions, and participated in and/or had actual knowledge of the fraudulent conduct

23   alleged herein. In exchange for engaging in and allowing the unlawful practices alleged herein to

24   occur, Defendants received increased financial compensation in the form of annual fees and costs

25   associated with the Advisory Programs as well as undisclosed promotional payments from

26   investing clients in Bridge Builder, all while avoiding the disclosure requirements of the DOL

27   Fiduciary Rule because Lead Plaintiffs and the other Class members were no longer in

28   commission-based accounts.

188.    The prosperity of Edward Jones' Advisory Programs was vital to the success of its business during the Class Period, as evidenced by the Company's 2017 Form 10-K. Edward Jones reported billions of dollars in increases in asset-based fees during the Class Period which more than offset the decrease in commission-based fees about which Defendants hyperbolically warned. Edward Jones further disclosed that, every year during the Class Period, the majority of the increases in the assets under care in the Advisory Programs came from *existing* client assets.

189.    Although evident based on the sheer profitability of its Advisory Programs, as alleged herein, Edward Jones specifically acknowledged that its fee-based Advisory Programs are central to its business.  For example, in an October 23, 2017 Edward Jones press release touting its milestone of reaching $1 trillion in assets under management, the Company specifically focused on proclaiming the size of its fee-based platforms, providing that:

> This $1 trillion AUC milestone demonstrates the size and scale of Edward Jones as a major North American financial-services firm with *the second largest fee-based mutual fund platform in the U.S*. Serving clients individually, with personal service; the firm has resources to support financial advisors who want to build their own business.

190.    Edward Jones' partners, including the Individual Defendants, were primarily compensated through revenue-sharing proportionate to their general partner, subordinated limited partner and limited partner capital ownership interests in the Company. Thus, while general partners received a healthy base salary of $175,000 per year, the vast majority of their earnings – in excess of $10 million every year in several cases – were dependent on Edward Jones' generation of an annual profit.

191.    As demonstrated in the chart below, the massive compensation totals received by the Individual Defendants were directly the result of the perpetration of the fraud and deceit alleged herein. It is important to note that Edward Jones disclosed only the compensation of its CEO, CFO, and the next three highest earning general partners. As such, income data is not available for each of the Individual Defendants for every year in the class period. However, it is equally significant that these individuals, who were most proximately responsible for implementing the alleged scheme, were so well compensated for their efforts that they routinely

57

1  ranked within the top five highest earning partners. Consequently, during the class period, the

2  Individual Defendants earned at least $277,148,723 – likely substantially more. Put another way,

3  subtracting away their guaranteed salaries, the seven Individual Defendants for which

4  compensation data is known received over $277 million that was largely dependent on Edward

5  Jones' fee-based revenue.   The Individual Defendants were therefore directly incentivized to

6  execute the scheme alleged herein.

| Name | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|------|------|------|------|------|------|-------|
| James D. Weddle | $12,921,019 | $13,917,899 | $13,952,940 | $11,199,029 | $11,443,462 | $63,434,349 |
| Kevin D. Bastien | $8,617,937 | $10,453,515 | $11,173,621 | $10,043,559 | $11,770,557 | $52,059,189 |
| Penelope ("Penny") Pennington | N/A | N/A | N/A | N/A | $10,538,707 | $10,538,707 |
| Daniel J. Timm | $9,842,907 | $11,307,332 | $11,228,250 | $9,572,125 | $10,566,370 | $52,516,984 |
| Brett A. Campbell | $11,383,365 | $12,682,360 | Retired | Retired | Retired | $24,065,725 |
| Norman L. Eaker | $11,024,076 | $12,002,075 | $11,758,012 | $9,882,748 | Retired | $44,666,911 |
| James A. Tricarico Jr. | N/A | N/A | $10,306,348 | $9,143,785 | $10,416,725 | $29,866,858 |
| **Sum TOTAL** | | | | | | **$277,148,723** |

14       192.    The reverse churning scheme, as a whole, represented a complete overhaul of

15  Edward Jones' business model in that the Company which had at one time prided itself on its

16  client first attitude, became all about how much money it could squeeze out of its clients. Such a

17  significant policy shift from commission-based to asset-based revenue in such a short period of

18  time represented a fundamental change to Edward Jones' corporate strategy that Defendants,

19  particularly Defendant Weddle – whose responsibility it was to create, approve and/or implement

20  the Company's policies – knew of and spearheaded.

21       193.    The Defendants acted with scienter in that they all conspired to participate in the

22  aforementioned scheme whereby they directed and/or approved the strategy, policy, procedure

23  and/or training for the supervision, workflow, and/or compensation of Financial Advisors, which

24  put pressure on Financial Advisors to move Lead Plaintiffs and the other Class Members into a

25  fee-based Advisory Program, regardless of whether the move was suitable for them and served

26  their best interest.

27       194.    Defendants further acted with scienter because they knew that coercing Lead

28  Plaintiffs and the other Class members into moving their assets from commission-based accounts

to a fee-based Advisory Program – regardless of the suitability for the client – was illegal, created conflicts of interest, and violated SEC and FINRA Rules prohibiting reverse churning.

195.   Defendants knew of and/or consciously disregarded the scheme and material omissions alleged herein where the details of same were presented to Defendants in the August 2015 Presentation discussed *supra*.

196.   Defendants are charged with knowledge of FINRA Rule 2111, which provides, in relevant part, the following:

(a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

197.   As registered broker-dealers, Defendants are also charged with knowledge of the SEC's Guide to Broker-Dealer Registration, wherein their duty of fair dealing is espoused:

These include the duties to execute orders promptly, disclose certain material information (*i.e.,* information the customer would consider important as an investor), charge prices reasonably related to the prevailing market, and fully disclose any conflict of interest.

198.   Defendants failed to uphold their duty of fair dealing when they (1) failed to disclose to clients the material information alleged herein and (2) charged clients unreasonable fees as alleged herein.

199.   The Guide to Broker-Dealer Registration further obligates Defendants, as broker-dealers, "to recommend only those specific investments or overall investment strategies that are suitable for their customers."  Defendants, as broker-dealers, are further obligated "to determine customer-specific suitability. In particular, a broker-dealer must make recommendations based on a customer's financial situation, needs, and other security holdings." Defendants failed to meet their FINRA Rule 2111 and Guide to Broker-Dealer registration suitability obligations when they implemented the policy, alleged herein, of placing as many clients as possible into fee-based

accounts without making adequate suitability determinations. Defendants also failed to meet these obligations when they explicitly placed the onus of making a suitability determination on investors, as evidenced in Edward Jones Advisory Solutions Fund Models Brochure as of August 11, 2017: "You should consider the investment objectives, risks, and charges and expenses of each Program Fund before deciding to invest in Advisory Solutions."

200.    In addition, Defendants acted with scienter in that they knew the statements made to Lead Plaintiffs and the other Class members to induce them to shift their assets from commission-based accounts into a fee-based Advisory Program omitted material information. Defendants knew that Lead Plaintiffs and the other Class members were wholly relying on the expertise of Edward Jones, yet they betrayed that trust to financially benefit handsomely at the expense of Lead Plaintiffs and the other Class members.

201.    Moreover, Defendants were highly motivated to conceal this scheme from Lead Plaintiffs and the other Class members because had Lead Plaintiffs and the other Class members known that moving their commission-based accounts to a fee-based Advisory Program was not in their best interests and/or suitable for them, Lead Plaintiffs and the other Class members would not have agreed to make the move, and thereby would not have paid the improper, substantially increased fees.

## VII.    CLASS ACTION ALLEGATIONS

202.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons, or their beneficiaries without limitation, who had their assets moved from Edward Jones' commission-based accounts to an Advisory Program during the Class Period and were damaged thereby.  Excluded from the Class are the officers and directors of Edward Jones at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns.

203.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Record owners and other Class members may be identified from records maintained by Edward Jones or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class

actions. While the exact number of Class members is unknown to Lead Plaintiffs, Edward Jones has reported billions of dollars in increases in asset-based fees while the commission-based fees have decreased during the Class Period.  In addition, Edward Jones has also disclosed that the majority of the increase in assets under its management in its Advisory Programs every year during the Class Period came from existing client assets.  Edward Jones has further disclosed in its 2017 Form 10-K that it manages assets for 5.2 million households, totaling $1.121 trillion, of which approximately 28% is in Advisory Programs.  Accordingly, Lead Plaintiffs reasonably believe there are thousands, if not tens of thousands, of members in the proposed Class.

204.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

205.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

206.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are the following:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether Defendants breached their fiduciary duties to Class members;

(c)    Whether statements made by Defendants to Class members omitted material facts about their investments Defendants' pecuniary interests, and the Advisory Programs; and

(d)    To what extent the Class members have sustained damages and the proper measure of damages.

207.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

1   of individual litigation make it impossible for Class members to individually redress the wrongs

2   done to them. There will be no difficulty in the management of this action as a class action.

3        208.    Churning cases are adequate for class action treatment when they are based

4   predominately on common issues of facts relevant to the entire class. Reverse churning, by its

5   nature, involves a course of conduct more favorable for class treatment than traditional churning

6   because it occurs when a financial advisor moves a client from a commission-based account into

7   a fee-based account for sole purpose of generating fees. Edward Jones' concerted and uniform

8   movement of clients from commission-based accounts into fee-based Advisory Accounts, all

9   during a specific timeframe, and without an appropriate suitability check in place to determine if

10  it is in the best interest on the account, for the purpose of generating fees amounts to reverse

11  churning for Class members. Class actions involving omissions are adequate for class treatment

12  where the defendant's employees received uniform training on how and what to communicate to

13  clients. As alleged herein, Edward Jones Financial Advisors received uniform training on how

14  and what to communicate to clients in moving the clients from commission-based accounts into

15  fee-based Advisory Programs.

16       209.    Furthermore, a rebuttable presumption of reliance is generally available to

17  plaintiffs alleging violations of § 10(b) based on omissions of material fact.

18                                   **COUNT I**
                  **For Violation of § 10(b) of the 1934 Act and Rule 10b-5(a) and (c)**
19                       **Promulgated Thereunder Against All Defendants**

20       210.    Lead Plaintiffs hereby repeat, reallege and incorporate by reference each and every

21  allegation contained above as though the same were fully set forth herein.

22       211.    During the Class Period, each Defendant carried out a plan, scheme, and course of

23  conduct which was intended to and, throughout the Class Period, did deceive members of the

24  Class, as alleged herein and caused members of the Class to move their assets from commission-

25  based accounts into a fee-based Advisory Program and to otherwise suffer damages. In

26  furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set

27  forth herein.

28

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF
FIDUCIARY DUTY

212.   Defendants (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon Lead Plaintiffs and the other Class members who were compelled into moving assets from their commission-based accounts into a fee-based Advisory Program. This was done by Defendants in an effort to enrich themselves through undisclosed manipulative tactics by which they (1) Wrongfully generated more revenue by requiring members of the Class to pay substantially more fees without receiving any increased recognizable benefit; and (2) Wrongfully received undisclosed promotional payments.

213.   All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

214.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Edward Jones and the scheme to compel clients into a fee-based Advisory Program, as specified herein.

215.   Defendants employed devices and artifices to defraud and engage in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and promotional payments as a result of the undisclosed practices of compelling clients into a fee-based Advisory Program, as alleged herein, and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon members of the Class.

216.   Class members reasonably relied upon the representation of Defendants, who were acting in a fiduciary capacity in coercing members of the Class to move their assets from commission-based accounts into a fee-based Advisory Program.

217.   Class members were ignorant of Defendants' fraudulent scheme. Class members were injured because had Class members known of Defendants' unlawful scheme, they would not have agreed to move their assets from commission-based accounts into a fee-based Advisory Program, and they would not have paid the fees or costs associated with that Advisory Program. Absent Defendants' wrongful conduct, Class members would not have been injured.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

218.    By virtue of the foregoing, Defendants each violated § 10(b) of the 1934 Act and Rule 10b-5(a) and (c) promulgated thereunder.

219.    As a direct and proximate result of Defendants' wrongful conduct, Class members suffered damages in connection with the movement of their assets from commission-based accounts into a fee-based Advisory Program during the Class Period.

220.    This claim was brought within the applicable statute of limitations.

**COUNT II**
**For Violation of § 10(b) of the 1934 Act and Rule 10b-5(b)**
**Promulgated Thereunder Against All Defendants**

221.    Lead Plaintiffs hereby repeat, reallege and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

222.    During the Class Period, Defendants employed manipulative and deceptive devices and contrivances in that they omitted to state material facts, including that moving Class members' assets from commission-based accounts into a fee-based Advisory Program would improperly result in substantially increased fees to Class members and that Defendants would receive undisclosed incentives from revenue sharing in exchange for pushing their clients into an Advisory Program, and that such incentives created inherent, insurmountable conflicts of interest.

223.    Defendants, individually and in concert, direct and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in and participated in a continuous course of conduct to conceal the adverse material information about the improper incentives and conflicts of interest alleged herein. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

224.    Defendants omitted to state material facts in order to profit improperly from millions of dollars in incentive payments, as described above, made to them in the form of promotional payments from investing Class members in certain mutual funds after moving their assets into an Advisory Program.

225.    Defendants omitted to state material facts in order to improperly receive additional fees from members of the Class, with members of the Class receiving no additional, recognizable benefits.

226.    Defendants had actual knowledge of the omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts because they knew that the misconduct described herein was, *inter alia*, against SEC and FINRA rules. Such Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

227.    By failing to disclose material facts, as set forth above, Defendants exploited the fiduciary relationship with Lead Plaintiffs and the other members of the Class, manipulating them into moving their assets from commission-based accounts into a fee-based Advisory Program and paying substantially increased fees. Lead Plaintiffs and the other Class members would have refused to have paid these increased fees had they known about the practices alleged herein. In relying on the purported honesty of Edward Jones' business practices, and/or upon the fiduciary relationship established between Defendants and Class members, and/or on the absence of material adverse information that was known to and/or recklessly disregarded, but not disclosed by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class moved their assets from commission-based accounts into a fee-based Advisory Program during the Class Period, even though such a move was adverse to their interests and improperly caused them to pay excessive fees, and were damaged thereby.

228.    At the time of the alleged material omissions, Lead Plaintiffs and the other members of the Class were ignorant of the existence of the alleged material facts. Had Lead Plaintiffs and the other members of the Class known the truth concerning Defendants' improper motives to benefit from moving their assets from commission-based accounts into fee-based accounts, including to receive substantially increased fees and promotional payments, lead Plaintiffs and the other members of the Class would not have agreed to such a move, and thereby would not have paid the improperly excessive fees.

229.    By virtue of the foregoing, Defendants have violated § 10(b) of the 1934 Act, and Rule 10b-5(b) promulgated thereunder.

230.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with the movement of their assets from commission-based accounts into a fee-based Advisory Program during the Class Period.

231.     This claim was brought within the applicable statute of limitations.

### COUNT III
### For Violation of § 20(a) of the 1934 Act
### Against Individual Defendants

232.     Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

233.     During the Class Period, the Individual Defendants participated in the operation and management of Edward D. Jones and Jones Financial, conducted, and participated, directly and indirectly, in the conduct of Edward D. Jones's and Jones Financial's business affairs. Because of their senior positions, they knew of and participated in the plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive members of the Class, as alleged herein and caused members of the Class to move their assets from commission-based accounts into a fee-based Advisory Program and to otherwise suffer damages.

234.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various contacts, disclosures, internal policies, compensation packages, press releases and public filings which Edward D. Jones and Jones Financial disseminated during the Class Period.

235.     Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Edward D. Jones and Jones Financial to engage in the wrongful acts complained of herein. The Individual Defendants, therefore were "controlling persons" of Edward D. Jones and Jones Financial within the meaning of § 20(a) of the Exchange Act. In this capacity, the Individual Defendants participated in the unlawful conduct alleged which improperly caused members of the Class to move their assets from commission-based accounts into a fee-based Advisory Program.

236.     By reason of the above conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act for the violations committed by Edward D. Jones and Jones Financial.

1

2

3

**COUNT IV**
**For Violation of § 12(a)(2) of the 1933 Act**
**Against Edward D. Jones and Jones Financial**

4        237.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if

5    fully set forth herein, except that, for purposes of this claim, Lead Plaintiffs expressly exclude and

6    disclaim any allegation that could be construed as alleging fraud or intentional or reckless

7    misconduct.

8        238.    This claim is brought pursuant to § 12(a)(2) of the 1933 Act, 15 U.S.C. §

9    77l(a)(2), against Edward D. Jones and Jones Financial.

10       239.    Edward D. Jones and Jones Financial were the sellers, or the successors-in-interest

11   to the seller, within the meaning of the 1933 Act, for one or more of the respective mutual funds

12   sold to Class members because they either transferred title of shares of the mutual funds to

13   members of the Class and/or solicited the purchase of shares of the mutual funds by members of

14   the Class, motivated in part by a desire to serve their own financial interests.

15       240.    During its sale of mutual funds to members of the Class, Edward D. Jones and

16   Jones Financial failed to disclose to Lead Plaintiffs and the other members of the Class that

17   moving their commission-based accounts into one of the Advisory Programs was adverse to their

18   interests, and benefited Defendants at their expense.

19       241.    During their sale of mutual funds to members of the Class, Edward D. Jones and

20   Jones Financial failed to disclose the incentives alleged herein that their investment advisors

21   received in exchange for pushing Edward D. Jones and Jones Financial clients into the mutual

22   funds. These incentives created insurmountable conflicts of interest which were never

23   meaningfully disclosed to investors.

24       242.    During their sale of mutual funds to members of the Class, Edward D. Jones and

25   Jones Financial made numerous untrue statements of material fact to Lead Plaintiffs and the other

26   members of the Class to coerce them to move into an Advisory Program, as alleged herein.

27       243.    Class members have sustained damages due to Edward D. Jones's and Jones

28   Financial violations.

1   244.   At the time their commission-based accounts were moved into an Advisory

2   Program pursuant to or traceable to Edward D. Jones's and Jones Financial's untrue statements of

3   material fact and omissions, Class members were without knowledge of the facts concerning the

4   untrue statements of fact and material omissions alleged herein and could not reasonably have

5   possessed such knowledge.

6   245.   This claim was brought within the applicable statute of limitations.

7                                        **COUNT V**
                            **For Violation of § 15 of the 1933 Act**
8                              **Against Individual Defendants**

9   246.   Lead Plaintiffs repeat and re-allege each and every allegation contained above,

10  except that for purposes of this claim, Lead Plaintiffs expressly excludes and disclaims any

11  allegation that could be construed as alleging fraud or intentional or reckless misconduct.

12  247.   This claim is brought pursuant to § 15 of the 1933 Act against the Individual

13  Defendants as control persons of Edward D. Jones and Jones Financial . It is appropriate to treat

14  the Individual Defendants as a group for pleading purposes and to presume that the incomplete

15  information complained about herein is the collective actions of the Individual Defendants and

16  Edward D. Jones.

17  248.   Edward D. Jones and Jones Financial are liable under § 12(a)(2) of the 1933 Act as

18  set forth herein.

19  249.   Each of the Individual Defendants was a "control person" of Edward D. Jones and

20  Jones Financial within the meaning of §15 of the 1933 Act, by virtue of their positions of

21  operational control and/or ownership. At the time that Edward D. Jones and Jones Financial

22  improperly coerced Lead Plaintiffs and the other members of the Class to move their

23  commission-based accounts into one of the Advisory Programs – by virtue of their positions of

24  control and authority over Edward D. Jones and Jones Financial – the Individual Defendants

25  directly and indirectly, had the power and authority, and exercised the same, to cause Edward D.

26  Jones and Jones Financial  to engage in the wrongful conduct complained of herein.

27  250.   Pursuant to § 15 of the 1933 Act, by reason of the foregoing, the Individual

28  Defendants are liable to Lead Plaintiffs and the other members of the Class to the same extent as

1  are Edward D. Jones and Jones Financial for their primary violations of § 12(a)(2) of the 1933

2  Act.

3       251.    By virtue of the foregoing, Lead Plaintiffs and the other members of the Class are

4  entitled to damages against the Individual Defendants.

**COUNT VI**
**For Breach of Fiduciary Duty**
**Against All Defendants**

7       252.    Lead Plaintiffs hereby repeat, reallege and incorporate by reference each and every

8  allegation contained above, with the exception of those related to material omissions, as though

9  the same were fully set forth herein.

10      253.    Prior to moving the assets of Lead Plaintiffs and the other Class members into an

11  Advisory Program, Edward Jones acted as a stockbroker to Lead Plaintiffs and the other Class

12  members in managing their commission-based accounts.

13      254.    The Advisory Solutions agreement signed by Lead Plaintiffs and the other Class

14  members provides the agreement shall be enforced in accordance with the laws of the State of

15  Missouri.

16      255.    Under Missouri law, stockbrokers owe customers a fiduciary duty.  This fiduciary

17  duty includes at least these obligations: to manage the account as dictated by the customer's needs

18  and objectives, to refrain from self-dealing, to follow the customer's order instructions, and to

19  stay abreast of market changes.

20      256.    In acting as a stockbroker to Lead Plaintiffs and the other Class members prior to

21  and during the transition of their assets from commission-based accounts to a fee-based Advisory

22  Program, Defendants owed Lead Plaintiffs and the other Class members a fiduciary duty.

23      257.    In shifting the assets of Lead Plaintiffs and the other Class members from a

24  commission-based structure to a fee-based structure, Defendants were required to act as

25  fiduciaries.

26      258.    Defendants knew that Lead Plaintiffs and the other Class members entrusted their

27  assets to, and totally relied on the relationship of trust established with Defendants, and thereby

28

1   intentionally assumed the position of fiduciaries of the assets of Lead Plaintiffs and the other

2   Class members.

3          259.    Lead Plaintiffs and the other Class members relied exclusively and without

4   reservation upon the course of dealing and expertise of Defendants. In effect, Defendants

5   exercised total discretionary or control authority over the assets of the Lead Plaintiffs and the

6   other Class members in Edward Jones' accounts.

7          260.    The fiduciary duty owed to Lead Plaintiffs and the other Class members by

8   Defendants required them to manage the accounts of Lead Plaintiffs and the other Class members

9   as dictated by the customer's needs and objectives, to refrain from self-dealing, to follow the

10   customer's order instructions, and to stay abreast of market changes.

11          261.    The fiduciary duty owed to Lead Plaintiffs and the other Class members by

12   Defendants required that, in moving Lead Plaintiffs and the other Class members' assets from a

13   commission-based structure to a fee-based structure, Defendants must justify the move as

14   economical.

15          262.    All of the foregoing fiduciary duties have been breached by Defendants by virtue

16   of the afore-described wrongful activities, and said breaches directly and proximately caused

17   Lead Plaintiffs and the other Class members to suffer substantial damages for which Lead

18   Plaintiffs pray for relief, full restitution of all losses, punitive damages, and recovery of all costs

19   and expenses, including reasonable attorneys' fees.

20                                          **COUNT VII**
                                     **For Breach of Fiduciary Duty**
21                              **(On Behalf of California Subclass Only)**
                                       **Against All Defendants**
22

23          263.    Lead Plaintiffs hereby repeat, reallege and incorporate by reference each and every

24   allegation contained above, with the exception of those related to material omissions, as though

25   the same were fully set forth herein.

26          264.    Prior to moving the assets of Lead Plaintiffs and the other Class members into an

27   Advisory Program, Edward Jones acted as a stockbroker to Lead Plaintiffs and the other Class

28   members in managing their commission-based accounts.

265.    Under California law, stockbrokers owe customers a fiduciary duty. This imposes on the broker the duty of acting in the highest good faith.  Furthermore, if the stockbroker has discretionary control over a customer's account, a more heightened fiduciary duty is imposed.

266.    In acting as a stockbroker to Lead Plaintiffs and the other Class members prior to and during the transition of their assets from commission-based accounts to a fee-based Advisory Program, Defendants owed Lead Plaintiffs and the other Class members a fiduciary duty.

267.    In shifting the assets of Lead Plaintiffs and the other Class members from a commission-based structure to a fee-based structure, Defendants were required to act as fiduciaries.

268.    Defendants knew that Lead Plaintiffs and the other Class members entrusted their accounts to, and totally relied on the relationship established with Defendants, and thereby intentionally assumed the position of fiduciaries of the accounts of Lead Plaintiffs and the other Class members.

269.    Lead Plaintiffs and the other Class members relied exclusively and without reservation upon the course of dealing, and expertise of Defendants. In effect, Defendants exercised total discretionary or control authority over the accounts of Lead Plaintiffs and the other Class members.

270.    The fiduciary duty owed to Lead Plaintiffs and the other Class members by Defendants required Defendants to manage the accounts of Lead Plaintiffs and the other Class members as dictated by the customer's needs and objectives, to refrain from self-dealing, to follow the customer's order instructions, and to stay abreast of market changes.

271.    The fiduciary duty owed to Lead Plaintiffs and the other Class members by Defendants required that, in moving the assets of Lead Plaintiffs and the other Class members from a commission-based structure to a fee-based structure, Defendants must justify the move as economical.

272.    All of the foregoing fiduciary duties have been breached by Defendants by virtue of the afore-described wrongful activities, and said breaches directly and proximately caused Lead Plaintiffs and the other Class members to suffer substantial damages for which Lead

71

1    Plaintiffs pray for relief, full restitution of all losses, punitive damages, and recovery of all costs

2    and expenses, including reasonable attorneys' fees.

3    **VIII.   PRAYER FOR RELIEF**

4         WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

5         A.    Declaring that Defendants are liable pursuant to the 1933 and 1934 Acts;

6         B.    Declaring that Defendants breached their fiduciary duties;

7         C.    Determining and certifying that this action is a proper class action, certifying Lead

8               Plaintiffs as class representatives, and appointing their counsel as Class Counsel

9               pursuant to Federal Rule of Civil Procedure 23;

10        D.    Awarding compensatory damages in favor of Lead Plaintiffs and the Class against

11              Defendants, jointly and severally, for damages sustained as a result of Defendants'

12              wrongdoing, in an amount to be proven at trial;

13        E.    Awarding all appropriate relief, including actual damages, statutory damages,

14              double damages, treble damages, punitive damages, consequential damages,

15              restitution, disgorgement, and any other appropriate compensatory, equitable, or

16              exemplary relief;

17        F.    Awarding Lead Plaintiffs and the Class pre-judgment and post-judgment interest

18              as well as reasonable attorneys' fees, costs and expenses incurred in this action;

19              and

20        G.    Awarding such other relief as the Court may deem just and proper.

21   **IX.   JURY DEMAND**

22        Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiffs hereby demand a trial

23   by jury as to all claims in this action.

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF
FIDUCIARY DUTY

1     Dated: September 24, 2018                    Respectfully submitted,

2                                                  */s/ Ivy T. Ngo* _____
                                                   Ivy T. Ngo (249860)
3                                                  Brian Hanlin (*pro hac vice*)
                                                   Franklin D. Azar (*pro hac vice*)
4                                                  FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                                   14426 East Evans Avenue
5                                                  Aurora, CO 80014
                                                   Telephone:     (303) 757-3300
6                                                  Facsimile:     (303) 759-5203
                                                   ngoi@fdazar.com
7
                                                   John R. Garner (246729)
8                                                  Maria E. Minney (289131)
                                                   GARNER LAW OFFICE
9                                                  109 North Marshall Avenue
                                                   P.O. Box 908
10                                                 Willows, CA 95988
                                                   Telephone:     (530) 934-3324
11                                                 Facsimile:     (530) 934-2334
                                                   john@garner-associates.com
12
                                                   *Attorneys for Lead Plaintiffs*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF
FIDUCIARY DUTY