1

MERYL L. YOUNG, SBN 110156
  myoung@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

2

3

4

5

ALEXANDER K. MIRCHEFF, SBN 245074
  amircheff@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

6

7

8

SAMUEL A. KEESAL, SBN 38014
  skip.keesal@kyl.com
KEESAL, YOUNG & LOGAN
400 Oceangate
Long Beach, CA 90802
Telephone: 562.436.2000
Facsimile: 562.436.7416

JULIE L. TAYLOR, SBN 154341
  julie.taylor@kyl.com
KEESAL, YOUNG & LOGAN
450 Pacific Avenue
San Francisco, CA 94133
Telephone: 415.398.6000
Facsimile: 415.981.0136

9

*Attorneys for Defendants*

10

11

UNITED STATES DISTRICT COURT

12

EASTERN DISTRICT OF CALIFORNIA

13

SACRAMENTO DIVISION

14

IN RE EDWARD D. JONES & CO., L.P.
SECURITIES LITIGATION

CASE NO. 2:18-cv-00714-JAM-AC

15

16

17

**NOTICE OF MOTION AND MOTION OF
DEFENDANTS TO DISMISS PLAINTIFFS'
AMENDED COMPLAINT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

18

19

*[Declaration of Alexander Mircheff and Exhibits
thereto, Request for Judicial Notice and
Incorporation by Reference, Declaration of
Shelley Graf filed concurrently herewith]*

20

21

**Hearing:**
Date:      May 21, 2019
Time:     1:30 p.m.
Place:    Courtroom 6, 14th Floor
          501 I Street
          Sacramento, CA 95814

22

23

24

Judge:    Hon. John A. Mendez

25

26

27

28

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on May 21, 2019 at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Eastern District of California, Sacramento Courthouse, Courtroom 840, located at 501 I Street, Sacramento, California 95814, Defendants Edward D. Jones & Co., L.P., The Jones Financial Companies, L.L.L.P., EDJ Holding Company, Inc., James D. Weddle, Penelope ("Penny") Pennington, Daniel J. Timm, Kenneth R. Cella, Jr., Brett A. Campbell, Kevin D. Bastien, Norman L. Eaker, Vincent J. Ferrari, Timothy J. Kirley, James A. Tricarico, Jr., Richard D. Link, Pamela K. Cavness, Olive Street Investment Advisors, LLC, Passport Holdings, LLC, and Passport Research, Ltd. (collectively, "Defendants") through their undersigned counsel, will, and hereby do, move to dismiss all claims asserted against Defendants in the Amended Complaint for Violation of Federal Securities Laws and Breach of Fiduciary Duty pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rules 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure for failure to meet the pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b), lack of subject-matter jurisdiction, and failure to state a claim (the "Motion").  This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, Defendants' Request for Judicial Notice and Incorporation by Reference, the accompanying Declaration of Alexander Mircheff and exhibits submitted therewith, the Declaration of Shelley Graf and the exhibit thereto, the Court's files in this action, the arguments of counsel, and any other matter that the Court may properly consider.  The grounds for the Motion include the following:

Counts I and II, alleging various violations of the Securities Exchange Act of 1934, should be dismissed with prejudice for failure to state a claim under the heightened pleading standards required by the PSLRA and Fed. R. Civ. P. 9(b).  Plaintiffs fail to properly plead any "untrue" or "misleading" statement or omission of material fact, or that any Defendant other than Edward D. Jones & Co., L.P. "made" any of the statements at issue.  Similarly, Plaintiffs have not properly pleaded scienter, reliance, or causation of any losses.  Moreover, Plaintiffs' claims for "scheme" liability under Rule 10b-5(a) and (c) fail because they do not plead with particularity that any Defendant committed an

act constituting manipulative or deceptive conduct, and the failure to properly plead scienter, reliance, or causation of any losses is fatal to the "scheme" liability claims as well.

Additionally, Count IV, alleging a violation of Section 12(a)(2) of the Securities Act of 1933, should be dismissed with prejudice for failure to state a claim because Plaintiffs fail to allege that they purchased securities in a public offering pursuant to a "prospectus" that contains a misstatement. Moreover, the claims sound in fraud, and they fail to meet the heightened pleading standards required by Fed. R. Civ. P. 9(b). The defense of negative causation also appears on the face of the pleadings.

Counts III and V are "control person" claims that should be dismissed with prejudice for failure to state a claim because Plaintiffs fail adequately to plead an underlying violation of the federal securities laws.

Counts VI and VII, alleging class-wide claims for breach of fiduciary duty under state law, should be dismissed because they are based upon alleged misstatements, omissions, or deceptive conduct in connection with the sale of covered securities, and the Securities Litigation Uniform Standard Act of 1998 precludes such claims. Moreover, the claims sound in fraud, and they similarly fail to meet the heightened pleading standards required by Fed. R. Civ. P. 9(b), as discussed above for Counts I through V.

This Motion is made following the conference of counsel pursuant to the Court's standing order, which was held on November 13, 2018. The conference did not resolve the issues underlying Defendants' Motion to Dismiss.

Dated: November 21, 2018          By:          /s/ Meryl L. Young

MERYL L. YOUNG
GIBSON, DUNN & CRUTCHER LLP

# TABLE OF CONTENTS

Page

I.    Introduction ................................................................................................ 1

II.   Factual Background ..................................................................................... 4

III.  Argument .................................................................................................... 6

    A.    The Exchange Act Claims Fail as a Matter of Law ............................ 6

        1.    Plaintiffs Fail to State a Claim for a Material Misstatement or Omission ........ 6

            a.    Plaintiffs Fail to Plead Any "Untrue" or "Misleading" Statement (or Omission) of Material Fact .............................. 6

            b.    Plaintiffs Fail to Plead Scienter .......................................... 13

            c.    Plaintiffs Fail to Plead Reliance ......................................... 15

            d.    Plaintiffs Fail to Plead Causation of Any Losses ............................... 16

        2.    Plaintiffs Fail to State a Claim for "Scheme Liability" ................... 17

    B.    The Securities Act Claims Fail as a Matter of Law ......................... 19

    C.    The State Law Claims Are Precluded by Federal Law ............................... 19

IV.   Conclusion ................................................................................................ 20

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbate v. Wells Fargo*,
  2011 WL 9698215 (C.D. Cal. Nov. 17, 2011) .............................................................17

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ...................................................................................................16

*Atari Corp. v. Ernst & Whinney*,
  981 F.2d 1025 (9th Cir. 1992) ...................................................................................15

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) .......................................................................13

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...................................................................................................16

*Binder v. Gillespie*,
  184 F.3d 1059 (9th Cir. 1999) .....................................................................................7

*Brown v. Ambow Educ. Holding Ltd.*,
  2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ................................................................19

*Brown v. Brewer*,
  2010 WL 2472182 (C.D. Cal. June 17, 2010) .............................................................7

*Brown v. E.F. Hutton Grp., Inc.*,
  991 F.2d 1020 (2d Cir. 1993) ....................................................................................10

*Cent. Bank of Denver v. First Interstate Bank of Denver*,
  511 U.S. 164 (1994) ...................................................................................................17

*Chamber of Commerce v. U.S. Dep't of Labor*,
  885 F.3d 360 (5th Cir. 2018) ...........................................................................3, 12, 13

*Chiarella v. United States*,
  445 U.S. 222 (1980) .....................................................................................................7

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..........................................................................7

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) .....................................................................................18

Gibson, Dunn &
Crutcher LLP

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009)............................................................................16, 17, 18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ...............................................................................................15

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ...............................................................................................13

*Fernandez v. UBS AG*,
    2018 WL 4440498 (S.D.N.Y. Sept. 17, 2018) ................................................11, 17

*Fleming v. Charles Schwab Corp.*,
    878 F.3d 1146 (9th Cir. 2017)................................................................................20

*Freeman Inv., L.P. v. Pac. Life Ins. Co.*,
    704 F.3d 1110 (9th Cir. 2013)................................................................................19

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
    68 F. Supp. 3d 530 (S.D.N.Y. 2014).....................................................................15

*Geman v. SEC*,
    334 F.3d 1183 (10th Cir. 2003)..............................................................................17

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008)..................................................................................13

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ...............................................................................................19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) .............................................................................................6

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................................................9

*In re Interbank Funding Corp. Sec. Litig.*,
    629 F.3d 213 (D.C. Cir. 2010) ............................................................................7, 16

*In re Interbank Funding Corp. Sec. Litig.*,
    668 F. Supp. 2d 44 (D.D.C. 2009) .........................................................................15

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980)..................................................................................10

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
    564 U.S. 135 (2011) .................................................................................................7

*Khoja v. Orexigen Therap., Inc.*,
    899 F.3d 988 (9th Cir. 2018)....................................................................................4

Gibson, Dunn &
Crutcher LLP

MOTION TO DISMISS AMENDED COMPLAINT

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)................................................................................17

*In re Levi Strauss & Co. Sec. Litig.*,
   527 F. Supp. 2d 965 (N.D. Cal. 2007) ...............................................................19

*Lorenzo v. SEC*,
   872 F.3d 578 (D.C. Cir. 2017) ...........................................................................17

*Mallen v. Alphatec Holdings*,
   861 F. Supp. 2d 1111 (S.D. Cal. 2012) ..............................................................19

*Matrixx Initiatives Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................................7

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   704 F. Supp. 2d 378 (S.D.N.Y. 2010).................................................................18

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
   434 F. Supp. 2d 233 (S.D.N.Y. 2006)...................................................................9

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006) ..............................................................................................19

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008)...............................................................................6

*Miller v. Thane Int'l*,
   519 F.3d 879 (9th Cir. 2008)...............................................................................19

*Northstar Fin. Advisors, Inc. v. Schwab Investments*,
   904 F.3d 821 (9th Cir. 2018).........................................................................19, 20

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014)...........................................................4, 6, 7, 13, 19

*Ore. Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014)...............................................................................16

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996)...............................................................................15

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005).................................................................17

*In re Peregrine Sys., Inc. Sec. Litig.*,
   310 F. App'x 149 (9th Cir. 2009) ........................................................................17

*Poulos v. Caesers World, Inc.*,
   379 F.3d 654 (9th Cir. 2004).................................................................................7

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012)..................................................................................17

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)..................................................................................13

*Rubke v. Capitol Bancorp Ltd*,
    551 F.3d 1156 (9th Cir. 2009)...........................................................................6, 13

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)..................................................................16

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977).............................................................................................18

*Schwab v. E*Trade Fin. Corp.*,
    285 F. Supp. 3d 745 (S.D.N.Y. 2018)............................................................15, 16

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015)...........................................................16, 18

*SEC v. Daifotis*,
    2011 WL 2183314 (N.D. Cal. June 6, 2011) .......................................................18

*SEC v. Loomis*,
    969 F. Supp. 2d 1226 (E.D. Cal. 2013).................................................................17

*Siegal v. Gamble*,
    2016 WL 1085787 (N.D. Cal. Mar. 21, 2016) .....................................................20

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999).........................................................................6, 13, 14

*Simpson v. AOL Time Warner*,
    452 F.3d 1040 (9th Cir. 2006)..........................................................................17, 18

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012)..................................................................15

*In re Splash Tech. Inc. Sec. Litig.*,
    2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ....................................................18

*Stanislaus Food Prod. Co. v. USS-POSCO*,
    782 F. Supp. 2d 1059 (E.D. Cal. 2011).................................................................15

*Stoneridge Inv. Partners, LLC, v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008).........................................................................................15, 17

*Teamsters Local 282 Pension Tr. Fund v. Angelos*,
    762 F.2d 522 (7th Cir. 1985)................................................................................15

*Tellabs v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..................................................................................13, 15

*Tribeca Cos., LLC v. First Am. Title Ins. Co.*,
   239 Cal. App. 4th 1088 (2015) ..............................................................20

*Veltex Corp. v. Matin*,
   2010 WL 3834045 (C.D. Cal. 2010) ......................................................18

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*,
   2018 WL 1142884 (N.D. Cal. Mar. 2, 2018) ...........................................7

*Weinraub v. Glen Rauch Sec., Inc.*,
   399 F. Supp. 2d 454 (S.D.N.Y. 2005) ....................................................10

*In re Wilma James Tr.*,
   487 S.W.3d 37 (Mo. Ct. App. 2016) .......................................................20

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) ................................................................17

*Yokoyama v. Midland Life Ins. Co.*,
   239 F.R.D. 607 (D. Haw. 2006) .............................................................10

*In re Zillow Group, Inc. Sec. Litig.*,
   2018 WL 4735711 (W.D. Wash. Oct. 2, 2018) ......................................14

*Zobrist v. Coal-X, Inc.*,
   708 F.2d 1511 (10th Cir. 1983) ..............................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...............................................................6, 13

**Statutes**

15 U.S.C. § 77l(b) ..........................................................................................19

15 U.S.C. § 77p(b) ........................................................................................19

15 U.S.C. § 78u-4(b)(1) ..................................................................................6

15 U.S.C. § 78u-4(b)(2) .........................................................................13, 18

**Rules**

Federal Rule of Civil Procedure 9(b) ...................................1, 17, 19, 20

**Regulations**

17 C.F.R. § 240.10b-5 ...............................................................................7, 8

# I.    INTRODUCTION

Edward Jones ("EDJ") offers multiple investment account options so that investors can choose the type of account that works best for them, and it provides extensive disclosures to help clients make their choices good ones.  Plaintiffs attempt to assert claims based on these highly individualized choices in the guise of a securities class action.  But they ignore the extensive disclosures they received about the different account options and the services and charges associated with each.  Their complaint does not come close to meeting the rigorous standards under the Private Securities Litigation Reform Act of 1995 ("PSLRA") or Federal Rule of Civil Procedure 9(b).

Consistent with EDJ's longstanding focus on helping serious long-term investors achieve their individual financial goals, and in response to client feedback, investor demand, and industry developments, EDJ expanded its account options over the past decade to include fee-based accounts with sophisticated advisory services backed by Firm research and technology, called "Advisory Solutions" and "Guided Solutions" (collectively, "Advisory Programs"), in addition to traditional brokerage accounts (in which clients pay commissions on each transaction).

After receiving EDJ's extensive disclosures, the five Plaintiffs here chose to open Advisory Program accounts.  They now claim to have been dissatisfied with their individual choices, presume that all other clients who chose to invest through Advisory Programs feel the same way, and attempt to use an unfounded "reverse churning" label to attack EDJ's business model.

Plaintiffs' attack does not fit within any cognizable legal theory and relies upon unsupported conclusions.  Most fundamentally, Plaintiffs fail to plead particularized factual allegations to show anything untrue or misleading about anything EDJ said (or did).  Plaintiffs further fail to plead actual or reasonable reliance, nor can they do so—they confirmed in writing when they opened their accounts that they were not relying on representations by EDJ, and have suggested in their pleadings that at least some of them did not read the disclosures EDJ provided.

EDJ's clear and robust written disclosures, and Plaintiffs' own representations, foreclose Plaintiffs' claims.  For example, EDJ disclosed that (1) choosing the additional services in Advisory Programs could be "more expensive over time" than commissions; (2) the client's "financial advisor will typically earn more over time" under Advisory Programs; and (3) investors need to decide for

themselves which account option they prefer, with clients acknowledging that they are "not relying on the advice or recommendation of Edward Jones . . . as a primary basis for such decisions." *See infra* Part II & n.3.  The disclosures also demonstrate the extensive steps EDJ takes to ensure its clients are well-informed, and that any recommendations are appropriate for the particular investor.

Plaintiffs do not dispute that they received significant additional services in Advisory Programs, or that those options are attractive for many investors for a variety of reasons.  For example, some clients prefer a fiduciary relationship, they value the portfolio construction, monitoring, rebalancing, or other services associated with Advisory Programs, and/or they like the predictability of asset-based charges.  Instead, Plaintiffs' premise is that—as EDJ explicitly disclosed was possible—they allegedly paid more in fees over time under Advisory Programs than they had previously paid in commissions while in brokerage accounts, in which they had traded infrequently. Am. Compl. ("¶") ¶¶ 1, 4.  Plaintiffs presume that higher payments, in and of themselves, suggest that Advisory Program accounts were unsuitable, and that the fees earned are somehow evidence of fraud.  But Plaintiffs leap past the enhanced services and advice they received, and ignore the representations each of them made when choosing to open their Advisory Program accounts, that they "***believe the investment advisory and other services provided under this Agreement will add value to their overall investment experience that more than justifies the additional expenses***."  *See infra* Part II & n.3.  Plaintiffs' representations belie their allegation that EDJ Advisory Programs involve "reverse churning."  ¶ 70 (describing reverse churning as a practice of "placing a client's funds into a fee-based account for no reason other than to collect the fee" where "the client often receives very little actual advice, trading, or account activity in exchange [for the fee]").

Plaintiffs also fundamentally mischaracterize several aspects of EDJ's business.  For example, they allege that EDJ sought to profit from making its proprietary "Bridge Builder" mutual funds available to Advisory Solutions clients.  ¶ 112.  But they ignore that, as EDJ discloses, neither EDJ nor any of its affiliates keeps any management fees for Bridge Builder; those fees go to pay unaffiliated third-party sub-advisers.  *See infra* Part III.A.1.a.3.  Bridge Builder is not a profit stream for EDJ; it was designed to "lower client investment management expenses" and helps increase access to high-quality mutual funds and efficiently manage sub-advisers, with the savings returned to

clients.  Ex. 5 at 5-6; Ex. 40.

Similarly, Plaintiffs suggest there is somehow evidence of wrongdoing in the extensive steps taken by EDJ to ensure *compliance* with the law—including the sea-change prompted by the U.S. Department of Labor's now-vacated Fiduciary Rule (the "DOL Rule" or the "Rule").  *See generally Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018).  Plaintiffs dramatically oversimplify the DOL Rule, ignoring the significant burdens (and consequences for non-compliance) it imposed when advice for retirement accounts could lead to variable compensation.  Indeed, some firms stopped offering brokerage accounts altogether when confronted with the Rule's onerous requirements.[1]  But even while the Rule was in effect, EDJ allowed clients to "grandfather" pre-existing brokerage IRAs as the Rule permitted, and it removed the restrictions prompted by the Rule as soon as it was vacated.  Plaintiffs plead no factual basis for the claim that EDJ somehow used the Rule as a pretext for policy changes, or otherwise "compelled" investors into Advisory Programs.

Indeed, Plaintiffs' limited attempt to plead a basis for their claims only highlights the lack of support.  The purported "August 26, 2015 presentation made to Edward Jones management by one of the Company's Branch Office Administrators," ¶¶ 50-55, is in fact an MBA student project by a financial advisor's administrative assistant, given only to the professor, about hypothetical "new" products; it was not based on any information from EDJ, and was not presented to, and certainly does not reflect the views of, "management."  *See* Declaration of Shelley Graf ¶ 2.

For these reasons and others set forth below, Plaintiffs' claims under the Securities Exchange Act of 1934 all fail to satisfy the rigorous standards that Congress mandated under the PSLRA. Plaintiffs fail to provide particularized factual allegations to satisfy the required elements.  Similarly, for the claims under the Securities Act of 1933, Plaintiffs do not plead the requisite misstatement in a prospectus or oral statement relating thereto; they take no issue with any prospectus at all.  And the claims for supposed breach of fiduciary duty are precisely the kind of end-runs around federal law that Congress precluded under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). The complaint should be dismissed in its entirety.

---

[1]  *E.g.*, Ex. 42 [Michael Wursthorn, *Merrill Lynch to End Commission-Based Options for Retirement Savers*, Wall St. J., Oct. 6, 2016]; *Chamber*, 885 F.3d at 368 (Rule "spawned . . . the withdrawal of several major companies, including Metlife, AIG and Merrill Lynch").

## II.     FACTUAL BACKGROUND

Edward D. Jones & Co., L.P. is a privately owned financial services firm headquartered in St. Louis, Missouri.  Ex. 5 at 3, 25.[2]  Its more than 15,000 financial advisors do business face-to-face with individual clients, largely in single-advisor branch offices.  *Id.* at 4, 29.

Plaintiffs acknowledge they were provided with a brochure entitled "Making Good Choices," which EDJ provides to investors considering an account, to help them choose the type of account they want based on their personal financial objectives, preferences for the type and level of service, and how they want to pay.  ¶¶ 108, 109, 124, 152; Exs. 30-33.  The options include brokerage accounts, where the client pays a commission for each trade; Advisory Solutions, where the client delegates some investment decisions to a team of EDJ research analysts; and Guided Solutions, where the client makes the final decision for trades aligned with EDJ guidance, subject to EDJ "guardrails" to help the client stay on track.  Exs. 30-33.  In both Advisory and Guided Solutions accounts, EDJ acts as a fiduciary, and clients pay an annual fee based on the value of their accounts. *Id.*  The Making Good Choices brochure compares, for example: the level of decision-making clients have in each account; how the financial advisor provides guidance; which investment choices are available; how the account is monitored; the level of account rebalancing; and costs.  *Id.*  The Making Good Choices brochure explicitly discloses that "[p]aying an ongoing fee can make expenses more predictable but can be more expensive over time" and refers investors to the applicable program brochures and fee schedules for additional details.  *Id.*; *see* ¶¶ 90, 107, 199.  Extensive disclosures are also found in other documents incorporated into the complaint, including EDJ's Client Services Agreements (¶¶ 8, 105-108, 154, 254); program brochures (¶¶ 90, 107, 180, 199, 234); Client Profiles (¶ 107); and mutual fund prospectuses (incorporated into brochures and Client Services Agreements).

These documents contain details about the various account options, the significant additional services provided in the Advisory Programs, and associated fees.  Among other things, the

---

[2]  This summary is drawn from the complaint, materials incorporated in it, and judicially noticeable materials.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014); *see also Khoja v. Orexigen Therap., Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); Request for Judicial Notice and Incorporation by Reference.  "Ex." refers to Exhibits to the Declaration of Alexander Mircheff.  Defendants include the Jones Financial Companies, L.L.L.P., various subsidiaries, and certain of its current and former general partners.  *See* ¶¶ 13-32.

disclosures explain that the program fees include qualitative and quantitative analysis to identify eligible investments; consultation with a financial advisor regarding the selection of an appropriate portfolio objective; execution of transactions; reporting; ongoing monitoring; reviews with a financial advisor of circumstances that might warrant changes to an account; and rebalancing services.  Exs. 7-8 at 3-13, 19, 21; Ex. 9 at 3-13, 20-24; Ex. 10 at 3-13, 19-22; Ex. 11 at 3-14, 20-21; Ex. 12 at 3-14, 21-22; Exs. 14-17 at 7-10, 15-21, 23-24; Exs. 18-19 at 1-3, 5; Exs. 28-29 at 1; Exs. 30-33).  Among other information, the documents state, with respect to the subjects of Plaintiffs' complaint:

- That program fees compensate EDJ for the additional advisory services clients receive as part of Advisory Programs, and that a portion of the fees go to the financial advisor.  *See, e.g.*, Exs. 7-8 at 6-7, 9, 19-20; Ex. 9 at 5-6, 9, 21; Ex. 10 at 5-6, 9, 20; Ex. 11 at 8-9, 11, 21; Ex. 12 at 9-10, 12, 22.

- That, as with brokerage commissions, fees from Advisory Programs, as well as the amount of assets under care, can affect a financial advisor's ability to receive a bonus and other compensation such as travel.  *See, e.g.*, Exs. 7-8, 10 at 20; Ex. 9 at 21; Ex. 11 at 21-22; Ex. 12 at 22.

- That investing in Advisory Program accounts may cost more than brokerage accounts, which offer many of the same or similar investments, and clients acknowledge that the services provided add value that justifies any additional expenses.  *See, e.g.*, Ex. 11 at 3, 6; Ex. 12 at 3, 7; Ex. 7-10 at 3; Exs. 14-17 at 24; Exs. 18-19 at 7; Exs. 30-33.

- That EDJ has an interest in affiliated mutual funds, including Bridge Builder, which is available for Advisory Solutions clients, and does not retain a fee for investments in Bridge Builder.  *See, e.g.*, Exs. 14-17 at 10; Ex. 38 at B-45-46.

These disclosures help EDJ clients choose accounts that are appropriate for their individual preferences, and by acknowledging the disclosures, clients confirm they understand the implications of their choices.  In fact, before opening an Advisory Program account, clients fill out a questionnaire with their investment objectives, life stages, time horizons, and risk tolerances.  Exs. 14-17, 22 at 1-4.  Clients decide for themselves which account is best for them; EDJ does not "move" assets into Advisory Program accounts, or make account selections for clients, as Plaintiffs suggest.  Indeed, clients confirm that they are "not relying on the advice or recommendation of Edward Jones . . . as a primary basis for such decisions," and believe the "advisory and other services provided . . . will add value to their overall investment experience that more than justifies the additional expenses."[3]

---

[3]  Exs. 14-17 at 8, 24-25 (confirming reading of brochure and that "Client made its own decision to invest in the Program."); Exs. 18-19 at 2 ("I have made an independent determination to participate in Guided Solutions based on . . . the source and amount of assets that I have available . . . , [my] time horizon . . . financial situation, investment objectives and risk tolerance."), 7.

### III.   ARGUMENT

**A.   The Exchange Act Claims Fail as a Matter of Law**

**1.   Plaintiffs Fail to State a Claim for a Material Misstatement or Omission**

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014). Private plaintiffs asserting such claims must adequately plead, among other things, (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) actual and justifiable reliance; (4) economic loss; and (5) loss causation. *NVIDIA*, 768 F.3d at 1053.

Plaintiffs "must satisfy both the pleading requirements of the PSLRA and the heightened pleading standard of [Fed. R. Civ. P.] 9(b)." *Id.* at 1057-58. For example, they must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *E.g.*, 15 U.S.C. § 78u-4(b)(1); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). For all allegations not within plaintiffs' personal knowledge, they must reveal "the sources of [their] information." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999); *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1166 (9th Cir. 2009).[4] "By requiring specificity," the PSLRA "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Plaintiffs fall far short of these standards here.

**a.   Plaintiffs Fail to Plead Any "Untrue" or "Misleading" Statement (or Omission) of Material Fact**

As the Supreme Court has recently emphasized, a claim under Rule 10b-5(b) requires an affirmative statement: it is unlawful "to make any untrue statement of a material fact or to omit to

---

[4]   Although Plaintiffs do not identify him as a source, they apparently are being aided by the former EDJ financial advisor to four of them—who was discharged by EDJ in December 2014 for unauthorized trading in client accounts and lying to compliance personnel, and who sued the Firm in an unsuccessful FINRA arbitration and a pending defamation action, while represented by one of Plaintiffs' counsel here. *Gundersen v. Edward Jones, et al.*, No. 15-CV-01484 (Cal. Super. Ct. filed Sept. 9, 2015); *see also* Ex. 45 at 8-10.

state a material fact necessary in order to make the statements made . . . not misleading."[5]  Plaintiffs attempt to characterize their claims as based on "material omissions," ¶¶ 1, 104-114, but that is a pleading artifice, likely designed to try to avoid the burden to plead reliance, which would preclude class treatment.  *See infra* Part III.A.1.c.  As Plaintiffs admit elsewhere in their complaint, their claims are based on supposed "untrue" or "misleading" statements.  *E.g.*, ¶ 157 (alleging "incorrect[]" assertions about DOL Rule); ¶ 200 (challenging "the statements made"); ¶ 206(c) (same); ¶ 242 (EDJ "made numerous untrue statements of material fact . . . as alleged herein"); ¶ 244 (same); *see also, e.g.*, Dkt. 1 at ¶¶ 1, 6, 81-84, 93, 102, 132, 134, 137 (alleging "misleading," "false," or "untrue" "statements"); Dkt. 14 at 2 (EDJ "made misleading statements").  Even Plaintiffs' laundry list of purported "omissions" leads with EDJ's supposed failure to provide "*accurate*" program descriptions—a veiled misstatement theory.  ¶ 112 (emphasis added).

Indeed, EDJ provided extensive disclosures on *all* of the topics at issue.  Artful pleading cannot "transform" the claims into omissions theories, as they are necessarily "based as much on what is *there* as what is purportedly missing."  *Poulos v. Caesers World, Inc.*, 379 F.3d 654, 667 (9th Cir. 2004); *see also, e.g.*, *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999); *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 216-20 (D.C. Cir. 2010) (plaintiffs cannot "superimpose[]" omissions theory over alleged misstatements at the "crux" of the case); *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*, 2018 WL 1142884, at *6 (N.D. Cal. Mar. 2, 2018) (claims not primarily for omissions when "predicated on affirmative statements").

Moreover, several allegedly omitted pieces of information are not facts at all, but rather Plaintiffs' unsupported conclusions, which cannot support a claim under Rule 10b-5.[6]  In any event,

---

[5]  17 C.F.R. § 240.10b-5(b); *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 37 (2011); *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142-43 (2011); *see also NVIDIA*, 768 F.3d at 1056 (under "Rule 10b-5, material information need not be disclosed unless omission of that information would cause other [statements] to be misleading"); *cf. Chiarella v. United States*, 445 U.S. 222, 229-31 (1980) (addressing insider trading claims).  Here, Plaintiffs do not challenge any statements "made" by any defendant other than Edward D. Jones & Co., which is an independent basis for dismissal as to all other defendants.  *Janus*, 564 U.S. at 142-43.

[6]  *See, e.g.*, ¶¶ 106-08, 112 (asserting that EDJ did not conduct a "sufficient" suitability analysis; "benefit[s] [itself] at [clients'] expense"; and acted "not in [clients'] best interest"); *cf. Brown v. Brewer*, 2010 WL 2472182, at *24 (C.D. Cal. June 17, 2010) ("As there is no duty of self-accusation, these proffered material omissions cannot support [an Exchange Act] claim[;] . . . unless and until [adjudication of them] they . . . simply could not have been material."); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (similar).

EDJ's statements were clear and robust, and did not misstate (or omit) any material facts.

1.      *Statements Comparing Different Account Types*.  Plaintiffs claim that EDJ made statements that did not "accurate[ly] descri[be] the material differences between . . . commission-based accounts and the fee-based accounts" (¶ 112), including that investing through Advisory Programs "would result in a higher fee to its formerly commission-based clients" (¶¶ 106-108, 112). This is patently incorrect.  Among other things, clients receive the Making Good Choices brochure, which explicitly breaks down material differences between the account types.  *Supra* Part II.  In addition, clients receive program-specific brochures that describe program features, investment options, and fees in great detail.  *Id.*  Those various program brochures (¶¶ 90, 107, 199) explain that investing through an Advisory Program account "may cost you more or less than purchasing advisory services and brokerage services separately, depending on certain factors, such as the frequency of your trading."  *E.g.*, Ex 11 at 6; *id.* at 3 ("[i]t is important . . . to consider the additional costs associated with an advisory program before investing."); Exs. 30-33.  They also explain that investors may "purchase many of the same or similar investments as those available in an advisory program *for a lower fee* through Edward Jones as a broker-dealer, although [they] will not receive the additional advisory services."[7]  After receiving and acknowledging these disclosures, Plaintiffs chose to receive the additional advisory services and agreed to pay for them.  No particularized factual allegations show that EDJ's statements were "untrue" or "misleading."  17 C.F.R. § 240.10b-5(b).

2.      *Statements Regarding Fees*.  Plaintiffs further claim that EDJ did not "accurate[ly] descri[be] fees charged by Advisory Programs" and "[t]he cost and impact" of the fees.  ¶ 112.  But Plaintiffs acknowledge receiving a schedule of fees (¶ 107, *see, e.g.*, Exs. 28-29), which is an outline of the exact annual fee rate as compared to the value of the account investments, as well as an estimate of their specific fees.  *See also, e.g.*, Exs. 24-26 at 8.  In addition to the disclosures discussed above comparing fees for the various account types, program brochures identified the "impact of the

---

[7]  Exs. 7-13 at 3 (emphasis added); *see also* Exs. 14-15, 17 at 24 ("Mutual funds, ETFs and money market funds can be purchased directly through . . . a brokerage account, subject to sales charges and/or commissions.  An Advisory Solutions Fee would not be assessed, therefore making a brokerage account alternative generally a lower cost alternative . . . ."); Ex. 19 at 7.

fees," including that "[a]ny internal fees and expenses charged by a mutual fund or ETF, as well as the fees you pay for [advisory services], will reduce your account's investment performance."[8]

Moreover, the Client Services Agreement each Plaintiff signed stated that "[t]he Program Fee compensates [EDJ] for providing advisory services," and that "[a] portion of the Program Fee is paid to the financial advisor." *See, e.g.,* Exs. 14-15 at 16; Ex. 17 at 17. EDJ also explained that "[a] financial advisor will typically earn more in upfront fees and commissions when you use brokerage services . . . [and] more over time if you invest in [Advisory Programs]." Ex. 7-8, 10 at 9; Ex. 11 at 11; Ex. 12 at 12.[9] Plaintiffs make no particularized factual allegations to specify why these disclosures supposedly were false or misleading.

Plaintiffs also make the conclusory claim that EDJ "incentivize[d] its financial advisors by promoting, giving pay raises and/or bonuses to, and/or not terminating advisors who moved their clients with commission-based accounts to an Advisory Program, even when it was not in their clients' best interest." ¶¶ 68, 106-113, 183. The complaint is devoid of any particularized factual allegations to support that characterization. Plaintiffs' allegation that compensation was "revenue-based" does not suggest that it depended on account type. ¶¶ 4, 152. The disclosures Plaintiffs received clearly stated that (as with commissions) the fees paid as part of Advisory Programs, as well as the amount of assets under care, can "impact your financial advisor's eligibility for a bonus," and that "Program Fees . . . are counted toward qualifying for the [Diversification/Travel Award] Program." Exs. 7-8, 10 at 20; Ex. 11 at 21-22; Ex. 12 at 22. Plaintiffs again fail to plead any particularized factual allegations to suggest that these disclosures were "untrue" or "misleading."

3.     *Statements Regarding Affiliated Mutual Funds*. Plaintiffs claim EDJ failed to disclose that its Bridge Builder family of mutual funds "is owned by, and financially benefits, Edward Jones, at the expense of its clients" (¶ 112), and "Defendants received an extra financial boost by investing clients' assets in Bridge Builder – on top of the asset-based fees they received from clients after moving their accounts into Advisory Solutions" (¶ 90). *See also* ¶¶ 85, 89. These allegations are

---

[8]  Ex. 11 at 11; *id.* at 8; Ex. 12 at 9 and 12; Exs. 7-8, 10 at 6; Exs. 14-15, 17 at 8-9; Exs. 18-19 at 2.

[9]  To the extent Plaintiffs suggest otherwise, "the precise allocation of those fees is not material . . . under the securities laws." *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008) (similar).

doubly flawed.  *First*, EDJ repeatedly disclosed its ownership interest in Bridge Builder and other affiliated funds.  *E.g.*, Ex. 38 at B-45-46; Ex. 7 at 9; *see also, e.g.*, Ex. 2 at 86.  *Second*, as EDJ explained, it waives all management fees related to Bridge Builder (and other affiliated funds) apart from those paid to unaffiliated third-party sub-advisers.[10]  Plaintiffs plead no particularized factual allegations to the contrary.

        4.     <u>Statements Regarding Suitability</u>.  Plaintiffs cite FINRA Rule 2111, which requires "a reasonable basis to believe that a recommended transaction or investment strategy . . . is suitable for the customer, based on . . . reasonable diligence . . . to ascertain the customer's investment profile," i.e., individualized factors including "age," "investment objectives," and "time horizon."  ¶¶ 72, 79, 196, 199.  Recognizing that there is no private right of action under that rule,[11] and that they cannot plead an actual unsuitability claim under Section 10(b),[12] Plaintiffs focus on supposed misstatements relating to the extent of EDJ's suitability analysis.  Plaintiffs begin by accusing EDJ of a supposed "absence of *any* measures taken to determine the suitability of Advisory Programs for clients"; but

---

[10]  Ex. 38 at B-46 (chart outlining the $0 net advisory fees for Bridge Builder).  The Bridge Builder prospectuses state: "[t]he Adviser has contractually agreed to waive its management fees to the extent management fees to be paid to the Adviser exceed the management fees the Adviser is required to pay the Fund's Sub-Advisers." Ex. 37 at 1, B-47; Ex. 38 at B-46.  Client agreements and brochures confirm the same. Exs. 14-15, 17 at 10; Exs. 7-8, 10 at 7; Ex. 11 at 9-10; Ex. 12 at 10-11; *see also* Ex. 2 at 40-41, 86.

Similarly, and contrary to Plaintiffs' presumption (¶ 59), EDJ explicitly disclosed to Guided Solutions clients that while "[c]ash balances awaiting investment or reinvestment . . . will be automatically swept into the Edward Jones Money Market Fund" (Exs. 18-19 at 1), and that "Edward Jones is the direct or indirect owner of 100% of the adviser" of the fund and "receives various revenues related to assets in the money market fund," EDJ "will apply a fee offset [to the Program Fees] equal to the amount of the [] Revenue received by Edward Jones" for investments in the fund, and thus not receive the "asset-based fee revenue" that normally would apply to the fund (Ex. 12 at 11; *see also* Ex. 11 at 22).

[11]  *See, e.g.*, *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 680-81 (9th Cir. 1980) (holding that the Exchange Act does not provide a private cause of action for NASD rules); *Weinraub v. Glen Rauch Sec., Inc.*, 399 F. Supp. 2d 454, 462 (S.D.N.Y. 2005) (same, NASD and FINRA rules).

[12]  Plaintiffs cannot plead the elements of such a claim, which include: "(1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations . . . relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment . . . ." *E.g.*, *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993).  Plaintiffs certainly could not meet the required elements on a class-wide basis. *See Yokoyama v. Midland Life Ins. Co.*, 239 F.R.D. 607, 608 (D. Haw. 2006) ("[I]ndividual issues clearly predominate in the Plaintiffs' suitability-based claims . . . .").

they later backtrack, saying instead that the Firm did not conduct a "*sufficient* analysis," thereby

acknowledging that measures *were* taken to assess suitability.  ¶¶ 1, 112 (emphases added).

In fact, as the complaint and the materials incorporated in it reflect, EDJ took *extensive* steps

to assess whether Advisory Program accounts were suitable choices for each individual investor.

Those steps included: (a) in-person meetings with financial advisors; (b) providing the Making Good

Choices brochure, which lays out the account options and the type of investor best suited for each one

(Exs. 30-33); (c) including extensive disclosures in client account agreements and brochures (*see* Exs.

7-19); (d) using client questionnaires with investment goals and portfolio objectives (EDJ "scores

certain answers to determine your risk tolerance . . . life stage or time horizon") (Exs. 7-8, 10 at 4; *see*

*also* Exs. 14-15, 17, 22 at 1-4; Exs. 24-26); (e) review of new accounts by supervisory personnel

(Exs. 7-8, 10 at 19; Ex. 11 at 20; Ex. 12 at 21); and (f) follow-up discussions and continuing

supervisory reviews as appropriate (Exs. 7-8, 10 at 19; Ex. 11 at 20-21; Ex. 12 at 21-22).

The suggestion that these steps were not "sufficient" is a legal conclusion—not a material

fact—that is unsupported by any particularized factual allegations (or any law).  Plaintiffs allude to

higher payments to EDJ and Plaintiffs' supposedly infrequent trading while in brokerage accounts (¶

1), but that cannot carry their burden.  Plaintiffs agreed that they wanted the "additional" services that

these programs offer, *e.g.*, *supra* n.7, which are designed to help manage portfolios more

effectively.[13]  In addition to failing to adequately plead any misstatement (or omission), any claim

based on an allegation that the steps taken to assess suitability for individual investors were not

sufficient is simply not viable on a class-wide basis.  *See Fernandez v. UBS AG*, 2018 WL 4440498,

at *3-4 & n.3 (S.D.N.Y. Sept. 17, 2018) (denying class certification on claim that defendant breached

express contractual obligations by "failing to perform any suitability analysis," and noting that a

"client-focused suitability analysis" entails "a highly individualized determination").

5.    *Statements Regarding the DOL Rule.*  Plaintiffs also suggest vaguely that EDJ

---

[13]  Plaintiffs also suggest that Advisory Programs were not suitable for investors who had purchased
class A share mutual funds but had "not yet reap[ed] the full benefit of their initial front-end
cost."  ¶ 98.  That theory is conclusory, and ignores the fact that EDJ, as it disclosed, "review[ed]
how [clients] funded [their] account[s], considering such factors as how long [they] held the
investments [they] sold in order to fund the account" (Ex. 10 at 19; *see also id.* at 7 (Fee
Reduction); Exs. 7-8 at 7-8, 19; Ex. 11 at 10, 20; Ex. 12 at 11, 21) and could "discount[] or
reduce[]" the program fee where appropriate (Exs. 28-29).

misstated the requirements of the DOL Rule in explaining that it was an impetus for some of the changes to its commission-based retirement accounts.  ¶¶ 46, 49.  In addition to not pointing to any particular statements by the Firm, *cf.* Ex. 41, Plaintiffs incorrectly characterize the 275+ pages of the DOL Rule as simply requiring boilerplate certifications of "best interest."  *See, e.g.*, ¶ 42.  That is plainly wrong.  Promulgated in April 2016, the Rule "fundamentally transform[ed] over fifty years of settled and hitherto legal practices in a large swath of the financial services and insurance industries." *Chamber of Commerce*, 885 F.3d at 363.  The Rule prohibited transaction-based commissions in retirement accounts (which were deemed to be a conflict of interest), except pursuant to a "Best Interest Contract Exemption" ("BICE").  The BICE required financial advisors to enter into complex contracts "with a web of duties and legal vulnerabilities"—including significant diligence, documentation, and disclosure burdens, with consequences for non-compliance.  *Id.* at 366-67.  In vacating the Rule, the Fifth Circuit noted that it adversely impacted small account investors because "brokerage and insurance firms cannot afford to service small accounts, *given the regulatory burdens*."  *Chamber of Commerce*, 885 F.3d 360, 368 (emphasis added); *see also supra* n.1.  EDJ openly anticipated these issues—not as a "marketing strategy," ¶ 49, but in a public letter to regulators setting forth its concerns.  Ex. 44.

Despite the vast regulatory burden associated with the Rule—and in particular with implementation of the BICE—EDJ determined to continue to offer its clients account choices consistent with the Rule.  For example, EDJ allowed all IRA clients to grandfather their accounts, and allowed new transactional accounts with minimums to be opened for the purchase of stocks, bonds, and variable annuities.  ¶ 61.  Contrary to Plaintiffs' contentions (¶¶ 63, 176), the burdens imposed by the Rule made it prohibitively difficult to allow IRA investors to purchase mutual funds on commission.  In particular, the "neutral factors" analysis required a showing that a product's commission was reasonable based upon "the skill of the financial advisor, the complexity of a . . . product and the time spent explaining [its] features."  Ex. 44 at 3-4.  Moreover, adjustments to account minimums were made to help ensure compliance—and no EDJ policy "put" clients into any account without their written consent.  *Cf.* ¶¶ 61, 63.

Plaintiffs do not allege that the restrictions designed to meet the Rule remain in effect now

1   that it has been vacated (and they do not).  The suggestion that EDJ used the DOL Rule as a pretext

2   is—like the rest of the claimed misstatements or omissions—entirely unsupported.

3          **b.**      **Plaintiffs Fail to Plead Scienter**

4        Plaintiffs also fail to adequately plead the requisite "strong inference" of "scienter"—i.e., a

5   "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425

6   U.S. 185, 193 n.12 (1976); *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); 15

7   U.S.C. § 78u-4(b)(2).  Plaintiffs must plead particularized factual allegations, using "great detail,"

8   *Silicon Graphics*, 183 F.3d at 974, and point to "specific contemporaneous statements or conditions

9   that demonstrate the *intentional* or the *deliberately reckless* false or misleading nature of the

10   statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (emphases added);

11   *NVIDIA*, 768 F.3d at 1053.  And, to be "strong," the inference of scienter must be "cogent" and

12   "compelling" in light of competing "innocent inferences." *Zucco*, 552 F.3d at 991.  Here, by far the

13   most compelling inference is that Defendants always endeavored to (and did) comply with the law,

14   and believed (correctly) that the Firm's disclosures were truthful and adequate.

15        Plaintiffs mainly claim that individual Defendants had scienter from "day-to-day involvement

16   in" managing departments or individuals responsible for purported misstatements.  *See, e.g.*, ¶¶ 120-

17   193.  But such conclusory allegations fall far short of the standard.  *E.g.*, *Zucco*, 552 F.3d at 998.

18   "[P]laintiffs must do more than allege that . . . officers had the requisite knowledge by virtue of their

19   'hands-on' positions, because that would eliminate the necessity for specially pleading scienter . . . ."

20   *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000).  Plaintiffs also refer to a

21   supposed profit motive (¶¶ 183, 201, 215, 224), but that too is insufficient. *Silicon Graphics*, 183

22   F.3d at 979; *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008).  That the

23   accounts generated revenue does not imply intent to defraud; it suggests the account options were

24   popular.  And the claim that fees were "high[]" is not actionable, wholly conclusory, and unsupported

25   by analysis of true peer firm services or the all-in costs of investing. ¶¶ 92-93; *supra* Part III.A.1.a.3.

26        Unlike in many securities cases, Plaintiffs do not rely on information from confidential

27   witnesses. *E.g.*, *Zucco*, 552 F.3d at 998.  They do not reveal the sources for their purported beliefs at

28   all, which is reason enough to reject those claims. *E.g.*, *Rubke*, 551 F.3d at 1166.  Instead, for

example, they make vague, conclusory allegations of "pressure" and "veiled threat[s]" from supervisory personnel, without even attempting to provide particularized factual support.  ¶¶ 56, 164; *see also supra* n.4.  Plaintiffs cite only a single supposedly internal document they apparently found online, but they plead no particularized facts to support their mischaracterization of that MBA course project as a presentation to, or sanctioned by, management.  *Supra* p.3; Graf Decl.  Also inadequate are vague media comments or assertions from long-departed former employees.  *E.g.*, ¶¶ 37, 56.

Also unlike most securities cases, Plaintiffs do not identify a *single* allegedly false or misleading statement in EDJ's SEC filings.  To the contrary, Plaintiffs implausibly suggest that evidence of fraud was published in EDJ's Forms 10-K (¶¶ 5, 58, 66, 68, 188), its public comment letters regarding the DOL Rule (¶ 49), and statements by its managing partner.  "Surely, such public disclosure speaks to Defendants' belief—and the existence or lack of scienter—that the [business strategy] was legal."  *E.g.*, *In re Zillow Group, Inc. Sec. Litig.*, 2018 WL 4735711, at *8 (W.D. Wash. Oct. 2, 2018).  Not a single fact is pleaded to suggest that any Defendant shared Plaintiffs' simplistic view of the DOL Rule or suspected, much less intended, that the Firm's efforts to ensure compliance were somehow designed to violate the law.  Nor do any particularized factual allegations even suggest *any* basis to believe—much less actual awareness—that EDJ's extensive steps to work with its clients to tailor an appropriate investment strategy were not "sufficient."  *See, e.g.*, ¶¶ 194, 200.

By contrast, under the requisite "holistic review," *Tellabs*, 551 U.S. at 324, by far the most compelling inference is that Defendants believed the Firm's disclosures were fulsome and accurate, and that offering clients the option to choose fee-based accounts was appropriate.  The detailed disclosures that Plaintiffs concede they received support the innocent inference and refute the suggestion of fraud.  It is impossible to view the Making Good Choices brochure, for example, as anything other than a clear and simple description of Plaintiffs' options, and the details were set forth in numerous additional disclosures.  *Supra* Parts II, III.A.1.  Plaintiffs also cite numerous training, compliance, and supervisory functions instituted by the Firm to oversee adherence to legal standards, including the complex DOL Rule.  *See, e.g.*, ¶¶ 42-46, 131-33, 160-68.  In short, rather than implying fraud, the facts pled in the complaint depict a firm that provides a wealth of information to its clients and is committed to following the law.  There is no inference of scienter, much less a "strong" one.

### c.    Plaintiffs Fail to Plead Reliance

"Reliance by the plaintiff . . . is an essential element of the § 10(b) private cause of action." *Stoneridge Inv. Partners, LLC, v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  Reliance must be actual and "justifiable," to ensure "that there is a causal connection between the [alleged] misrepresentation and the [alleged] harm."  *E.g.*, *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1159 (9th Cir. 1996).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on [it]."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011).

Here, Plaintiffs do not even in conclusory fashion claim actual reliance on the statements.  *See Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 753 (S.D.N.Y. 2018) (dismissing Section 10(b) claim "[b]ecause plaintiff has again failed to allege he actually read, or was otherwise aware of [the] representations").  The closest Plaintiffs come is boilerplate that they relied on EDJ's "fiduciary capacity" and "representation," ¶ 216, but that is not the same as relying on allegedly deceptive statements or conduct.  "[T]his theory of reliance—if accepted—would amount to a novel presumption" that would improperly swallow the reliance element.[14]

In fact, in the original complaint, Plaintiffs acknowledged the lack of reliance by asserting that at least some of them did not read the disclosures they received. Dkt. 1 ¶ 80 ("Plaintiffs often simply signed any papers that the branch office administrator placed in front of them on their way out without question"); *see Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992); *Teamsters Local 282 Pension Tr. Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir. 1985); *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1517 (10th Cir. 1983); *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 542 (S.D.N.Y. 2014) ("Courts have generally found it unreasonable to rely on oral statements when, as here, there is a [writing] that each investor was required to read in full before investing."); *see also Stanislaus Food Prod. Co. v. USS-POSCO*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011) ("a court need not accept as true allegations in an amended complaint that contradict an earlier complaint without explanation").  Moreover, there can be no actual or justifiable reliance on

---

[14]    *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152 (S.D.N.Y. 2012); *In re Interbank Funding Corp. Sec. Litig.*, 668 F. Supp. 2d 44, 49-51, n.5 (D.D.C. 2009) (claim plaintiffs "relied on Defendants to disclose all material facts . . . does not satisfy the standard for direct reliance").

alleged statements about suitability because Plaintiffs confirmed they were "not relying on the advice or recommendation of Edward Jones . . . as a primary basis for such decisions."  *Supra* n.3; *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213 (C.D. Cal. 2015) (dismissing Section 10(b) claim where document acknowledged plaintiff did not rely).

Nor does any recognized presumption of reliance apply here.  Plaintiffs do not (and could not) invoke the efficient market presumption.  *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988).  Rather, they try to fit into the narrow presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), which applies to claims based primarily on omissions.  ¶ 209.  But as explained above, because the claims actually concern (flawed) allegations of misstatements—or at most a mix of alleged misstatements and omissions, *supra* Part III.A.1.a—*Affiliated Ute* does not apply, particularly under the Ninth Circuit's "restrictive" interpretation.  *Interbank*, 629 F.3d at 219.  *Affiliated Ute* is reserved for cases "where reliance would be difficult to prove because it was based on a negative."  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009).  But a plaintiff who had read and relied on EDJ's statements could simply say so.  And "that the plaintiff apparently did not read, and was not otherwise aware of, the . . . alleged misrepresentations does not transform this case from one about [alleged] misrepresentations into one 'involving primarily a failure to disclose.'"  *Schwab*, 285 F. Supp. 3d at 755.  That defeats any claim of reliance.

### d.  Plaintiffs Fail to Plead Causation of Any Losses

Moreover, Plaintiffs fail to allege, with the requisite particularity, "a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered."  *E.g.*, *Ore. Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014).  *First*, Plaintiffs allege they paid more in fees than in commissions, but paying a higher fee for a higher level of services is not a "loss."  *E.g.*, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006).  Indeed, Plaintiffs confirmed that the additional fees paid were justified by the additional Advisory Program services received.  *See supra* Part II & n.3.  *Second*, Plaintiffs do not even allege that they were worse off overall than if they had continued in brokerage accounts (presumably because at least some of them cannot), let alone identify any losses attributed to supposedly deceptive conduct.  *E.g.*, *Apollo*, 774 F.3d at 608.  *Third*, for the claims

about suitability analysis, "Plaintiffs cannot [establish] the necessary element of causation without proving that the [Advisory Program accounts] were actually unsuitable for them." *Fernandez*, 2018 WL 4440498, at *20.  Plaintiffs fail to allege actual unsuitability, however.  *See supra* Part III.A.1.a.4 & n.12.  *Fourth*, as to statements concerning the DOL Rule and the changes it temporarily prompted, Plaintiffs do not allege that they affected them in any way, let alone with particularity.

All of these defects are fatal to the claims for supposed misstatements or omissions.

### 2.   Plaintiffs Fail to State a Claim for "Scheme Liability"

Plaintiffs' claims for "scheme" liability under Rule 10b-5(a) and (c) also should be dismissed, because the Ninth Circuit has squarely held that scheme liability must encompass manipulative or deceptive "conduct beyond . . . alleged misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057-58 (9th Cir. 2011).  The lines dividing the various Rule 10b-5 claims are "carefully maintained" and "well-established." *Desai*, 573 F.3d at 940-41; *SEC v. Loomis*, 969 F. Supp. 2d 1226 (E.D. Cal. 2013).[15]  There is no aiding and abetting claim under Section 10(b), and participating in another's statement "is not 'conduct' that can support . . . scheme liability."[16]  Moreover, a private "scheme" claim must meet the heightened pleading standards under the PSLRA and Rule 9(b).[17]

Here, although the complaint includes a section captioned supposed "omissions," there is no

---

[15]  *Accord, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 986 (8th Cir. 2012).  A divided D.C. Circuit panel recently held to the contrary, *Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017), with then-Judge Kavanaugh dissenting, and the Supreme Court has granted certiorari.

Plaintiffs cite *Geman v. SEC*, 334 F.3d 1183 (10th Cir. 2003), to try to suggest that there is a recognized "reverse churning" claim for purposes of "scheme liability" under the securities laws. ¶ 71.  But *Geman* is a misstatement case, and the propriety of fee-based accounts was not at issue. 334 F.3d at 1190.  Moreover, Plaintiffs' "reverse churning" allegations, claiming that EDJ "plac[ed] client's funds into a fee-based account for no reason other than to collect the fee" and "the client often receives very little actual advice, trading, or account activity in exchange [for the fee]," ¶ 70, are belied by their representations that the additional services they receive "more than justifies" the additional expenses.  *See supra* Part II & n.3.

[16]  *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 177 (1994); *Abbate v. Wells Fargo*, 2011 WL 9698215, at *3 (C.D. Cal. Nov. 17, 2011); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005) ("Subsections (a) and (c) are not a backdoor into . . . (b)").

[17]  The claims must also adequately plead scienter, reliance, economic loss, and loss causation, none of which is present here.  *Stoneridge*, 552 U.S. at 159-60; *In re Peregrine Sys., Inc. Sec. Litig.*, 310 F. App'x 149, 150-51 (9th Cir. 2009); *Simpson v. AOL Time Warner*, 452 F.3d 1040, 1047

Gibson, Dunn &
Crutcher LLP

parallel section concerning allegations of supposed "manipulative" or "deceptive" conduct. *See* ¶¶ 104-14 & Table of Contents.  Paragraph 1 characterizes the complaint as asserting a "scheme" to "ma[k]e material omissions."  A subsection of "background" allegations refers to a supposed "scheme," (pp. 2, 15, ¶¶ 39-91), but that is largely devoted to mischaracterizations of EDJ's fees and the DOL Rule, which are wholly conclusory as explained above.  No particularized factual allegations suggest any Defendant "committed a manipulative or deceptive act"—i.e., "conduct that had the principal purpose and effect of creating a false appearance of fact." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997); *Simpson*, 452 F.3d at 1048.  Plaintiffs do not allege anything like the requisite "sham" or "illegitimate" transactions that could not have a "principal legitimate business purpose." *See Simpson*, 452 F.3d at 1050, 1053; *Daifotis*, 2011 WL 2183314, at *9.

While the word "deceptive" only appears once in the complaint, Plaintiffs do sprinkle in conclusory uses of "manipulative" (notably, in both the Rule 10b-5(a)/(c) and (b) claims, underscoring that they are one and the same).  ¶¶ 212, 215, 222, 227.  But "manipulative" is a "term of art and refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity" and "simulating market activity that does not reflect genuine investor demand." *Santa Fe Indus., Inc. v. Green*, 430 U. S. 462, 476-477 (1977); *Desai*, 573 F.3d at 940-41.  Plaintiffs plead nothing like that here.  For example, the insinuation that a computer system was "cumbersome," or provided automated recommendations about account types in "the Agreement that Class Members signed" (¶¶ 154-155)—which is certainly not pleaded with anything approaching particularity—explicitly refers to the disclosures made to investors.  Likewise, the conclusory allegations that clients were "compelled" into Advisory Programs (¶ 212) by the Firm's response to the DOL Rule or otherwise do not involve manipulative (or deceptive) conduct.  Where "a transaction's terms are fully disclosed," there can be no "scheme" claim. *E.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 390 (S.D.N.Y. 2010); *ScripsAmerica*, 119 F. Supp. 3d at 1237.  The failure to plead scienter, reliance, or loss causation is

---

(9th Cir. 2006); *Veltex Corp. v. Matin*, 2010 WL 3834045, at *6 n.9 (C.D. Cal. 2010); *In re Splash Tech. Inc. Sec. Litig.*, 2000 WL 1727377, at *5 n.2 (N.D. Cal. Sept. 29, 2000); 15 U.S.C. § 78u-4(b)(2).  *Simpson* includes dicta on the reliance element that is in tension with *Stoneridge* and so was vacated.  *Simpson* nonetheless is persuasive, including for its holding about what conduct can be "deceptive."  *SEC v. Daifotis*, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011).

1  fatal as well, as with the other Exchange Act claims.  *See supra* Part III.A.1.b-d & n.17.

2  **B.      The Securities Act Claims Fail as a Matter of Law**

3            Plaintiffs' claims under Section 12(a)(2) of the Securities Act fail because they do not allege

4  that they purchased securities in a public offering pursuant to a "prospectus" (or oral communication

5  relating thereto) that contains a misstatement.[18]  In addition to pleading no misstatement with

6  particularity (*supra* Part III.A.1.a), the complaint cites no "prospectus" at all.  *See* ¶¶ 237-

7  245.  Plaintiffs point only to the account agreements and brochures, which are *not* prospectuses.

8  Moreover, the absence of loss causation also defeats the Section 12(a)(2) claims: "the face of [the

9  complaint] demonstrates negative causation."  *See Brown v. Ambow Educ. Holding Ltd.*, 2014 WL

10  523166, at *14-16 (C.D. Cal. Feb. 6, 2014); 15 U.S.C. § 77*l*(b); *supra* Part III.A.1.c, d.

                                    *      *      *

12            The failure to adequately plead primary liability also defeats the control person claims.  *E.g.*,

13  *NVIDIA*, 768 F.3d at 1052.  All of the federal securities claims should be dismissed.

14  **C.      The State Law Claims Are Precluded by Federal Law**

15            After passage of the PSLRA, plaintiffs began trying to avoid that statute's rigorous

16  requirements by asserting "what were essentially federal securities law claims as state law causes of

17  action."  *Northstar Fin. Advisors, Inc. v. Schwab Investments*, 904 F.3d 821, 828 (9th Cir. 2018).  In

18  response, Congress enacted SLUSA to preclude "covered" state law class actions (i.e., more than 50

19  plaintiffs) alleging misstatements, omissions, or deceptive conduct in connection with the sale of

20  "covered" securities, including those "issued by an investment company registered under the

21  Investment Company Act of 1940."  15 U.S.C. § 77p(b); *Merrill Lynch, Pierce, Fenner & Smith Inc.*

22  *v. Dabit*, 547 U.S. 71, 83 (2006); *Freeman Inv., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1115 & n.3

23  (9th Cir. 2013).  This is a covered class action, ¶ 203, and the investments in the accounts include

24  covered securities, such as the Bridge Builder mutual funds featured in the complaint.  *See* Dkt. 14-1,

25  Exs. 34-39.

26            SLUSA applies even though Plaintiffs purport not to incorporate their allegations of "material

---

[18]  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *Miller v. Thane Int'l*, 519 F.3d 879, 885 (9th Cir. 2008); *Mallen v. Alphatec Holdings*, 861 F. Supp. 2d 1111, 1122 (S.D. Cal. 2012); *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 982-83 (N.D. Cal. 2007); Fed. R. Civ. P. 9(b).

omissions" into the fiduciary duty claims.  ¶¶ 252, 263.  Plaintiffs cannot "avoid preclusion through artful pleading that removes words . . . but leaves in covered concepts." *Northstar*, 904 F.3d at 829. Indeed, "SLUSA bars . . . any [state law class] claim that could give rise to liability under § 10(b) or Rule 10b-5," including attempts to plead "manipulative" or "deceptive" conduct (which Plaintiffs do not purport to excise). *Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1154 (9th Cir. 2017).[19]

## IV.    CONCLUSION

The motion to dismiss should be granted, with prejudice and without leave to amend.

Dated: November 21, 2018           By:        /s/ Meryl L. Young

MERYL L. YOUNG
GIBSON, DUNN & CRUTCHER LLP

---

[19] In any event, Plaintiffs' allegations "sound in fraud" and fail to state a breach of fiduciary duty claim.  *Supra*; *Tribeca Cos., LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1114 (2015); *In re Wilma James Tr.*, 487 S.W.3d 37, 48 (Mo. Ct. App. 2016); *Siegal v. Gamble*, 2016 WL 1085787, at *8 (N.D. Cal. Mar. 21, 2016); Fed. R. Civ. P. 9(b).

Gibson, Dunn & Crutcher LLP