# EXHIBIT 43

July 21, 2015


**VIA ELECTRONIC MAIL:** e-ORI@dol.gov

Office of Regulations and Interpretations
Employee Benefits Security Administration
Attn: Conflict of Interest Rule
U.S. Department of Labor
200 Constitution Avenue NW, Room N-5655
Washington D.C. 20210

> Re:   **RIN 1210-AB32**
>       **Edward D. Jones and Co., L.P. Comment on Proposed Conflict of Interest Rule**

**VIA ELECTRONIC MAIL:** e-OED@dol.gov

Office of Exemptions Determinations
Employee Benefits Security Administration
Attn: D-11712, D-11713, D-11687, D-11850, D-11327, D-11820
U.S. Department of Labor ( the "Department")
200 Constitution Avenue NW, Suite 400
Washington D.C. 20210

> Re:   **ZRIN-1210-ZA25** (ESBA Docket ID No. EBSA-2014-0016)
>       **Edward D. Jones and Co., L.P. Comment on:**
>       **Proposed Best Interest Contract Exemption,** Attn: D-11712
>       **Proposed Class Exemption for Principal Transactions,** Attn: D-11713
>       **Proposed Amendment to PTE 75-1,** Attn: D-11687
>       **Proposed Amendment to and Proposed Partial Revocation of PTE 84-24,** Attn: D-11850
>       **Proposed Amendment to and Proposed Partial Revocation of PTE 86-128 and PTE 75-1,**
>       Attn: D-11327
>       **Proposed Amendments to Class Exemptions 75-1, 77-4, 80-83 and 83-1,** Attn: D-11820


Dear Sir or Madam:

Edward D. Jones and Co., L.P. ("Edward Jones"), appreciates the opportunity to submit comments in response to the Department's Proposed Conflict of Interest Rule, the related Definition of the Term "Fiduciary" (the "Proposed Rule" or "Proposal"), the Proposed Best Interest Contract Exemption ("BICE"), the Proposed Class Exemption for Principal Transactions, and the various Proposed Amendments to and Partial Revocations of certain Prohibited Transaction Exemptions ("PTEs") and Class Exemptions.[1]

Edward Jones is a dually registered investment adviser and broker-dealer headquartered in St. Louis, Missouri. We focus on serving the needs of the individual investor with long-term investment objectives by

---

[1] 80 Fed. Reg. 21928, 21960, 22004, 22034, 22010, 22021 and 21989 (April 20, 2015).



promoting an investment philosophy that emphasizes maintaining a diversified portfolio of quality investments.

Our financial advisors work closely with our clients to understand their financial needs, help them define their financial goals, and assist them in creating savings and investment solutions to help them save for a secure retirement. We have historically served individual investors from all economic backgrounds and income levels. Our clients range from young families just starting to prepare for retirement to retirees who have successfully saved for a secure retirement. We have never imposed account minimums for transactional services nor established separate service options, such as call centers, for clients with more modest resources. Today, we serve more than four million individual account holders with IRAs.

The Proposal would fundamentally alter the standards applicable to the delivery of investment advice to individual retirement savers and small business owners. In that regard, and as further described below, we are deeply concerned about the Proposal's direct impact on the ability of millions of individuals to create holistic and comprehensive financial strategies for retirement – those who work with Edward Jones financial advisors and those who work with other firms and other forms of advice.

Edward Jones supports the application of a best interest standard of care. We have always sought, and will continue to seek, to act in our clients' best interest. We believe any new best interest standard should be carefully crafted to enhance the protection of retirement savings without diminishing or prohibiting proven practices that benefit investors today. We commend the Department for its sincere efforts to address and minimize harmful practices that can impact investors saving for retirement.

However, after careful analysis, we do not believe the Proposal as written would yield the intended results. We are concerned that, if the Proposal is adopted without significant changes, it would reduce access many investors have to information and support from financial advisors, in some cases eliminating their access altogether, and limit investors' choices and options in how they save for retirement at the very time that our nation has seen an increase in the millions of workers retiring or living in retirement.

The impact of the Proposed Rule will fall disproportionally on lower and moderate-income investors who stand likely to lose access to affordable guidance and assistance that is crucial if they are to meet their retirement savings needs. These investors have consistently opted to invest through transaction-based compensation structures rather than a flat-fee based advisory structure.[2] The Proposed Rule would effectively eliminate these investors' ability to continue to utilize transaction-based services. We believe that loss of guidance and assistance would be disruptive to retirement savings at a time when individual savings rates are already dangerously low. Therefore, we respectfully request that the Proposal be modified as detailed below. We include specific recommendations that we believe will improve the Proposal and more closely reflect the Department's intent.

1.    The Proposed Definition of "Investment Advice" is Overly Broad

Fundamentally, we are concerned the definition of "investment advice" in the Proposal is so broad in its scope and its application that it is difficult to distinguish conduct that would be subject to the regulation from conduct that is not. The vagueness of the definition makes it extremely difficult for financial services providers to serve existing clients and potential clients by providing them with access to education and

---

[2] Oliver Wyman, "Assessment of the impact of the Department of Labor's proposed 'fiduciary' definition rule on IRA consumers", 2011.

information. As described below, the Proposal would appear to subject virtually all investment-related communication that could potentially impact retirement savings to a fiduciary standard, regardless of the nature of the communication or whether the communication is with an existing client or potential client.

We understand the intent of the Department is to broaden the definition of "investment advice" to include the delivery of information *specifically directed* to an individual investor that *may be considered* by that investor in making an investment decision.[3] As we understand it, this proposed definition of "investment advice" can be met in a single communication – it would not have to be the result of ongoing dialogue. The recipient of the information would not need to be a client or enter into a mutual agreement or an understanding with the party delivering the information, and may in fact never become a client. Rather, the person delivering "investment advice" as defined by the Proposal would be deemed a fiduciary and would therefore owe fiduciary obligations to the individual receiving the information and be subject to the ERISA rules and its complex framework of prohibited transaction exemption conditions.

We are concerned this proposed definition of "investment advice" can be read to broadly cover the delivery of virtually any information to retirement savers in the general public, in circumstances that no reasonable person would infer a fiduciary relationship could exist. Commonplace commercial activity such as direct mail advertising would appear to fall within the proposed definition by virtue of having been addressed and therefore "specifically directed" to an individual who could "consider" the information when making an investment decision. Similarly, "pop-up" advertising with investment information delivered to individuals on the internet based on their use of search engines appears to be captured as "investment advice" under the Proposal. The definition would also seem to embrace any delivery of a research report or similar information to individual investors, even if those individuals requested the information themselves through a financial service provider's website.[4]

We do not believe these results would benefit retirement savers. Today, American working men and women enjoy ready access to a wide range of information from financial services providers. A foreseeable result of the Proposal could be a dramatic decline in the information generally made available by financial services providers, resulting in a diminution in the opportunities for retirement savers to learn about and understand the full range of options available to them. The very definition of investment advice should not inhibit the flow of information about investments that are meaningful to investors.

Indeed, the vagueness of the definition of investment advice would also impact existing relationships between investors and their financial advisors. For example, a financial advisor's communication to her client regarding assets or strategies in a joint account (which is not covered by the rule), would meet the definition of "investment advice" if such communication could be considered when making investment decisions about a retirement account. The Proposal offers no clarity on this point, nor does it provide guidance of how to address this dilemma. More to the point, the Proposal does not appear to offer any exemptions under ERISA that would otherwise permit these types of activities that would be newly defined as investment advice. Under ERISA's statutory framework, in the absence of an exemption, these types of activities would effectively be prohibited.

---

[3] Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice, 80 Fed. Reg. 75 (April 20, 2015).

[4] Each of these illustrated types of communication is today subject to federal and state regulation, including regulation by other federal agencies. In addition, for brokerage firms and their financial advisors, these types of activities are subject to regulations promulgated and actively enforced by FINRA.


Accordingly, we recommend the Department clarify the proposed definition of investment advice in a way that it can be distinguished from the type of communication that would not be considered investment advice under the Proposal. We also respectfully recommend the Department clarify what, if any, exemptions are available to allow financial services providers to engage in the types of general commercial communications detailed herein, or to state whether or to what extent such communications would be prohibited. At a minimum the definition of investment advice should allow investors to learn and receive information and explanations about the types of services available to them from a financial advisor, which would be consistent with recent guidance issued by the Department in its rules concerning fee disclosures for service providers.[5]

### 2.   By Narrowing the Definition of "Education" to Prohibit Reference to Specific Investments the Proposal Renders Education to Investors Meaningless

The Proposal would substantially narrow the existing definition of education to include only discussions related to generalized investment and distribution concepts. Under the Proposed Rule, any references to specific investments would be prohibited. This would significantly impact the ability of individual investors to save for retirement. Studies demonstrate investors are more equipped to save for retirement if they can obtain education on how to allocate assets through specific investments.[6]

We agree with the Department that investors should be informed about the importance of asset allocation and diversification as they consider their choices for retirement savings. For those conversations to be meaningful however, investors must be allowed to receive information on specific examples of investments within each of these asset classes.

Many investors need examples of specific investment products that can be used to implement a given retirement strategy. For example, an investor who has received information about a balanced and properly diversified portfolio may be stymied if he or she is unable to independently identify particular investments that would meet this asset allocation mix. Financial advisors should be allowed to provide specific examples that would give an investor meaningful and useful information without giving rise to a fiduciary relationship.

We recommend the Department reconsider the limitation of investor education in the Proposal. Specifically, we recommend the Department consider what other information could be provided to investors about specific investments that would meet the Department's objectives of mitigating harmful conflicts of interest without rendering these important conversations meaningless to investors. We believe providing two or more examples of specific investments within an asset class, combined with adequate disclosure of any material conflicts in connection with any of the examples provided, would give investors meaningful information about their investment choices.

---

[5] In February, 2012 the Department issued regulations under the ERISA section 408b-2. Those regulations made clear that activities involved in the marketing of a fiduciary's own professional services are not in and of themselves fiduciary activities. See e.g., 29 C.F.R. 2550, 408b-2(f), Ex. 4.E.

[6] See, e.g., Lusardi and Rooij, "Financial Literacy: Evidence and Implications for Consumer Education", 2009.


**3.    Under the Proposal Fiduciaries are Not Allowed to Offer Additional Services to Individuals Investors**

Under ERISA's regulatory scheme, in order for a fiduciary to offer its own services to individual investors (including additional services to existing clients), the fiduciary must rely on what is referred to as a "seller's carve-out." In the absence of a seller's carve-out, a fiduciary is effectively prohibited from offering its own additional services to clients.[7]

Because the Department expressly declined to include a seller's carve-out applicable to individual investor transactions, individual investors are effectively prohibited from receiving information from their financial advisors about additional services that may in fact be beneficial to them. This would be true even if the investor owns an advisory account where the financial advisor is held to a fiduciary standard. We believe this is a critical mistake that would be disruptive to existing relationships and would cripple the ability for new savers to ultimately reach their saving objectives.

The needs of individual investors change over time and as life events unfold: investors' retirement savings needs are impacted by marriage, divorce, changes in their expected income, and changes to their health. Today, investors benefit greatly from the flexibility they have in working with financial service providers who offer different ways of investing and a variety of investment products that meet the wide array of their changing investment needs. They have the ability to plan for the unexpected, to leverage different products as their financial needs change and to plan holistically and comprehensively with the assistance of their financial advisor. Without a seller's carve-out, conversations about retirement goals based on changes in life events that impact investment needs and objectives would be effectively prohibited. Moreover, it would be unclear how a fiduciary could properly discharge its obligations if prohibited from offering its services or solutions that would in fact be reasonable under the circumstances and in their clients' best interest. It would furthermore be unclear how a financial services provider could establish a supervisory system and compliance procedures that would work to prohibit financial advisors from recommending additional products or services in circumstances where it would be prudent to do so.

Individuals saving for retirement must retain the ability to have open dialogue with their financial advisors about the products and services that are available through the advisor and in the marketplace to meet their financial needs. Accordingly, we recommend the Department reconsider and include a seller's carve-out for transactions with individual investors, including individuals owning IRAs and small business owners, in any final regulation. In revising the Proposal, we respectfully recommend the Department consider leveraging existing regulations, including FINRA rules concerning disclosure obligations around compensation and the management of conflicts of interest, when developing the seller's exemption. Application of a fiduciary standard within the framework of those rules and regulations, brought within an appropriately drafted exemption, could preserve the protections the Department seeks without being disruptive or harmful to individual retirement savers.

---

[7] In the Proposal, the Department provides for a seller's carve-out to large retirement plans with at least 100 participants or greater than $100 million of assets under management. However, there is no carve-out in the Proposal for financial advisors to offer services to individuals or to small business owners. The impact to small businesses is discussed in Section 6, below.


### 4.    Conversations About IRA Rollovers for Investors, Particularly those Considering Retirement, should not be Prohibited

As drafted, the Proposal would designate all conversations related to IRA rollovers from a 401(k) as fiduciary conversations. However, the Proposal does not provide for an exemption under which a rollover conversation can take place. Therefore, any meaningful discussion with a client or potential client regarding rolling over assets to an IRA would be prohibited under the Proposal.

Many times and for many reasons, individual investors desire to consolidate retirement plan assets by rolling those assets over to an IRA. IRAs often give individual investors greater flexibility in how to allocate assets to achieve their retirement strategy. In addition, many investors are faced with the choice of what to do with assets in their employer's 401(k) or similar plan when they change jobs. The average investor is faced with this decision multiple times in his or her lifetime. According to the Bureau of Labor Statistics the average job tenure for all Americans is less than 5 years. In its own longitudinal study, the Bureau found the average person born between1957-1964 has held 11.7 jobs between the ages of 18 and 48.[8] In each instance, those workers must decide what to do with their assets left in a former employer's retirement plan.

The Proposal clearly favors a result where the departed employee's assets remain with the plan of the former employer. However, studies have documented the desire of many employees (particularly young and low and moderate income workers) to cash out retirement savings at a former employer when they change jobs and to use that money for other purposes. Those actions result in significant costs and significant detriment later on when those assets are otherwise needed for retirement.[9] Those studies have further shown that individuals who do not have the benefit of appropriate advice on what to do when they change jobs, cash out their retirement savings at a much higher rate than individuals who receive advice from a financial advisor.[10] We respectfully submit that prohibiting advice in this area would accelerate the trend of workers cashing out their retirement savings when they change jobs.

The need to preserve the ability for investors to be able to discuss rollovers with their financial advisors is even more pronounced for investors who are at or near retirement. Those investors have a need to consolidate their assets. The act of consolidation can simplify the complex process necessary to plan how to meet income needs in retirement, which often requires a reallocation of assets from a capital appreciation focus to a long-term plan to generate income. Investors working with a financial advisor *must* have the ability to engage in conversations about consolidating their assets through a rollover. To prohibit those conversations as the Proposal effectively does, would be to deny retiring investors information critical to their retirement planning and constrain the ability of financial advisors to provide meaningful assistance.

To be clear, we agree with the Department that the decision of whether an investor should rollover their assets from a retirement plan to an individual IRA is an important one: it should be handled with care and in a way that investors understand the benefits and consequences of that decision. We share the Department's

---

[8] Bureau of Labor Statistics, "Number of Jobs Held, Labor Market Activity, and Earnings Growth Among the Youngest Baby Boomers: Results from a Longitudinal Survey Summary", 2015.

[9] See, e.g., Quantria Strategies, LLC (Quantria) , "Access to Call Centers and Broker Dealers and Their Effects on Retirement Savings," 2014; and Oliver Wyman, "Role of Financial Advisors in the US Retirement Market", 2015.

[10] See, e.g., Quantria Strategies, LLC (Quantria) , "Access to Call Centers and Broker Dealers and Their Effects on Retirement Savings," 2014; and Oliver Wyman, "Role of Financial Advisors in the US Retirement Market", 2015.


view that the guidance issued by FINRA in its Notice to Member 13-45: *Rollovers to Individual Retirement Accounts*, is an important step toward confirming that investors are aware of the options available to them when considering a rollover and have the necessary information to make an informed decision.

However, given the reality of the frequency with which American workers change employment, the notion that it always best serves investors to hold retirement assets in multiple plans sponsored by former employers, and to do so without the ability to speak to a financial advisor about those assets, seems at odds with a holistic and comprehensive approach to managing one's retirement savings. It is also contrary to good public policy to require workers who are about to retire to manage their assets held in a series of retirement plans without the benefit of meaningful assistance to guide their impending decisions about how to consolidate their assets to ensure they generate sufficient retirement income.

Accordingly, we recommend the Department reconsider the prohibition of financial advisors providing meaningful assistance to individual investors concerning rollovers.

## 5. The Proposal's New Prohibited Transaction Exemption (the "Best Interest Contract Exemption") is Unworkable and Will Result in Large Scale Migration to Fee Based Accounts

The Proposal attempts to strike a balance by offering a "Best Interest Contract" exemption that would allow certain practices, including compensation practices, in a manner similar to those that exist in the transaction-based marketplace today. We commend the Department for attempting to craft, at least in part, a disclosure-based exemption that gives individual investors the ability to work with their financial advisor on a transactional basis. However, after careful analysis, a broad consensus of the financial services industry, including Edward Jones, have concluded the proposed exemption is impracticable and not workable.

The requirements of the exemption are numerous and significant. Generally, the Best Interest Contract exemption requires a financial advisor to provide services to an investor "without regard to the financial or other interest" of the advisor.[11] Contrary to the Department's intent, this would appear to limit the type of compensation the financial advisor can receive with respect to the sale of a particular investment by indicating that any variable compensation received on the sale of an investment would be a breach of fiduciary duty. Additionally, the exemption contains a number of terms that are not well-defined and disclosure requirements we do not believe are workable. For example, the exemption requires disclosure regarding one, five and ten year cost projections, which requires financial services providers to make assumptions about future investment performance that appears to be in conflict with current SEC and FINRA rules and regulations.

The proposed exemption also calls for reformation of existing client account agreements to include specified provisions associated with the exemption. In our case, for example, this would require the revision of millions of contracts with clients, who individually have to agree to the revised contract terms before we could provide them with guidance about their retirement account. The revised contract terms are complex and may confuse investors who are attempting to understand what impact, if any, these terms would have on the provision of services by the firm. Given the length of time this process would take (and the possibility clients may not agree to these contract revisions), this situation would potentially jeopardize the investment strategies our clients already have established with the assistance of their financial advisor.

---

[11] BICE Section II(c)(1), 80 Fed. Reg. at 21984.


This lengthy process would also require the expenditure of significant resources. The amount of time and resources required by such a process should not be underestimated.

Under the contract arrangement required by the exemption, while some transaction-based practices are expressly permitted, there are new limitations on the products that may be offered and other limitations to the services available based on the application of other rules promulgated by the Department. By so doing, the exemption reduces many of ERISA's statutory provisions, as well as federal and state law provisions and Self-Regulatory Organization rules, to contract terms enforceable in litigation or arbitration. Individual clients are already protected by these various regulatory regimes and placing additional contractual obligations on financial services providers would not promote the provision of financial services to retirement savers.

Because of the specified contract terms, limitations, and ambiguities in the Proposal, we believe financial services providers will not be able to use the Best Interest Contract exemption. As a result, investors with transactional accounts will have to shift retirement savings from transaction-based accounts to fee-based advisory accounts as the only available alternative. In advisory accounts, financial advisors provide services in exchange for a monthly fee based on total assets held in an account, and, therefore, fee-based advisory accounts have minimum account values that must be maintained by a client. A shift from transaction-based accounts to fee-based advisory accounts would harm millions of retirement savers who are low and middle-income investors who do not meet the account minimum requirements necessary to qualify for an advisory account. Those investors will be left without access to the investment assistance provided by financial advisors today.[12]

There are also practical concerns with the Best Interest Contract exemption. The Proposal would seem to require fiduciaries to have the contract in place as a prerequisite to being able to discuss certain topics or provide certain services to individual investors. It is unclear how that would apply to investors who are simply seeking information on a prospective basis but are not (and may never decide to be) clients of a financial advisor. To require a signed contract in order to have a conversation seems unreasonable.

The application of the exemption is similarly unclear with respect to existing clients with advisory accounts. Those clients, who are in a fiduciary relationship with their financial advisor, should presumably not need to execute a new or separate contract. However, as contemplated, the Proposal presumes that certain services can only be delivered if the contract exemption is utilized. This means investors with advisory accounts will be required to execute new contracts with financial services providers that would exist for the sole purpose of performing the specific acts that the Proposal allows only under the contract exemption. We respectfully believe such a result would not benefit retirement savers. We see no reason why services available to retirement savers should be limited when there is an existing fiduciary relationship.

We recommend the Department devise a transaction-based exemption that would allow investors to pay for retirement savings on a transaction by transaction basis. In order to receive variable compensation under the transactional exemption financial advisors and their employers must agree to be held to a fiduciary standard with respect to the account and transactions within it. The exemption should require appropriate disclosure of fees and conflicts of interest, but those requirements should be principles based, not

---

[12] Oliver Wyman, "Assessment of the impact of the Department of Labor's proposed 'fiduciary' definition rule on IRA consumers", 2011.


prescriptive as is the case with the Best Interest Contract exemption. In devising the exemption we recommend the Department work with the SEC and FINRA to develop disclosure requirements that are harmonized with the existing framework of rules and regulations imposed on financial services providers. We believe the imposition of a fiduciary obligation under these parameters would sufficiently meet the stated objectives of the Department.

**6.      The Proposed Rule will Significantly Limit the Ability of Small Businesses to Establish and Maintain Retirement Plans**

The Proposed Rule will significantly limit the ability of small businesses to establish and maintain retirement plans. Many small businesses do not offer retirement plans for their employees because of the administrative complexity, costs and eligibility requirements. Today 19 million individuals who work for small businesses with fewer than 50 employees do not currently have access to a workplace sponsored retirement plan.[13]

Small businesses value the education and guidance on how to establish and maintain retirement plans they receive from financial advisors. Small businesses that work with a financial advisor are 50% more likely to set up a retirement plan and micro businesses with 1-9 employees are twice as likely to establish such plans.[14]

Under the Proposed Rule, small businesses will no longer be able to receive education and guidance from financial advisors on establishing or maintaining retirement plans. This means small businesses would no longer receive information regarding investment options for retirement plans and would need to fend for themselves in obtaining such information. Given the multitude of investment options available, coupled with the complexity, costs and eligibility requirements for retirement plans, many small businesses will be at risk of no longer maintaining or establishing plans for their employees.

Small businesses must be able to continue to work with a financial advisor to promote the retirement savings of employees. The Proposed Rule would limit small businesses from helping their employees save for retirement by preventing financial advisors from giving necessary education and guidance to small businesses.

We recommend the Department revise the Proposed Rule to allow small businesses to gain access to necessary education and guidance about retirement plans from financial advisors.

**7.      The Proposed Rule's Timeline for Implementation is not Feasible and will have a Disruptive and Negative Impact on Investors**

Based on the concerns raised herein, we do not believe the eight-month implementation period contained in the Proposal is reasonable. The breadth of the Proposal suggests that the final rule will likely result in significant changes across every division of our firm and our industry. It is unrealistic to create and implement the business units, supervisory structures and compliance procedures necessary to manage these vast changes within the timeline in the Proposal.

---

[13] Oliver Wyman, "Role of Financial Advisors in the US Retirement Market", 2015.

[14] Oliver Wyman, "Role of Financial Advisors in the US Retirement Market", 2015.

Accordingly, we recommend the Department take into account the comments it will receive on this issue and consider a meaningful adjustment to any implementation period that will allow financial services providers the necessary time to build compliant processes and procedures.

## 8.     A Recommended Approach

Edward Jones appreciates that the Department has solicited input from members of the financial industry and the public on the Proposed Rule and PTEs. We believe the right way to accomplish this conceptually would be to incorporate the fundamental principles set forth in the comment letter submitted by FINRA to the Department: amending the Proposal to clarify the scope and meaning of the best interest standard, offering financial institution a choice as to how to offer services to investors by simplifying the procedures required to receive variable compensation from investors through appropriate and practical disclosure of conflicts, utilizing existing principles in the federal securities laws and FINRA rules when revising the proposal, streamlining the Best Interest Contract exemption to impose tailored conditions that address conflicts of interest, and clarifying the PTEs to eliminate conditions that do not address conflicts of interest in a meaningful way.[15]  These principles are consistent with our comments above and would, we believe, provide a framework to revise the rule and exemptions and for carefully applying a fiduciary standard to retirement savings in a way that enhances and preserves the critical assistance investors receive today.

The firm sincerely appreciates the opportunity to comment on these proposals.  Please contact the undersigned if you have questions regarding this comment letter.

Very truly yours,

Jesse Hill
Principal - Government and Regulatory Relations

---

[15] FINRA, "Comment Letter re: Proposed Conflict of Interest Rule and Related Proposals, RIN-1210-AB32", July 17, 2015.