# EXHIBIT 44

12555 Manchester Road
St. Louis, MO 63131-3710
314-515-2000
www.edwardjones.com

**Edward Jones**

April 17, 2017

The Office of Regulations and Interpretations
Employee Benefits Security Administration
Attn: Fiduciary Rule Examination
Room N-5655
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, DC 20210

**Re: RIN 1210-AB79 – Definition of the Term "Fiduciary" - Comments Regarding the Economic Impact Review Ordered by the President's Memorandum Dated February 3, 2017**

Ladies and Gentlemen:

Edward D. Jones and Co., L.P. ("Edward Jones") appreciates the opportunity to submit comments on the review of the fiduciary regulation ("the rule") and Regulatory Impact Analysis ordered by the President's Memorandum to the Department of Labor ("DOL"), dated February 3, 2017, examining the ability of investors to gain access to retirement information and financial advice under the Employee Retirement Income Security Act of 1974, as amended that redefines the term "fiduciary" under section 3(21) of ERISA and Section 4975(e) of the Internal Revenue Code of 1986, as amended.

The President's Memorandum asked, in part, the following questions:

(i) Whether the anticipated applicability of the Fiduciary Duty Rule has harmed or is likely to harm investors due to a reduction of Americans' access to certain retirement savings offerings, retirement product structures, retirement savings information, or related financial advice;

(ii) Whether the anticipated applicability of the Fiduciary Duty Rule has resulted in dislocations or disruptions within the retirement services industry that may adversely affect investors or retirees; and

(iii) Whether the Fiduciary Duty Rule is likely to cause an increase in litigation, and an increase in the prices that investors and retirees must pay to gain access to retirement services.

Edward Jones believes the President's Memorandum raises important questions that need to be analyzed before the rule is implemented. It is unfortunate that the DOL has chosen not taken into account the intent of the President's Memorandum in the release delaying the applicability date of the rule. Instead of making policy following a review of new, empirical evidence on the experience of firms attempting to implement the rule and the resulting impact on investors, the

1

12555 Manchester Road
St. Louis, MO 63131-3710
314-515-2000
www.edwardjones.com

**Edward Jones**

DOL has effectively implemented the very policy it was ordered to review by calling for the implementation of the "impartial conduct standards" on June 9th. We strongly urge the DOL to revisit this decision, and delay the whole regulation until the review ordered by the President can be completed.

We welcome the opportunity to provide practical feedback on the fundamental shortcomings of this rule and urge the DOL, at a minimum, to significantly rewrite the rule in order to empower investors to save for retirement security. In endeavoring to align our services to retirement investors to the requirements of the rule, we have determined that the final design of the rule will result in diminished access to retirement advice and increased costs for many investors. We believe the DOL has vastly underestimated the complexity and related costs associated with implementing the rule and any resulting benefits are far out-weighed by the increased costs to investors.

For the past year we have worked diligently towards implementation of the numerous profound changes to meet the rule's wide-ranging requirements. Among other things, we have worked to update client account agreements, to educate our clients on the impact of the rule and to create the supervisory structures and compliance procedures necessary to manage these changes. We have also examined the compensation and structure of retirement savings products and amended agreements with product manufacturers to ensure conformity with the rule and for the benefit of our clients.

The rule's 1,000 plus pages are incredibly dense and significant aspects of the rule remain unclear. For example, it is still unclear how to apply the so-called "neutral factors" to determine the compensation that can be received when offering transaction-based services. As explained further below, the lack of clarity in the rule, combined with the rule's complexity, has resulted in increased costs and more limited product and service offerings for retirement savers.

<u>The Fiduciary Rule limits investor's retirement savings options</u>

Edward Jones has historically served individual investors from all economic backgrounds and income levels. Our clients range from young families just starting to prepare for retirement to retirees who have successfully saved for a secure retirement. Today we serve more than five million individual account holders with IRAs. We have never imposed account minimums for transaction-based services nor established separate service options, such as call centers, for clients with more modest resources.

The rule fundamentally alters the delivery of investment advice to retirement savers. Investors will have reduced access to information and guidance as a result of the rule. The rule will also lead to significant changes in retirement

12555 Manchester Road
St. Louis, MO 63131-3710
314-515-2000
www.edwardjones.com

**Edward Jones**

service offerings throughout the financial services industry, including increased account minimums. These higher account minimums are necessary given the additional due diligence, documentation and disclosure requirements resulting from the rule. The impact of these changes will result in fewer choices and options in how to save for retirement and will be particularly detrimental to low and moderate-income investors who will see service offerings limited or eliminated.

As a result of the rule, Edward Jones will be implementing account minimums for all retirement savers. The imposition of minimum account sizes will mean that low and moderate-income investors and younger investors who may only be able to invest $500 or $1000 per year as they begin saving for retirement security will no longer receive personal service from a financial advisor through our transaction services. At the same time, these investors may not be able to meet the minimums associated with our fee-based solutions – leaving these investors with fewer options to save for retirement. We also anticipate many other financial advisors will review the fiduciary rule's onerous, inflexible and time-consuming requirements and choose higher account minimums for their practices than those established by the firm, resulting in even more investors losing access to meaningful guidance and assistance to save for a secure retirement.

The Best Interest Contract ("BIC") Exemption is unworkable for many investors

Historically, many low and moderate-income investors have opted to invest through transaction-based compensation structures rather than fee-based advisory programs. The DOL attempted to provide investors with the ability to work with their financial advisors on a transactional basis by offering the BIC exemption.

The BIC exemption's new and poorly-defined conditions have led to significant changes in retirement service offerings throughout the financial services industry, including eliminating brokerage services for IRA investors, limiting investment options and increased account minimums. This will lead to higher costs for investors and more limited access to financial advisors resulting in less retirement savings.

Our firm is planning to offer a transaction-based account to retirement savers who have at least $100,000 in qualified retirement assets at the firm. While the firm is offering this account to preserve investor choice, changes required by the rule mean that many low and moderate income investors will no longer be able to use the transaction-based model to save for retirement. Instead these investors will be limited to using a fee-based program at a potentially higher cost.

The BIC exemption harms retirement savers by limiting access to mutual funds

The BIC contractual arrangement permits some transaction-based practices, but also imposes new limitations on the products that may be offered and services available based on the application of other rules promulgated by the DOL. For example, the BIC exemption imposes new limitations on the compensation a financial advisor can receive, restricting the receipt of variable transaction-based compensation to ill-defined "neutral factors", such as the skill of the financial advisor, the complexity of a retirement product and the time spent explaining the product's features. Because of these requirements, mutual funds, which are foundational to the retirement savings of millions of investors, will not initially be offered in our transaction-based account.

The challenge presented by the BIC exemption has resulted in the mutual fund industry considering the development of new share classes to meet the rule's requirements, namely the so-called "clean" shares and T-shares. "Clean" shares and T-shares present significant limitations to investors. For example, "Clean" shares and T-shares do not permit load-waived exchanges between funds increasing costs to investors to diversify their portfolios. "Clean" shares and T-shares also do not permit rights of accumulation where investors incur lower sales loads based on the amount invested over a period of time.

In the near term investors will not have access to mutual funds in transaction-based retirement accounts. Even when mutual fund share classes become available that meet the rule's requirements, investors will not have the same rights as they have today. These changes to the way mutual funds can be used to meet their retirement savings goals will potentially harm millions of investors.

<u>The Grandfather provision in the rule is unworkable for many investors</u>

The DOL appropriately included a grandfathering provision in the rule to permit investors to hold existing IRA assets. The grandfathering provision enables investors to continue contributing to this account through automatic purchases and reinvest dividend and interest payments if the process to do so was established before the applicability date. The DOL also permits the sale of investments and the exchange of most mutual funds within fund families in the grandfathered account.

While the inclusion of a grandfather provision was beneficial and necessary for existing retirement savers, the DOL has once again imposed overly prescriptive requirements that significantly undermine the utility of this provision. We have provided below a number of examples of the need for a broad, clear and comprehensive grandfather provision and how the grandfather provision as currently written will not serve the best interests of investors.

12555 Manchester Road
St. Louis, MO 63131-3710
314-515-2000
www.edwardjones.com

**Edward Jones**

An overarching concern with the rule and the grandfather provision is the unnecessary complexity and confusion that will result from clients being required to open multiple IRA accounts. Because investors have limited ability to contribute to grandfathered accounts, it is conceivable that in the future investors will have four IRA accounts due to the current rule: grandfather, transaction-based, fee-based and a fixed annuity account. The fixed annuity account is indirectly required due to the unique compensation limitations imposed on this retirement savings product under the revised PTE 84-24.

This myriad of accounts will lead to additional and unnecessary complexity as financial advisors and investors determine and document the appropriate account for contributions and distributions. Financial advisors and investors discuss a number of considerations in connection with contribution and distribution requests, particularly potential tax implications of the account and asset selected. That the fiduciary rule effectively requires the creation of multiple accounts further complicates this already complex set of considerations, likely resulting in higher costs to the investor, challenges in properly diversifying investor's assets to meet retirement goals, and no corresponding benefit.

Similarly, the grandfather provision has imposed unnecessarily restrictive limitations on automatic purchase plans put in place prior to the applicability date. For example, an investor establishes an automatic purchase by sending $100 each month from their bank account to an Edward Jones IRA. The investor wishes to turn off this automatic purchase due to confronting an unexpected expense or a loss of employment. The investor is permitted to discontinue the automatic purchase plan, but is unable to restart it as the grandfather provision does not permit automatic purchases plans to be reinitiated after the applicability date. In order to restart the automatic purchase plan the investor would be required to open a new account and incur additional costs. Once again, the grandfather provision's overly restrictive requirements forces investors to consider less convenient, more costly alternatives rather than serving the best interest of the investor.

An additional restriction imposed by the grandfather provision is limiting investors' options should they decide to transfer their grandfathered account to another financial services firm. Grandfathered assets may not be transferred to another firm and maintain grandfather status under the current rule. The DOL effectively forces investors to remain with a financial professional or provider who may not be meeting their retirement savings needs or expectations or lose the benefits of remaining in a grandfathered account.

<u>DOL should consider the impact on retirement savers of the concerns raised in our July 21, 2015 comment letter that were not addressed in the rule</u>

5

We have attached the firm's July 21, 2015 comment letter which includes a more fulsome discussion of the following concerns:

- The DOL's narrow definition of "education" and overly broad definition of "investment advice" will result in a loss of guidance and assistance to investors at a time when retirement savings rates are already troubling low.

- The lack of a workable "seller's carve-out" effectively prohibits individual investors from receiving information from their financial advisor about additional services that may be beneficial to them.

- The rule's rollover provisions will make it more difficult for investors to receive meaningful guidance from financial advisors about the range of options available when changing jobs, heightening the risk that investors will cash out retirement savings.

- The rule will significantly limit the ability of small businesses to establish and maintain retirement plans by curtailing the ability of financial advisor to provide necessary education and guidance.

We believe all of these concerns need to be addressed by the DOL as part of the study mandated by the President's memorandum.

<u>The DOL should work with the SEC and FINRA on a uniform best interest standard</u>

The DOL should coordinate with the SEC and FINRA on creating a uniform best interest standard of care. The DOL should leverage the SEC and FINRA's expertise on investor protection to develop a best interest standard that is harmonized with the existing framework of rules and regulations imposed on financial services providers.

The standard should preserve investor options to a wide range of retirement products and choice in how to pay for these services. Investor protections could be strengthened by simplifying the procedures required to receive variable compensation and through appropriate and practical disclosure of conflicts in language readily-understood by the investor, utilizing existing principles in the federal securities laws and FINRA rules.

<u>Conclusion</u>

Edward Jones appreciates the opportunity to provide comments on the questions raised by the President's Memorandum. We regret that the DOL has acted to

partially implement the rule before completing this mandated review, essentially foreclosing further analysis, given the rule's complexity and the impact it will have on millions of retirement savers. We urge the DOL to revisit this decision, and to work with the SEC and FINRA to significantly rewrite the rule to adopt a uniform best interest standard of care that promotes investor protection, preserves investor choice and options, and ensures investors have access to meaningful assistance and guidance from financial professionals.

If you have any questions regarding the comments contained in this letter please contact me at 314-515-9711.

Sincerely,

Jesse Hill
Principal – Government and Regulatory Relations