IVY T. NGO (249860)
BRIAN HANLIN (*pro hac vice*)
FRANKLIN D. AZAR (*pro hac vice*)
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 East Evans Avenue
Aurora, CO 80014
Telephone:      (303) 757-3300
Facsimile:      (720) 213-5131
ngoi@fdazar.com
hanlinb@fdazar.com
azarf@fdazar.com

JOHN R. GARNER (246729)
**GARNER & ASSOCIATES**
109 North. Marshall Avenue
P.O. Box 908
Willows, CA  95988
Telephone:      (530) 934-3324
Facsimile:      (530) 934-2334
john@garner-associates.com
*Counsel for Lead Plaintiffs*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: EDWARD D. JONES & CO., L.P., SECURITIES LITIGATION | Case No. 18-cv-00714-JAM-AC |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANTS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |
| | **Hearing:**<br>**Date:**      May 21, 2019<br>**Time:**      1:30 p.m.<br>**Place:**     Courtroom 6, 14th Floor<br>         501 I Street<br>         Sacramento, CA 95814<br>**Judge:**     Hon. John A. Mendez |

# TABLE OF CONTENTS

I.   INTRODUCTION & OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME   1

II.   LEGAL STANDARD   2

III.   PLAINTIFFS PROPERLY ALLEGED EXCHANGE ACT CLAIMS   2

   A.   Plaintiffs Adequately Plead Defendants' Omissions of Material Fact   3

      1.   Defendants Had a Duty to Disclose All Material Facts   3

      2.   Defendants Failed to Disclose That Fee-Based Accounts Charged More Fees for Services That Were Unnecessary for Buy-and-Hold Investors   5

      3.   Defendants Failed to Disclose That They Instructed, Incentivized, and/or Otherwise Coerced Advisors to Act Against Clients' Best Interests   6

      4   Defendants Failed to Disclose That the DOL Rule Did Not Require Clients with Commission-Based Accounts to Convert to Fee-Based Ones   6

   B.   Plaintiffs Alleged a Strong Inference of Scienter   7

      1.   The Individual Defendants Envisioned and Implemented Company-wide Policies and Procedures to Improperly Increase Asset-Based Revenue   8

      2.   The Omitted Facts Were Core to Edward Jones' Operations   10

      3.   Defendants Publicly Discussed Commission- vs. Fee-Based Accounts   11

      4.   Defendants' Motive Supports a Strong Inference of Scienter   13

   C.   This Is Primarily an Omissions Case, Thus Affiliated Ute Applies   14

   D.   Plaintiffs Adequately Plead Loss Causation   15

   E.   Plaintiffs Sufficiently Alleged Scheme Liability   16

IV.   PLAINTIFFS PROPERLY ALLEGED SECURITIES ACT CLAIMS   18

V.   PLAINTIFFS' STATE LAW CLAIMS ARE NOT BARRED BY FEDERAL LAW   19

VI.   CONCLUSION   20

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

**CASES**

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128, 152 (1972) ...........................................................................14, 15

*In re Allstate Life Ins. Co. Litig.*,
  2013 WL 5161688, at *14 (D. Ariz. Sept. 13, 2013); ..................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662, 678 (2009). .............................................................................2

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833, 842-43 (N.D. Cal. 2000) .............................................7

*Basic Inc. v. Levinson*,
  485 U.S. 224, 231-32 (1988) ..........................................................................3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). ...................................2

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982, 988 (9th Cir. 2008) .........................................................10, 11

*Binder v Gillespie*,
  184 F.3d 1059 (9th Cir. 1999) ......................................................................17

*Bridges v. Geringer*,
  2015 WL 2438227, at *5 (N.D. Cal. May 21, 2015) ...................................18

*Bruce v. Suntech Power Holdings Co.*,
  64 F. Supp. 3d 1365, 1374-75 (N.D. Cal. 2014) .........................................13

*Casella v. Webb*,
  883 F.2d 805, 808-9 (9th Cir. 1989) ............................................................18

*Cooper v. Pickett*,
  137 F.3d 616 at 625 (oth Cir. 1997) ............................................................17

*Desai v. Deutsche Bank Sec. Ltd.*,
  573 F.3d 931, 939 (9th Cir. 2009) (citing *Chiarella v. U.S.*, 445 U.S. 222, 230
  (1980)) .....................................................................................................4, 15

*Diamond Foods, Inc., Sec. Litig.*,
  2012 WL 6000923, at *12 (N.D. Cal. Nov. 30, 2012) .............................11, 12

*In re Daou Systems, Inc.*,
  411 F.3d 1006, 1014 (9th Cir. 2005) ........................................................2, 10

*Fernandez v. UBS AG*,
  2018 WL 4440498 (S.D.N.Y. Sept.17, 2018) ...............................................15

*Fleming v. Charles Schwab Corp.*,
  878 F.3d 1146, 1153 (9th Cir. 2017) ............................................................19

*Freeman Inv., L.P. v. Pac. Life Ins. Co.*,
  704 F.3d 1110, 1116 (9th Cir. 2013) .......................................................18,19

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

*Geman v. SEC*,

    334 F.3d 1183, 1191-92 (10th Cir. 2003). ................................................................. 1,5,6

*Glazer Cap. Mgmt., LP v. Magistri*,

    549 F.3d 736 (9th Cir. 2008) ............................................................................................ 14

*Gustafson v. Alloyd Co.*,

    513 U.S. 561, 569-73 (1995) ............................................................................................ 18

*Intergbank Funding Corp. Sec. Litig.*,

   629 F.3d 213 (D.C. Cir. 2010) ......................................................................................... 14

*Levi Strauss & Co. Sec. Litig.*,

    527 F. Supp. 2d 965, 982 (N.D. Cal. 2007) ................................................................... 18

*Mallen v. Alphatec Holdings, 861 F. Supp. 2d 1111, 1123 (S.D. Cal. 2012)* ........................... 18

*Matrixx Initiatives, Inc. v. Siracusano*,

    563 U.S. 27, 44 (2011). ................................................................................................... 4,8

*Merrill Lynch Auction Rate Sec. Litig.*

    704 F. Supp  2d 378, 390 (S.D.N.Y. 2010) .................................................................... 18

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,

    540 F.3d 1049, 1066-68 (9th Cir. 2008) ........................................................................ 14

*Miller v. Thane Int'l, Inc.*,

    519 F.3d 879, 885 (9th Cir. 2008) ................................................................................... 18

*Mineworker's Pension Scheme v. First Solar Inc.*,

    881 F.3d 750, 752 (9th Cir. 2018) ................................................................................... 15

*Moore v. Kayport Package Exp., Inc.*,

    885 F.2d 531, 536 (9th Cir. 1989) ................................................................................... 18

*NVIDIA Corp Sec. Litig.*

    768 F.3d 1046, 1052 (9th Cir. 2104) ............................................................................... 19

*New York Cty. Emps.' Ret. Sys. v. Berry*,

    616 F. Supp. 2d 987, 996 (N.D. Cal. 2009) ............................................................... 16, 17

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp*

320 F.3d 920, 944-45 (9th Cir. 2003) ................................................................................... 14

*Northstar Fin. Advisors, Inc. v. Schwab Investments*,

    904 F.3d 821, 828-29 (9th Cir. 2018) ......................................................................... 19, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __,
135 S. Ct. 1318, 1333 (2015) .................................................................................. 3 11,12,13

*Poulos v Caesers World, Inc.*,

   379 F.3d 654, 667 (9th Cir. 2004) ..................................................................................... 1

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,

    759 F.3d 1051, 1062 (9th Cir. 2014) ........................................................................... 10, 14

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

*Primo v. Pac. Biosciences of California*, Inc.,
   940 F. Supp. 2d 1105, 1125 (N.D. Cal. 2013). ...................................................... 18

*Questcor Sec. Litig.*,
   2013 U.S. Dist. LEXIS 142865, at *35, n.8 (C.D. Cal. Oct. 1, 2013). ..................... 10

*Reese v. Malone*,
   747 F.3d 557, 575 (9th Cir. 2014)..............................................................7, 11, 13

*Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*,
   768 F.3d 938, 945 (9th Cir. 2014)....................................................................... 2

*Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co*,
   845 F.3d 1268, 1274 (9th Cir. 2017) (citing 15 U.S.C. § 78u–4(b)(1)(A)–(B); Fed. R. Civ. P. 9(b)). ...................................................................................... 5,6

*Rieckborn v. Jefferies LLC*,
   81 F. Supp. 3d 902, 925 (N.D. Cal. 2015) .......................................................... 18

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ........................................................................... 10

*S.E.C. v. Loomis*,
   969 F. Supp. 2d 1226, 1237 (E.D. Cal. 2013)..................................................... 16

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072, 1094 (9th Cir. 2010).................................................................... 8

*S.E.C. v. Bardman*,
   216 F. Supp. 3d 1041, 1057 (N.D. Cal. 2016) .................................................... 17

*Salomon Smith Barney Mut. Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006) ................................................................ 16

*Shankar v. Imperva, Inc.*,
   2016 WL 2851859, at *8 (N.D. Cal. May 16, 2016) ............................................ 10

*Silicon Graphics Sec. Litig.*,
   183 F.3d 970, 983 (9th Cir. 1999)........................................................................ 8

*Simpson v. AOL Time Warner, Inc.*
   452 F.3d 1040, 1048 (9th Cir. 2006).................................................................. 17

*South Ferry LP v. Killinger*,
   542 F.3d 776, 785-86 (9th Cir. 2008) ..........................................................8,9,14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 322-23 (2007) ....................................................................2, 9, 11

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694, 701 (9th Cir. 2012)...............................................................2, 7, 11

*Washentaw Cty. Emps. Ret. Sys. v. Celera Corp.*,
   2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012)............................................. 11

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

*WPP Luxembourg Gamma Three Sarl v. Spot Runner*, Inc.,
     655 F.3d 1039, 1057 (9th Cir. 2011) ................................................................................ 16

*Zillow Group, Inc. Sec. Litig.*,
     2018 U.S. Dist. LEXIS 170194 (W.D. Wash. Oct. 2, 2018).  ................................................ 8

*Zucco Partners, LLC v. Digimarc Corp.*,
     552 F.3d 981, 990 (9th Cir. 2009). ........................................................................... 2, 7, 9

**Rules**

Federal Rule of Civil Procedure 9(b) ................................................................................ 2,5

Federal Rule of Civil Procedure 15(a)(2) ................................................................................ 20

**Regulations**

17 C.F.R. § 240.10b–5. ................................................................................ 3

15 U.S.C. §§77p(b), 78bb(f)(1) ................................................................................ 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

1   Lead Plaintiffs Edward Anderson, Colleen Worthington, and Janet Goral ("Plaintiffs")

2   respectfully submit this opposition to Defendants' Motion to Dismiss Plaintiffs' Amended

3   Complaint (Dkt. No. 29) ("Motion" or "MTD").[1]

4   **I.      INTRODUCTION & OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME**

5   Plaintiffs plead specific facts alleging a top-down reverse-churning scheme in which

6   Defendants generated over ***$17.2 billion*** in asset-based revenue by leveraging the trust that long-

7   time clients had in their financial advisors ("FAs") to convert large swaths of commission-based

8   clients into fee-based Advisory Programs over a short time period. ¶¶1, 4, 39-40, 48. Plaintiffs

9   plead with particularity how Defendants, motivated by personal gain and corporate profits,

10  systematically dismantled an 86-year-old business model which offered personal service and

11  commission-based retirement accounts (which only charged a fee if a transaction was completed)

12  to small-town, middle-class, buy-and-hold investors. ¶¶1, 3, 34-36, 48, 67-68. Defendants'

13  conduct is the very definition of reverse-churning, as they made a widespread push to convert

14  existing commission-based clients into fee-based accounts, without regard to the suitability of a

15  fee-based account for those clients, for no other reason but to charge a fee on previously low-

16  profit accounts. *See Geman v. SEC*, 334 F.3d 1183, 1191-92 (10th Cir. 2003).

17  In carrying out their reverse-churning scheme, Defendants misled Plaintiffs by

18  withholding material information from documents provided to compel them into an Advisory

19  Program, in violation of the 1934 Act. ¶¶1, 3, 37, 46, 63, 71-74, 80, 104-108, 177, 203.[2] Edward

20  Jones historically touted its face-to-face, primarily commission-based business model as being

21  ideally suited for buy-and-hold investors like Plaintiffs who did not trade frequently and wanted a

22  personal relationship with their financial advisors. ¶¶4, 34-36. Although the investment needs of

23  its aging clientele did not change, in 2008 Edward Jones, motivated by a desire to increase

24  Company profits, began an abrupt and massive shift of commission-based clients – without

25  _____

26  [1]      All defined terms shall have the definitions set forth in the First Amended Complaint for Violation of Federal Securities Laws and Breach of Fiduciary Duty (Dkt. No. 24) ("FAC"). All "¶_" references are to the FAC, all emphasis added, and citations and internal quotations omitted unless otherwise stated.

27  [2]      Defendants, citing *Poulos v Caesers World, Inc.*, 379 F.3d 654, 667 (9th Cir. 2004), argue that the FAC uses

28  "artful pleading" to mischaracterize statements as omissions. But unlike in *Poulos*, the FAC alleged that the written documents provided to Plaintiffs to compel them into an Advisory Program omitted specific, material information.

1   regard to their best interests – into fee-based accounts which charged a set monthly fee regardless

2   of the number of transactions executed.

3        Defendants' Motion attempts to muddy the law and splits hairs over facts which Plaintiffs

4   have not yet had the opportunity to develop in discovery. Even without discovery, and under the

5   heightened pleading standards of Federal Rule of Civil Procedure ("Rule") 9(b) and the PSLRA,

6   Plaintiffs plead facts sufficient for this Court "to draw the reasonable inference" that Defendants

7   are "liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

8   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Considering the FAC as a whole and

9   accepting the facts alleged as true, this Court should find that Plaintiffs plead facts sufficient to

10  allege a claim and deny Defendants' Motion in its entirety. *See Twombly,* 550 U.S. at 570.

11  **II.    LEGAL STANDARD**

12       At this stage, Plaintiffs must simply plead "sufficient factual matter, ***accepted as true***, to

13  state a claim to relief that is ***plausible on its face***" such that the facts alleged "allows the court to

14  draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

15  U.S. at 677-78. In assessing plausibility, the Court must "accept as true all factual allegations in

16  the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop.*

17  *Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).

18       A securities "complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the

19  dual pleading requirements of . . . Rule 9(b) and the PSLRA." *Zucco Partners, LLC v. Digimarc*

20  *Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Under Rule 9(b), "circumstances constituting fraud . . .

21  shall be stated with particularity." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

22  The PSLRA requires "specify[ing] each statement alleged to have been misleading, the reason or

23  reasons why the statement is misleading, and, if an allegation . . . is made on information and

24  belief, stat[ing] with particularity all facts on which that belief is formed." 15 U.S.C. §78u-

25  4(b)(1). Despite the heightened standards, courts must accept all facts alleged as true and consider

26  the complaint in its entirety. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th

27  Cir. 2012) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007)).

28  **III.   PLAINTIFFS PROPERLY ALLEGED EXCHANGE ACT CLAIMS**

### A.     Plaintiffs Adequately Plead Defendants' Omissions of Material Fact

Defendants argue that Plaintiffs failed to plead the alleged misleading statements with particularity. MTD at 1. Not so. Plaintiffs specifically alleged the who, what, where, when, and why of each one. ¶¶104-14. Defendants also cite a litany of disclosures that Edward Jones made to Plaintiffs, primarily through the "Client Service Agreement" and the "Making Good Choices" brochure. MTD at 4-5, 8-9. But nowhere did Defendants disclose that: (1) Edward Jones had not conducted a sufficient suitability analysis of a fee-based Advisory Program for its commission-based clients, (2) moving into an Advisory Program would result in higher fees to commission-based clients, financially benefitting Defendants at those clients' expense, or (3) Edward Jones was training and incentivizing FAs to move commission-based clients to an Advisory Program, even when it was not in their best interests. ¶¶104-14. Plaintiffs were harmed by Defendants' omissions as a result of being compelled into an Advisory Program and paying higher fees without receiving more or better services, giving rise to violations of §10(b) and Rule 10b-5.

### 1.     Defendants Had a Duty to Disclose All Material Facts

Under §10(b), it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 makes it "unlawful to . . . omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." *Id.* (quoting 17 C.F.R. § 240.10b–5). Under Rule 10b-5, Plaintiffs must plead, *inter alia*, "a material misrepresentation or omission by the defendant." *Id.*

In assessing omission allegations, "the court must determine whether the omitted fact would have been material to a reasonable investor—i.e., whether 'there is a substantial likelihood that a reasonable [investor] would consider it important.'" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1333 (2015). In other words, whether "the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485

U.S. 224, 231-32 (1988). Disclosure is required of any material facts necessary to make statements "not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

Defendants had a duty to disclose the omitted facts detailed *supra* as they would have altered the "total mix" of information available to Plaintiffs and significantly impacted their decision to convert their account, rendering Defendants' purported disclosures misleading. *See* ¶¶227, 230. No more is required by Plaintiffs at this stage as they already adequately plead that Defendants withheld material facts in compelling them into an Advisory Program. ¶¶104-14.

Further, in the Ninth Circuit, "a duty to disclose may arise 'from a relationship of trust and confidence between parties to a transaction." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (citing *Chiarella v. U.S.*, 445 U.S. 222, 230 (1980)). Here, Plaintiffs trusted and were confident in their FAs based on their existing personal relationship as well as Edward Jones' reputation for low-cost, client-focused services. ¶¶1, 3, 66, 200, 258, 268. Plaintiffs specifically alleged how Defendants took advantage of the vulnerable position they were in as unsophisticated investors who completely trusted their FAs advice. ¶¶8-11, 104, 163, 176-77, 188.

As former CEO and managing partner of Edward Jones, John W. Bachman stated in a Wall Street Journal article in 2002, the Company kept its business model ***despite*** the fact that it could "'double [its] revenue overnight' if it introduced fee-based accounts" ***precisely*** because "such a pricing strategy doesn't make sense for investors who don't trade frequently." ¶37. While Edward Jones historically advocated a buy-and-hold strategy (¶¶37-38), during the Class Period, Defendants implemented Company-wide policy and procedure changes to convert as many commission-based clients to fee-based accounts as possible. ¶¶39-42, 46, 50-58, 63-66, 69, 163.

Defendants knew Edward Jones' clients relied on their personal, face-to-face relationships with FAs for investment decisions, yet would have this Court find that the boilerplate agreements and brochures provided to them – describing the Advisory Programs as actively-managed accounts where clients delegated investment decisions to Defendants – exist in a vacuum and negate the important context of long-standing relationships of trust. ¶¶3, 8-11, 34-36, 104-09, 225. Providing fine print disclosures is not a substitute for ensuring understanding as a fiduciary.

2. **Defendants Failed to Disclose That Fee-Based Accounts Charged More Fees for Services That Were Unnecessary for Buy-and-Hold Investors**

For an actionable omission, "plaintiffs must allege a misrepresentation or a misleading omission with particularity and explain why it is misleading" and "applying an objective standard, that misrepresentation or omission must have been material to investor." *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co*, 845 F.3d 1268, 1274 (9th Cir. 2017) (citing 15 U.S.C. § 78u–4(b)(1)(A)–(B); Fed. R. Civ. P. 9(b)).

Here, Plaintiffs alleged that nowhere in the Fund Account Authorization and Agreement Form, the Fund Models Brochure, the Account Client Services Agreement, the Schedule of Fees, the Client Profile, or the "Making Good Choices" brochure did Defendants disclose that (1) Edward Jones had not conducted a sufficient analysis to determine the suitability of an Advisory Program for Plaintiffs, (2) an Advisory Program would charge Plaintiffs higher fees, and (3) an Advisory Program would financially benefit Edward Jones at Plaintiffs' expense. ¶¶105-08. By failing to disclose that their primary motivation for converting accounts was to increase revenue and not better Plaintiffs' interests, Defendants misled Plaintiffs and withheld material information which they needed to make an informed decision.[3] Defendants' failure to disclose their primary profit motive mirrors that in *Geman. See* 334 F.2d at 1188-89 ("The purported reasons for the decision, changes in regulations and in technology, were not actually factors in the decision at all. The firm failed to disclose that the primary motivation was to earn profits, and misleadingly represented that its fees would not be affected."). Defendants here too thus violated 15 U.S.C. §78j and Rule 10b-5. *Id.* at 1191-92; *Retail Wholesale*, 845 F.3d at 1278 (materiality requires "a substantial likelihood that [the omitted fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

Defendants argue that they warned Plaintiffs of the increased cost of moving into a fee-

---

[3]     After having their accounts converted, Plaintiffs paid higher fees without receiving more or better services while Defendants enjoyed a huge revenue increase as a result. ¶¶4, 41, 65, 90-92, 97, 106-08, 112, 190-91. Since Plaintiffs already received advice and guidance from their FAs before the conversion, Defendants' claim that this was a "new benefit" falls flat. ¶36. Their argument that the DOL Rule compelled them to convert accounts similarly fails. MTD at 3, 11-12. The DOL Rule had no such requirement and has since been struck down. Yet commission-based clients who had been moved into an Advisory Program have not been moved back to a commission-based account.

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

based account and the corresponding benefit to their FA. MTD at 8. Nonsense. These disclosures were misleading because they did not explain to Plaintiffs that (1) based on their trading histories as infrequently trading, buy-and-hold investors, they were certain to pay dramatically higher fees than they had paid in commission-based accounts and (2) their FAs' motivation to push fee-based accounts onto them was based on policies and procedures Defendants themselves promulgated to line their own pockets with Plaintiffs' money. ¶¶105-08. Had Plaintiffs known that fee-based accounts were not in their best interests and were unsuitable for them and that Defendants were merely converting essentially dead assets into revenue-generating ones, Plaintiffs would not have agreed to convert their accounts. ¶¶1, 63, 65, 187, 192, 201, 212, 217, 228.[4,5]

### 3.   Defendants Failed to Disclose That They Instructed, Incentivized, and/or Otherwise Coerced Advisors to Act Against Clients' Best Interests

Plaintiffs alleged with particularity how Defendants orchestrated the reverse-churning scheme through Company-wide changes incentivizing FAs to push commission-based clients into an Advisory Program at the expense of those clients' best interests. See ¶¶4, 56, 68, 113, 149-53, 163-64, 180-81. Since bonuses were a substantial part of FAs' compensation, changing the structure from rewarding FAs for the number of transactions executed to the amount of assets under management fundamentally altered the way they were compensated and incentivized them to perpetuate the reverse-churning scheme. ¶¶180-84, 190-91. Without disclosing this change in the way FAs were compensated, all of the purported "disclosures" by Defendants are rendered meaningless at best, when not affirmatively misleading. See Retail Wholesale, 845 F.3d at 1278.

### 4.   Defendants Failed to Disclose That the DOL Rule Did Not Require Clients with Commission-Based Accounts to Convert to Fee-Based Ones

---

[4]   Defendants' assertion that individual questions of suitability render this case not viable on a class-wide basis is a premature attempt to litigate class certification, and should be disregarded.

[5]   Defendants' claim that fee-based accounts were suitable, so placing Plaintiffs into those accounts did not constitute reverse-churning due to the "enhanced services and advice they received" cannot withstand scrutiny. MTD at 2. Nothing had changed in Plaintiffs' investment strategies and goals such that their commission-based accounts were no longer suitable. ¶38. No suitability analysis could explain the conversion of such a massive number of commission-based clients into a fee-based Advisory Program in such a short period of time, since they traded infrequently and were unlikely to utilize "enhanced services and advice." See ¶38 (Weddle stating that there won't be major changes to EJD's approach). Any suitability analysis that Defendants conducted was, by definition, a sham. See Geman, 334 F.2d at 1188-89. In any case, whether an Advisory Program was suddenly suitable for so many Edward Jones commission-based clients is a question of fact which should be examined in discovery.

Defendants argue that there is "no factual basis" for Plaintiffs' allegations that Defendants utilized the DOL Rule as a pretext for the reverse churning scheme. MTD at 3, 11-13. Not true. Plaintiffs plead facts alleging what the DOL Rule was, its purpose, how it would affect Edward Jones' business, and Edward Jones' internal and external response to it. ¶¶42-46, 49-56, 60-64, 69. Plaintiffs also plead facts regarding how Defendants used the DOL Rule as a cover for the changes to Edward Jones' policies and procedures that supported the reverse-churning scheme and for their primary motive of generating more revenue. ¶¶41, 62, 64, 163. By omitting the material facts that the DOL Rule did not require fee-based accounts and that the Advisory Programs were pushed onto commission-based clients simply to increase corporate profits, Defendants "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *See* ¶157; *Brody*, 280 F.3d at 1006. Furthermore, by compelling Plaintiffs into fee-based accounts under the guise of the DOL Rule, Edward Jones was able to side-step full disclosure of its self-serving relationships with preferred vendors – yet another material fact omitted from the documents provided to or signed by Plaintiffs. ¶¶45.

### B.    Plaintiffs Alleged a Strong Inference of Scienter

For Exchange Act claims, the Ninth Circuit requires plaintiffs to allege "facts sufficient to create an inference of, at a minimum, deliberate recklessness." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842-43 (N.D. Cal. 2000). Such allegations must give rise to a strong inference that defendants acted with that required state of mind. *Zucco*, 552 F.3d at 991. But a "strong inference" is not synonymous with irrefutability. *Tellabs*, 551 U.S. at 324. Nor need "'[f]ederal courts . . . close their eyes to circumstances that are probative of scienter viewed with a practical and commonsense perspective." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014).

The relevant inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323; *see VeriFone*, 704 F.3d at 698 ("the sum is greater than the parts"). Scienter is adequately alleged where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.* That inference need not be "the most plausible of competing inferences." *Id.* If "no reasonable person could deny that

1   a statement was materially misleading," a defendant "aware of the facts that made the statement

2   misleading . . . 'cannot ignore the facts and plead ignorance of the risk.'" *SEC v. Platforms*

3   *Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010). And while the PSLRA requires

4   Plaintiffs plead with particularity, the heightened standard does not require them to "ultimately

5   prove their allegations," as that "is an altogether different question." *Matrixx*, 563 U.S. at 48, 50.

6           **1.     The Individual Defendants Envisioned and Implemented Company-wide
                     Policies and Procedures to Improperly Increase Asset-Based Revenue**
7

8           That the Individual Defendants served on committees and led divisions at Edward Jones

9   responsible for creating and implementing policies and procedures aimed at increasing asset-

10  based fee revenue gives rise to a strong inference of scienter because, in those roles, they were

11  exposed to facts rendering the alleged statements misleading. *See* ¶¶19-30; *South Ferry LP v.*

12  *Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (finding scienter based on allegations regarding

13  management's role in a company where they showed that defendants had actual access to the

14  disputed information). Plaintiffs specifically alleged the Individual Defendants' roles in core

15  Edward Jones operations, the duties those roles entailed, and how – through those roles – they

16  were exposed to, created, and/or implemented the reverse-churning scheme. ¶¶115-47.[6]

17          Plaintiffs also specifically alleged how Regional Management set up regional meetings

18  attended by Defendant Weddle via video conferences to disseminate information and strategies to

19  FAs for converting commission-based clients to fee-based accounts in compliance with the new

20  corporate policy, essentially instructing FAs to reverse-churn their clients. ¶¶148-53. Plaintiffs

21  even alleged how Weddle personally interacted with FAs, often eating lunch with them and

22  regularly attending the annual Managing Partnership Conferences where executives met with top

---

[6]     To argue that Edward Jones' Form 10-Ks, comments, and letters about the DOL Rule, and compliance
measures indicate a belief in the legality of the "business strategy" of account conversion, Defendants try to liken
Plaintiffs' allegations to those in *In re Zillow Group, Inc. Sec. Litig.*, 2018 U.S. Dist. LEXIS 170194 (W.D. Wash.
Oct. 2, 2018). MTD at 14. However, *Zillow* is inapposite, as it involved allegations that a defendant developed a co-
marketing program to conceal violations of the Real Estate Settlement Procedures Act, but publicly disclosed how
the program worked. *Id.* at *24-25. Here, rather than alleging that Defendants created the reverse-churning scheme to
conceal violations of another law, Plaintiffs alleged the illegality of the reverse-churning scheme *itself* and of the
facts Defendants withheld from Plaintiffs to further the scheme. At this stage, the Court must accept as true Plaintiffs'
allegations that those documents, training, and compliance measures supported inappropriate account conversion
perpetuating the reverse-churning scheme. *See In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999).

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

FAs and, according to Weddle, "discuss[ed] a multitude of topics, including how to provide an ideal client service experience." ¶¶169-74. That "ideal client service experience" included how to effectively coerce commission-based clients into fee-based accounts by touting purported benefits while omitting key facts, which Weddle himself encouraged at the Managing Partnership Conferences. ¶112, 173, 175. And according to Edward Jones' 2017 Form 10-K, Weddle and Pennington, as Executive Committee Sponsors on the Investment Policy Committee, acted as "steward[s] of the Partnership's investment philosophy, and develop[ed] and align[ed] the advice and guidance . . . primarily related to investments and solutions and how they are incorporated into portfolios." ¶121-22. This Committee "develops the firm's investment guidance," which is "integrated into the tools, systems, and materials that [Edward Jones' clients'] financial advisor[s] use[]" to move them towards their financial goals. ¶123. Weddle and Pennington were thus not only aware of, but responsible for, developing the tools, systems, and alleged misleading materials. ¶¶106-09, 124. Taken together, these allegations support a strong inference of scienter. *See Zucco*, 552 F.3d at 1000 (permitting general allegations about management's role to support scienter when coupled with specific allegations about its exposure to factual information).[7]

As Edward Jones' CEO and managing partner, Weddle was responsible "for administering the Partnership's business, determining its policies, and controlling the management and conduct of the partnership's business," including the shift from commission-based accounts to fee-based ones. *See* ¶116. When Weddle took the reins in 2006, he publicly stated that fee-based investment models did not suit the Company's typical client who had a buy-and-hold philosophy. ¶38. Yet just two years later – despite the needs and characteristics of Edward Jones' clientele not changing – Defendants fundamentally changed the core operations from a commission-based to a fee-based model as part of a reverse-churning scheme. ¶¶39-41. As

---

[7]    Defendants' argument that Plaintiffs' allegations of the Individual Defendants' "day-to-day involvement" fall short of the pleading standard ignores Supreme Court and Ninth Circuit precedent. General allegations, when coupled with specific allegations that defendants were exposed to, and in this case created, the alleged misleading information are sufficient. *See Tellabs*, 551 U.S. at 324 (allegations about management's role in a company may be evaluated alongside other allegations, and together raise an inference of scienter"); *see also South Ferry*, 542 F.3d at 785-86. Defendants' argument also disregards Plaintiffs' specific allegations about how the Individual Defendants implemented the policies and procedures underlying the changes in training, bonus structure, and computer program that pushed FAs to convert client accounts. ¶¶136-39, 149-57, 165-68, 176-77, 180, 185.

1   such, "it would be absurd to suggest that [Weddle] was without knowledge" of the reverse-

2   churning scheme and the misleading statements made to Plaintiffs. *See Berson v. Applied Signal*

3   *Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008).[8]

4   **2.   *The Omitted Facts Were Core to Edward Jones' Operations***

5          The strong inference of scienter is reinforced here because the alleged misleading

6   statements relate to Edward Jones' core source of revenue and operations – the fees it charges

7   clients for investment services – and more specifically, Advisory Solutions, which was "central to

8   [its] business" and the second largest fee-based platform in the country. *See, e.g.*, ¶189; *Shankar*

9   *v. Imperva, Inc.*, 2016 WL 2851859, at *8 (N.D. Cal. May 16, 2016) (finding scienter adequately

10  plead under "the 'core operations' theory" because alleged misstatements "go[] to the heart of

11  [its] business"). The core operations theory may establish scienter in three ways:

12          First, the allegations may be used in any form along with other allegations that,
        when read together, raise an inference of scienter that is cogent and compelling,
13      thus strong in light of other explanations . . . . Second, such allegations may
        independently satisfy the PSLRA where they are particular and suggest that
14      defendants had actual access to the disputed information . . . . Finally, such
        allegations may conceivably satisfy the PSLRA standard in a more bare form,
15      without accompanying particularized allegations, in rare circumstances where the
        nature of the relevant fact is of such prominence that it would be absurd to suggest
16      that management was without knowledge of the matter.

17  *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).

18          Former managing partner and CEO John W. Bachmann publicly touted Edward Jones'

19  commitment to middle-class investors who were typically long-term, infrequently trading, "buy

20  and hold" clients. ¶¶34-38. But under the watch of the Individual Defendants, the Company

21  introduced a fee-based platform – Advisory Solutions – in 2008 and added Bridge Builder to that

22  platform in 2013, which increased its asset-based fee revenue from those buy-and-hold clients by

23

---

24  [8]       Defendants argue that Plaintiffs' allegations fail because they did not reveal sources for each allegation.
    MTD at 13. But they "overstate the PSLRA's requirement that the complaint 'state with particularity all facts on
25  which that belief is formed' including by naming the sources of the information alleged." *In re Questcor Sec. Litig.*,
    2013 U.S. Dist. LEXIS 142865, at *35, n.8 (C.D. Cal. Oct. 1, 2013). To support their argument that not revealing
26  sources is grounds to reject all claims, Defendants cite *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009)
    but there, the Court found a scienter allegation insufficient absent a source as it was based solely "on information and
27  belief." *Id.* Here, Plaintiffs' scienter allegations reference internal and external documents (¶¶104-08), which when
    combined with the detailed allegations describing the Individual Defendants' roles and duties (¶¶115-47), suffice to
28  support the inference that they were in a position to possess the information alleged. *See Daou*, 411 F.3d at 1016.

1   approximately $500M from 2012 to 2013 and hundreds of millions of dollars every year since.

2   ¶¶12-30, 39-41. Defendants were so successful at increasing its asset-based fee revenue during

3   the Class Period that Edward Jones made **$17.2 billion** specifically in asset-based fees from long-

4   term, infrequently trading clients, pushing its earnings to record highs. ¶4.

5       It is "reasonable to conclude that high-ranking corporate officers have knowledge of the

6   critical core operations of their companies." *Reese*, 747 F.3d at 569; *VeriFone*, 704 F.3d at 708

7   (finding it "'difficult to grasp'" that top executives who reported "'gangbuster earnings'" "'really

8   had no idea'" "[t]he difficulty of [a large new] integration combined with general downward

9   pressure on gross margins"); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702,

10  709 (7th Cir. 2008). Because generating revenue from the investment services it provided to its

11  clients was core to Edward Jones' business, moving the business model from commission- to fee-

12  based was of "such prominence" to Defendants' future, "it would be 'absurd' to suggest" they

13  were "without knowledge" that millions of dollars of clients' assets were being inappropriately

14  moved to fee-based accounts. *See Reese*, 747 F.3d at 576; *Berson*, 527 F.3d at 989.

15              *3.        Defendants Publicly Discussed Commission- vs. Fee-Based Accounts*

16      A strong inference of scienter may be supported by Defendants' public statements. *Reese*,

17  747 F.3d at 572; *VeriFone*, 704 F.3d at 708. When a corporate officer elects to speak on a subject,

18  the implication is he has investigated and knows the facts underlying his statements (or is reckless

19  in not doing so). *Omnicare,* 135 S. Ct. at 1328-29. Here, Defendants spoke directly about Edward

20  Jones' commission versus fee-based accounts throughout the Class Period, and thereby "bridge[d]

21  the [scienter] gap" as to the alleged omissions. *See* ¶¶49, 64, 69, 110; *Reese*, 747 F.3d at 572.

22      For example, scienter may be drawn from Weddle's statement that Edward Jones'

23  "clientele, by and large, is not aware of the [DOL] rule, the impact or the changes that will be

24  necessary or the changes they will need to make to align, [] [o]ur job, and we embrace this, is

25  reaching out to them with an understanding some of them will need to change." ¶110. There is a

26  strong inference of scienter where, as here, "[t]he wording of Defendants' statements . . . suggests

27  they understood what was going on." *Washentaw Cty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL

28  3835078, at *3 (N.D. Cal. Sept. 4, 2012); *see also In re Diamond Foods, Inc., Sec. Litig.*, 2012

WL 6000923, at *12 (N.D. Cal. Nov. 30, 2012). Weddle's statement indicates he knew of the DOL Rule, its effect on Edward Jones and its clients, and how and what about the DOL Rule was presented to clients. Weddle must have known that the DOL Rule did not require fee-based accounts, that those accounts would result in higher revenue to Edward Jones at its commission-based clients' expense, and that this information was not told to those clients. ¶¶41, 106-12, 176.

Scienter may also be drawn from Pennington's "refer[ence] to Edward Jones' response to the DOL Fiduciary Rule as an 'opportunity to react' that the Company took full advantage of." ¶69. By her statement, it may be inferred that Pennington investigated and knew, or recklessly did not know, of the omitted facts regarding Edward Jones' response to the DOL Rule. *See* ¶¶1, 62, 111); *Omnicare*, 135 S. Ct. at 1328-29. As part of the scheme, Edward Jones would "'stop offering its clients mutual funds (and ETFs ["Exchange Traded Funds"] for commission-based retirement accounts' even though doing so '***all but force[d] those investors into asset-based fee accounts, which [meant] higher costs for many of the firm's investors***.'" ¶¶63, 106-08, 112, 176.

Similarly, Edward Jones' statements that "[i]mplementation of the rule will require changes in the manner in which the Partnership serves clients with retirement accounts" and will result in lower commission-based and net revenue support a strong inference of scienter. ¶64. Edward Jones implicitly investigated or had knowledge of the facts underlying potential changes in its business in response to the DOL rule and understood how those changes would affect its clients and its revenue. *See Omnicare*, 135 S. Ct. at 1328-29; *Diamond Foods*, 2012 WL 6000923, at *12; ¶41. Such facts included that the DOL Rule did not require commission-based clients to be converted to fee-based (¶111) and that ceasing to offer mutual funds and ETFs to commission-based accounts "'all but forced investors into asset-based fee accounts,'" which not only prevented those investors from being properly diversified, but was also not necessary to comply with the DOL Rule and only served to financially benefit Defendants at the expense of their clients (¶¶63, 106-08, 111-12). Yet Defendants failed to disclose these material facts to Plaintiffs. ¶¶106-08, 112.

Scienter may further be inferred from Edward Jones' comment letter to the DOL stating

1   that the DOL Rule's impact "'will fall disproportionately on lower and moderate-income

2   investors who stand likely to lose access to affordable guidance and assistance that is crucial if

3   they are to meet their retirement savings needs.'" ¶49. Defendants had knowledge of (or

4   investigated) material facts relating to the DOL Rule's impact, including that it did not require

5   fee-based accounts or prevent access to affordable retirement guidance and assistance, or

6   recklessly did not do so. *See* ¶¶70, 106-08, 111-12, 188, 192; *Omnicare*, 135 S. Ct. at 1328-29;

7   *see also Reese*, 747 F.2d at 571 (defendant's knowledge his statement was misleading is in and of

8   itself sufficient to infer scienter).

9   ### 4.   Defendants' Motive Supports a Strong Inference of Scienter

10   While the above facts evidence a strong inference of scienter, Plaintiffs also identify

11   Defendants' motive to mislead clients. *See* ¶¶187-91; *Bruce v. Suntech Power Holdings Co.*, 64

12   F. Supp. 3d 1365, 1374-75 (N.D. Cal. 2014) (considering motive in finding "an inference of

13   scienter at least as compelling as any opposing, non-fraudulent inference"). The Supreme Court

14   has made clear that "personal financial gain may weigh heavily in favor of a scienter inference."

15   *Tellabs*, 551 U.S. at 325. Plaintiffs specifically alleged that under Weddle's reign, Edward Jones

16   underwent a Company-wide policy shift flying in the face of over 86 years of investment

17   philosophy causing long-time, infrequently-trading clients to convert to fee-based accounts for no

18   other reason than to generate profits for the Company at clients' expense. ¶¶34, 38-39, 192-93.[9]

19   Moreover, Plaintiffs alleged that the Individual Defendants were directly incentivized to execute

20   the reverse-churning scheme as the vast majority of their earnings depended on Edward Jones'

21   profits. ¶¶187-91.

22   By evaluating all circumstances and allegations together under *Tellabs*' "holistic" review,

23   a strong inference of scienter exists here where (1) the Individual Defendants' were employed as

24   ---

25   [9]      Defendants' conclusory, unsupportable explanation that revenue generated by fee-based accounts evidences their popularity, not fraud, fails to overcome Plaintiffs' cogent and compelling fraud allegations. *See* MTD at 13. The accounts were indeed popular with Defendants, due to their profitability for *Defendants* versus commission-based accounts. ¶1. Defendants do not and cannot argue that the popularity is attributable to revenue generated for *clients*, as Plaintiffs alleged how *unpopular* the fee-based accounts were for clients. *See* ¶¶49, 98-103. These allegations are "strong in light of other explanations." *See Tellabs*, 551 U.S. at 324. Far from just alleging motive and opportunity to profit, Plaintiffs alleged specific acts by Defendants to increase their own profits via a reverse-churning scheme.

28

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

top-level managers and had access to, created, implemented, and/or oversaw the alleged misleading documents, the FA training which encouraged such misleading statements, and the corporate policies which cloaked the reverse churning scheme as a legitimate response to the DOL Rule; (2) Defendants publicly explained why fee-based platforms were unsuitable for the Company's clientele; (3) the alleged misleading statements and reverse churning scheme involved the Company's core operations; and (4) Defendants were highly motivated and had the opportunity to commit securities fraud.[10] 551 U.S. at 326; *see also Intuitive Surgical*, 759 F.3d at 1062 ("allegations may be used in any form with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations").

### C.       This Is Primarily an Omissions Case, Thus *Affiliated Ute* Applies

As discussed *supra*, Plaintiffs alleged that among the material facts not disclosed to them when their accounts were converted were: (1) the lack of a sufficient suitability analysis, (2) the higher fees and financial benefit to Edward Jones at their expense, and (3) the incentivizing of FAs to act against clients' best interests. ¶¶106-08. Nor were Plaintiffs told: (1) an accurate description of the material differences between their commission-based accounts and the fee-based Advisory Program accounts, (2) the cost and impact of the Advisory Program fees, and (3) that Edward Jones owned, and financially benefitted from, Bridge Builder. ¶112. Due to these material omissions, Plaintiffs signed the Fund Account Authorization and Agreement Form to move their assets into an Advisory Program without full knowledge of adverse material facts. ¶105.

Since Plaintiffs primarily alleged that Defendants violated the Exchange Act by omitting key facts they had a duty to disclose, the *Affiliated Ute* presumption of reliance applies. *See* ¶¶110-12; *Binder v Gillespie*, 184 F.3d 1059 (9th Cir. 1999). That presumption recognizes the

---

[10]       Defendants misconstrue Ninth Circuit caselaw in claiming that "profit motive…is insufficient" to infer scienter. MTD at 13 (citing *Silicon Graphics*, 183 F.3d at 979; *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008)). While "general" or "conclusory" motive allegations do not suffice, "specific facts" and "detail" about motive and intent, together with access to the undisclosed information – which Plaintiffs alleged here – support scienter. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066-68 (9th Cir. 2008); *South Ferry*, 542 F.3d at 784. This case is more akin to *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, in which "specific, particularized allegations" of motive contributed to the "totality" of the allegations sufficing "to meet the stringent pleading standard set forth in the PSLRA." 320 F.3d 920, 944-45 (9th Cir. 2003).

1  practical difficulty of showing affirmative reliance on an omission and exempts plaintiffs from

2  needing to plead individualized reliance where, as here, they allege defendants failed to disclose,

3  rather than affirmatively misrepresented, a material fact. *Affiliated Ute Citizens of Utah v. U.S.*,

4  406 U.S. 128, 152 (1972) ("Congress intended securities litigation enacted for the purpose of

5  avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its

6  remedial purpose."). Since *Affiliated Ute* applies, Plaintiffs need not plead individualized

7  reliance.[11]

8          **D.      Plaintiffs Adequately Plead Loss Causation**

9          The Ninth Circuit recently held that a "plaintiff can satisfy loss causation by showing that

10  the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the

11  plaintiff's economic loss," reconciling "two competing lines of case law." *Mineworker's Pension*

12  *Scheme v. First Solar Inc.*, 881 F.3d 750, 752 (9th Cir. 2018). "This inquiry requires no more than

13  the familiar test for proximate cause." *Id.* at 753. To prove loss causation, Plaintiffs thus need

14  only show a "causal connection" between the fraud and the loss by tracing the loss back to "the

15  very facts about which the defendant lied." *Id.* "Disclosure of the fraud is not a *sine qua non* of

16  loss causation, which may be shown even where the alleged fraud is not necessarily revealed

17  prior to the economic loss," and "revelation of fraud on the marketplace is simply one of the

18  'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Id.* at

19  754. Plaintiffs' allegations clear this threshold for pleading loss causation.[12]

20          Plaintiffs plead that Defendants' omissions from the documents Edward Jones provided to

21  them were a direct, proximate cause of their losses due to the higher fees they were charged in an

22

---

23  [11]      Defendants' argument that *Affiliated Ute* does not apply misconstrues Plaintiffs' allegations to liken them to
those in factually inapposite caselaw. MTD at 7, 16. In both *Desai*, 573 F.3d 931, and *In re Interbank Funding Corp.*
24  *Sec. Litig.*, 629 F.3d 213 (D.C. Cir. 2010), unlike the specific omissions alleged here, the omissions alleged were that
Defendants failed to disclose to investors they were engaging in fraud or running a "Ponzi scheme." Further, while the *Desai*
25  Court did not find a duty to disclose that arose "'from a relationship of trust and confidence between parties," here Edward
Jones had a fiduciary relationship with Plaintiffs and thus had a duty to disclose. *See supra* III.A.1.
26  [12]      Defendants argue, relying on an out-of-circuit case involving breach of contract, that Plaintiffs fail to prove
that the Advisory Programs were actually unsuitable and thus cannot establish loss causation. MTD at 15-16 (citing
27  *Fernandez v. UBS AG*, 2018 WL 4440498 (S.D.N.Y. Sept. 17, 2018)). At this stage, it suffices that Plaintiffs plead a
Company-wide strategy to move infrequently trading, buy-and-hold, commission-based clients to fee-based accounts
28  which could not have been based upon suitability and the best interests of specific clients. ¶¶38, 63.

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

Advisory Program versus their prior commission-based accounts. ¶¶8-11, 103, 227, 230.[13] If Defendants had disclosed the alleged material omissions to Plaintiffs, then they would not have moved their assets into an Advisory Program and would not have suffered losses. ¶¶227, 230.[14]

Defendants argue that the pleading standard requires Plaintiffs to allege "they were worse off overall than if they had continued in brokerage accounts." MTD at 16. While not in those exact words, Plaintiffs did just that. They alleged that although they already paid fees when their assets were first put into commission-based accounts, they paid more fees to move their assets into an Advisory Program – even if they bought into the same fund family – and then they paid one of the highest monthly wrap fees in the industry. ¶¶92-98. Plaintiffs also alleged how the wrap fee caused economic damage and how they incurred further losses if their assets were placed in Edward Jones' preferred partner and/or proprietary Bridge Builder funds (¶¶94-103), the egregious amount of fees they were charged following conversion (¶¶8-11), and the effect of those fees over time (¶¶101-02).

**E.     Plaintiffs Sufficiently Alleged Scheme Liability**

Defendants' scheme liability hinges on whether they undertook an inherently deceptive act distinct from their omissions. *See WPP Luxembourg Gamma Three Sarl v. Spot Runner*, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011). A scheme "used to perpetuate a[n] . . . omission may still be the basis of liability under 10b-5 . . . so long as there exists conduct beyond the . . . omission." *In re Allstate Life Ins. Co. Litig.*, 2013 WL 5161688, at *14 (D. Ariz. Sept. 13, 2013); *S.E.C. v. Loomis*, 969 F. Supp. 2d 1226, 1237 (E.D. Cal. 2013) ("the same set of facts may give rise both to a violation of subsection (b) and subsections (a) and/or (c) if plaintiff alleges 'that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations'"). Scheme liability attaches if "a defendant's conduct makes it necessary or inevitable that [misstatements] are made to investors on the basis of that conduct." *New York Cty. Emps.' Ret.*

---

[13]     Defendants assert that "paying a higher fee for a higher level of services is not a 'loss.'" MTD at 16 (citing *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006)). But, as Plaintiffs alleged, they did not receive more or better investment services in an Advisory Program, they continued to receive the same services that had come for free with their commission-based account. ¶36.

[14]     Ignoring Plaintiffs' allegations, Defendants argue that Plaintiffs do not allege that the statements about the DOL Rule affected them. MTD at 17. As discussed *infra*, included in the material omissions that directly and proximately caused Plaintiffs' losses are those relating to the DOL Rule. ¶¶41, 62, 64, 163.

*Sys. v. Berry*, 616 F. Supp. 2d 987, 996 (N.D. Cal. 2009). In this case, to further the conversion of commission-based clients "for no other reason than to collect additional fees" – the essence of reverse churning – Defendants undertook deceptive acts distinct from their omissions. ¶1.[15]

Beyond omitting that the DOL Rule did not require fee-based accounts, Defendants implemented Company-wide policy and procedure changes based on that purported requirement and concealed promotional payments Edward Jones received from investing clients in preferred partner or proprietary mutual funds to create a false appearance of fact and further the reverse churning scheme. ¶¶64, 91, 111, 137, 152, 163; *see S.E.C. v. Bardman*, 216 F. Supp. 3d 1041, 1057 (N.D. Cal. 2016) (because defendants knew the false income they brought about would be publicly reported, "their allegedly deceptive acts amount to more than making a false statement").

Specifically, Defendants implemented FA training "to use various sales tactics and strategies to specifically omit the aforementioned material information in their presentation of the 'Making Good Choices' brochure" (¶¶109, 129, 136-37, 139, 152, 165-68) and changed FA compensation to incentivize FAs to ignore their fiduciary duties and punish FAs who did not do so (¶¶68, 112, 179-86) – all for the "deceptive purpose and effect" of converting accounts without disclosing the goal of profiting at clients' expense. *See Simpson v. AOL Time Warner, Inc.* 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041. Plaintiffs thus adequately alleged conduct by Defendants, distinct from their omissions, which had the purpose and effect of creating a false appearance that caused FAs to omit material facts when they converted accounts as they had been trained and incentivized to do. *See* ¶¶4, 110-12, 183; *Berry*, 616 F. Supp. 2d at 995-96 (finding scheme liability where "the systematic perpetration and concealment of improper stock option granting practices" directly caused misstatements). Further, because their scheme liability claim arises out of the same facts as their other claims, Plaintiffs

---

[15]     Defendants' patchwork quoting grossly mischaracterizes ¶1 as "a 'scheme' to 'ma[k]e material omissions'" to paint Plaintiffs' scheme liability claim as an impermissible "aiding and abetting" claim. While Defendants made material omissions, that conduct does not foreclose their scheme liability because they acted deceptively and made and provided misstatements to FAs with the purpose (and effect) of those misstatements being passed on to clients. *See Cooper v. Pickett*, 137 F.3d 616 at 625 (9th Cir. 1997) (plaintiffs' scheme liability claim was not an "aiding and abetting" claim where they allege "that [defendant], through false statements to analysts, and those analysts, by issuing reports based on statements they knew were false, together engaged in a scheme to defraud.").

1    also adequately plead scienter, reliance, economic loss, and loss causation for their other claims.[16]

2    **IV.    PLAINTIFFS PROPERLY ALLEGED SECURITIES ACT CLAIMS**

3         Defendants ignore the express requirements of §12(a)(2 in arguing that Plaintiffs' claims

4    fail solely because they did not allege they purchased securities pursuant to a prospectus. MTD at

5    19. "Section 12(2) is a broad anti-fraud measure" intended "to promote full and fair disclosure of

6    information to potential buyers of securities." *Casella v. Webb*, 883 F.2d 805, 808-9 (9th Cir.

7    1989); *Moore v. Kayport Package Exp., Inc*., 885 F.2d 531, 536 (9th Cir. 1989). For a §12(a)(2)

8    claim, Plaintiffs may allege that the sale of a security was effected by an "oral communication" as

9    long as it "contained a material misstatement *or omission*." *Rieckborn v. Jefferies LLC*, 81 F.

10   Supp. 3d 902, 925 (N.D. Cal. 2015).[17] "One is liable under § 12(2) as a seller if successfully

11   solicits the purchase, while motivated at least in part by a pecuniary interest." *Id.; see also Primo*

12   *v. Pac. Biosciences of California*, Inc., 940 F. Supp. 2d 1105, 1125 (N.D. Cal. 2013).

13        Plaintiffs alleged that Edward D. Jones and Jones Financial, motivated by a pecuniary

14   interest, successfully solicited the purchase of proprietary funds, Bridge Builder, by certain

15   Plaintiffs and putative class members. *See*, *e.g.*, ¶¶1, 8-10, 40-41, 82-91, 99-103. In so doing,

16   Defendants Edward D. Jones and Jones Financial omitted material facts about Bridge Builder.[18]

---

17   [16]     Defendants attempt to rewrite the FAC to suit their position in arguing that Plaintiffs fail to adequately
18   allege a "manipulative" scheme. *See Freeman*, 704 F.2d at 1116 ("[D]efendants may not recast [] claims as fraud
     claims by arguing that they 'really' involve deception or misrepresentation"). Plaintiffs allege both manipulation *and*
19   deceit. ¶¶211-12, 215. For example, Plaintiffs allege that Defendants implemented a new computer system under the
     guise of ensuring FA compliance with regulations when in truth, it furthered the reverse-churning scheme as it
20   "inevitably recommended a fee-based account" and "routinely attempt[ed] to place clients into Advisory Solutions –
     even when a client and his/her FA did not believe conversion would be in the client's best interest." ¶¶154-55. Since
21   this computer system, which FAs and clients relied upon, led FAs to disregard clients' best interests, FAs were
     "forced to manipulate answers" to avoid converting clients. *Id.*; ¶216. Defendants cite to *In re Merrill Lynch Auction*
22   *Rate Sec. Litig.*, 704 F.Supp.2d 378, 390 (S.D.N.Y. 2010) to dispute the deceptive nature of the new computer
     system. MTD at 18. But unlike here, *Merrill Lynch* involved market manipulation arising from a "transaction." *Id.*
23   Moreover, the disclosures cited by Defendants do not refer to the new computer system, and thus could not have
     possibly fully disclosed it.
24   [17]     Defendants' cases similarly hold that "To prevail under Section 12(a)(2), a plaintiff must demonstrate (1) an
     offer or sale of a security . . . (3) by means of a prospectus *or oral communication*, (4) that includes an untrue
25   statement of material fact *or omits to state a material fact that is necessary to make the statements not misleading*."
     *Miller v. Thane Int'l, Inc*., 519 F.3d 879, 885 (9th Cir. 2008); *Mallen v. Alphatec Holdings*, 861 F. Supp. 2d 1111,
26   1123 (S.D. Cal. 2012) (same); *In re Levi Strauss & Co. Sec. Litig*., 527 F. Supp. 2d 965, 982 (N.D. Cal. 2007)
     (same).
27   [18]     Defendants' narrow reading of *Gustafson v. Alloyd Co*., 513 U.S. 561, 569-73 (1995), is incorrect. MTD at
     19. Plaintiffs can and do rely on marketing materials provided by Defendants which contained material omissions.
28   *See, e.g.,* ¶¶105-109; *Bridges v. Geringer*, 2015 WL 2438227, at *5 (N.D. Cal. May 21, 2015) ("[Defendant] also
     argues based on *Gustafson* that Plaintiffs failed to allege the Fund had an associated prospectus. *But Plaintiffs do*

1   ¶112. Plaintiffs, therefore, have adequately alleged a §12(2)(a) claim.[19,20]

2   **V.     PLAINTIFFS' STATE LAW CLAIMS ARE NOT BARRED BY FEDERAL LAW**

3   By their silence, Defendants concede they owe Plaintiffs a fiduciary duty which they

4   breached by converting Plaintiffs' accounts. MTD 19-20. They oppose Plaintiffs' fiduciary duty

5   claims on SLUSA preemption, but SLUSA only bars class actions based on *state* law alleging "an

6   untrue statement or omission" or a "manipulative or deceptive device or contrivance" connected

7   to "the purchase or sale of a covered security." 15 U.S.C. §§77p(b), 78bb(f)(1). "[A] claim is not

8   automatically SLUSA-barred merely because it involves securities." *Fleming v. Charles Schwab*

9   *Corp*., 878 F.3d 1146, 1153 (9th Cir. 2017). Nor may defendants "recast [] claims as fraud claims

10  by arguing that they 'really' involve deception or misrepresentation." *Freeman Inv., L.P. v. Pac.*

11  *Life Ins. Co*., 704 F.3d 1110, 1116 (9th Cir. 2013). SLUSA-preemption requires that (1)

12  "defendant's conduct involves conduct specified in SLUSA, and (2) the alleged conduct will be

13  part of the proofs in support of the state law cause of action." *Northstar Fin. Advisors, Inc. v.*

14  *Schwab Investments,* 904 F.3d 821, 828-29 (9th Cir. 2018) (finding SLUSA-preemption where

15  the "gravamen or essence of the ***claim***" is based on misrepresentations or omissions).[21]

16  Here, Plaintiffs plead two distinct sets of claims: (1) federal securities law allegations

17  involving Defendants' omissions, and (2) breach of fiduciary duty allegations under state law

18  which rest solely on Defendants' legal fiduciary duties and their ***conduct*** that breached those

19  duties – specifically, compelling Plaintiffs into an Advisory Program (¶¶225, 257, 265, 267).[22]

20  *allege the existence of a prospectus, albeit in the form of marketing materials*.").

[19]   Defendants' loss causation argument fails (*supra* III.D) and does not even meet the high bar their own case
21  sets for using loss causation as an affirmative defense. *See Brown v. Ambow Educ. Holding Ltd*., 2014 WL 523166, at
    *14 (C.D. Cal. Feb. 6, 2014) ("*[O]n the face of the complaint*, the absence of loss causation [must be] apparent.").

22  [20]   Defendants' passing reference that Plaintiffs failed to plead primary liability for control person claims is
    irrelevant because Plaintiffs have alleged a primary violation of §10(b) and Rule 10b–5 and that the Individual
23  Defendants exercised actual power over the primary violators – Edward D. Jones and Jones Financial. *See* ¶¶19-30,
    115-74, 235, 249); *In re NVIDIA Corp. Sec. Litig*., 768 F.3d 1046, 1052 (9th Cir. 2014) (§20(a) requires Plaintiff to
24  establish a primary violation of the securities laws and that the defendant exercised power over the primary violator).
    [21]   *Fleming* and *Northstar* are factually distinguishable. *See Fleming*, 878 F.3d at 1154 (SLUSA barred best
25  execution claims as only based on fraud and nondisclosure allegations); *Northstar*, 904 F.3d at 830-33 (SLUSA
    barred breach of contract and fiduciary claims as only based on defendants' misrepresentations and omissions). This
26  case is more like *Freeman* in that proof of Plaintiffs' claims do not require that defendants made misrepresentations
    or omissions. 704 F.3d at 1115-16, 1118. And since Plaintiffs agree that Defendants' conduct involved covered
27  securities, that analysis in *Merrill Lynch, Pierce, Fenner & Smith Inc.v. Dabit* is irrelevant. 547 U.S. 71, 83-4 (2006).
    [22]   Plaintiffs do not refer to omissions or fraudulent conduct in the fiduciary duty causes of action, and indeed,
28  expressly exclude allegations "*related to material omissions*." ¶¶252-72. What Defendants describe as "artful

1    Plaintiffs' fiduciary duty claims do not rely on the omissions alleged under their federal securities

2    law causes of action, and the omissions are not part of the proofs supporting the state law causes

3    of action. Moreover, Defendants' legally established fiduciary duties and alleged breach exist

4    regardless of, and separate from, their material omissions. Accordingly, Plaintiffs' fiduciary duty

5    claims fall squarely in line with the cases in this circuit holding that SLUSA does not preempt

6    state law claims which are not based on misrepresentations or omissions, including breach of

7    fiduciary duty.[23],[24]

8    **VI.     CONCLUSION**

9          For the reasons discussed herein, Defendants' Motion should be denied. Should the Court

10    disagree, Plaintiffs respectfully request leave to amend under Rule 15(a)(2).

     Dated:  January 22, 2019

11                                              Respectfully submitted,

12                                              */s/ Ivy T. Ngo*
                                                IVY T. NGO (249860)
13                                              BRIAN HANLIN (*pro hac vice*)
                                                FRANKLIN D. AZAR (*pro hac vice*)
14                                              FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                                14426 East Evans Avenue
15                                              Aurora, CO 80014
                                                Telephone:     (303) 757-3300
16                                              Facsimile:     (720) -213-5131
                                                ngoi@fdazar.com
17                                              hanlinb@fdazar.com

18

19

20

___

21    pleading" is clear indication that Plaintiffs' fiduciary duty claims do not rely on Defendants' omissions. Any attempt
      by Defendants to show otherwise would be futile. *See In re Charles Schwab Corp. Sec. Litig*., 257 F.R.D. 534, 551
22    (N.D. Cal. 2009) (finding Plaintiffs' misrepresentations "which underpin the federal securities claims" irrelevant to
      the state law claims and not SLUSA-barred as they must "give[] rise to liability, not merely an extraneous detail.")
23    [23]     *See, e.g., Charles Schwab*, 257 F.R.D. at 551 ("fiduciary-duty claim predicated on self-dealing" not
      SLUSA-barred as it was "not predicated upon a misrepresentation"); *Tuttle v. Sky Bell Asset Mgmt*, LLC, 2011 WL
24    208060 at *2 (N.D. Cal. Jan. 21, 2011) (state law claims not SLUSA-barred as they alleged "defendants had an
      obligation to act with due care and failed to do so. . . . references to misrepresentations or omissions can be properly
25    described as extraneous"); *Stoody-Broser v. Bank of America, N.A.*, 2012 WL 1657187, at *4 (N.D. Cal. May 10,
      2012) (rejecting SLUSA-preemption where allegation was "that Defendants fail to act with due care under their
26    fiduciary obligations")
      [24]     Should this Court find Plaintiffs' fiduciary duty claims not adequately plead, they request leave to amend,
27    which is commonly granted. *Beckett v. Mellon Investor Servs. LLC*, 329 F. App'x 721, 723-24 (9th Cir. 2009)
      (granting leave to amend); *Northstar*, 904 F.3d at 834-35 (lower court erred in dismissing claims based on SLUSA-
28    preemption).

                                                        PLAINTIFFS' OPPOSITION TO
                              20                        DEFENDANTS MOTION TO DISMISS

JOHN R. GARNER (246729)
GARNER & ASSOCIATES
109 North. Marshall Avenue
P.O. Box 908
Willows, CA  95988
Telephone:      (530) 934-3324
Facsimile:      (530) 934-2334
john@garner-associates.com

*Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I, Ivy T. Ngo certify that on January 22, 2019 the foregoing opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint was filed electronically in the Court's Electronic Filing System ("ECF"); thereby upon completion, the ECF system automatically generated a "Notice of Electronic Filing" as service through CM/ECF to registered email addresses to parties of record in the case, in particular on the following:

| | |
|---|---|
| MERYL L. YOUNG, SBN 110156<br>GIBSON, DUNN & CRUTCHER, LLP<br>3161 Michelson Drive<br>Irvine, CA  92612-4412<br>Telephone: (949) 451-3800<br>Facsimile: (949) 451-4220<br>myoung@gibsondunn.com | SAMUEL A. KEESAL, SBN 38014<br>KEESAL, YOUNG & LOGAN<br>400 Oceangate<br>Long Beach, CA 90802<br>Telephone: (562) 436-2000<br>Facsimile: (562) 436-7416<br>skip.keesal@kyl.com |
| ALEXANDER K. MIRCHEFF, SBN 245074<br>GIBSON, DUNN & CRUTCHER LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>Telephone: 213.229.7000<br>Facsimile: 213.229.7520<br>amircheff@gibsondunn.com | JULIE L. TAYLOR, SBN 154341<br>KEESAL, YOUNG & LOGAN<br>450 Pacific Avenue<br>San Francisco, CA 94133<br>Telephone: (415) 398-6000<br>Facsimile:  (415) 981-0136<br>julie.taylor@kyl.com |

*Counsel for Defendants*

By:     /s/ *Ivy T. Ngo*
        Ivy T. Ngo

PLAINTIFFS' OPPOSITION TO
DEFENDANTS MOTION TO DISMISS