PAUL R. WOOD (*pro hac vice*)
FRANKLIN D. AZAR (*pro hac vice*)
MICHAEL D. MURPHY (*pro hac vice*)
BRIAN HANLIN (*pro hac vice*)
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone:    (303) 757-3300
woodp@fdazar.com
azarf@fdazar.com
murphym@fdazar.com
hanlinb@fdazar.com

JOHN R. GARNER (246729)
GARNER & ASSOCIATES
109 North Marshall Avenue
P.O. Box 908
Willows, CA 95988
Telephone:    (530) 934-3324
john@garner-associates.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD ANDERSON, RAYMOND KEITH CORUM, JESSE AND COLLEEN WORTHINGTON, and JANET GORAL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD D. JONES & CO., L.P.,<br><br>Defendant. | No.  2:18-cv-00714-JAM-AC<br><br>THIRD AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Edward Anderson, Raymond Keith Corum, Colleen and Jesse Worthington, and Janet Goral ("Plaintiffs"), by and through their counsel, allege the following against Defendant Edward D. Jones & Co., L.P. ("EDJ" or "Defendant") based upon personal information as to those allegations concerning Plaintiffs and the investigation of counsel as to all other matters.

## I.    PRELIMINARY STATEMENT

1.    EDJ breached its fiduciary duty to Plaintiffs and putative Class members ("Class members") by taking advantage of trusting, long-standing buy-and-hold[1] clients and profiting greatly at those clients' expense. Plaintiffs bring this action on behalf of themselves and Class members (including, without limitation, their beneficiaries) who had their assets improperly moved from commission-based accounts with EDJ into fee-based accounts with Edward Jones Advisory Solutions ("Advisory Solutions") and/or Edward Jones Guided Solutions ("Guided Solutions") (collectively, "Advisory Accounts"), between March 30, 2013 and March 30, 2018 (the "Class Period"), inclusive, and who were damaged thereby (the "Class").

2.    EDJ had previously operated under a long-standing and economically sound determination that commission-based accounts were suitable for Plaintiffs and Class members because they engaged in little or no trading activity, and thus paid minimal commissions. In 2013, EDJ changed its business model of over 80 years and began a widespread shift of its clients from commission-based accounts (which only charged a fee when a trade was executed) to fee-based accounts (which charged a flat, annual percentage fee on the assets in the account regardless of the number of trades).

3.    But fee-based Advisory Accounts are not suitable for all investors. Clients who execute few trades in their accounts, because, for example, their investment strategy is to buy and hold their assets, end up paying substantially higher fees in a fee-based Advisory Account than in a commission-based account despite receiving little in return for those increased fees. Thus, fee-

---

[1] "'Buy-and-hold' is a passive investment strategy in which an investor buys stocks (or other types of securities such as ETFs) and holds them for a long period regardless of fluctuations in the market." Brian Beers, *Buy and Hold Definition*, Investopedia (Updated May 13, 2020), https://www.investopedia.com/terms/b/buyandhold.asp.

based Advisory Accounts are not suitable for investors such as Plaintiffs and Class members who conducted few if any trades each year.

4.      For buy-and-hold clients such as Plaintiffs and Class members who conducted little to no trading each year, an annual percentage fee based on the assets in the account had a negative impact on the long-term growth of those clients' accounts.

5.      Before transferring clients from commission-based accounts to fee-based Advisory Accounts, EDJ had a duty to determine whether fee-based account types were suitable for those clients. EDJ uniformly failed to conduct the required account-suitability analysis. In fact, EDJ encouraged its financial advisors ("FAs") to move clients to fee-based Advisory Accounts in order to generate additional fees for EDJ and allow the registered representatives to focus their attention on clients with larger account balances.

6.      Before transferring clients from commission-based accounts to fee-based Advisory Accounts, EDJ had a duty to determine whether fee-based account types were suitable for those clients. EDJ uniformly failed to conduct the required account-suitability analysis. In fact, EDJ "coached" its registered representatives to move clients with smaller account balances to managed Advisory Accounts in order to allow the registered representatives to focus their attention on clients with larger account balances. This practice allowed the registered representatives, who received a portion of the asset management fee, to increase their compensation without providing additional services to their clients.

7.      EDJ failed to conduct an appropriate account-type suitability analysis before transferring its clients' assets into these fee-based Advisory Accounts. Its failures to do so violated accepted norms of practice as reflected by the rules of the Financial Industry Regulatory Authority ("FINRA"), the self-regulatory organization ("SRO") that regulates securities broker-dealers such as EDJ. FINRA's rules are evidence of the standard of care imposed on broker-dealers. And EDJ's failure to comply with FINRA's rules without conducting account-suitability analyses is evidence that it breached its duty of care under state law, which includes a duty to act in accordance with the standard of care used by other professionals in the community.

8.     EDJ, like all broker-dealers registered with FINRA, had internal policies and procedures designed to ensure that its FAs complied with FINRA rules. EDJ's failure to make sure its FAs followed those policies and procedures by conducting an appropriate account-type suitability analysis is a further breach of EDJ's duties to Plaintiffs and the Class members. In fact, rather than confirm that its FAs were following FINRA rules and conducting appropriate account-type suitability analyses, EDJ financially incentivized its FAs to move their commission-based clients into fee-based Advisory Accounts, and it subjected those FAs who did not do so to increased scrutiny and disciplinary actions by upper management.

9.     EDJ also owed Plaintiffs and its other customers fiduciary duties of care and loyalty under state law. EDJ breached its duty of care and loyalty by failing to conduct an appropriate account-type suitability analysis to ensure that fee-based Advisory Accounts were suitable for its clients. Again, the scope of the fiduciary duties is evidenced by the regulatory framework.

10.     As a result, Plaintiffs and Class members were harmed because, in the Advisory Accounts, they paid substantially higher asset-based fees.

11.     EDJ benefited from its failure to enforce the FINRA rules, industry standards, and its own policies requiring FAs to conduct appropriate account-type suitability analyses before transferring its clients to fee-based Advisory Accounts. As a result of transferring its clients' assets from commission-based accounts into fee-based Advisory Accounts, EDJ profited significantly at the expense of its clients to the tune of $17.2 billion in revenue specifically from asset-based fees, pushing EDJ's earnings to record highs during the Class Period.

12.     In addition to the increased revenue, moving clients into fee-based Advisory Accounts also provided EDJ predictability as to what fees it would earn yearly from each client's account and when it would receive those fees. Conversely, the fees generated by commission-based accounts would appear to be far more unpredictable and inconsistent in both timing and amount, as they depend solely upon the client's desire to conduct trades in the account.

13.     Accordingly, EDJ transferred its low-trading-activity (e.g., buy-and-hold) clients into fee-based Advisory Accounts without conducting appropriate account-type suitability analyses

1  and against their clients' best interests, resulting in substantial increased fees based on the total

2  assets in the account, as opposed to modest commissions based on seldomly executed trades.

3      14.    Although EDJ recommended that its clients transferr their assets into fee-based

4  Advisory Accounts, it did so without first conducting an appropriate account-type suitability

5  analysis to determine whether the fee-based Advisory Account was appropriate—in breach of its

6  duties under state law as evidenced by the regulatory framework. EDJ's duty to conduct a proper

7  suitability analysis was independent from any of EDJ's disclosure obligations, and EDJ could not

8  satisfy its fiduciary and common-law obligations to conduct an independent suitability analysis via

9  disclosures it made to its clients.

10     15.    The breaches of EDJ's duties under state law, evidenced by the regulatory

11  framework, industry standards, and its own internal policies, occurred at the time EDJ moved each

12  Plaintiff or Class member into a fee-based Advisory Account without conducting an appropriate

13  account-type suitability analysis. EDJ collected increased fees from Plaintiffs and members of the

14  Class regardless of whether any trades were made in the Advisory Accounts.

15     16.    EDJ's transfer of Plaintiffs' and the putative Class members' assets into the ill-suited

16  fee-based Advisory Accounts without first conducting a suitability analysis resulted in the "reverse

17  churning" of Plaintiffs' and the putative Class members' accounts. The SEC's 2010 Study on

18  Investment Advisers and Broker Dealers described "reverse churning" as follows:

19     [C]ertain retail customers might face increased costs, and consequently the profitability of
       their investment decisions could be eroded, especially accounts that are not actively traded,

20     e.g., fee-based accounts that trade so infrequently that they would have incurred lower costs
       for the investor had the accounts been commission-based. This practice is commonly

21     referred to as "reverse churning" or "underutilization."[2]

22     17.    In 2016, the SEC found that dual-registered broker-dealers and investment advisors

23  failed to monitor advisory accounts for "reverse churning" or "inactivity" as required under their

24  policies and procedures meant to ensure that fee-based advisory or "wrap" accounts that charged

25  an inclusive fee for both advisory services and trading costs remained in the best interest of clients

26

27  _____

28  [2] SEC, *Study on Investment Advisors and Broker-Dealers*, at 152 (Jan. 2011),
    https://www.sec.gov/news/studies/2011/913studyfinal.pdf.

                                    CASE NO. 2:18-CV-00714-JAM-AC
                    THIRD AMENDED COMPLAINT

who traded infrequently.[3] Thus, unlike traditional "churning," "[r]everse churning generally refers to the practice where a client is charged a wrap fee that covers all advisory services and trading costs even though the client trades infrequently. A wrap-fee account may not be in the best interest of a client with minimal or no trading activity as compared to a non-wrap fee account or brokerage account where the client would otherwise pay trading costs incurred but a lower fee in a non-wrap account or no advisory fee in a brokerage account."[4] Compliance policies and procedures must be implemented to ensure that fee-based advisory or "wrap" accounts that charge an inclusive fee for both advisory services and trading costs remain in the best interest of clients that trade infrequently.[5]

## II.    JURISDICTION AND VENUE

18.    This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative Class members, and minimal diversity exists because at least one member of the Class is a citizen of a State different from EDJ.

19.    This Court has personal jurisdiction over EDJ because it intentionally availed itself of this jurisdiction by regularly conducting business in California and by promoting, selling, and marketing its services to consumers in California, as well as nationwide.

20.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v(a). EDJ is licensed to do business in this District, maintains a number of branch offices in this District, and services clients who are residents of this District – including Plaintiffs. In addition, many of the acts and conduct that constitute the violations of law complained of herein occurred in this District.

## III.    PARTIES

### A.    Plaintiff Edward Anderson

21.    Plaintiff Edward Anderson is a resident of Elk Creek, California.

---

[3] *In re Royal All. Assocs., Inc., et.al*, SEC Administrative Proceeding No. 3-17169, Release No. 4351, 2016 WL 945975, at *2 (Mar. 14, 2016).
[4] *Id.*, ¶ 23.
[5] *Id.*, ¶ 4.

22. Plaintiff Anderson opened a commission-based EDJ account in July 2012. Anderson was a "buy and hold" investor who conducted few trades in his account.

23. In June 2015, Anderson's EDJ FA, Lisa Rodriguez, met with him and recommended that Anderson transfer his commission-based account into a fee-based Advisory Solutions account. Anderson's FA failed to conduct an account-type suitability analysis for Anderson's account before making the recommendation because, had she done so, the FA would have realized that a fee-based Advisory Account was unsuitable for Anderson based on the historic level of trading activity and commission fees paid by Anderson in the account.

24. Anderson followed his FA's recommendation and agreed to open a fee-based Advisory Account with an annual asset-based fee of between 1.3% and 1.5% of his account balance. Between opening the account and the date he closed it in 2018, Anderson paid over $6,000 in asset-based fees to EDJ.

**B.      Plaintiff Raymond Keith Corum**

25. Plaintiff Raymond Keith Corum is a resident of Willows, California

26. Plaintiff Corum opened a commission-based EDJ account prior to 2014. Corum was a "buy and hold" investor who conducted few trades in his account.

27. In early 2015, Corum's EDJ FA, Lisa Rodriguez, recommended that he transfer his commission-based account into a fee-based Advisory Solutions account. Corum's FA failed to conduct an account-type suitability analysis for Corum's account before making the recommendation because, had she done so, the FA would have realized that a fee-based Advisory Account was unsuitable for Corum based on the historic level of trading activity and commission fees paid by Corum in the account.

28.  Corum followed his FA's recommendation and agreed to open a fee-based Advisory Account with an annual asset-based fee of between 1.3% and 1.5% of his account balance. Between opening the account and the date he closed it in 2018, Corum paid over $671 in asset-based fees to EDJ.

**C.    Plaintiffs Colleen and Jesse Worthington**

29.    Plaintiffs Colleen and Jesse Worthington (the "Worthingtons") are residents of Willows, California.

30.    The Worthingtons opened their commission-based EDJ accounts prior to 2014. The Worthingtons were "buy and hold" investors who conducted few trades in their accounts.

31.    In 2014 the Worthingtons' EDJ FA, Lisa Rodriguez, met with them and recommended that the Worthingtons transfer their assets from commission-based accounts into fee-based Advisory Solutions accounts. The Worthingtons' FA failed to conduct an account-type suitability analysis for their accounts before making the recommendation because, had she done so, the FA would have realized that a fee-based Advisory Account was unsuitable for the Worthingtons based on the historic level of trading activity and commission fees paid by the Worthingtons in the accounts.

32.    The Worthingtons followed their FA's recommendation and agreed to open fee-based Advisory Accounts in 2015 and 2016 with annual asset-based fees of between 1.3% and 1.5% of their account balances. Between opening the accounts and the date they closed those accounts in 2018, the Worthingtons paid over $6,000 in asset-based fees to EDJ.

**D.    Plaintiff Janet Goral**

33.    Plaintiff Janet Goral is a resident of Durham, North Carolina.

34.    Plaintiff Goral opened a commission-based account with EDJ in 2017.

35.    In January 2018, Goral's EDJ FA, Bernie Franco III, recommended that she transfer her commission-based account into a fee-based Advisory Solutions account. Goral's FA failed to conduct an account-type suitability analysis for Goral's account before making the recommendation because, had he done so, the FA would have realized that a fee-based Advisory Account was unsuitable for Goral based on the historic level of trading activity and commission fees paid by Goral in the account.

36.    Goral followed her FA's recommendation and agreed to open a fee-based Advisory Account with an annual asset-based fee of between 1.3% and 1.5% of her account balance. Between

opening the account and the date she closed it four months later, Goral paid over $2,303 in asset-based fees to EDJ.

**E. Defendant Edward D. Jones & Co., L.P.**

37.    Defendant EDJ, a Missouri Limited Partnership headquartered in St. Louis, Missouri, is dually registered as a broker-dealer and as an investment advisor under federal and state securities laws. EDJ provides brokerage and related financial services to individuals and small businesses.

## IV.    FACTUAL ALLEGATIONS

**A. The Regulatory Framework for Broker-Dealers Such as EDJ.**

38.    In the late 1930's, Congress amended the Exchange Act to authorize self-regulatory organizations for broker-dealers.[6]

39.    The SEC and FINRA (formed in 2007 to replace the NASD) regulations serve as sources of fiduciary-like duties.[7]

40.    FINRA is a private corporation that acts as a self-regulatory organization. FINRA is the successor to the NASD and the member regulation, enforcement, and arbitration operations of the New York Stock Exchange ("NYSE"). FINRA is authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly. Working under the supervision of the SEC, FINRA:

- Write[s] and enforce[s] rules governing the ethical activities of all registered broker-dealer firms and registered brokers in the U.S.; [and]
- Examines firms for compliance with those rules[.][8]

41.    EDJ is regulated by FINRA through FINRA's Missouri district office and is required to follow FINRA's rules governing the conduct of its business.

---

[6] Andrew F. Tuch, The Self-Regulation of Investment Bankers, 83 Geo. Wash. L. Rev. 101, 112 & n.50 (Dec. 2014); Securities Exchange Act of 1934, Pub. L. No. 73–291, 48 Stat. 8881 (codified as amended at 15 U.S.C. §§ 78a–78pp (2012)).

[7] Thomas Lee Hazen, *Are Existing Stock Broker Standards Sufficient? Principles, Rules, and Fiduciary Duties*, 2010 Colum. Bus. L. Rev. 710, 733-55 (2010).

[8] FINRA, What We Do, finra.org/about/what-we-do (last visited May 31, 2022).

CASE NO. 2:18-CV-00714-JAM-AC
THIRD AMENDED COMPLAINT

42.    Sections 6(b)(5) and 15A(b)(6) of the Securities Exchange Act require stock exchanges and associations of brokers and securities dealers to establish rules to protect the investing public.[9] In response, a number of national exchanges and SROs have adopted suitability rules for brokers.

43.    The NYSE adopted a "know your customer" rule, NYSE Rule 405(a), which requires the officers of member organizations to use diligence to learn essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization.

44.    Rule 405(a) required "NYSE members to make a determination, prior to opening an account in [a Non-Managed Fee-Based Account ("NFBA")] Program, that such program is appropriate for each customer taking into account the services provided, anticipated costs, and customer objectives."[10]

45.    In adopting NYSE Rule 405(a), the SEC observed that "[o]ne concern raised by fee-based accounts is that customers are being inappropriately moved into these accounts when commission-based accounts would cost them less due to their low volume of trading. . . . The NYSE proposal should help to ensure that customers are placed in the account that is the most appropriate for them."[11]

46.    Based on NYSE Rule 405(a), FINRA adopted Rule 2111, which is a suitability rule that imposes a customer-specific suitability obligation on broker-dealers, including EDJ.[12]

47.    "Under FINRA's suitability rule, the broker-dealer has a duty to undertake reasonable diligence to ascertain the customer's investment profile."[13]

---

[9] 15 U.S.C. § 78o–3(b)(6).

[10] SEC Release Notice, Release No. 51907, 85 S.E.C. Docket 2185, 2005 WL 2589187, at *1 (June 22, 2005).

[11] *Id.* at *4. EDJ is a member of the NYSE. *See* NYSE, https://www.nyse.com/markets/nyse/membership (last visited May 31, 2022).

[12] *See Regulation Best Interest*, Release No. 83062, 2018 WL 1911162, at *56 n.239 (Apr. 18, 2018) (quoting FINRA Rule 2111.05(b)) ("The customer-specific obligation requires that a member or associated person have a reasonable basis to believe that the recommendation is suitable for a particular customer based on that customer's investment profile, as delineated in Rule 2111(a).").

[13] *See Regulation Best Interest*, Release No. 83062, 2018 WL 1911162, at *56 n.241 (quoting FINRA Rule 2111(a); citing FINRA Regulatory Notice 12-25 at Q15-Q21 (discussing broker-dealer's information-gathering requirements)) ("A customer's investment profile includes, but is not limited to, the customer's

48.    FINRA Rule 2111 requires that a firm or associated person "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile."[14]

49.    "In interpretive guidance, FINRA has stated that '[t]he suitability requirement that a broker make only those recommendations that are consistent with the customer's best interests prohibits a broker from placing his or her interests ahead of the customer's interests.'"[15] Specifically, FINRA Regulatory Notice 12-25, "Additional Guidance on FINRA's New Suitability Rule" reiterated the "best interest" standard in applying the suitability rule and provides examples of instances where FINRA and the SEC have found brokers in violation of the suitability rule by placing their interests ahead of customers' interests, including "[s]ome of the cases in which FINRA and the SEC have found that brokers placed their interests ahead of their customers' interests involved cost-related issues."[16]

50.    In its "Fee-Based Account Questions & Answers," the NASD (now FINRA) explains that because "customer accounts with low trading activity might be better suited for a commission-based arrangement," the onus is on firms (including EDJ) to "take those steps necessary to assess whether a fee-based account is appropriate for a particular customer and to periodically update this assessment." Such steps include having "reasonable grounds to conclude that a fee-based account is appropriate" and training "brokers with respect to the features of fee-based accounts and the need to assess whether a fee-based account is appropriate for a customer."

51.    Consistent with FINRA, the SEC, in its January 2015 annual priority list for examinations, kept "Fee Selection and Reverse Churning" as a priority in 2016[17] and added "Wrap

---

age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.").

[14] *Know Your Customer and Suitability*, FINRA Notice 11-02, 2011 WL 127154, at *1-2 (Jan. 10, 2011) (quoting FINRA Rule 2111(a)).

[15] *Regulation Best Interest*, 2018 WL 1911162, at *5 n.15 (citing FINRA Regulatory Notice 12-25, Additional Guidance on FINRA's New Suitability Rule (May 2012)).

[16] *Suitability*, FINRA Notice 12-25, 2012 WL 1898671, at *3 (May 18, 2012).

[17] Examination Priorities for 2016, National Exam Program, Office of Compliance Inspections and Examinations, at 2 (Jan11, 2016), https://www.sec.gov/about/offices/ocie/national-examination-program-

1    Fee Programs" as a priority in 2017 and 2018. The SEC advised that it would "review whether

2    investment advisers are acting in a manner consistent with their fiduciary duty and whether they

3    are meeting their contractual obligations to clients."[18]

4        52.    "The suitability obligation is not limited to recommendations of specific securities."

5    Thus, Thomas Lee Hazen, a noted scholar in the field, observes that, "for example, the NASD [now

6    FINRA] has reminded its members that they must take steps to assure that wrap fees or other fee-

7    based accounts should meet the customer's needs."[19]

8        53.    Thus, according to FINRA, "[i]t generally is inconsistent with just and equitable

9    principles of trade—and therefore a violation of Rule 2110—to place a customer in an account with

10   a fee structure that reasonably can be expected to result in a greater cost than an alternative account

11   offered by the member that provides the same services and benefits to the customer. Accordingly,

12   before opening a fee-based account for a customer, members must have reasonable grounds to

13   believe that such an account is appropriate for that particular customer."[20]

14       54.    FINRA prohibits broker-dealers from disclosing away their suitability obligations.[21]

15   Thus, the Advisory Account Agreements and any related agreements entered into between EDJ and

16   its clients cannot discharge EDJ's duty to perform a suitability analysis before transferring its

17   clients' assets from commission-based accounts into fee-based Advisory Accounts and/or allowing

18   these assets to remain in fee-based Advisory Accounts.

19       55.    Using FINRA's rules, including the suitability rule, as evidence of industry

20   standards and practices, EDJ breached its duties owed to Plaintiffs and the Class members under

21   _____

22   priorities-2016.pdf.
     [18] Examination Priorities for 2017, National Exam Program, Office of Compliance Inspections and

23   Examinations, at 2 (Jan. 12, 2017), https://www.sec.gov/about/offices/ocie/national-examination-program-
     priorities-2017.pdf; 2018 National Exam Program Examination Priorities, National Exam Program, Office

24   of Compliance Inspections and Examinations, at 5 (Feb. 7, 2018),
     https://www.sec.gov/about/offices/ocie/national-examination-program-priorities-2018.pdf.

25   [19] 5 THOMAS LEE HAZEN, Treatise on The Law of Securities Regulation, *Broker-Dealer
     Recommendations and Suitability-Introduction*, § 14:136, n.3 (May 2020 Update).

26   [20] *See* FINRA, Rules & Guidance, NASD Reminds Members That Fee-Based Compensation Programs Must
     Be Appropriate, https://www.finra.org/rules-guidance/notices/03-68 (last visited May 31, 2022).

27   [21] *Regulation Best Interest*, 2018 WL 1911162, at *3 n.7; *see also* Rule 2111, Supplementary Material .02
     ("Disclaimers. A member or associated person cannot disclaim any responsibilities under the suitability

28   rule.").

state law by recommending and transferring their assets from commission-based accounts into fee-based Advisory Accounts without conducting any suitability analysis.

56.    Courts throughout the country have found that FINRA rules and FINRA's Regulatory Notices establish applicable industry standards and practices for broker-dealers such as EDJ.[22]

**B. EDJ's Historically Commission-Based Business Model.**

57.    From its inception in 1922, EDJ has marketed itself as, and has been known as, an investment firm that offered individually tailored solutions for investors who want to have a personal relationship with the person investing their money. To succeed in its goal of providing individually tailored investment advice, EDJ has historically focused on offering commission-based accounts which only charged a large fee when a client completed a transaction. Otherwise, the client only paid a small annual custodial fee.

58.    Because EDJ focused on building goodwill and trust among mainly unsophisticated, middle-income investors in small communities, it prided itself on its "knock-on-the-door" approach to offering financial services. This approach was and still is accomplished through EDJ's unique model of staffing one FA per branch office. An EDJ office usually only has one other associate, a branch office administrator. While EDJ's one-FA-per-office model has allowed clients to choose their FA directly and deal with just that FA, it has also allowed EDJ to open offices in less-populated areas and towns and has contributed to EDJ obtaining a stronghold in small communities. EDJ currently has the largest number of branch offices among brokerage firms in the U.S.

59.    Under its commission-based model, EDJ provided its clients free financial advice, only charging them on a per-trade basis. This commission-based model particularly benefitted middle-income investors in small communities who engaged in little to no trading.

---

[22] *See, e.g.*, *Milliner v. Mut. Sec., Inc.*, 207 F. Supp. 3d 1060, 1065 (N.D. Cal. 2016) (While a violation of an exchange rule will not support a private claim, courts often looked to such rules in defining the scope of common law duties.); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (same): *Mihara v. Dean Witter & Co., Inc.* 619 F.2d 814, 824 (9th Cir. 1980) (SRO rules "reflect the standard to which all brokers are held."); *Ginzkey v. Nat'l Sec. Corp.*, No. C18-1773RSM, 2022 WL 716841, at *4 (W.D. Wash. Mar. 10, 2022) (denying defendant's summary judgment motion where "Plaintiffs are citing to FINRA rules to set forth the standard of care applicable to [defendant] [and] Plaintiffs argue that FINRA rules were incorporated into [defendant's] own internal policies which also inform the applicable standard of care.").

1   60. As explained in a February 27, 2002 Wall Street Journal ("WSJ") article titled "Wall

2 Street Firms Are Divided Over Brokers' Pay on Fee-Based Accounts," EDJ didn't "offer fee-based

3 accounts at all" at that point in time because it "advocate[d] a buy-and-hold investing strategy, in

4 which investors h[u]ng on to a security or mutual fund for decades. The strategy [wa]sn't the most

5 conducive for generating trading commissions, but many of its customers [we]ren't well-suited to

6 fee-based accounts, either."[23] The article quotes former EDJ managing partner and CEO John W.

7 Bachmann as stating that the Company "could 'double [its] revenue overnight' if it introduced fee-

8 based accounts, but such a pricing strategy doesn't make sense for investors who don't trade

9 frequently, and would likely alienate customers."[24]

10   61. After taking the reins of the Company as Managing Partner in 2006, James Weddle

11 purported to adopt a stay the course strategy, specifically pointing out that "customers shouldn't

12 expect to see a big change in [EDJ's] overall strategy."[25]

13   62. In an April 1, 2006 interview with WealthManagement.com, Weddle detailed EDJ's

14 clientele and explained why a wrap based, *i.e.*, fee-based, investment model did not suit them: "We

15 have a managed accounts program with $500,000 minimums, but our clients are buy and hold."

16 Mr. Weddle acknowledged that "[t]he wrap pricing approach doesn't fit with that philosophy."[26]

17 **C. EDJ Transitions to a Fee-Based Business Model.**

18   63. Less than two years after Weddle acknowledged that the wrap pricing approach did

19 not fit with EDJ's clients' buy-and-hold philosophy, EDJ shifted gears in 2008 and introduced –

20 for the first time in its 86-year history – a fee-based platform named Advisory Solutions. Unlike

21 the Company's long-established commission-based model which charged a commission per

22 transaction, the fee-based accounts in Advisory Solutions charged a flat annual asset-based

23 management fee. The standard fee was 1.35% to 1.50% of a client's assets under management, plus

24

25 [23] Lynn Cowan, *Wall Street Firms Are Divided Over Brokers' Pay on Fee-Based Accounts*, WSJ (Feb. 27, 2022), https://www.wsj.com/articles/SB1014846136951927520.

26 [24] *Id.*

 [25] Susanne Craig, *St. Louis's (Other) Slugger: Weddle at Jones*, WSJ, Oct. 31, 2006,

27 https://www.wsj.com/articles/SB116226535603308595.

 [26] John Churchill, *Keeping Up With the Joneses*, Wealth Management (Apr. 1, 2006),

28 https://www.wealthmanagement.com/institutions/keeping-joneses.

CASE NO. 2:18-CV-00714-JAM-AC

THIRD AMENDED COMPLAINT

1  an administrative fee of nine basis points (i.e., 0.09% of the assets under management). This

2  standard fee, however, could reach as high as 2% when including underlying fund expenses

3  together with fees generated by managers who sub-advised the Advisory Solutions funds ranging

4  from 60 to 70 basis points (*i.e.*, 0.6-0.7% of the total assets under management).

5       64.    During the Class Period, EDJ encouraged its FAs to recommend its fee-based

6  Advisory Accounts to all clients with commission-based accounts, including Plaintiffs and other

7  Class members. In recommending these clients to move from commission-based accounts to fee-

8  based Advisory Accounts, the FAs – following EDJ's directives – uniformly and systematically

9  failed to conduct any appropriate analysis of the suitability of a fee-based account for any particular

10  client.

11       65.    Beginning in or around 2013, EDJ began to systematically transition its business

12  model from its traditional commission-based model to a fee-based model.

13       66.    EDJ changed its bonus and compensation structure to focus on the amount of assets

14  under management, rather than the amount of transactions executed, in order to incentivize FAs to

15  sell Advisory Accounts. FAs who disagreed with the Company's strategy and kept their historically

16  buy-and-hold clients in commission-based accounts were not eligible for asset-based bonuses or

17  extravagant trips offered as incentives for higher producers, and were passed over for limited and

18  general partnership opportunities.

19       67.    EDJ registered representatives are typically compensated based on their annual

20  gross revenue generation, with higher gross revenues generally resulting in higher payouts. Since

21  asset-based fee accounts generate higher payouts than commission-based accounts, the registered

22  representative's gross fee compensation is generally higher when the account program fee is higher.

23  This compensation structure further incentivized EDJ FAs to recommend fee-based Advisory

24  Accounts to existing clients.

25       68.    As EDJ touted in its Form 10-K for fiscal year ended December 31, 2014, filed on

26  March 27, 2015, "Financial advisor compensation increased 9% ($178 million) in 2014 primarily

27  due to increases in asset-based fee and trade revenues on which financial advisor commissions are

28  paid."

1    69.    EDJ incented its FAs to move clients from commission-based accounts to Advisory

2    Solutions. A former general partner with EDJ confirmed in an April 5, 2016 International Business

3    Times article that the Company was "putting heavy pressure on their advisers to sell their Advisory

4    Solutions platform."[27]

5    70.    EDJ's training sessions for new FAs during the Class Period focused primarily on

6    teaching new FAs how to sell fee-based accounts, including how to move existing clients from

7    commission-based accounts into a fee-based Advisory Account without first conducting any

8    suitability analysis.

9    71.    EDJ aggressively instructed FAs to sell Advisory Solutions during regional

10   leadership meetings, attended by at least one general partner, and which were held at least four

11   times each year.

12   72.    In addition to the regional meetings, trainings, and written materials, EDJ

13   implemented a new computer system for FAs in the summer of 2016. The FAs' computer system

14   – the only means by which FAs effected account activity – was a core aspect of how EDJ ran its

15   business. The new computer system overhauled the way FAs managed clients, opened new client

16   accounts, and ran their day-to-day operations. The new computer system thus represented a

17   dramatic transformation of EDJ's business. However, the newly implemented computer system did

18   not provide a form for the FAs to document that they had conducted an account-type suitability

19   analysis.

20   73.    During the Class Period, EDJ's Field Supervision Directors conducted branch office

21   visits under the auspices of "regulatory compliance." Field Supervision Directors customarily

22   targeted larger commission-based accounts for review, and would explain to the FAs how they

23   would make more money by transferring their clients' assets from commission-based accounts to

24   Advisory Accounts and how the FA had a vested interest in transferring those assets to Advisory

25   Accounts and shifting the investment management decisions to EDJ.

26

27   [27] Owen Davis, *Obama's Conflict Interest Rule Could Rattle Edward Jones Investment Giant*, International
     Business Times (Apr. 5, 2016), https://www.ibtimes.com/obamas-conflict-interest-rule-could-rattle-
28   edward-jones-investment-giant-2348134.

74.     The purpose of the Field Supervision Directors' visit was to deliver a message from upper management – transfer more assets from commission-based accounts to Advisory Accounts or face stricter scrutiny and possible termination. Refusing to move commission-based clients into Advisory Accounts and potentially being disciplined posed a risk that most FAs did not feel was worth taking. The more clients an FA moved into Advisory Accounts, the less likely it was that the FA would be visited by a Field Supervision Director.

75.     In the second quarter of 2016, EDJ launched a second fee-based advisory service named Guided Solutions. Like Advisory Solutions, Guided Solutions charged a standard fee of 1.35% to 1.50% of a client's assets which could reach as high as 2% when including the underlying fund expenses. "The launch of Guided Solutions in the second quarter of 2016 contributed to the increase in the average advisory programs' assets under care, the majority of which came from existing client assets."[28]

76.     After launching its Advisory Solutions and Guided Solutions fee-based accounts, the client assets managed in EDJ's Advisory Accounts increased substantially. Assets under the Advisory Accounts' care nearly *tripled* from $101 billion in 2013 to *$265 billion* in 2017. EDJ accomplished this growth by incenting its FAs to transfer clients from commission-based accounts into fee-based accounts. EDJ stated in its Forms 10-K for fiscal years ending December 31, 2014, 2015, 2016, and 2017 that the annual increases were primarily driven by the relocation of client assets from commission-based accounts rather than new client assets.

77.     As a result, billions of clients' dollars placed with EDJ were shifted into Advisory Accounts during the Class Period. As stated in EDJ's Form 10-K for fiscal year ending December 31, 2017 ("2017 Form 10-K"), the Company's 14% increase in net revenue in 2017 was driven by "a 36% increase in asset-based fee revenue due to the increased investment of client assets into advisory programs." EDJ used this money to reward its partners and FAs through *$277 million* in bonuses.

---

[28] Form 10-K for fiscal year ending December 31, 2016, filed on March 15, 2017 ("2016 Form 10-K").

**D.  EDJ's FAs Recommended Fee-Based Advisory Accounts Without Conducting an Appropriate Account-Type Suitability Analysis.**

78.     During the Class Period, EDJ failed to properly supervise its FAs to assure they were conducting or documenting a proper account-type suitability analysis when they recommended that clients, including Plaintiffs, transfer from commission-based accounts to fee-based Advisory Accounts.

79.     At a minimum. EDJ FAs should have conducted an account-type suitability analysis that included an assessment of the historic trading activity and commission cost of the client accounts to determine whether a more expensive fee-based account was suitable for the client's needs.

80.     Moreover, EDJ's policies and best practices in the financial services industry required that FAs document the basis for their recommendation.

81.     EDJ's class-wide transfer of client assets into fee-based Advisory Accounts without conducting suitability analyses is evidenced by EDJ's large increase in profits from fee-based accounts as recorded in financials in SEC filings.

82.     As a result of transferring clients' assets from commission-based accounts into fee-based Advisory Accounts, EDJ profited significantly at the expense of its clients.

**E.  EDJ Breached Its Fiduciary Duty to Plaintiffs and Class Members by Recommending They Transfer to Fee-Based Advisory Accounts Without Conducting an Appropriate Account-Type Suitability Analysis.**

83.     FINRA's rules are excellent tools to determine the applicable industry standards and practices for broker-dealers such as EDJ for determining EDJ's duties to Plaintiffs and Class members when making recommendations to transfer clients from commission-based accounts into fee-based accounts.

84.     EDJ acted as Plaintiffs' and Class members' fiduciary when making investment recommendations, including recommendations regarding account type, under both Missouri and California law. As a fiduciary, EDJ owed Plaintiffs and Class members a duty to only recommend suitable account types.

85.     As a fiduciary, EDJ was required to act with the utmost good faith on behalf of Plaintiffs and Class members and solely for their benefit.

86.     Under FINRA's rules, including the suitability rule, EDJ was required to have processes and procedures in place requiring FAs to determine, then document, the suitability of the fee-based accounts before recommending that clients transfer into these accounts.

87.     Under FINRA's rules, EDJ had a duty to supervise its FAs to make sure they were making appropriate account-type recommendations to EDJ's clients based on EDJ's policies and FINRA rules.

88.     EDJ should have required its registered representatives to conduct an account-type suitability analysis that included, at a minimum, a review of the client's historic account activity history and commissions before recommending any transition to fee-based Advisory Accounts, and to document that recommendation as well as the basis for it. EDJ's supervisory rules, however, either did not require such a review and/or documentation, or EDJ failed to enforce its own rules.

89.     Instead, EDJ recommended that each of the Plaintiffs and other Class members transition their accounts from commission-based accounts to fee-based accounts without conducting or documenting any account-type suitability analysis. EDJ served as Plaintiffs' and Class members' financial advisors and broker-dealers.

90.     EDJ's breach of fiduciary duties under state law in failing to conduct a suitability analysis prior to transferring its clients' assets from commission-based accounts into fee-based Advisory Accounts has cost EDJ customers, including Plaintiffs and the putative Class members, millions in excess fees.

91.     EDJ has not, and cannot, show an economically justifiable benefit to Plaintiffs and Class members for its fee-based Advisory Account fees because these fee-based Advisory Accounts were unsuitable for Plaintiffs and Class members who, as buy-and-hold investors, engaged in little trading and, therefore, had previously paid only commissions in connection with the minimally executed trades in their commission-based accounts, and small annual custodial fees.

92.     EDJ cannot evade its fiduciary duties owed to Plaintiffs and the Class members by requiring them to sign documents stating that they are not "relying on the advice or

recommendation of" EDJ because FINRA specifically precludes broker dealers such as EDJ from disclaiming away their duties to recommend only suitable account-type recommendations.

93.    Further, EDJ's breach of fiduciary duty occurred and was complete when the recommendation was made and accepted by Plaintiffs and other Class Members, not when the account agreements were signed.

94.    EDJ incented its FAs to recommend Plaintiffs and Class members transfer their assets into fee-based Advisory Accounts regardless of the best interests of the Plaintiffs and failed to enforce its own internal policies requiring the FAs to properly analyze and document the suitability of those recommendations. This was done by EDJ in an effort to increase its fee revenue based on the amount of assets under management, as opposed to commissions, with no recognizable benefit to Plaintiffs and Class members.

**F.    Damages Caused by EDJ's Breach.**

95.    EDJs' breach of fiduciary duty directly and proximately caused Plaintiffs and Class members to suffer substantial damages.

96.    Plaintiffs and Class members have been damaged in the amount of the fees they paid EDJ after having their assets improperly transferred from commission-based accounts into unsuitable fee-based accounts, less the commissions they would have paid if the assets had properly remained in the commission-based accounts, plus the increase in value the assets would have achieved over time had EDJ not improperly deducted the substantial fees from the accounts.

97.    Plaintiffs' and Class members' allegations are not that the annual asset-based fees are excessive per se, but instead that Plaintiffs and Class members should not have been transferred from commission-based accounts into fee-based accounts in the first place and, thus, should not have been charged annual asset-based fees at all, only commissions. Nevertheless, the U.S. Department of Labor's ("DOL") observation regarding the dramatic impact of excessive fees on employees' and retirees' retirement assets is instructive here. Specifically, the DOL has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. This DOL statistic portrays the significant damages Plaintiffs and Class members have incurred as a direct result of EDJ's violation of its duties.

**G. Class Allegations.**

98.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of:

> All persons, or their beneficiaries without limitation, who were buy-and-hold investors who transferred their assets from an EDJ commission-based account to an Advisory Account during the Class Period and were damaged by paying higher asset-based fees. Excluded from the Class are the officers and directors of EDJ at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns.

99.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

100.     As detailed herein, this action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure.

**i.     Numerosity**

101.     Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Class members may be identified from records maintained by EDJ and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in class actions.

102.     While the exact number of Class members is unknown to Plaintiffs, EDJ disclosed in its 2017 Form 10-K that it manages assets for 5.2 million households, totaling $1.121 trillion, of which approximately 28% is in Advisory Accounts. In addition, EDJ has also disclosed that the majority of the increase in assets under its management in its Advisory Accounts every year during the Class Period came from existing client assets. Accordingly, Plaintiffs reasonably believe there are thousands, if not tens of thousands, of members in the proposed Class.

**ii.     Typicality**

103.     Plaintiffs were buy-and-hold investors whom EDJ improperly recommended transfer from commission-based to fee-based Advisory Accounts without determining whether fee-based Advisory Accounts were suitable for Plaintiffs.

104.    Plaintiffs' claims are typical of the claims of the members of the Class as all Class members are similarly affected by EDJ's wrongful conduct in violation of common law that is complained of herein.

**iii.    Adequacy**

105.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class action and fiduciary litigation.

106.    Plaintiffs' interests do not conflict with the interests of the Class, and Plaintiffs and their counsel are committed to vigorously representing the Class and prosecuting this action.

107.    Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class members.

108.    Plaintiffs are not aware of any other pending litigation concerning this controversy that involves Class members.

**iv.    Existence and Predominance of Common Questions of Law and Fact**

109.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are the following:

    a)    Whether EDJ breached its duties to Class members by failing to employ or enforce appropriate supervisory measures to determine the suitability of fee-based Advisory Accounts before transitioning its clients into those accounts;

    b)    Whether EDJ breached its fiduciary duties owed to Class members under state law by transferring their assets from commission-based accounts into fee-based Advisory Accounts without conducting an appropriate account-type suitability analysis; and

    c)    To what extent the Class members have sustained damages, and the proper measure of damages.

110.    Further illustrating that common issues of law and fact are shared by Plaintiffs and the Class members is:

a) each of the agreements signed by Plaintiffs contains a choice of law provision providing that the laws of the State of Missouri govern disputes. Therefore, resolution of the instant count turns on the application of Missouri law, a determination common to Plaintiffs and Class members alike; and

b) EDJ policies and FINRA rules apply to all EDJ FAs regardless of the location of their offices.

**v.    Superiority**

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>**CLAIM FOR RELIEF**</u>
**BREACH OF FIDUCIARY DUTY**

112.    Plaintiffs incorporate by reference the allegations above.

113.    Under California and Missouri law, EDJ as a broker-dealer was Plaintiffs' (and Class members') fiduciary with regard to investment-related recommendations made by EDJ or its FAs, and with regard to recommendations regarding account type. This imposes on EDJ the duty of acting in the highest good faith and in the best interest of its clients.

114.    Under FINRA rules, industry standards, and its own policies, EDJ had a duty to Plaintiffs to conduct an appropriate account-type suitability analysis before recommending that Plaintiffs transfer from commission-based accounts to fee-based Advisory Accounts.

115.    EDJ breached the fiduciary duties owed to Plaintiffs and Class members by failing to perform an appropriate account-type suitability analysis before recommending Plaintiffs transfer from commission-based accounts to fee-based Advisory Accounts.

116.    EDJ's foregoing breach of fiduciary duties has directly and proximately caused Plaintiffs and the other Class members to suffer damages by paying excessive account fees, for

1   which Plaintiffs pray for relief, full restitution of all losses, and recovery of all costs and expenses,

2   including reasonable attorneys' fees, for themselves and on behalf of the Class.

3   **V.    PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiffs pray for relief and judgment as follows:

5        A.    Finding that EDJ breached its fiduciary duties owed to Plaintiffs and Class members;

6        B.    Determining and certifying that this action is a proper class action, certifying

7              Plaintiffs as class representatives, and appointing their counsel as Class Counsel

8              pursuant to Federal Rule of Civil Procedure 23;

9        C.    Awarding compensatory damages in favor of Plaintiffs and the Class against EDJ,

10             jointly and severally, for damages sustained as a result of EDJ's wrongdoing, in an

11             amount to be proven at trial;

12       D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest as well

13             as reasonable attorneys' fees, costs and expenses incurred in this action; and

14       E.    Awarding such other relief as the Court may deem just and proper.

15  **VI.    JURY DEMAND**

16       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury

17  as to all claims in this action.

18

19  DATED: May 31, 2022            *s/ Paul R. Wood*_____

20                                 FRANKLIN D. AZAR (*pro hac vice*)
                                   PAUL R. WOOD (*pro hac vice*)

21                                 MICHAEL D. MURPHY (*pro hac vice*)
                                   BRIAN HANLIN (*pro hac vice*)

22                                 **FRANKLIN D. AZAR & ASSOCIATES, P.C.**
                                   14426 East Evans Avenue

23                                 Aurora, CO 80014
                                   Telephone:    (303) 757-3300

24                                 azarf@fdazar.com
                                   woodp@fdazar.com

25                                 murphym@fdazar.com
                                   hanlinb@fdazar.com

26                                 JOHN R. GARNER (246729)

27                                 **GARNER & ASSOCIATES**
                                   109 North. Marshall Avenue

28                                 P.O. Box 908
                                   Willows, CA 95988

                                   23

Telephone:    (530) 934-3324
john@garner-associates.com

*Counsel for Plaintiffs & the Putative Class*

THIRD AMENDED COMPLAINT                    CASE NO. 2:18-CV-00714-JAM-AC

**CERTIFICATE OF SERVICE**

I, Stephanie Chateauneuf, certify that on May 31, 2022 the foregoing THIRD AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY was filed electronically in the Court's Electronic Filing System ("ECF"); thereby upon completion, the ECF system automatically generated a "Notice of Electronic Filing" as service through CM/ECF to registered email addresses to parties of record in the case, in particular on the following:

MERYL L. YOUNG, SBN 110156
GIBSON, DUNN & CRUTCHER, LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: (949) 451-3800
Facsimile: (949) 451-4220
myoung@gibsondunn.com

ALEXANDER K. MIRCHEFF, SBN 245074
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
amircheff@gibsondunn.com

*Counsel for Defendant Edward D. Jones & Co., L.P.*

By:    *Stephanie Chateauneuf*
       Stephanie Chateauneuf, Paralegal