1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EDWARD ANDERSON, RAYMOND              No. 2:18-CV-00714-DJC-AC
     KEITH CORUM, JESSE AND COLLEEN
12   WORTHINGTON, individually and on
     behalf of others similarly situated,
13                                         ORDER
                      Plaintiffs,
14
           v.
15
     EDWARD D. JONES & CO., L.P.,
16
                      Defendants.
17

18         Before the Court is Defendant Edward D. Jones and Co., L.P.'s Motion for

19   Summary Judgement.  As discussed below, because Defendant was acting only as a

20   prospective investment adviser when recommending Advisory Solutions accounts to

21   Plaintiffs, Defendant did not owe them a fiduciary duty.  Defendant did owe a fiduciary

22   duty to Plaintiffs Jesse and Colleen Worthington when recommending a subsequent

23   Guided Solutions account, but Plaintiffs have failed to establish a genuine issue of

24   material fact with respect to whether Defendant breached its fiduciary duty.  In fact,

25   the evidence establishes that Defendant would have met its fiduciary obligations

26   toward *all* Plaintiffs if it had owed a fiduciary duty.  Accordingly, no jury could find in

27   favor of Plaintiffs.  The Court therefore GRANTS Defendant's Motion for Summary

28   Judgement.

                                          1

I.      **Background**

   A.  **Factual Background**

Plaintiffs Edward Anderson, Raymond Keith Corum, and Colleen and Jesse Worthington ("Plaintiffs") have sued Defendant Edward D. Jones & Co., L.P. ("Edward Jones") on behalf of themselves and a putative class of similarly situated individuals. (TAC ¶¶ 21–36.)  Plaintiffs are former clients of Defendant, a broker-dealer and investment advising firm, who utilized Defendant's services.  (*Id*. ¶¶ 21–37.)

Initially, Defendant provided a brokerage-only service model.  Defendant would conduct securities transactions on behalf of clients and charge only custodial fees and commission fees on a per-trade basis. (*Id*. ¶¶ 57–62.)  However, in 2008, Defendant introduced a new advisory model called "Advisory Solutions" in which Defendant provided ongoing investment advice and account management services and charged a flat annual management fee corresponding to the total amount of each client's assets. (*Id*. ¶ 63; Mot. Summ. J. ("MSJ") at 2.)  Plaintiffs allege that in 2013 Defendant  began encouraging its financial advisers to transition clients from the commission-based accounts to Advisory Solutions accounts without determining whether the Advisory Solutions accounts were appropriate for them.  (TAC ¶¶ 64–78, 94.)

The named Plaintiffs initially opened commission-based brokerage-only accounts with Defendant but were later recommended to switch their commission-based accounts to Advisory Solutions accounts, and did so.  (*Id*. ¶¶ 23–24, 27–28, 31–32.)  Plaintiff J. Worthington opened an Advisory Solutions account in January 2014 after speaking with Defendant's former employee Dallas Gundersen.  (Pls.' Response to Def.'s Statement of Undisputed Facts (ECF No. 213-1) ¶ 50.)  Thereafter, Gundersen separated from Defendant, and Lisa Rodriguez took over the accounts for all Plaintiffs.  In 2015, Plaintiffs Anderson, Corum, and C. Worthington also switched from brokerage-only accounts to Advisory Solutions accounts after speaking with Rodriguez.  (TAC ¶¶ 23, 27, 32.)  In 2016, Defendant introduced a second advisory

2

1   account model called "Guided Solutions."  (*Id.* ¶ 75.)  That year, the Worthingtons

2   jointly established a trust account, and months later transferred their trust assets into a

3   Guided Solutions account after meeting with Rodriguez.  (Pls.' Response to Def.'s

4   Statement of Undisputed Facts ¶ 59.)

5        As previous "buy and hold" investors who engaged in minimal trading, Plaintiffs

6   allege that the advisory accounts were not suitable for their needs because switching

7   Plaintiffs to those accounts led to them paying higher fees.  (*Id.* ¶¶ 22, 26, 30, 60,

8   93–96.)  Plaintiffs allege that Defendant breached its fiduciary duty to Plaintiffs by

9   failing to supervise its financial advisers so as to ensure the advisers were conducting

10  a proper suitability assessment before advising Plaintiffs to switch their accounts.  (*Id.*

11  ¶¶ 53, 78–82, 91–97.)  As a result of this breach, Plaintiffs allege, they paid higher fees

12  than they otherwise would have under the commission-based accounts.  (*Id.* ¶¶ 95–

13  96.)  Plaintiffs bring one cause of action against Defendant alleging breach of fiduciary

14  duty under California and Missouri law.

15            **B.  Procedural Background**

16        Plaintiffs initially filed this action on March 30, 2018.  ((ECF No. 1).)  Since then,

17  Plaintiffs have amended their complaint three times.  The First Amended Complaint,

18  (ECF No. 24), was dismissed with leave to amend, (ECF No. 46), and the Second

19  Amended Complaint ("SAC" (ECF No. 47)) was dismissed with prejudice on the basis

20  that the Securities Litigation Uniform Standards Act ("SLUSA") presented a

21  jurisdictional bar to Plaintiff's claims.  (*See* ECF No. 60.)  Plaintiffs appealed the

22  dismissal of the SAC, and the Ninth Circuit reversed, reasoning that Plaintiffs' breach

23  of fiduciary duty claim was not based on conduct in connection with the purchase or

24  sale of covered securities, and therefore not within the scope of SLUSA.  *Anderson v.*

25  *Edward D. Jones & Co., L.P.*, 990 F.3d 692 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 745

26  (2022).

27  ////

28

1    After the case was remanded, Defendant once again moved to dismiss

2    Plaintiffs' SAC, but on the basis that Plaintiffs had failed to plead their fraud-based

3    claim with the particularity required by Rule 9(b).  (ECF No. 81.)  The Court granted

4    this motion with leave to amend.  (*Id.*)  Plaintiffs then filed the operative Third

5    Amended Complaint, (ECF No. 82) which Defendant again moved to dismiss.  (ECF

6    No. 83.)  The Court denied Defendant's Motion to Dismiss the TAC, finding that

7    Plaintiffs sufficiently stated a non-fraud-based claim for breach of fiduciary duty.  (ECF

8    No. 93.)  Defendant subsequently filed a second Motion to Dismiss the TAC, which

9    the Court also denied.  (ECF No. 244.)

10    Presently before the Court is Defendant's Motion for Summary Judgement,

11    (Mot. Summ. J. ("MSJ") (ECF No. 188), which Plaintiffs have opposed (Opp'n (ECF No.

12    213).  The Court held oral argument on the Motion on May 23, 2024, with Franklin

13    Azar, Ognian Gavrilov, John Garner, Michael Murphy, III, and Paul Wood appearing

14    for Plaintiffs and Bernard Suter, Alexander Mircheff, Kaitlyn Beaudin, and Monica

15    Loseman appearing for Defendant.  The parties each provided supplemental briefing

16    following the hearing, (ECF Nos. 276 and 277), after which the matter was taken under

17    submission.

18    **II.    Legal Standard for Motion to Summary Judgement**

19    Summary judgment may be granted when the evidence shows that there is no

20    genuine issue as to any material fact and the moving party is entitled to a judgment as

21    a matter of law.  Fed. R. Civ. P. 56(c).  The principal purpose of summary judgment is

22    to dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477

23    U.S. 317, 325 (1986).  Therefore, the "threshold inquiry" is whether there are any

24    factual issues that could reasonably be resolved in favor of either party, or conversely,

25    whether the facts are so one-sided that one party must prevail as a matter of law.

26    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).  However, "[o]nly

27    disputes over facts that might affect the outcome of the suit under the governing law

28    will properly preclude the entry of summary judgment."  *Id.* at 248.

4

1    In a summary judgment motion, the moving party must inform the court of the

2    basis for the motion and identify the portion of the record which it believes

3    demonstrates the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at

4    323.  If the moving party meets its initial burden, the burden then shifts to the

5    opposing party, which must establish that there is a genuine issue of material fact.

6    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  To meet

7    their burden, parties must either cite to materials in the record supporting their

8    position or show that the materials cited do not establish the absence or presence of a

9    genuine dispute.  Fed. R. Civ. P. 56(c)(1).

10    For the opposing party to succeed and avoid summary judgment, they "must

11    do more than simply show that there is some metaphysical doubt as to the material

12    facts*." Matsushita*, 475 U.S. at 586.  Rather, the opposing party must produce enough

13    evidence such that the specific facts set forth by the nonmoving party, coupled with

14    undisputed background or facts, are such that a reasonable jury might return a verdict

15    in its favor.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th

16    Cir. 1987).  In other words, for the moving party to succeed, the court must conclude

17    that no rational trier of fact could find for the opposing party.  *Matsushita*, 475 U.S. at

18    587.  However, so as not to usurp the role of the jury, "[c]redibility determinations, the

19    weighing of the evidence, and the drawing of legitimate inferences from the facts are

20    jury functions," and so the court draws all reasonable inferences and views all

21    evidence in the light most favorable to the opposing party.  *Liberty Lobby*, 477 U.S. at

22    255; *Matsushita*, 475 U.S. at 587–88.

23    **III.    Discussion**

24    Under California law,[1] the elements of a cause of action for breach of fiduciary

25    _____

26    [1] While Plaintiffs have brought their Cause of Action under both California and Missouri law, California
      law applies to this case.  In the TAC, Plaintiffs allege that the contractual choice of law provisions in
      Plaintiffs' agreements provide that Missouri law governs the disputes.  However, this is a tort action not

27    based in contract.  "Claims arising in tort are not ordinarily controlled by a contractual choice of law
      provision.  Rather, they are decided according to the law of the forum state."  *See Sutter Home Winery,*

28    *Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (quoting *Consolidated Data Terminals*

1  duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3)

2  damage proximately caused by the breach.  *Stanley v. Richmond*, 35 Cal. App. 4th

3  1070, 1086 (1995) (citing *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991)).

4          Plaintiffs' argument is that as Plaintiffs' then broker-dealer, Defendant Edward

5  Jones, through its employees, had a fiduciary duty to conduct an "account-type

6  suitability analysis" before recommending advisory accounts.  By allegedly failing to

7  adequately assess the likely increase in fees which would have resulted from switching

8  from a commission-based to fee-based account, Plaintiff argues that Defendant failed

9  to conduct an appropriate assessment.  Because Plaintiffs incurred more in fees by

10  paying for advisory accounts than they would have if they had continued paying only

11  commission fees on a per trade basis, Plaintiffs argue that the accounts were per se

12  unsuitable, and that the increased fees evince the failure to conduct an appropriate

13  assessment.  By recommending these unsuitable accounts, they allege, Defendant

14  breached its fiduciary duty.

15          **A.  Existence of a Fiduciary Duty**

16          Although Plaintiffs' cause of action arises under state law, they assert that

17  federal regulations including the Financial Industry Regulatory Authority ("FINRA")

18  rules and the Investment Advisers Act ("IAA"), which regulate broker-dealers and

19  financial advisers, respectively, provide the applicable fiduciary standard.  While these

20  laws in themselves do not allow for a private cause of action, courts have used the laws

21  to define the appropriate fiduciary duty in state law breach of fiduciary duty claims.

22  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 501–02 (3d Cir. 2013).  California law

23  also independently imposes fiduciary duties on brokers and financial advisers.  *See In*

24  *the Matter of O'brien Partners, Inc.*, Release No. 1772, 88 S.E.C. Docket 615, 1998 WL

25

26  *v. Applied Digital Data Systems,* 708 F.2d 385, 390 n. 3 (9th Cir.1983) (internal citation omitted)).
    Plaintiffs have not provided any other reason why Missouri law should apply, and in fact focus their
27  briefing entirely on California law.  Defendants have not argued that Missouri law applies, either.
    Because the conduct which Plaintiffs complain of occurred exclusively in California, and the forum state
28  is California, the Court will apply California law.

1    744085, *9, n. 20 (Oct. 27, 1998).  The Court will assess both potential sources of

2    fiduciary obligations in turn.

3              **i.    Federal Standards**

4              While many investment firms like Edward Jones are dually registered broker-

5    dealers and investment advisers, "[a]s a general matter, broker-dealers and

6    investment advisers have different types of relationships with investors, offer different

7    services, and have different compensation models when providing investment

8    recommendations or investment advisory services to customers."  *Regulation Best*

9    *Interest: The Broker-Dealer Standard of Conduct*, Exchange Act Release No. 34-86031,

10   2019 WL 2420297, *3 (June 5, 2019).[2]  The roles are governed by distinct regulatory

11   schemes and are subject to different standards of care.  *Compare* 15 U.S. Code § 78c

12   (a)(4) (defining a "broker"), *with* 15 U.S. Code § 80b-2 (a)(11) (defining an "investment

13   adviser"); *see also* Sec. & Exch. Comm'n v. Criterion Wealth Mgmt. Servs., Inc.

14   *("Criterion")*, 599 F. Supp. 3d 932, 948–49 (C.D. Cal. 2022).  The roles are

15   distinguished both by the activities performed and the nature of the compensation.

16   Exchange Act Release No. 34-86031at *3.  The Court will summarize the duties that

17   govern each of these roles.

18             Under federal law, a broker-dealer is "any person engaged in the business of

19   effecting transactions in securities for the account of others," such as providing

20   transaction-specific advice and effectuating the transaction of securities.  15 U.S.C.

21   § 78c(a)(4)(A).  Broker-dealers offer "transaction-specific recommendations" and are

22   typically compensated per transaction on a commission basis.  *Id.*  Broker-dealers are

23   _____

24   [2] Although Exchange Act Release No. 34-86031 primarily provides guidance on the new Regulation
     Best Interest which was not in effect at the time of the conduct in question, the guidance compiles and
     reaffirms previous SEC guidance.  *See Regul. Best Interest: The Broker-Dealer Standard of Conduct*,

25   Exchange Act Release No. 34-86031, 2019 WL 2420297 (June 5, 2019).  The Court accordingly
     references and relies on Exchange Act Release No. 34-86031 solely to the extent it reaffirms then-

26   existing guidance.  While the agency guidance does not have the force of law, such guidance is
     persuasive and useful to the Court's analysis, and the Court affords the agency due "respect" under

27   *Skidmore*.  *Vigil v. Leavitt*, 381 F.3d 826, 835 (9th Cir. 2004) ("Interpretations such as those ... contained
     in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law . . ."

28   warrant *Skidmore* deference. (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000))).

governed by FINRA.  FINRA Rule 2111 provides the standard of care for recommendations to customers.  While broker-dealers now have a heightened duty to act in the best interest of their client,[3] under the regulations applicable at the relevant time, broker-dealers only had an obligation to ensure that any recommended transaction or strategy involving a security was suitable for the client.  Exchange Act Release No. 34-86031 at *3-*9; FINRA Rule 2111.03.  As the U.S. Securities and Exchange Commission ("SEC") has reaffirmed in recent guidance, neither the then-existing "suitability" standard, nor the new "best interest" standard rise to the level of a fiduciary duty.  Exchange Act Release No. 34-86031 at *7-*8 (distinguishing the obligations of broker-dealers with the fiduciary duty applicable to investment advisers, and discussing why the SEC has declined to impose a fiduciary duty on broker-dealers).

Investment advisers, on the other hand, have a more expansive role, and are subject to a fiduciary duty.  Investment advisers "'provide ongoing, regular advice and services in the context of broad investment portfolio management, and are compensated based on the value of assets under management' or other fee-based arrangements." *Criterion*, 599 F. Supp. 3d at 948 (quoting Exchange Act Release No. 34-86031 at *3); *see also* 15 U.S. Code § 80b-2 (a)(11) (defining an investment adviser as someone who "for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.").  Investment advisers are compensated for their advising services with standard professional fees or fees based on the value of the assets under their management, and not on a per transaction basis as broker-dealers.

---

[3] In July 2019, after the commencement of this case, the SEC adopted a "best interest" standard of conduct for broker-dealers when making recommendations related to securities transactions.  17 C.F.R. § 240.15l-1 ("Regulation Best Interest"); Exchange Act Release No. 34-86031 at *3-*9.  *See infra* note 4.

*Criterion*, 599 F. Supp. 3d at 948.  The definition of investment adviser specifically excludes "any broker or dealer whose performance of [the above] services is *solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor*."  15 U.S. Code § 80b–2 (a)(11) (emphasis added); *see Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160–64 (10th Cir. 2011).  Investment advisers are governed by the Investment Advisers Act and owe a fiduciary duty to their clients to act in the clients' best interests.  *See Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191 (1963).  The fiduciary duty is imposed at the account opening.  Prior to opening an account, an investment adviser is subject to a separate anti-fraud standard with respect to *prospective* customers.  *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Investment Advisers Act Release No. 5248, 84 Fed. Reg. 33669, 33674 n. 42 (July 12, 2019).

When a dual registrant is both a broker-dealer and an investment adviser, the applicable regulations depend on which capacity the financial professional was acting in:

> [FINRA rules] would not apply to investment advice provided to a retail customer by a dual-registrant when acting in the capacity of an investment adviser, even if the retail customer has a brokerage relationship with the dual-registrant or the dual-registrant executes the transaction in its brokerage capacity.  Similarly, as proposed, **we are confirming that a dual-registrant is an investment adviser solely with respect to those accounts for which a dual-registrant provides investment advice or receives compensation that subjects it to the Advisers Act**.

*Regulation Best Interest: The Broker-Dealer Standard of Conduct*, Release No. 86031 (June 5, 2019) (emphasis added).  For example, in *SEC v. Criterion Wealth Management Services, Inc.*, the court determined that when the dual registrants "were providing investment advice in the context of broader portfolio management" they were acting in their role as investment adviser, but once the investor directed the advisers to execute the transaction, they were acting as brokers and needed to "broker the transaction in a suitable way on behalf of their client."  *Criterion*, 599 F. Supp. 3d at 949.  "Simply put, when [the dual registrant] discussed or recommended

1    *whether* a client should invest . . . they were acting as investment advisers; when they

2    discussed or recommended *how* to execute a . . . transaction (and actually brokered

3    and executed the transaction), they were acting as broker-dealers." *Id.* (emphasis in

4    original).

5        Critically, in this case *neither* the duty under FINRA to conduct a suitability

6    analysis nor the IAA fiduciary duty apply to the intentionally narrow claim brought by

7    Plaintiffs because Defendant was not acting as either a broker-dealer or investment

8    adviser, but rather as a *prospective* investment adviser.  First, Defendant was not

9    acting in its capacity at broker-dealer, and therefore the recommendation is not within

10   the scope of FINRA.  The conduct that Plaintiffs specifically complain of is Defendant's

11   alleged recommendation that they switch from brokerage-only accounts to advisory

12   accounts before assessing whether those accounts were suitable for Plaintiffs.  Under

13   then-existing rules and guidance,[4] a recommendation to open an account fell within

14   the scope of FINRA only to the extent a broker recommended "to sell securities . . .  or

15   purchase securities" *in connection with* opening an account.  *Cf.* Financial Industry

16   Regulatory Authority, *Rollovers To Individual Retirement Accounts*, Regulatory Notice

17   13-45, 2013 WL 6912779, *4 (December 30, 2013); Exchange Act Release No. 34-

18   86031 at *31, n. 172 (noting that FINRA had not addressed "whether such a

19   recommendation would be an investment strategy in the absence of such a

20   recommended securities transaction.").[5]

21

22   [4] In June 2019, after the date of filing this suit, the SEC instituted a new rule called "Regulation Best
     Interest" which expanded the scope of FINRA regulations and imposed heightened care obligations on
23   broker-dealers.  17 C.F.R. § 240.15l-1 ("Regulation Best Interest"); Exchange Act Release No. 34-86031
     at *5.  Specifically, the SEC determined that the new rule would classify account-type recommendations
24   as investment strategies, "regardless of whether they are tied to a specific securities transaction."
     Exchange Act Release No. 34-86031 at *34–*35.  The SEC's discussion emphasizes that under prior
25   rules and guidance, an account-type recommendation was only considered an "investment strategy
     involving securities" if it involved a recommendation to actually buy or sell securities in connection with
26   opening the account.  The new rule that applies to all account-type recommendations is a departure
     from the prior regulatory scheme.  *Id.*  Accordingly, while FINRA Regulation Best Interest *now* regulates
27   account-type recommendations like that at issue here, there was no such rule or standard in effect at
     the time Defendant made the account recommendations at issue here.
28   [5] In its 2018 Regulatory and Examination Priorities Letter, FINRA stated that it "will review situations in
     which registered representatives recommend a switch from a brokerage account to an investment

1   Significantly, Plaintiffs' cause of action is narrowly tailored to avoid SLUSA

2   preemption, and therefore does not (and cannot) implicate any securities transactions

3   that may have accompanied the switch between accounts.  *Anderson v. Edward D.*

4   *Jones & Co., L.P.*, 990 F.3d 692, 709 (9th Cir. 2021) ("Plaintiffs' state law claims are not

5   based on alleged conduct that is 'in connection with' the purchase or sale of any

6   covered securities.")  By the terms of Plaintiffs' narrow cause of action, Defendant was

7   not "engag[ing] in the business of effecting transaction in securities," 15 U.S.C.

8   § 78c(a)(4)(A), or making a recommendation to purchase or sell securities, and

9   therefore was not acting as a broker-dealer.  Accordingly, the duties prescribed under

10   FINRA would not have applied to this recommendation.

11   Nor does the fiduciary duty imposed by the IAA apply because Defendant was

12   not yet acting as an investment adviser.  By recommending that Plaintiffs open a fee-

13   based advisory account, Defendant was acting in the capacity of a *prospective*

14   investment adviser, and Plaintiffs were *prospective* clients of Defendants' investment

15   advice services.[6]  The fiduciary duty imposed by the IAA does not apply until "the

16   point in time at which the prospective client becomes a client of the investment

17   adviser (e.g., at account opening)."  Investment Advisers Act Release No. 5248, 84

18   Fed. Reg. at 33674 n. 42;[7] *see Belmont*, at 504–05 (distinguishing between parties who

19   had an investment advisory agreement and those who did not in determining whether

20   there was a fiduciary duty).  Plaintiffs assert that because they had an existing broker-

21   client relationship with Defendant, they could not have been prospective clients of

22   Defendant.  This argument, however, conflates the two roles.  Before opening the

23   _____

24   adviser account . . ." FINRA, 2018 Regulatory and Examination Priorities Letter (Jan. 8, 2018), and later
     issued a new rule bringing account-type recommendations into the scope FINRA, Exchange Act

25   Release No. 34-86031 at *34-*35.  This new rule underscores that there was no FINRA rule governing
     purely account-type recommendations when the recommendations at issue occurred.

26   [6] In Exchange Act Release No. 34-86031, the SEC confirmed its prior interpretation of the difference
     between the roles of an investment adviser and a broker-dealer.  The guidance contemplates that when

27   a dually-registered professional is making a recommendation for a fee-based account, they are acting
     in a prospective adviser-client capacity.  Exchange Act Release No. 34-86031 at *35, n. 203, *45.

28   [7] Although this guidance on the IAA was issued after the events in question, the guidance confirms the
     SEC's interpretation of then-existing rules.  It does not address any new rules or regulations.

Advisory Solutions accounts, Plaintiffs had only ever engaged Edward Jones in its role as a broker-dealer.  Defendant had not provided investment advisory services, nor had it charged Plaintiffs professional fees for such services.  (See TAC ¶ 59 (stating that under the commission model, Defendant provided free advice and only charged clients on a per trade basis)); 15 U.S. Code § 80b–2 (a)(11) (a broker who provides incidental advice to clients and "who receives no special compensation therefor" is not an investment adviser); *see, e.g.*, *Thomas*, 631 F.3d at 1166 (broker was not subject to the IAA where he provided investment advice only in connection with selling an investment, and was compensated based on the specific transaction).

While it is true that Defendant's recommendation of the advisory account was not subject to the affirmative duties imposed by FINRA (because the adviser was not acting as a broker) or the IAA fiduciary duty (because Plaintiffs were not yet clients of Defendants' investment advising services), there is no "regulatory void" with respect to recommendations made to prospective clients as Plaintiffs claim.  "[W]ith respect to prospective clients, investment advisers have antifraud liability under section 206 of the Advisers Act, which, among other things, applies to transactions, practices, or courses of business which operate as a fraud or deceit upon prospective clients, including those regarding investment strategy, engaging a sub-adviser, and account type."  Investment Advisers Act Release No. 5248 at 33674 n. 42; 15 U.S.C. § 80b-6. Accordingly, because Plaintiffs had not yet become clients of Defendant in its investment adviser role, and had not yet opened advisory accounts, at the time of the recommendation, Defendant's conduct was subject to this anti-fraud standard, not the fiduciary duty standard. [8]  Therefore, Defendant owed no fiduciary duty pursuant to FINRA or the IAA when recommending the Advisory Solutions accounts to Plaintiffs,

---

[8] Plaintiffs have specifically disavowed claims of fraud.  In their Opposition to the Motion to Dismiss the SAC, they stated that "Plaintiffs' fiduciary duty claims are based on a failure to act, not fraud."  (Opp'n to Mot. to Dismiss SAC (ECF No. 75) at 2; Order (ECF No. 81) at 4.)  Plaintiffs were thereafter granted leave to file the TAC in order to plead this breach of fiduciary duty based on the failure to act theory, not the fraud theory.  (Order No. 81 at 6.)  Nowhere in the TAC is fraud or misrepresentation alleged.  Thus, Plaintiffs' TAC does not proceed on a fraud theory.  The anti-fraud provision, as applied to prospective

1    but rather was governed by the IAA anti-fraud standard.

2          Defendant did owe a fiduciary duty, however, to Plaintiffs J. and C. Worthington

3    when recommending their subsequent advisory account because at that point

4    Defendant was acting as an investment adviser to the Worthingtons.  Once a financial

5    professional assumes the role of investment adviser, the adviser takes on a fiduciary

6    duty that:

7          applies to all investment advice the investment adviser provides to
           clients, including . . . account type. Advice about account type includes
8          advice about whether to open or invest through a certain type of account
           (*e.g.,* a commission-based brokerage account or a fee-based advisory
9          account) and advice about whether to roll over assets from one account
           (*e.g.,* a retirement account) into a new or existing account that the
10         adviser or an affiliate of the adviser manages.

11   *Id.*  After each of the Worthingtons opened their individual advisory accounts,

12   Rodriguez recommended they open a joint "Guided Solutions" advisory account as

13   well.  Thus, after Defendant assumed the role of investment adviser to the

14   Worthingtons, Defendant had a fiduciary duty with respect to the recommendation to

15   open their joint Guided Solutions account.  The Court addresses application of this

16   duty in Section III.B.

17                  **ii.    California Law**

18          California does not distinguish between brokers and investment advisers as

19   clearly as federal regulation does, but the scope of the applicable fiduciary duty

20   similarly correlates to whether a financial professional is acting as a broker or

21   providing investment advice.  "It is a 'long-settled rule' [in California law] that a

22   stockbroker owes a fiduciary duty to his or her customer."  *Apollo Cap. Fund, LLC v.*

23   *Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 245 (2007) (quoting (*Brown v.*

24   *California Pension Administrators & Consultants, Inc.*, 45 Cal. App. 4th 333, 348

25   ───────────────────

26   clients, requires that a prospective investment adviser have a reasonable basis to provide any advice.
     Investment Advisers Act Release No. 5248 at 33674 n. 42.  As discussed below, *infra* Section III.B,
     Defendant has exceeded this standard of care, and has in fact met the more rigorous fiduciary standard
27   of care which would have been owed to full-fledged clients.  Thus, even if Plaintiffs had raised an
     argument that Defendant violated the anti-fraud standard, such an argument would not survive
28   summary judgement.

                                              13

1   (1996)).  "The question is not whether there is a fiduciary duty, which there is in every

2   broker-customer relationship; rather, it is the scope or extent of the fiduciary

3   obligation, which depends on the facts of the case."  *Duffy v. Cavalier*, 215 Cal. App.

4   3d 1517, 1535 (1989).  A fiduciary duty arises out of the principal/agent relationship

5   between a customer and stockbroker, and the scope of a stockbroker's fiduciary duty

6   is directly tied to the extent of the broker's agency.  *See Duffy*, 215 Cal. App. 3d at

7   1529, 1534–36; *In the Matter of O'Brien Partners*, 1998 WL 744085, *9, n. 20 ("[U]nder

8   California law, a fiduciary relationship is created where a person 'reposes trust and

9   confidence in another and the person in whom such confidence is reposed obtains

10  control over the other person's affairs.'" (quoting *Recorded Picture Co. v. Nelson

11  Entertainment, Inc.*, 53 Cal. App. 4th 350, 370 (1997)).  "Indeed, even when a

12  stockbroker acts on behalf of a customer, the scope of the broker's fiduciary duty

13  depends on the nature of the broker/customer relationship."  *Apollo*, 158 Cal. App.

14  4th at 245.

15          Accordingly, a higher duty is imposed on those acting as advisers, and a lesser

16  duty on those merely brokering transactions.  *See Twomey v. Mitchum, Jones &

17  Templeton, Inc.*, 262 Cal. App. 2d 690, 719 (1968).  "'[W]here the agent "for all

18  practical purposes" controls the account' – i.e., where 'the customers alleged or

19  proved that the broker also served as their investment counselor and, in most cases,

20  had authority to make trades on the customers' accounts'" California imposes

21  heightened fiduciary obligations.  *Flores v. Gain Cap. Grp.*, LLC, No. CV 17-7873-

22  DMG, 2018 WL 6133644, at *6 (C.D. Cal. June 20, 2018) (quoting *Leboce, S.A. v.

23  Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.2d 605, 607 (9th Cir.1983)).  If the

24  advisor's recommendations are invariably followed, the advice is considered

25  "controlling."  *Duffy*, 215 Cal. App. 3d at 1532.  When the adviser provides advice in

26  this capacity, California imposes the "obligation to determine the customer's financial

27  situation and needs."  *See id.* at 1537 (quoting *Twomey*, 262 Cal. App. 2d at 719).

28  ////

14

On the other hand, the fiduciary duty of a stockbroker that does not control the account is very limited.  This kind of duty "arises when the client places an order and terminates when the transaction ordered is complete" without any continuing obligation to the customer.  *Duffy*, 215 Cal. App. 3d  at 1535–36 (quoting *Caravan Mobile Home Sales v. Lehman Bros. Kuhn Loeb*, 769 F.2d 561, 657 (9th Cir. 1985)); *Twomey*, 262 Cal. App. 2d at 719.  Accordingly, "when the broker is acting merely as agent to carry out purchases or sales selected by the customer, with or without the broker's recommendation" "the sole obligation of the broker-dealer is to carry out the stated objectives of the customer."  *Twomey*, 262 Cal. App. 2d at 719.  As one court put it, "the scope of a broker's duty . . . is delimited by the nature of the broker's relationship with the customer.  Where, as here, that relationship is confined to the simple performance of transactions ordered by a customer or his investment advisor, the duties described in *Twomey* and *Duffy* do not arise."  *Petersen v. Sec. Settlement Corp.*, 226 Cal. App. 3d 1445, 1456 (1991).   This distinction largely tracks the difference between the obligations of broker-dealers and investment advisers under federal law.  Moreover, the Ninth Circuit has also determined that where a broker does not effectively control the account, California law does not require more than federal law governing brokers under FINRA.  *See Leboce*, 709 F.2d 605 at 607.

For example, in *Twomey*, the stockbroker owed a duty to the plaintiff to "determine the customer's actual financial situation and needs" before making recommendations or acting on behalf of the plaintiff because the stockbroker had control over the plaintiff's assets beyond merely carrying out purchases and sales. *Twomey*, 262 Cal. App. 2d at 719.  There, the plaintiff, an older widow, sold all of the securities she inherited from her deceased husband and entrusted the stockbroker with investing these assets on her behalf.  *Id.* at 714.  The plaintiff told the broker "[y]ou have charge of everything, and I wouldn't know what to do."  *Id.*  The plaintiff then invariably followed every one of the broker's recommendations, such that the trial court concluded that the plaintiff was not exercising her own judgement and fully

15

1    relied on the broker for the transactions.  *Id.* at 719, 722.  The broker also undertook

2    transactions on behalf of the plaintiff without her prior knowledge or consent.  *Id.* at

3    714.  Because the broker exercised such agency and control over the plaintiff's assets,

4    the court found that the broker was acting as a financial advisor, and that "[u]nder

5    these circumstances, there should be an obligation to determine the customer's

6    actual financial situation and needs" beyond merely "carry[ing] out the stated

7    objectives of the customer."  *Id.* at 717–20.

8            Here, Plaintiffs do not allege that, at the time the advisory accounts were

9    recommended to them, they had the kind of relationship with Defendant that would

10   give rise to a fiduciary duty beyond merely brokering deals in alignment with the

11   Plaintiffs' objectives.  As described above, before Plaintiffs opened their advisory

12   account, Defendant had up until that point only acted as a broker-dealer for Plaintiffs.

13   Plaintiffs do not allege that Gundersen or Rodriguez exercised control over their

14   accounts or provided more than incidental investment advice prior to opening the

15   advisory accounts.  Given the nature of the relationships, Defendant's fiduciary duty

16   extended only so far as "carry[ing] out the stated objectives" of the Plaintiffs when

17   executing a trade on Plaintiffs' behalf without any continuing obligation.[9]  Accordingly,

18   the duty owed under California law does not extend to Defendant's recommendation

19   to open an advisory account.

20          As with the obligations under federal law, however, Defendant would have

21   owed a duty to the Worthingtons under California law with respect to advice about

---

[9] In their supplemental brief, Plaintiffs cite to *Marshall v. Ameriprise Fin. Serves.*, No. 2:24-cv-00112-DJC-AC, 2024 WL 2801535 (E.D. Cal. May 31, 2024) in which this Court found that a fiduciary duty was imposed where there was a preexisting relationship of trust between the broker and the client because the client specifically requested that the broker read and explain things to him due to his dyslexia.  In that case, the broker owed a duty of full disclosure as to the contents of the agreements because of the specific relationship of trust in that case.  This is in keeping with the general principle that the duty is tied to the nature of the relationship – that is, where a Plaintiff reposes trust in the broker, the broker must not exploit that trust.  Here, there is no allegation that Defendant failed to disclose or misrepresented the terms of the agreements.  Instead, this case is more like *Duffy* and *Twomey* where the existence of a duty to "determine the customer's financial situation and needs" before providing recommendations is tied to the level of control the broker has over the client's investments.  *See Duffy*, 215 Cal. App. 3d at 1537; *Twomey*, 262 Cal. App. 2d at 719.

opening the Guided Solutions account because, at that point, they had established an advisory relationship with Defendant.  Under the structure of the advisory solutions account, Defendant was authorized to purchase and sell securities on behalf of the Worthingtons.  (Pls.' Response to Def.'s Statement of Undisputed Facts ¶ 7.)  C. Worthington stated in her deposition that, at the time Rodriguez discussed the Guided Solutions account, her and her husband "took [Rodriguez's]  advice to do whatever she was advising us to do."  (C. Worthing Dep. at 200:22–11.)  This is sufficient to establish that Defendant had "control" over the Worthingtons' accounts, and, thus, under California law, that Defendant owed the fiduciary duty  described in *Duffy* and *Twomey* to the Worthingtons.

Accordingly, while Plaintiffs have shown that Defendant owed a fiduciary duty to "determine the [Worthingtons'] actual financial situation and needs" at the point Rodriguez recommended the Guided Solutions account, no similar fiduciary duty was owed to any of the Plaintiffs with respect to the initial recommendation to open Advisory Solutions accounts under California law.  This conclusion is a sufficient basis to grant summary judgment as to all Plaintiffs other than the Worthingtons.  Given that the Court must address whether there is a triable issue of fact as to whether the fiduciary duty was breached as to the Worthingtons, however, the Court will analyze this issue with respect to each of the Plaintiffs.

### B.  Breach of Fiduciary Duty

Under the IAA, "[a]n investment adviser must have a reasonable belief that the advice it provides is in the best interest of the client based on the client's objectives." Investment Advisers Act Release No. 5248, at 33673.  "The basis for such a reasonable understanding generally would include, for retail clients, an understanding of the investment profile . . . ."  *Id.*  "In order to develop a reasonable understanding of a retail client's objectives, an adviser should, at a minimum, make a reasonable inquiry into the client's financial situation, level of financial sophistication, investment experience, and financial goals (which we refer to collectively as the retail client's

17

1  'investment profile')."  *Id.*  Thus, the appropriate inquiry is whether the adviser had a

2  reasonable understanding of the client's financial status and goals, and made a

3  recommendation which they reasonably believed was in the best interest of the client.

4      California law similarly imposes an "obligation to determine the customer's

5  financial situation and needs" and make recommendations in line with those needs on

6  investment advisers.  *See Duffy*, 215 Cal. App. 3d at 1537 (quoting *Twomey*, 262 Cal.

7  App. 2d at 719).  In *Twomey*, the court found that the defendants breached this duty

8  by making no effort "to learn the essential facts as to plaintiff's financial situation and

9  needs" and by recommending speculative transactions which were not in line with the

10  plaintiff's needs.  *Twomey*, 262 Cal. App. 2d at 719.  Plaintiff, a widow, needed to

11  produce a stable income from her securities, but instead the defendants engaged in

12  excessive, speculative, and high-risk trading which was not suitable for this purpose.

13  *Id.* at 718, 720–22.

14      Here, the evidence presented by Defendant shows that Defendant met its

15  fiduciary obligation with respect to the Worthingtons when recommending the

16  Guided Solutions Account because Rodriguez had an understanding of Plaintiffs'

17  financial needs and recommended an account in line with those needs.  Plaintiffs have

18  provided no evidence to the contrary, instead relying on a purported per se rule that a

19  0.5% fee increase would violate Defendant's fiduciary duty – a rule that has no basis in

20  law.  In addition, although the Court has found that there was no fiduciary duty owed

21  to the Worthingtons or the remaining Plaintiffs when recommending the initial

22  Advisory Solutions accounts, Defendants have likewise proffered sufficient evidence

23  that Defendant would have regardless met such a fiduciary duty had it been owed.

24      **i.   Defendant's understanding of Plaintiffs' investment profiles**

25      The evidence shows that Rodriguez had developed a reasonable

26  understanding of Plaintiffs' financial situations and goals before making any

27  recommendation for the advisory accounts.  In her deposition, Rodriguez testified that

28  part of her responsibilities was to establish a client's "Financial Foundation" and

1  "guide clients through the process of identifying and prioritizing financial goals."

2  (Rodriguez Dep. at 132:8–12, 25, 133:1–25.)  A Financial Foundation, as described by

3  Rodriguez, is "a tool that we use to look at the – to look at the individual goals that the

4  client has to input data into each of these goals to see if we're on track, or if we need

5  to maybe make some changes."  (*Id.* at 134:2–8.)  Rodriguez testified that the financial

6  foundations is something she would "fine tune every single year," and that it was her

7  practice when meeting with clients to have "already analyzed where they're at."  (*Id.* at

8  134:15, 153:4–6)

9         And, as Plaintiffs themselves assert, Edward Jones required financial advisers to

10  conduct a "Making Good Choices" conversation with clients before recommending

11  any account type.  (Def.'s Response to Pls.' Statement of Disputed Facts ¶ 16; MSJ, Ex.

12  48 at 5, 9–11.)  Advisers use a brochure intended to provide "a readily understandable

13  overview of important information about the client's account choices and help[] start a

14  conversation about key considerations so we can better understand the client's

15  preferences and recommend solutions that best meet their needs."  (Def.'s Response

16  to Pls.' Statement of Disputed Facts ¶ 20.)  Rodriguez testified that it was her practice

17  to conduct a "Making Good Choices" conversation and "use the Making Good

18  Choices brochure [to] point out the things [clients] like and they don't like, and how

19  their current situation would compare to the option they want to choose."  (*Id.* at

20  153:4–6, 149:23–150:1, 149:13–15.)  These discussions, taken together, elicit the

21  information which comprises a client's "investment profile" as described by the SEC.

22  *See* Investment Advisors Act Release No. 5248, at 33673 (requiring a "reasonable

23  inquiry into the client's financial situation, level of financial sophistication, investment

24  experience, and financial goals").  As discussed below, Defendants have submitted

25  evidence that Rodriguez followed this practice with each of the named Plaintiffs, who

26  have submitted no evidence to the contrary.

27  ////

28  ////

1    ***The Worthingtons***

2    Rodriguez states that when she discussed the Guided Solutions account with

3    the Worthingtons, she followed "[b]asically the same process for every Making Good

4    Choices conversation" including "what they would like to see in their account, what

5    they had been doing in the past, what they wanted to do in the future, what that cost

6    difference meant to them, [and] the parameters that are required to maintain that

7    account." (*Id.* 176:5–12.)  While Rodriguez said that she could not remember the

8    specific conversation she had with the Worthingtons or the words she used, she stated

9    that she believed she would have followed the same processes. (*Id.* 176:13–19, 20–

10   24.)  She did specifically recall the Worthingtons being pleased with their Advisory

11   Solutions accounts and wanting to switch their remaining brokerage account to a

12   Guided Solutions account. (*Id.* 177:1–6; MSJ, Ex. 43 at 2.)

13   Rodriguez's testimony that she reviewed the Worthingtons' financial situation is

14   supported by various documents in the record.  The alleged recommendation to

15   switch to a guided solutions account occurred during an annual meeting to review the

16   Worthingtons' accounts in July 2016. (C. Worthington Dep. at 186:10–19.)  Defendant

17   provides a portfolio summary for the Worthingtons from the periods June 25 through

18   July 29, 2016 and July 30 through August 26, 2016 which contains an overview of the

19   various assets in their trust account. (MSJ, Ex. 61 at 1–16.)  The document provides an

20   overview of the Worthingtons' "Financial Foundation" and states that the

21   Worthingtons' financial goals were reviewed on July 11, 2016, that the Worthingtons

22   had completed a risk tolerance questionnaire on April 7, 2016, and that a portfolio

23   review discussion was conducted on July 11, 2016. (*Id.* at 9.)  The risk tolerance

24   questionnaire contains questions which gauge, for example, whether a client would

25   prefer "more consistent, but most likely lower, returns" or whether they are willing to

26   accept a higher risk of loss in exchange for potential higher gains, what their goal is

27   for their portfolio, and how they would react to certain fluctuations in their assets.

28   (Reply to MSJ (ECF No. 239), Ex. 8 at 1–3.)  The record also contains a "living in

1   retirement" document prepared on July 11, 2016 which provides an overview of the

2   Worthingtons' assets, life expectancy, annual spending, and retirement goals.  (MSJ,

3   Ex. 12.)  The same document also modeled the anticipated future outcome of the

4   Worthingtons' investments.  (*Id.*)  In her deposition, Rodriguez testified that the living

5   in retirement document is one of the documents used to establish a client's "Financial

6   Foundation."  (MSJ, Ex. 5 136:1–3.)

7         The Worthingtons do not deny that Rodriguez engaged in an inquiry of their

8   financial situation and reviewed the Making Good Choices brochure with them.  While

9   C. Worthington stated she did not recall her conversation with Rodriguez, she also

10  testified that she had no reason to doubt that she was presented a copy of the Making

11  Good Choices brochure and that Rodriguez reviewed her investment history and

12  investment profile prior to discussing the Guided Solutions account.  (C. Worthington

13  Dep. at 187:1–188:18.)  J. Worthington simply testified that he had "no recollection" of

14  meeting with Rodriguez about the Guided Solutions account.  (J. Worthington Dep. at

15  173:14–23.)  Moreover, Plaintiffs admitted to Defendant's undisputed fact that

16  Rodriguez reviewed the "suitability factors," including their investment objectives,

17  financial situation, risk-tolerance, and brokerage-only account history "every time"

18  they discussed investment options.  (Pls.' Response to Def.'s Statement of Undisputed

19  Facts ¶ 62.)  Accordingly, because Plaintiffs do not present any contrary evidence,

20  there is no genuine dispute of fact as to whether Defendant, through Rodriguez,

21  assessed the Worthingtons' financial situation and objectives before recommending a

22  Guided Solutions account.  *Fed. Election Comm'n. v. Toledano*, 317 F.3d 939, 950 (9th

23  Cir. 2002), *as amended on denial of reh'g* (Jan. 30, 2003) (failures of recollection and

24  unsupported denials are insufficient to establish a genuine issue of material fact).

25        There is similar evidence that Defendant's advisers also had a reasonable

26  understanding of the Worthingtons' investment profile before recommending the

27  initial Advisory Solutions accounts, although, as the Court found above, these advisers

28  had no duty to at that point.  J. Worthington initially opened an Advisory Solutions

1   account under the advisement of Mr. Gundersen before his separation from Edward

2   Jones.  Plaintiffs admit that the Worthingtons "discussed their life stage and financial

3   status, investment plans, goals, and risk tolerance with Gundersen" before Gundersen

4   even mentioned the Advisory Solutions Account.  (Pls.' Resp. to Def.'s Statement of

5   Undisputed Facts ¶ 53.)  C. Worthington stated in her deposition that Rodriguez

6   conducted a similar "getting to know your client" discussion, which involved

7   discussing investment objectives, investment experience, time horizon, liquidity

8   needs, risk tolerance, before Rodriguez presented any options to C. Worthington.  (C.

9   Worthington Dep. at 81:10–83:10.)  She also stated that she had no reason to doubt

10  that Rodriguez reviewed her spending and retirement goals, assets, and securities

11  investments during a March 2015 meeting where C. Worthington opened her

12  Advisory Solutions Account.  (*Id.* at 127:16–132:9.)  This, too, would have complied

13  with the IAA's fiduciary requirements, had they applied at this point in time.

14      ***Anderson***

15      With respect to Plaintiff Anderson, Rodriguez developed a reasonable

16  understanding of his investment profile before discussing the Advisory Solutions

17  account with him.  Rodriguez testified that she remembered having an initial meeting

18  with him and his wife on June 23, 2015, reviewing their current assets, and conducting

19  the Making Good choices conversation.  (Rodriguez Dep. at 195:25–196:15.)  She did

20  not believe that Plaintiff Anderson's investments were suitable for his goals, and

21  explained different options including the Advisory Solutions account.  (*Id.* at 197:5–

22  198:11.)  Rodriguez's notes from the meeting corroborate her recollection of these

23  events.  (MSJ, Ex. 20 at 2.)  In addition, Defendant provides the risk tolerance

24  questionnaire Plaintiff Anderson completed that day.  (MSJ, Ex. 26 at 1–5.)  Plaintiff

25  Anderson does not dispute that he discussed his financial situation with Rodriguez,

26  and, in fact, stated in his deposition that he and his wife discussed their investment

27  objectives, investment history, prior transactions, risk tolerance, liquidity needs, and

28  minimum distributions at the June 23, 2015 meeting with Rodriguez.  (Anderson Dep.

1    at 80:16–81:15.)  He testified that he believed Rodriguez "had all the information she

2    needed" to act in his best interest.  (*Id*. at 81:16–21.)

3        ***Corum***

4        Rodriguez met with Plaintiff Corum to discuss his financial situation twice before

5    allegedly recommending the Advisory Solutions account.  (Corum Dep. at 22:7–15.)

6    Rodriguez and Corum had an initial meeting on April 8, 2015.  (Corum Dep. at 98:12 –

7    99:1; Opp'n, Ex. L, Corum Decl. ¶¶ 6–7.)  Prior to this meeting, Rodriguez reviewed

8    Corum's holdings.  (Rodriguez Dep. at 206:24–207:9.)  Defendant's evidence includes

9    a performance summary and an income analysis prepared by Rodriguez for Plaintiff

10   Corum on April 6, 2015 prior to this meeting.  (MSJ, Exs. 46 and 47.)  Rodriguez also

11   prepared a Living in Retirement document for Plaintiff Corum and his wife on

12   December 12, 2014.  (MSJ, Ex. 44.)  Rodriguez testified that during their first meeting

13   she asked questions about Corum's financial situation to gain a "good understanding"

14   of who he was and his financial situation.  (Rodriguez Dep. at 206:16–23; Corum Decl.

15   ¶ 6.)  On April 8, 2015, Rodriguez prepared a "Portfolio Builder" document for Plaintiff

16   Corum which showed his projected annual income and yield, and stated his objective

17   as "Balanced Growth and Income."  (MSJ, Ex. 45.)  According to Corum, he and

18   Rodriguez met again on April 27, 2015 wherein Rodriguez discussed the Advisory

19   Solutions account with Plaintiff.  (Corum Decl. ¶ 7.)  Over the course of the two April

20   2015 meetings, Rodriguez discussed Plaintiff's risk tolerance, investment objectives,

21   time horizon, and the tax implications of his investments.  (Corum Dep. at 98:2–11;

22   122:16–23.)  Rodriguez thus had a reasonable understanding of Corum's financial

23   situation prior to discussing or recommending the Advisory Solutions account.

24       ***Plaintiffs' Counterarguments***

25       Plaintiffs asserts that Rodriguez's inquiry into Plaintiffs' financial situations was

26   deficient for two reasons.  *First*, Plaintiffs state that the questionnaires used to collect

27   the information were not specifically aimed at assessing account-type suitability

28   because those documents are used for other purposes.  (*See* Opp'n. at 20 (citing Ex.

23

V., Weindel Dep. at 40:5–41:9).)  However, Plaintiffs fail to explain *how* the questionnaires were deficient.  Plaintiffs do not assert that Rodriguez failed to collect information which she would have needed in order to make a determination about the Plaintiffs' financial situations or whether an account was suitable.  The fact that the answers to the questionnaires may have been used for multiple purposes, or that they addressed additional topics that were not necessarily relevant for assessing the financial condition of the Plaintiffs, does not in itself mean that Rodriguez lacked sufficient information.  Plaintiffs also do not argue that Rodriguez failed to rely on the information collected in assessing the Plaintiffs' financial situations.  Without more, Plaintiffs' argument does not create a genuine dispute of fact as to whether Rodriguez had a reasonable understanding of Plaintiffs' investment profiles.

*Second*, Plaintiffs argue that "EDJ offers no evidence to show that EDJ or Rodriguez directly compared the costs of Plaintiffs' Commission Accounts with the Advisory Account fees." (Opp'n at 21.)  Plaintiffs provide no legal authority to support its theory that Rodriguez had a duty to directly compare the fees of both accounts. And in any event, Defendant *does* offer evidence that Rodriguez considered the fees in the advisory accounts and the cost of the commissions in the brokerage-only accounts.  Rodriguez stated "I look at their activity that they've had in the past, I look at the cost they're currently paying, and I look at – at a minimum – what they're expecting to do in the future[,]" and that she would "give them the comparison of: [t]his is what we've done in the past; this is how much it cost in the past; this is where you're currently at; and this is what this program is going to be able to do for you." (Rodriguez Dep. at 148:25–150:1–10; *see also id.* at 150:20–25, 154:20–24, 155: 2–12.) She also stated that she would discuss fees when going over the Making Good Choices brochure and would calculate the fees so that she could tell her clients what the monthly cost would be.  (*Id.* at 201:23–202:2.)  Moreover, the Making Good Choices brochure, which Rodriguez testified she would review every time she met with clients, discloses the fee structure for each of the different account types

24

1  including both brokerage-only and Advisory Solutions accounts.  The brochure states

2  that "[p]aying an ongoing fee can make expenses more predictable, but it can be

3  more expensive over time."  (MSJ, Ex. 11 at 2.)  Plaintiffs offer no evidence to

4  contradict these facts.

5       Accordingly, there is no genuine dispute that Rodriguez had a sufficient

6  understanding of Plaintiffs' investment profiles.

7       **ii.   Defendant's reasonable belief that the accounts were in**

8              **Plaintiffs' best interests.**

9       Plaintiffs' main argument for breach is that because the advisory account fees

10  "exceeded the mutual fund operating expenses in [Plaintiffs'] Commission Account[s]

11  by 0.5% or more" they were per se not in the best interest of Plaintiffs "*regardless of*

12  *any other factors.*"  (Opp'n at 19 (emphasis added).)  This theory of breach is patently

13  unsupported by the SEC's guidance regarding the applicable fiduciary duty and

14  Plaintiffs provide no other authority to support this legal argument.  While a financial

15  advisor would be required to consider the costs of different accounts, which the

16  evidence shows the advisers did, (Rodriguez Dep. at 148:25–150:1-10; *see also id.* at

17  150:20-25, 154:20-24, 155:2-12), recommending an account that costs more is not a

18  per se violation of the fiduciary duty.  The SEC's guidance on the IAA rules specifically

19  contemplates that an account may be in the client's best interest despite having a

20  higher cost:

21         The cost (including fees and compensation) associated with investment
   advice would generally be one of many important factors–such as an

22         investment product's or strategy's investment objectives, characteristics
   (including any special or unusual features), liquidity, risks and potential

23         benefits, volatility, likely performance in a variety of market and economic
   conditions, time horizon, and cost of exit–to consider when determining

24         whether a security or investment strategy involving a security or securities
   is in the best interest of the client. When considering similar investment

25         products or strategies, the fiduciary duty does not necessarily require an
   adviser to recommend the lowest cost investment product or strategy . . . .

26         Rather, the adviser could recommend a higher-cost investment or strategy
   if the adviser reasonably concludes that there are other factors about the

27         investment or strategy that outweigh cost and make the investment or
   strategy in the best interest of the client, in light of that client's objectives.

28

1  Investment Advisers Act Release No. 5248, at 33674;[10] *cf. Nguyen v. Raymond James &*

2  *Assocs., Inc.*, No. 8:20-CV-195-CEH-AAS, 2022 WL 3026075, at *7 (M.D. Fla. Aug. 1,

3  2022) (finding that the suitability of a particular account cannot be determined based

4  on fees alone, and that other factors should be considered).

5      Defendants have provided evidence articulating the reasons why Rodriguez

6  concluded the accounts to be in the best interest of Plaintiffs despite the higher fees

7  associated with the accounts.  The advisory accounts provide clients with either

8  discretionary trading which automatically rebalances their portfolios, or specific

9  investment recommendations tailored to their investment goals, in exchange for the

10  fees charged.  (Rodriguez Dep. at 82:6 –15; Pls.' Response to Def.'s Statement of

11  Undisputed Facts ¶¶ 7–8.)  Rodriguez testified that she believes advisory accounts add

12  value to a client's overall investment experience by giving them "the ability to make

13  good investment choices without the day-to-day decision making," through providing

14  multiple layers of investment monitoring and regular account rebalancing.  (Rodriguez

15  Dep. at 98:2–18.)

16      Rodriguez also provided reasons as to why she believed these accounts to be

17  suitable for Plaintiffs in particular.  She recalled in her deposition that the

18  Worthingtons had been "pleased with their [Advisory Solutions] account

19  performances" and wanted to "do something different with the [trust] account that

20  they had that was a brokerage only account."  (Rodriguez Dep. at 177:1–5.)  This

21  testimony is corroborated by her contemporaneous notes.  (MSJ, Ex. 43 at 2.)

22  Rodriguez's notes also reflect that C. Worthington chose to open an Advisory

23  Solutions account because she wanted the same account type as her husband J.

24  Worthington.  With respect to Plaintiff Anderson, Rodriguez stated that Plaintiff

25  _____

26  [10] While the SEC's interpretative guidance does not have the force of law, this guidance provides a
    persuasive and common-sense approach to assessing whether an adviser has acted in a client's best
    interest.  *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (agency guidance should be afforded

27  respect if persuasive).  Plaintiff's position, instead, would lead to the absurd conclusion that an adviser
    could never, consistent with their fiduciary duty, recommend a higher-cost product or service even if

28  the additional services would be more beneficial and desirable to a client.

Anderson's investments before opening the Advisory Solutions account were not the most appropriate for him because they were not diversified, and that an Advisory Solutions account was one option for diversifying his portfolio.  (*Id.* at 197:5–198:11.) As to Plaintiff Corum, Rodriguez testified that because of Corum's status as an early retiree, she did not believe that his investment approach at the time was appropriate for him because he would have paid long term internal fees with no room for "significant changes," and accordingly advised him of multiple alternate options, including the advisory account.  (*Id.* at 208:8–14.)

Aside from their argument that the accounts were unsuitable based on the higher fees alone, Plaintiffs have not put forward other evidence that the advisers did not act in Plaintiffs' best interests.  At the hearing, Plaintiffs asserted that a trier of fact could infer that the advisers did not act in the best interest of Plaintiff because a high number of accounts were switched, and because Defendant generates a large amount of fees from those accounts.  However, Plaintiffs have not provided evidence about the relative number of accounts which were switched or the increase in revenue from which to base such an inference.  The mere fact that Defendant recommended customers to open advisory accounts and that Defendant increased revenue by providing these additional services does not, standing alone, support an inference that Defendant made those recommendations without a reasonable belief that the accounts were in the clients' best interests, especially in the face of contrary evidence as discussed above.

Further, Plaintiffs assert only conclusory accusations that Rodriguez did not act in their best interest, but do not provide any specific facts to support these allegations. For example, Plaintiff J. Worthington asserted that he "just [didn't] feel as though [Rodriguez] had my best interest at heart,"  (J. Worthington Dep. at 38:10–11), and C. Worthington stated that "it did not appear" that Rodriguez acted in their best interest based solely on the amount of fees (C. Worthington Dep. at 46 at 9).  When Plaintiff Corum was asked if Rodriguez acted in his best interest, he replied "[a]t that time, I

1    can't say yes or no.  But then the way that it appeared it was not performing, that's

2    how we felt it may have been the wrong decision to make." (Corum Dep. at 162:12–

3    19.)  These mere allegations do not meet the opposing party's burden of showing a

4    genuine issue of material fact.  *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 959–60

5    (9th Cir. 1994).[11]

6                                                                * * * *

7         To summarize, Defendant has put forward significant evidence that Rodriguez

8    fulfilled her fiduciary obligations by developing a reasonable understanding of

9    Plaintiffs' investment profiles and reasonably believing that the accounts would be in

10   Plaintiffs' best interests.  For the same reasons, Rodriguez complied with her duty

11   under California law to determine Plaintiffs' financial situations and needs, and make a

12   recommendation in line with those needs.[12]  Plaintiffs have not provided evidence that

13   calls into question this evidence.  Plaintiffs' argument that Rodriguez breached her

14   fiduciary duty solely by recommending accounts with higher fees is contrary to the

15   applicable law.  Because Plaintiffs have not that established that Defendant owed a

16   fiduciary duty to Plaintiffs, nor provided evidence that Defendant breached its

17   fiduciary duty, no trier of fact would be able to find in favor of the Plaintiffs.

18   Accordingly, Defendant's Motion for Summary Judgement is GRANTED.

19   ////

20   ////

21   ////

22   ───────────────

23   [11] Plaintiff Anderson asserted in his deposition that he believed that Rodriguez misled him about the
     terms of the advisory account.  (Anderson Dep. at 60:5–22.)  However, such a claim of fraud or
     misrepresentation is specifically not within the scope of the TAC.  *See supra* note 8.

24   [12] Even if the Court were to accept Plaintiffs' argument that Defendant had a duty to ensure the
     accounts were "suitable" under FINRA Rule 2111, Defendant would have fulfilled such an obligation

25   with respect to Plaintiffs based on the same evidence.  Under FINRA Rule 2111, a broker "must have a
     reasonable basis to believe that a recommended transaction or investment strategy involving a security

26   or securities is suitable for the customer, based on the information obtained through the reasonable
     diligence of the member or associated person to ascertain the customer's investment profile." This is a

27   similar inquiry as required under the IAA, but a lower standard of care.  Exchange Act Release No. 34-
     86031 at *7–*8 (new "Best Interest" standard is a higher standard of care than the then-existing

28   "Suitability" standard, but still not as high as the level of care required under the IAA).

1

**IV.    Conclusion**

2          For the above reasons, IT IS HEREBY ORDERED that Defendant's Motion for

3  Summary Judgement, ECF No. 188, is GRANTED.  All other pending motions are

4  DENIED AS MOOT.[13]

5          The Clerk of Court is directed to enter judgement in favor of Defendant and

6  close the case.

7

8          IT IS SO ORDERED.

9  Dated:   **September 6, 2024**

                                        *Daniel J. Calabretta*
10                                       Hon. Daniel J. Calabretta
                                        UNITED STATES DISTRICT JUDGE

11

12

13

14

15  DJC2 – Anderson18cv00714.msj

16

17

18

19

20

21

22  [13] Plaintiffs recently filed a Motion for Sanctions based on the SEC's finding that Defendant had not
    properly preserved evidence in a period beginning after this suit was filed, which Plaintiffs contend
    would prove that Defendant made recommendations to Plaintiffs and potential class members.  (Plfs.'

23  Mot. for Sanctions (ECF No. 279).)  While Plaintiffs suggest that the Court should infer that Defendant
    engaged in spoliation in this case, there is no evidence that this in fact occurred.  The unpreserved, "off-

24  channel" communications at issue in the SEC finding were generated in 2019 onward, after the events
    occurring in this suit, and thus would not relate to any recommendations made to these Plaintiffs.  (*Id.*,

25  Ex. 1 ¶ 3.)  Moreover, whether or not Defendant made a recommendation to Plaintiffs to switch
    accounts does not establish that Defendant violated a duty owed to Plaintiffs in this case, given the

26  evidence that, at least for the named Plaintiffs, Rodriguez in fact considered each individual Plaintiff's
    financial circumstance, disclosed the fees, and made an individualized determination as to each

27  Plaintiff.  In fact, the Court assumed for purposes of this analysis that a recommendation to switch
    accounts had been made.  In short, nothing in Plaintiff's Motion for Sanctions calls into question the

28  conclusions in this Order.